**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Panama City Division**

| | |
|---|---|
| ROBERT J. MEYER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) Civil Action No. 5:11-cv-00027-RS-EMT |
| Plaintiff, | ) |
| v. | ) **CONSOLIDATED CLASS ACTION** |
| | ) **COMPLAINT FOR VIOLATIONS** |
| THE ST. JOE COMPANY, et al., | ) **OF FEDERAL SECURITIES LAWS** |
| | ) |
| Defendants. | ) |
| | ) **JURY TRIAL DEMANDED** |
| | ) |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................1

II.   THE EXCHANGE ACT CLAIMS..........................................................2

    A.    Jurisdiction And Venue.................................................................7

    B.    Parties.........................................................................................8

          1.    Lead Plaintiff ..................................................................8

          2.    The Company...................................................................8

          3.    Officer Defendants..........................................................8

    C.    Factual Background And Substantive Allegations ....................11

    D.    The Drastic Downturn in the Florida Residential Real Estate Market ......12

    E.    St. Joe's Residential Real Estate Development Projects Suffered During the Class Period ............................................................16

          1.    Further Development of St. Joe's Projects Was Not Economic ................................................................16

          2.    St. Joe's Development Projects Were Not Performing Well.........17

                (a)    RiverTown ................................................... 18

                (b)    WaterColor and the WaterSounds .................... 21

                (c)    SummerCamp Beach ........................................ 23

                (d)    WindMark Beach ........................................... 26

          3.    Average Sales Prices Decreased Across All of St. Joe's Projects.........................................................29

    F.    St Joe's Residential Real Estate Projects Were A Core Part of the Company's Class Period Operations ...................................34

    G.    Defendants' False And Misleading Statements And Omissions ..............36

          1.    Fourth Quarter and Full Year 2007 Financial Results.................36

2.      First Quarter 2008 Financial Results ...............................................42

3.      Second Quarter 2008 Financial Results............................................45

4.      Third Quarter 2008 Financial Results...............................................47

5.      Fourth Quarter And Full Year 2008 Financial Results.................50

6.      First Quarter 2009 Financial Results ...............................................55

7.      Second Quarter 2009 Financial Results............................................57

8.      Third Quarter 2009 Financial Results...............................................61

9.      Fourth Quarter and Full Year 2009 Financial Results.................64

10.     First Quarter 2010 Financial Results ...............................................69

11.     Second Quarter 2010 Financial Results............................................71

12.     Third Quarter 2010 Financial Results...............................................74

H.      The Truth Is Revealed.......................................................................76

I.      Failure to Comply with SEC Regulations and Generally Accepted
        Accounting Principles ("GAAP")...................................................79

1.      Failure to Comply With Regulation S-K, Item 303......................79

2.      Failure to Comply With Regulation S-X and GAAP...................82

J.      Additional Indicia of Scienter........................................................92

1.      Defendants' Knowledge of Average Sales Prices on St. Joe's
        Properties..............................................................................................92

2.      Defendants' Fair Value Analyses Grossly Differ From Their
        Undiscounted Future Cash Flow Analyses...................................96

3.      The February 2008 Stock Offering..................................................98

4.      Defendants Knew the Airport Could Not Justify Carrying
        Values .....................................................................................................99

5.      The Officer Defendants Were Highly Compensated During
        the Class Period.................................................................................100

K.    Loss Causation/Economic Loss ...........................................................101

L.    Control Person Allegations ...................................................................102

M.   No Safe Harbor .....................................................................................104

N.    Applicability Of Presumption Of Reliance Under The Affiliate Ute Doctrine And/Or, In The Alternative, The Fraud On The Market Doctrine..................................................................................................105

III.   CLASS ACTION ALLEGATION RELEVANT TO ALL CLAIMS ................107

IV.   EXCHANGE ACT COUNTS..................................................................109

COUNT I: Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(b) Promulgated Thereunder Against St. Joe and The Officer Defendants .............................................................................................109

COUNT II: Violation Of Section 20(a) Of The Exchange Act Against the Officer Defendants ...................................................................................113

V.   THE SECURITIES ACT CLAIMS .........................................................114

A.    Nature Of The Securities Act Claims ...................................................115

B.    Jurisdiction And Venue.........................................................................116

C.    Parties....................................................................................................116

D.    Substantive Allegations ........................................................................120

VI.   SECURITIES ACT COUNTS................................................................125

COUNT III: For Violations Of § 11 Of The Securities Act Against St. Joe, Rummell, Greene, McCalmont, Connolly, the Director Defendants and Deutsche Bank .......................................................................................125

COUNT IV: For Violations Of § 12(a)(2) Of The Securities Act Against St. Joe, Rummell, Greene, McCalmont, Connolly And Deutsche Bank .............127

COUNT V: For Violations Of § 15 Of The Securities Act Against Rummell, Greene, McCalmont, And Connolly ....................................................129

JURY TRIAL DEMANDED .........................................................................130

I.    **INTRODUCTION**

1.    Lead Plaintiff City of Southfield Fire & Police Retirement System ("Lead Plaintiff" or "Plaintiff"), by its undersigned attorneys, hereby brings this Consolidated Amended Class Action Complaint ("Complaint") against The St. Joe Company ("St. Joe" or the "Company"), certain of its officers and directors, and Deutsche Bank Securities ("Deutsche"). The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel, which included interviews of former employees of St. Joe and other persons with knowledge of the matters alleged herein (some of whom have provided information in confidence; these confidential witnesses ("CWs") will be identified herein by number (CW 1, CW 2, etc.)), review and analysis of publicly available information, including United States Securities and Exchange Commission ("SEC") filings by St. Joe, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and consultations with experts. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.    Plaintiff brings this federal securities class action on behalf of itself and all similarly situated persons and entities that purchased St. Joe's publicly traded securities between February 19, 2008 and October 12, 2010, inclusive, including purchasers of the Company's securities pursuant or traceable to the Company's public offering of over 17

million shares of common stock on or about February 27, 2008 (the purchasers being the "Class" and the time frame being the "Class Period").  Lead Plaintiff seeks remedies under the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.* (the "Securities Act"), and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* (the "Exchange Act").

## II.     THE EXCHANGE ACT CLAIMS

3.     St. Joe is one of the largest real estate development companies in Florida, owning approximately 577,000 acres of land concentrated primarily in Northwest Florida.  Approximately 405,000 acres (70%) of St. Joe's total land holdings are within 15 miles of the coast of the Gulf of Mexico.  St. Joe is engaged in residential development, commercial and industrial development and rural land sales, and also has significant ownership interests in timber.  The Company operates through four business segments: (1) residential real estate; (2) commercial real estate; (3) rural land sales; and (4) forestry.

4.     For more than two years, St. Joe systematically and fraudulently misled the market regarding the true value of its residential real estate development projects. The Company has recognized only marginal impairments over the Class Period (including quarters in which St. Joe booked no impairment at all), even though sales and sale prices of property lots in St. Joe's projects have plummeted, and St. Joe has dramatically reduced or halted development spending in partially developed projects.  By failing to take appropriate impairment charges reflecting the known true value of its development projects, St. Joe materially overstated its asset values and its earnings during the Class Period.

5.      Many of St. Joe's residential real estate projects remain largely unfinished and undeveloped.  One of its largest projects, RiverTown in St. Johns County, is less than 5% developed with only 215 developed lots out of a planned 4,500.  The WindMark project in Gulf County is only 15% developed with 224 developed lots out of a planned 1,516.  Similarly the WaterSound and SummerCamp Beach projects in Walton and Franklin Counties, respectively, are both less than 50% developed.  Even though only fractions of their biggest projects have been developed, St. Joe has only invested minimally in further development, and large tracts of undeveloped land remain.

6.      Under the relevant accounting rules, explained more fully below, St. Joe must test its development projects for impairment when there are certain indicators of impairment such as, *inter alia*, a significant decrease in the market price of real estate properties, as occurred in Florida during the Class Period.  Indeed, St. Joe tacitly admits that these indicators were present throughout the Class Period since it claims to have tested its development projects for impairment every quarter during the Class Period.

7.      Testing for impairment is critical.  Impairment charges are special, non-recurring charges on an asset with an overstated carrying value.  Thus, taking an impairment charge decreases the previously reported value of an asset and reduces earnings.

8.      Because St. Joe classified its residential real estate projects as long-lived assets "to be held and used," once it determined there were certain indicators of impairment, St. Joe was required to perform an undiscounted cash flow analysis for these development projects to determine the "recoverable value" for each project – the value of

the project to St. Joe over its useful life. If the undiscounted cash flow total *meets or exceeds* the carrying value for the relevant project (which represents the amount St. Joe has spent to date in developing the land, including acquisition costs), no impairment charge is necessary.

9.     Generally Accepted Accounting Principles ("GAAP") require that all available evidence be considered (including current conditions in the real estate market) when performing a valid cash flow analysis for the purposes of impairment testing and measurement. Florida has been hit especially hard by the economic recession, and real estate prices have suffered accordingly, yet St. Joe repeatedly represented, quarter after quarter, that the values of its partially developed projects remain near constant.

10.     Core factors that St. Joe and its senior officers knew and were required to consider in deriving the carrying value of the Company's residential real estate projects include: (1) the recent sales prices of lots and units; (2) the "sales velocities" for the region, *i.e.*, the sales volumes and rates of sales; (3) the number of developed units that were ready to be sold; and (4) the time period for each project's useful life (*i.e.*, the time period for complete development), which in turn depends on the expiration date of the permits and entitlements St. Joe obtained from agencies in order to develop the land.

11.     Given the states of the economy and the real estate market, the recent sales history at St. Joe's residential real estate projects, and the development progress of its projects, Defendants knew, or were severely reckless in not knowing, that the value of St. Joe's residential real estate development projects were overstated in the Company's

financial statements and, accordingly, should have been significantly impaired under GAAP.

12.     Other factors that Defendants purportedly relied on to support St. Joe's overstated carrying values were equally untenable.  St. Joe repeatedly touted the new "international airport" in Panama City, which St. Joe emphasized would drive up property values for its nearby projects.  However, as Defendants knew:  (1) the airport is tiny, unbefitting its "international" moniker; (2) it is served by only two airlines, Southwest and Delta, with limited flight options; (3) St. Joe had to agree to cover any losses suffered by Southwest for the first three years of operations in order to secure the airline's services for the airport; and (4) unlike other regional airports, the new airport does not serve any colleges, commercial districts, or dense population centers.  The airport, in fact, is located in the middle of a pine forest.

13.     The inescapable conclusion is that St. Joe fraudulently manipulated the values of its assets by overstating their carrying values and failing to take the necessary impairment charges required by GAAP.  As a result, the Company overstated its earnings throughout the Class Period.

14.     For the quarters during the Class Period in which St. Joe did take small impairment charges to its development projects, the Company's undiscounted cash flow analysis must not have met the carrying value for the relevant project.  To determine the amount of impairment necessary, St. Joe must then conduct a fair value analysis.  Given current market conditions during the Class Period, there was *no* possibility of a non-fraudulent fair value analysis supporting the minimal charges recorded by St. Joe.

15.     St. Joe's failure to timely write down its impaired residential real estate is further evidenced by the comparatively huge impairments recorded by the Company on its sales of entire residential projects, where St. Joe is forced to write-off the difference between the final sales price (which is dictated by current market conditions, as is any valid fair value analysis) and reported carrying value.

16.     In December 2009, for example, St. Joe announced that it was going to sell the Victoria Park residential real estate project.  For the quarters immediately preceding the sale of the project, the Company represented that no impairment charge was necessary.  However, just two days before the sale was completed, the Company took an impairment charge for *over 80%* of the project's purported carrying value.  In other words, St. Joe – by not taking any impairment charge– misled the market into believing that the carrying value of Victoria Park was completely recoverable when, in fact, the value of the project was significantly impaired.  The disparity between St. Joe's carrying value for the property and its actual fair market value thus demonstrates that the property's carrying value was grossly overstated.

17.     On October 13, 2010 the truth about St. Joe's inflated carrying values finally emerged.  David Einhorn, an investor in St. Joe, undertook a lengthy and in-depth analysis of St. Joe's real estate properties, relying on detailed information gleaned from tax assessment records, Freedom of Information Act requests, County records, and on-the-ground surveillance of St. Joe's properties, and presented his conclusions to the market at the Value Investing Congress.  Shocked investors learned (1) how undeveloped many of the properties were; (2) of the severe drop in sales prices at many of St. Joe's

projects; and (3) how many of St. Joe's properties were less than ideally situated for residential projects.  Thus, the market finally learned the truth about St. Joe's real estate development properties from evidence Einhorn presented that conclusively establishes the Defendants were manipulating their carrying values.

18.     As a result of the Einhorn presentation, St. Joe's stock plummeted 9.7% in a single day, with 12,828,900 shares traded (compared to an average daily trading volume during the Class Period of 1,093,197 shares).

## A. **Jurisdiction And Venue**

19.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in this District.  St. Joe's principal executive offices are also located within this District.

22.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

### B.   Parties

#### 1.   Lead Plaintiff

23.     On January 25, 2011, this Court appointed City of Southfield Fire &
Police Retirement System as Lead Plaintiff in this action.  As evidenced by the
Certificate previously filed, Lead Plaintiff purchased St. Joe stock during the Class Period
and was damaged thereby.

#### 2.   The Company

24.     Defendant St. Joe is a Florida corporation with its principal executive
offices located at 133 South WaterSound Parkway, WaterSound, Florida.  St. Joe is one
of the largest real estate development companies in Florida, owning approximately
577,000 acres of land concentrated primarily in Northwest Florida.  Approximately
405,000 acres (70%) of St. Joe's total land holdings are within 15 miles of the coast of
the Gulf of Mexico.  The Company operates through four business segments: (1)
residential real estate; (2) commercial real estate; (3) rural land sales; and (4) forestry.  St.
Joe trades its securities on the New York Stock Exchange under the ticker symbol "JOE."

#### 3.   Officer Defendants

25.     Defendant William Britton Greene ("Greene") has served as the
Company's Chief Executive Officer ("CEO") since May 2008 and as President of the
Company since October 2007.   Greene has worked at the Company since 1998, holding
various positions, including President of West Florida Residential and Resort Operations,
President of St. Joe Towns & Resorts, and President of St. Joe Commercial Real Estate.
Greene signed the Company's Forms 10-K for the Fiscal Years 2007, 2008, and 2009,

and Forms 10-Q throughout the Class Period. Pursuant to Sections 302 and 906 of

Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), Greene certified the accuracy of the

Company's Forms 10-K for the Fiscal Years 2008 and 2009, as well as its Forms 10-Q

throughout the Class Period. Greene also signed the Company's registration statement on

Form S-3 in connection with the Company's February 2008 stock offering.

26.     Defendant William S. McCalmont ("McCalmont") has served as the

Company's Chief Financial Officer ("CFO") since May 2007 and as Executive Vice

President of the Company since January 2009. McCalmont signed the Company's Forms

10-K for the Fiscal Years 2007, 2008, and 2009, and Forms 10-Q throughout the Class

Period. Pursuant to Sections 302 and 906 of Sarbanes-Oxley, McCalmont certified the

accuracy of the Company's Forms 10-K for the Fiscal Years 2007, 2008, and 2009, as

well as its Forms 10-Q throughout the Class Period. McCalmont also signed the

Company's registration statement on Form S-3, in connection with the Company's

February 2008 stock offering.

27.     Defendant Peter S. Rummell ("Rummell") was the Company's Chairman

of the Board and CEO from January 1997 until he retired from his position as CEO in

May 2008, and as Chairman in July 2008. Rummell signed the Company's Form 10-K

for the Fiscal Year 2007 and Form 10-Q for the Second Quarter 2008. Pursuant to

Sections 302 and 906 of Sarbanes-Oxley, Rummell certified the accuracy of the

Company's Form 10-K for the Fiscal Year 2007, as well as its Form 10-Q for the Second

Quarter 2008. Rummell also signed the Company's registration statement on Form S-3,

in connection with the Company's February 2008 stock offering.

28.     Defendant Janna L. Connolly ("Connolly") has served as the Company's Senior Vice President and Chief Accounting Officer since January 2010. Connolly has approximately 28 years of accounting experience and joined the Company in November 1996 as Controller. Connolly is a Certified Public Accountant in the State of Florida. Connolly signed the Company's Forms 10-K for the Fiscal Years 2007, 2008, and 2009, and Forms 10-Q throughout the Class Period. Connolly also signed the Company's registration statement on Form S-3, in connection with the Company's February 2008 stock offering.

29.     Defendants Greene, McCalmont, Rummell and Connolly are collectively referred to hereinafter as the "Officer Defendants." The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of St. Joe's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

C.      **Factual Background And Substantive Allegations**

30.      St. Joe was founded in 1936 as a paper mill and timber company.  It is now one of the largest real estate development companies in Florida.  The Company operates through four business segments: (1) Residential Real Estate, which develops mixed use resort, seasonal, and primary residences and amenities such as golf courses; (2) Commercial Real Estate, which plans, develops, and sells real estate for commercial purposes and concentrates on the area surrounding the airport in Panama City; (3) Rural Land Sales, which focuses in the sale and limited development of timberland; and (4) Forestry, which grows, harvests, and sells St. Joe's extensive timber holdings. The Company currently owns approximately 577,000 acres of land, the majority of which is located in Northwestern Florida.  Approximately 70 percent of St. Joe's land is within 15 miles of the Gulf of Mexico.  St. Joe acquired much of its land in the 1930s and 1940s.

31.      Although the Company was originally formed to operate as a paper mill, by the 1990s St. Joe was focused on real estate development.  By the summer of 2005, St. Joe's stock was soaring, regularly closing at more than $80 per share.  Not surprisingly, the economic recession that followed (with its concomitant real estate crash) had a profound effect on the Company, bringing St. Joe's main business to a standstill and forcing the Company to stop investing in further development, in order to avoid incurring even greater losses.  By 2010, the Company had sold nearly half of its real property, including much of its timberland, to stay afloat.

32.     Despite (1) the economic recession, which the Company itself has conceded was "the worst since the Great Depression,"[1]; and (2) the sharp decline in demand and drastically reduced sales prices for the homes and developed lots in St. Joe's residential real estate projects, St. Joe recorded only minimal impairment charges, if any, to the carrying values of its residential real estate projects during the Class Period.

**D.      The Drastic Downturn in the Florida
          Residential Real Estate Market**

33.     Prior to and during the Class Period, residential real estate development made up the overwhelming majority of St. Joe's business.  According to the Company's Forms 10-K filed with the SEC during the Class Period, in 2008, St. Joe's total investment in residential properties comprised almost *85%* of its entire investment in real estate.  In 2009, residential real estate investment totaled 82% of St. Joe's total investment in real estate.

| St. Joe's Investment in Real Estate ($ in thousands) | | |
|---|---|---|
| | **2009** | **2008** |
| **Residential Real Estate Operating Property** | $173,190 | $185,798 |
| **Residential Real Estate Development Property** | $470,364 | $596,011 |
| **Total Real Estate Investment** | $784,500 | $923,541 |
| **Percentage of Total Real Estate Investment** | **82%** | **85%** |

34.     Similarly, the Company's financial statements reveal that residential real estate made up a majority of St. Joe's total assets during the Class Period.  Residential real estate made up 63.2% of St. Joe's total assets in 2007, 64.2% in 2008 and 58.6% in

---

[1] Source: 2008 Form 10-K.

2009.  Residential real estate revenues, the Company's largest asset class, declined

drastically during the Class Period, while losses in residential real estate soared.

|  | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| **Revenue from Residential Real Estate ($ in thousands)** | $358,439 | $155,550 | $65,498 | $89,850 |
| **(Loss) Income from Residential Real Estate[2]** | $23,827 | ($43,071) | ($115,062) | ($137,855) |

35.     St. Joe's business suffered greatly from the downturn in the real estate

market.  According to the Company's Forms 10-K filed with the SEC during the Class

Period, the Company's home and homesite sales plummeted from 1,160 closed units in

2005 to a mere 164 in 2009.

|  | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| **Closed Units** | 1610 | 1260 | 478 | 122 | 164 |

36.     The drop in sales is further evidenced when analyzed on a quarterly basis.

For example, in the first two quarters of 2007 St. Joe sold 247 units compared with just

36 units in the first two quarters of 2008.

37.     Similarly, the Company's gross profit and gross profit margin from home

and homesite sales decreased dramatically during the Class Period.  Gross profit plunged

from $39.1 million to $2.7 million, and gross profit margins deteriorated from 34% to

9%.

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| **Sales of Homes & Homesites ($ in millions)** | $116.0 | $28.0 | $31.3 |

---

[2] Includes total impairment charges of $94.8 million, $60.3 million and $13.6 million for 2007, 2008 and 2009, respectively.

| | 2007 | 2008 | 2009 |
|---|---|---|---|
| **Gross Profit** | $39.1 | $4.0 | $2.7 |
| **Gross Profit Margin** | 34% | 14% | 9% |

38.     Just prior to and during the Class Period the United States, in general, and Florida, in particular, experienced one of the largest real estate crashes in decades. Empirical evidence and the Company's own disclosures demonstrate that the real estate market in Florida, which was one of the first states affected by the deteriorating real estate market, was devastated by the crash.

39.     A comparison of the percent change, by quarter, in the Federal Housing Finance Agency's Home Price Index for Florida and the United States, from 2007 to the third quarter of 2010, reveals the extent of the devastation suffered by the Florida real estate market:[3]

---

[3] Home Price Index information obtained from www.fhfa.gov/Default.aspx

**Four Quarter Percent Change in Federal housing Finance Agency's Home Price Index**



40.     Historical data from the Case Shiller Home Price Index for the city of

Tampa, Florida for the same period further evidences this decline:[4]

---

[4] Tampa is the closest city to the majority of St. Joe's residential real estate for which Case Shiller provided housing index information.



**Case Shiller Home Price Index for Tampa**
**January 2007 - November 2010**

### E.    St. Joe's Residential Real Estate Development Projects Suffered During the Class Period

#### 1.    Further Development of St. Joe's Projects Was Not Economic

41.    Given the state of the real estate market in the United States, particularly Florida, and the performance of St. Joe's residential real estate projects over the course of the Class Period, the Company concluded that it would not be economical to continue investing in the development of its residential real estate projects.

42.    Beginning in 2007, St. Joe effectively ceased its development activity. The Company drastically decreased the amount of money it invested in developing its residential real estate.  As shown in the table below, St. Joe invested $570,925,000 in 2006 on its residential real estate.  In 2007, that amount dropped almost *60%* to

16

$227,675,000. In 2008, St. Joe's capital expenditures on its properties again declined another 87% to $28,515,000, resulting in a decline of more than 95% in only two years. By 2009, St. Joe's expenditures on its residential real estate properties decreased yet again by more than 50%, to a mere $13,687,000.

| | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| **Capital Expenditures for Residential Real Estate ($ in thousands)** | $570,925 | $227,675 | $28,515 | $13,687 |

43. Moreover, the Company reduced its employee workforce by more than two thirds, or 69%, in 2007. A large portion of this reduction was centered in the residential real estate segment. In 2006, St. Joe reported that it had 441 employees in its residential real estate sector. By 2007, that number was just 148 employees.

44. That St. Joe so severely reduced the amount spent on its operating properties establishes that the Company had effectively halted development on its residential real estate projects. This lack of development, in turn, directly affects the undiscounted cash flow analyses that the Company is required to perform for each of its residential real estate projects. The recoverability of those assets was negatively affected by the halt in development, and the Company falsely and fraudulently overstated the value of those assets, and its earnings, by failing to take the appropriate impairment charges required by this material change in circumstances.

### 2. St. Joe's Development Projects Were Not Performing Well

45. As discussed below, when evaluating its properties for impairment, St. Joe is required to take into account *all available evidence*. The problems St. Joe encountered

with its projects is powerful evidence, fraudulently ignored by Defendants, that St. Joe's residential real estate was materially impaired during the Class Period, and St. Joe's failure to write down these assets establishes that the carrying values of the Company's assets were falsely and fraudulently overstated.

### (a)   RiverTown

46.     RiverTown is a residential real estate project in St. Johns County Florida that St. Joe started to develop in 2006.  In its 2009 Form 10-K, St. Joe described its plans for RiverTown : "[Rivertown is] situated on approximately 4,170 acres located in St. Johns County south of Jacksonville, [and] is currently planned for 4,500 housing units and 500,000 square feet of commercial space. The centerpiece of the community will be a 58-acre park along the St. Johns River.  RiverTown is planned to include several distinct neighborhoods and amenities."  The Company's SEC filings failed to disclose, however, that only 215, or less than 5%, of the planned 4,500 units have actually been developed.[5] Of those 215 lots, only 12 have homes built on them.[6]  Further, only 32 units, or less than 1% of the planned 4,500 units, have been sold.  In fact, on May 22, 2009, Issa Homes – one of the builders that had bought several lots within RiverTown – sued St. Joe, alleging that, *inter alia*, the lack of development rendered the property more of a "moonscape" than a luxury development.[7]

---

[5] The number of developed lots cited in the RiverTown Development of Regional Impact ("DRI") Biennial Monitoring Report 2008-2009, dated January 31, 2010 ("RiverTown Biennial Report").

[6] Einhorn Presentation, "Field of Schemes: If You Build It, They Won't Come," citing St. Johns County Tax Appraiser Office.

[7] *Issa Homes v. St. Joe Co.*, Case No. CA09-1229 (Fla. Cir. Ct. St. Johns County).

47.     By January 31, 2010, only a tiny fraction of the lots planned for RiverTown was developed, and St. Joe had yet to complete *any* of the retail space, office space, light industrial space, golf course, or school that had been planned.  Of a planned 186 acres of community parks, only 37 had been completed.[8]

48.     CW1, the former Site Development Manager at RiverTown from 2006 through July 31, 2008, confirmed that RiverTown was barely developed.  When CW1 left the Company in July 2008, CW1 noted that only a "handful" of homes had been built and the project still did not have electricity, utility lines had not been cleared and sewer lines had not been installed, making it highly unlikely that anyone would purchase the few homes that did exist.  CW1 agreed with Issa Homes' "moonscape" description.

49.     CW1 also explained that, during CW1's tenure at the Company, cost became a major concern for St. Joe.  When CW1 was initially hired in 2006, the Company planned to develop all of the land for sale to builders.  CW1 was later instructed to change the plans and focus only on particular neighborhoods.  CW1 stated that infrastructure plans changed as well.  The Company scaled back its plans for high-end aesthetics such as "fancy bridges" and similar features, and CW1 was instead instructed to implement only the necessities.

50.     The lack of progress and the uncertainty of future development at RiverTown is underscored by the expiration, in 2016, of its land entitlements (the necessary permits required in order to develop the land).  By January 31, 2010,

---

[8] Progress reports from the RiverTown DRI Monitoring Report 2008-2009, dated January 31, 2010.

development of RiverTown was far behind schedule, with no possibility of completion before the expiration of its land entitlements.

51.     St. Joe's sales prices for RiverTown units that were developed or completed were also plummeting over the Class Period.  For example, in October 2007, St. Joe sold six RiverTown lots to Weekley Homes at an average sales price of $72,133 per lot.  In August 2010, St. Joe sold two similar lots, also to Weekley Homes, for an average price of just $31,300 per lot.  This difference represents a 57% decline in the value of RiverTown lots.

52.     An independent study, conducted in the first quarter of 2010, of the sales velocities over the course of 2008, 2009 and the first quarter of 2010, in conjunction with the amount of homesite inventory on the market in central St. Johns county (where RiverTown is located), revealed that, as of the first quarter of 2010, there was almost *nine years* of homesite inventory in the region.[9]  In other words, it would take nine years to sell the available lots.

53.     St. Joe listed the carrying value for RiverTown as $65,615,000 in its 2007 Form 10-K, as $77,143,000 in its 2008 Form 10-K, and as $74,491,000 in its 2009 Form 10-K.[10]  St. Joe maintained these carrying values despite (1) that RiverTown was barely developed; (2) the Company had determined that it was not going to invest in any further

---

[9] Einhorn's October 13, 2010 presentation "Field of Schemes: If You Build It They Won't Come", citing Metrostudy Jacksonville Residential Survey, 1Q2010.

[10] St. Joe only reports carrying values by county, not by project, in its SEC filings making it extremely difficult, if not impossible, to determine the carrying values for individual lots and projects particularly if there is more than one residential real estate property in a county.  All of the carrying values cited in this Complaint are carrying values  before any accumulated depreciation.

development of the property; (3) the Company was selling very few lots, and the lots that did sell were for significantly lower amounts than prior to the Class Period; and (4) there was a nine-year supply of homesite inventory within the region of Florida where RiverTown was located.  Defendants were aware of this evidence, yet continued to represent that the carrying value of the project was 100% recoverable.

### (b)   WaterColor and the WaterSounds

54.     WaterColor, WaterSound, WaterSound Beach and WaterSound Beach West are all St. Joe residential real estate development projects situated in Walton County in northwest Florida.  WaterColor has 1,140 units planned, is 90% developed, and 81% of its planned units have been sold.  By contrast, the WaterSound project is the largest of the three WaterSound projects with 1,432 units planned, but only 211, or 14% of those units have been developed[11] and only 29 have been sold.[12]

55.     The WaterSound projects are described by the Company in its 2009 Form 10-K:

> WaterSound Beach is located approximately five miles east of WaterColor and is planned to include approximately 511 units. Situated on approximately 256 acres, WaterSound Beach includes over one mile of beachfront on the Gulf of Mexico. The WaterSound Beach Club, a private, beachfront facility featuring a 7,000 square-foot, free-form pool and a restaurant, is located within the community.
>
> WaterSound West Beach is located approximately one-half mile west of WaterSound Beach on the beach-side of County Road 30A. This community is situated on 62 acres and includes 199 units with amenities that include private

---

[11] WaterSound and Water Color DRI Monitoring Report 2007-2008, dated April 1, 2009 ("WaterSound North DRI Report").

[12] Form 10-Q for second quarter 2010.

> beach access through the adjacent Deer Lake State Park
> and a community pool and clubhouse facility.
>
> WaterSound is situated on approximately 2,425 acres and is
> planned for 1,432 residential units and approximately
> 450,000 square feet of commercial space. It is located
> approximately three miles from WaterSound Beach north
> of U.S. 98 in Walton County. WaterSound includes
> Origins, a uniquely designed Davis Love III golf course, as
> well as a community pool and clubhouse facility.

56.     There are no longer any beachfront lots available at WaterSound Beach.

The Company sold its last beachfront lot on September 20, 2010 for $1,253,800.[13]

WaterSound, WaterSound Beach and WaterSound Beach West collectively contain 253

interior lots that cannot command nearly as high a sales price as the beachfront lots.[14]

Many of the remaining interior lots are situated on land separated from the ocean, and the

rest of the development, by a highway.  Moreover, the average sales prices at

WaterSound and WaterColor steadily decreased during the Class Period.[15]

57.     At WaterSound, none of the retail or office space has been completed.  No

other units have been initiated.[16]  With no further investment in the property, it is unclear

when the WaterSound project will be fully developed, or even when the current existing

units will be sold.  Defendants, however, have failed to take any significant impairment

charge to these properties during the Class Period.  The Company's carrying value for

---

[13] Einhorn Presentation, "Field of Schemes: If You Build It They Won't Come",
citing Walton County Tax Appraiser Office.

[14] *Id.*

[15] Walton County Property Appraiser's website, http://qpublic.net/walton/index.html

[16] *Id.*

Walton County (encompassing all the WaterColor and all of the WaterSound projects) was $171,671,000 in 2007, $158,080,000 in 2008, and $93,765,000 in 2009.[17]

58.     Although the most valuable beachfront property is no longer available at WaterColor or WaterSound, and many of WaterSound's interior lots are separated from the beach by a highway and are undesirable, St. Joe continues to fraudulently maintain its carrying value for these assets even while it halts further development.

### (c)     SummerCamp Beach

59.     SummerCamp Beach is a residential real estate project located in Franklin County Florida.  In its 2009 Form 10-K, the Company describes SummerCamp Beach as being "situated on the Gulf of Mexico on approximately 762 acres in Franklin County. The community includes the SummerCamp Beach Club, a private beachfront facility with a pool, restaurant, boardwalks and canoe and kayak rentals. Plans for SummerCamp Beach include approximately 499 units."

60.     St. Joe failed to disclose, however, that Franklin County has a tiny population of 11,280,[18] with approximately 13% of that population living in Franklin

---

[17] The Company only discloses its carrying value by county, therefore, it is impossible to know the carrying value for a project if there is more than one project in that county.  WaterColor, WaterSound, WaterSound Beach and WaterSound Beach West are all located in Walton County and the reported carrying value is an aggregate carrying value for all of those properties.  The decrease in the carrying value for Walton County during the Class Period is likely due to the sales made at those properties during the Class Period, and is not explained by the minimal impairment charges that St. Joe recorded to its existing homes and homesites of $7.8 million in 2007, $12.8 million in 2008, and 7.3 million in 2009.  *See* ¶ 123 (2009 10-K).

[18] US Census 2009 Estimate, http://quickfacts.census.gov

County's prison.[19]  Only 4,934 people are in the labor force, and the median income is $34,787.[20]

61.     SummerCamp Beach is not fully developed.  Of its 499 planned units, 226, or less than half, are developed.[21]  Of those 226 units, only 87 have been sold as of September 30, 2010.  Because St. Joe has stopped further development of many of its residential real estate projects, it is unclear when or if this development will ever be completed.

62.     The sales prices at SummerCamp Beach have also decreased significantly throughout the Class Period.  In November 2006, the Company sold five beachfront lots for an average price of $880,000 per lot.[22]  However, in July 2010, St. Joe sold four beachfront lots for an average price of approximately $331,000, or a 62.4% decline in value.[23]  Moreover, *St. Joe* provided the mortgage on the 4 beachfront lots sold in July 2010.[24]

63.     The value of interior lots at SummerCamp Beach also plummeted during the Class Period.  Between 2005 and 2006, interior lots at SummerCamp Beach were sold

---

[19] Inmate population information list, http://www.dc.state.fl.us/activeinmates/list.asp?DataAction=Paging

[20] US Census 2009 Estimate, http://quickfacts.census.gov

[21] Einhorn Presentation, "Field of Schemes: If You Build It They Won't Come", citing Franklin County Tax Appraiser Office.

[22] Franklin County Property Appraiser's website, http://qpublic.net/franklin/index.html

[23] *Id*.

[24] http://www.myfloridacounty.com/services/officialrecords_intro.shtml

for approximately $150,000 to $165,000.[25]  By 2010, St. Joe was pricing interior lots for

as low as $39,000.[26]

64.     St. Joe's carrying value for this project was $36,329,000 in 2007,

increasing to approximately $41,218,000 in 2008, and remaining relatively constant at

approximately $41,768,000 in 2009.[27]

65.     Thus, St. Joe *increased* the carrying value for this project during the Class

Period in spite of (1) the free falling sales prices for both beachfront and interior lots; (2)

the location of the project in a sparsely populated and low-income area; and (3) halting its

plans to complete the project's development.

66.     CW4 was a former Senior Vice President and Regional General Manager

employed by the Company from 2004 until June 2008.  CW4 reported directly to

Defendant Greene and was responsible for all land management (including, but not

limited to, environmental concerns, the DRI process, engineering, feasibility, planning,

construction, sales, marketing) in CW4's region, which included Leon, Franklin and

Wakulla Counties.  As a Regional Manager, CW4 attended quarterly meetings of a

committee known internally as the "Management Committee" which consisted of, among

others, the other four Regional General Managers, Greene, Rummell, and McCalmont

---

[25] Franklin County Property Appraiser's website,
http://qpublic.net/franklin/index.html

[26] Einhorn Presentation, "Field of Schemes: If You Build It They Won't Come",
citing listings offered by SummerCamp Beach exclusive realtor.

[27] These carrying values include the carrying value of the Cutter Ridge project,
which is also in Franklin County.  However, according to the 2008 Form 10-K, the value
of Cutter Ridge is insignificant due to the minimal amount of work that has been done on
the project and the stated carrying values largely represent the carrying value for
SummerCamp Beach.

and Connolly. At the quarterly meetings, the Management Committee would discuss in detail all of the development projects on a project by project basis. Regional General Managers presented detailed information about their projects including, revenues and revenue projections, absorption rates, sales information, development plans and budget requests. Often, sales directors from the various projects would also attend the meetings.

67. CW4 confirmed that the 2007 carrying value of $36,329,000 for SummerCamp Beach was inflated. According to CW 4, in late 2006 St. Joe sold five lots at SummerCamp Beach for an average of $888,000, but the cheapest lots were being listed at $150,000. The number of lots available for sale was approximately 140. The carrying value of $36,329,000, when spread over 140 lots, gives rise to an average of approximately $259,500 per lot. Thus, with a carrying value of $36,329,000, St. Joe assumed that it would get an average price per lot of $259,500 at SummerCamp Beach. According to CW4, average comparable prices in late 2007 were *half* that amount. CW4 commented that if someone saw SummerCamp Beach they would be "aghast" and "not be able to understand how any one would pay more than $8 or $9 million" for the entire property.

### (d)    **WindMark Beach**

68. WindMark Beach is located in Gulf County. In its 2009 Form 10-K, St. Joe describes WindMark as "a beachfront resort community situated on approximately 2,020 acres in Gulf County near the town of Port St. Joe. Plans for WindMark Beach include approximately 1,662 residential units and 75,000 square feet of commercial space."

69.     Like many of St. Joe's other residential real estate projects, WindMark remains largely undeveloped. Of 1,516 planned units, only 224 (or 15%) are developed.[28] Of those 224 developed units only 150 units (10%) were sold as of September 30, 2010. Because St. Joe has ceased development of its projects, it is uncertain if the project will ever be completed.

70.     The Biennial Report[29] for WindMark confirms that no development occurred during the two year period covered by the report (April 1, 2008 – April 1, 2010). The project build-out date for all development is December 31, 2018 and the termination and development order expiration dates are December 31, 2023. From the current lack of development, it is unlikely that the Company will be able to meet these deadlines.

71.     WindMark is located in the rural area of Gulf County, with a population of 15,755.[30] There are only 6,411 people in the labor force and the median household income is $38,632.[31]

72.     Sales prices of the completed units in WindMark have, as with St. Joe's other projects, plummeted during the Class Period. St. Joe sold a beachfront lot at

---

[28] WindMark Beach DRI Monitoring Report 2008-2009, dated April 1, 2010.

[29] Biennial reports are status reports that the developer of a property is required to submit to the relevant local government agencies that are monitoring the development project on a biennial basis.

[30] US Census 2009 Estimate, http://quickfacts.census.gov

[31] *Id*.

WindMark in September 2007 for $695,000.  In October 2009, another beachfront lot

sold for $350,000.  In August 2010, a beachfront lot sold for only $188,000.[32]

73.     St. Joe's carrying value for WindMark, notwithstanding the plummeting

sales prices, was $189,800,000 in 2007, $195,386,000 in 2008 and $164,511,000 in 2009.

74.     Defendants knew that the carrying value for WindMark was overstated.

According to CW4, the WindMark project began as a joint venture with two luxury

resort, spa and timeshare developers.  CW4 explained that in late 2007, the joint venture

fell apart and St. Joe was forced to pay a $5 million break-up fee to one of its joint

venture partners, with the concomitant knowledge that, without the business partner, the

huge investment Defendants had made in this property would likely not be recovered.

75.     Sales data from the WindMark property further establishes that the

carrying value for this property was overstated.  Sales history data shows that a

beachfront lot sold in October 2009 for $350,000.[33]  The seller was Regions Bank.[34]  In

2010, several interior lots at WindMark were sold for an average price of $93,950.[35]

There are 17 developed beachfront lots remaining in WindMark and 55 interior lots.[36]

Using recent sales history, the remaining developed beachfront lots are worth $5,950,000

(17x$350,000) and the remaining interior lots at WindMark are worth $5,167,250 (55 x

---

[32] The October 2009 and August 2010 sales were not made directly by St. Joe, but were resales between third parties.  The Officer Defendants knew of resales of properties within the Company's development projects.  Rummell admitted on the Company's 1Q 2008 earnings conference call that resale pricing was a "benchmark" for St. Joe.

[33] Gulf County Property Appraiser's website, http://qpublic.net/gulf/index.html

[34] *Id.*

[35] *Id.*

[36] Einhorn Presentation, "Field of Schemes: If You Build It, They Won't Come," citing Gulf County Tax Appraisal Office

$93,950).[37]  WindMark also contains condominium units that Einhorn has valued at $5,000,000.  Collectively, therefore, the condominiums, beachfront and interior lots are worth $17,825,000.  In 2009, St. Joe reported WindMark's carrying value as $164,511,000 and took just $7.3 million in impairment charges for *all* of its residential real estate.  Defendants, however, knew from comparable sales evidence and other detailed information presented to them at the Management Committee meetings that the reported carrying value was overstated.

### 3. Average Sales Prices Decreased Across All of St. Joe's Projects

76.     Average sales prices dropped consistently across all of St. Joe's residential real estate properties during the Class Period.  The decrease in sales prices was evident not only in direct sales by St. Joe, but also in subsequent sales in the secondary market. The chart below demonstrates the steep drop in sales prices in Gulf County (consisting of WindMark) and Walton County (consisting of WaterColor, WaterSound, WaterSound Beach, and WaterSound Beach West) during the Class Period.[38]  The chart encompasses all sales at WindMark including re-sales and sales from foreclosures.

---

[37] Einhorn used an average price of $125,000 for interior lots.  He used that average price based on an August 2010 sale for $104,000 and then rounded up.  Even using this higher average price, the interior lots are only worth $6,875,000 and the total value of all lots plus condominiums is $17,825,000.

[38] Gulf County Property Appraiser's website, http://qpublic.net/gulf/index.html; Walton County Property Appraiser's website, http://qpublic.net/walton/index.html





77.    The sharp decline is also obvious in the average sales of the SouthWood development project in Leon County and the combined average sales prices for WindMark, SummerCamp Beach, Artisan Park, and Landings at Wetappo projects.[39] The charts encompass all sales at WindMark including re-sales and sales from foreclosures.



---

[39] Leon County Property Appraiser's website, http://qpublic.net/leon/index.html; Gulf County Property Appraiser's website, http://qpublic.net/gulf/index.html; Franklin County Property Appraiser's website, http://qpublic.net/franklin/index.html; Osceola County Property Appraiser's website, http://qpublic.net/osceola/index.html.



78.     Despite these marked declines in average sale prices, St. Joe failed to materially write down the value of its properties at any time during the Class Period.

79.     In an apparent attempt to justify its bloated carrying values, the Company refused to lower the asking prices for many of its lots.  CW2 was the Director of Construction on several projects for St. Joe from March 2006 through September 2009. CW2 reported to former President of Development Nick Cassala and Executive Vice President for WaterSound Mary Rosenheim.  During CW2's tenure, CW2 did a lot of work at the Wild Heron and RiverCamps projects.  CW2 focused primarily on building development amenities, and some commercial buildings. CW2 noted that, based on studies CW2 performed of sales in comparable properties, lots on St. Joe properties

where CW2 worked were significantly over priced. Mindful of the deteriorating market, CW2 approached Cassala and Rosenheim and suggested that St. Joe should "capitalize as quickly as [it] could to build up [its] capital reserves." In order to do that, CW2 explained, St. Joe would have had to lower its prices to be competitive in the market, which Cassala and Rosenheim found unacceptable. CW2 noted that both Cassala and Rosenheim were "very narrow minded about the market value of the properties."

80.     CW2 also helped to prepare projections of future sales. CW2 explained that, during CW2's tenure at the Company, St. Joe failed to meet its projected sales numbers. The Company projected that it would sell six to ten lots per year at RiverCamps in 2009, but only sold half that. According to CW2, the Company simply took the projected sales it could not meet and pushed them into the following year, or distributed the unmet sales projections over the next several years. As of 2009, St. Joe was projecting that by 2013 it would be back to the sales pace set in 2005, when it was selling 50 to 60 lots per year. This projection was highly unreasonable given current market conditions and that the Company had ceased its development activities. The Company itself admitted that market conditions were extremely difficult, and that there was no way to predict if things would improve, if ever. According to CW2, St. Joe projected selling out at RiverCamps by 2016, even though the project still contained 380 undeveloped lots, and St. Joe had ceased all development activity.

81.     Every two to three months during his tenure, CW2 performed a market analysis which included checking the Multiple Listing System ("MLS"), public records, and possible foreclosures including lis pendens notices. CW2 looked for lots of similar

33

size to those at RiverCamps and Wild Heron, and compared them to the St. Joe

properties. According to CW2, the St. Joe properties were "always substantially higher."

CW2 "constantly updated numbers and presented them" to Cassala, pointing out the trend

in the distressed and lower priced properties on a map so that Cassala could see the

proximity of those properties to the St. Joe properties.

82.     On occasion, Cassala informed CW2 that St. Joe could offer some price

reductions, but they were very modest and not usually more than a few thousand dollars.

When St. Joe did receive offers for properties that were less than its asking price, Cassala

informed CW2 that the Company would not accept the offer because doing so would

have required the Company to take an impairment charge.

83.     According to CW2, St. Joe had invested a great deal of money before the

Class Period developing its projects. "WaterSound North was tremendously expensive.

It cost $100,000 per lot and couldn't sell for close to that" because they were smaller lots

with small backyards and big setbacks. They were "bad when the market was half-way

decent and really bad after the market went bad."

**F.    St Joe's Residential Real Estate Projects Were
        A Core Part of the Company's Class Period Operations**

84.     Prior to and during the Class Period residential real estate development

made up the overwhelming majority of St Joe's business:

| St. Joe's Investment in Real Estate ($ in thousands) | | |
|---|---|---|
| | **2009** | **2008** |
| **Residential Real Estate Operating Property** | $173,190 | $185,798 |
| **Residential Real Estate Development Property** | $470,364 | $596,011 |
| **Total Real Estate Investment** | $784,500 | $923,541 |

| St. Joe's Investment in Real Estate ($ in thousands) | | |
|---|---|---|
| | 2009 | 2008 |
| **Percentage to Total Real Estate Investment** | 82% | 85% |

85.    Similarly, the Company's financial statements show that residential real estate makes up a majority of St. Joe's total assets.  Residential real estate equaled 63.2% of St. Joe's total assets in 2007, 64.2% in 2008 and 58.6% in 2009.

86.    In a 2010 letter to shareholders, St. Joe stated:

> When we first embarked on our highest and best use strategy, our priority was to seek as many land use entitlements for commercial and residential development in our region as possible.  This continues to be one of our core competencies. [Emphasis added].

87.    The Officer Defendants were all high-ranking officers who were intimately involved with, and had day-to-day responsibilities concerning the Company's core business of developing and selling residential real estate, including the overarching business of valuing the Company's assets.  Defendant Greene was, at all relevant times, the President of the Company and was the CEO for the majority of the Class Period, beginning in May 2008.  As the President and CEO, Greene was intimately involved in all aspects of the Company's business including its "priority" and "core competency" of entitling land for residential development, and had access to internal reports and information regarding the residential real estate projects, their values and impairment charges.

88.    CW3 was the Director of Financial Reporting at St. Joe from February 2006 through May 2010.  CW3 reported directly to Defendant Connolly, and was responsible for compiling and preparing the Company's SEC filings. CW3 stated that

Defendants McCalmont and Connolly were responsible for determining the quarterly impairment charges. CW3 noted that impairment was a "hot topic" at St. Joe's during CW3's tenure and confirmed that the Company was undertaking impairment analyses for all of its properties on a quarterly basis during the Class Period. CW3 described the impairment reviews as "very detailed" and explained that the ultimate analysis was performed by Defendants McCalmont and Connolly. Based on these meetings, Defendants McCalmont and Connolly told CW3 what impairment charges to report in the Company's SEC filings.

### G. Defendants' False And Misleading Statements And Omissions

89. Because asset values and impairment charges are a key element of each core financial metric reported by St. Joe and relied upon by investors, and because St. Joe failed to take proper impairment charges, all of St. Joe's key financial metrics that incorporate falsely and fraudulently understated impairment charges during the Class Period – including St. Joe's impairment charges, asset values, income or loss from continuing operations, net income or loss and earnings per share ("EPS") – were rendered materially false and misleading.

### 1. Fourth Quarter and Full Year 2007 Financial Results

90. On February 19, 2008, the first day of the Class Period, the Company issued a press release on Form 8-K entitled "The St. Joe Company (NYSE: JOE) Reports Fourth Quarter And Full Year 2007 Financials." The press release reported that the Company's investment in real estate was $943.5 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced Net Income for the fourth quarter 2007 of $1.0 million, or $0.01

per share, compared with $22.3 million, or $0.30 per share, for the fourth quarter of 2006…

For the full year 2007, JOE had Net Income of $39.2 million, or $0.53 per share, compared with $51.0 million, or $0.69 per share, for the full year 2006.  Full year results were affected by:

• Pre-tax impairment charges for the full year 2007 totaled $23.2 million, or $0.19 per share after tax, which included:

  ○ Approximately $13.6 million primarily related to a write-down of costs on homes and home sites in JOE's residential segment to approximate fair value;

*       *       *

### Consolidated Results

|  | Quarter End Dec. 31, 2007 | Year End Dec. 31, 2007 |
|---|---|---|
| Impairment Losses | $600,000 | $13,600,000 |
| Pre-tax Income from Continuing Operations | $4,800,000 | $18,400,000 |
| Net Income | $1,000,000 | $39,200,000 |
| Net Income Per Share | $0.01 | $0.53 |

*       *       *

### Summary Balance Sheet

|  | December 31, 2007 |
|---|---|
| **Assets** |  |
| Investments in real estate | $943,500,000 |

91.    On February 25, 2008, the Company filed its 2007 Annual Report with the SEC on Form 10-K.  The Company's Form 10-K reaffirmed the Company's 2007 financial results, financial position, and the reported value of the Company's investment

in real estate as announced on February 19, 2008.  With respect to the Company's asset

impairment costs, St. Joe's 2007 Annual Report stated:

> *During 2007, we recorded total asset impairment costs of $23.2 million, $13.0 million of which related to the write down of capitalized costs at certain projects due to changes in development plans and the impairment of completed homes in several of our communities due to current market conditions.*  If market conditions were to continue to deteriorate, and the market values for our home sites, remaining homes held in inventory and other project land were to fall below the book value of these assets, we would need to take additional write-downs of the book value of these assets.  Any such write-downs would decrease the value of these assets on our balance sheet and would reduce our net income.

*      *      *

> *Impairment Losses*.  We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.  *Homes and home-sites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell.*  For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing service potential of the project and *using management's best estimates about future sales prices and holding periods.* The decline in demand and market prices for residential real estate caused us to conclude that carrying amounts within our residential real estate segment may not be recoverable, and we performed an impairment analysis.  *As a result of our impairment analyses, we recorded an impairment charge of $13.6 million in the residential real estate segment.*

*      *      *

> In 2007 we recorded impairments totaling $13.6 million primarily due to current adverse market conditions for residential real estate.  Approximately $5.2 million of the

38

impairments related to capitalized costs at certain projects due to changes in development plans, approximately $7.8 million related primarily to completed spec homes in several communities and approximately $0.6 million related to the modified terms of certain promissory notes. [Emphasis added].

\*      \*      \*

### Consolidated Results

|  | Year End Dec. 31, 2007 |
| --- | --- |
| Impairment Losses | $13,609,000 |
| Pre-tax Income from Continuing Operations | $18,406,000 |
| Net Income | $39,207,000 |
| Net Income Per Share | $0.53 |

\*      \*      \*

### Balance Sheet

|  | December 31, 2007 |
| --- | --- |
| **Assets** |  |
| Investments in real estate | $943,540,000 |

92.   The Company's Form 10-K for 2007 was signed by Defendants Greene and Connolly.  Moreover, all of the Quarterly and Annual Reports contained the certification required by Sarbanes-Oxley ("SOX"), which was signed by Defendants Rummell and McCalmont:

I, [Peter S. Rummell / William S. McCalmont], certify that:

1.   I have reviewed this annual report on Form 10-K for the year ended December 31, 2007 of The St. Joe Company;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in

39

light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to

materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

                    *        *        *

Pursuant to 18 USC §1350, the undersigned officer of The St. Joe Company (the "Company") hereby certifies that the Company's Annual Report on Form 10-K for the year ended December 31, 2007 (the "Report") fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.[40]

93.    The statements in ¶¶ 90-92 were materially false and misleading when made because the Officer Defendants, and therefore St. Joe, knowingly and/or recklessly materially overstated the value of St. Joe's residential real estate assets, due to the failure to take adequate and necessary GAAP impairment charges.  The Officer Defendants,

_____

[40] Each of the Company's subsequent Class Period Form 10-Qs and 10-Ks also contain Sarbanes Oxley required certifications signed by certain of the Officer Defendants which are substantially similar to this certification.

41

therefore, materially overstated the Company's earnings in order to portray a

misleadingly positive financial picture of the Company and the state of its residential real

estate development business, thereby artificially inflating St. Joe's stock price. To the

extent that Defendants did take some impairment charges, those minimal charges cannot

be supported by any non-fraudulent impairment analyses. As explained more fully

above, St. Joe and the Officer Defendants knew, *inter alia*, that: (1) the Florida real estate

market had crashed; (2) many of its large residential real estate projects, including

RiverTown, the WaterSounds, SummerCamp Beach and WindMark remained largely

undeveloped; (3) St. Joe had halted further development activity at its residential real

estate projects; (4) sales prices at its projects sharply declined; and (5) sales volumes at

its residential real estate properties plummeted during the Class Period.

### 2. First Quarter 2008 Financial Results

94. On May 6, 2008, the Company issued a press release on Form 8-K entitled

"The St. Joe Company (NYSE: Joe) Reports First Quarter 2008 Financial Results." The

press release reported that the Company's investment in real estate was $950.7 million,

and stated:

> The St. Joe Company (NYSE: JOE) today announced Net
> Income for the first quarter 2008 increased $12.4 million to
> $32.1 million, or $0.40 per share, compared to Net Income
> of $19.7 million, or $0.27 per share, for the first quarter of
> 2007. JOE's first quarter results included pre-tax
> impairment charges of $2.3 million, or $.02 per share after
> taxes, as a result of continuing declines in sales and listing
> prices principally in our primary communities. Also
> included in 2008 results are pre-tax restructuring charges of
> $0.5 million, or less than $0.01 per share after tax,
> compared to $3.2 million, or $0.03 per share after tax, in

2007.  All per share references in this release are presented
on a diluted basis. [Emphasis added].

\*       \*       \*

### Consolidated Results

|  | Quarter Ended March 31, 2008 |
|---|---|
| Impairment Losses | $2,300,000 |
| Pre-tax Income from Continuing Operations | $49,500,000 |
| Net Income | $32,100,000 |
| Net Income Per Share | $0.40 |

\*       \*       \*

### Summary Balance Sheet

|  | March 31, 2008 |
|---|---|
| **Assets** |  |
| Investments in real estate | $950,000,000 |

95.    Also on May 6, 2008, St. Joe filed its Quarterly Report with the SEC on

Form 10-Q.  The Company's Form 10-Q was signed by Defendants Rummell and

Connolly, and reaffirmed the Company's quarterly financial results, financial position,

impairment losses and the reported value of the Company's investment in real estate.

Additionally, the Form 10-Q discussed asset impairments, reporting:

> The Company reviews its long-lived assets for impairment
> whenever events or changes in circumstances indicate that
> the carrying amount of an asset may not be recoverable.
> *Homes and home-sites substantially completed and ready
> for sale are measured at lower of carrying value or fair
> value less costs to sell.* For projects under development, an
> estimate of future cash flows on an undiscounted basis is
> performed using estimated future expenditures necessary to
> maintain the existing service potential of the project and
> *using management's best estimates about future sales*

*prices and holding periods.* The continued decrease in demand and market prices for residential real estate during the first quarter of 2008 indicated that certain carrying amounts within our residential real estate segment may not be recoverable. *As a result of the first quarter 2008 impairment analysis, the Company has recorded an impairment charge of $2.3 million in the residential real estate segment.* [Emphasis added].

\*      \*      \*

**Consolidated Results**

|  | **Quarter End Mar. 31, 2008** |
|---|---|
| Impairment Loss | $2,257,000 |
| Pre-tax Income from Continuing Operations | $49,500,000 |
| Net Income | $32,052,000 |
| Net Income Per Share | $0.40 |

\*      \*      \*

**Balance Sheet**

|  | **March 31, 2008** |
|---|---|
| **Assets** |  |
| Investments in real estate | $950,699,000 |

96.     Following the reporting of its financial results on May 6, 2008, the Company held its quarterly earnings call for the first quarter 2008.  Defendants Greene, Rummell and McCalmont participated in the call and discussed the Company's impairment charges for residential real estate.  Defendant Rummell stated:

> Joe's first quarter results included pretax impairment charges of $2.3 million or $0.02 a share after-tax as a result of continuing declines in sales and listing prices in our primary communities. Also included in first quarter results are pretax restructuring charges of $0.5 million or less than

$0.01 per share after-tax, compared to $3.2 million or $0.03
a share after-tax in 2007.

97.     The statements in ¶¶ 94-96 were potentially false and misleading when

made for substantially the same reasons set forth in ¶ 93.

## 3.     Second Quarter 2008 Financial Results

98.     On August 5, 2008, the Company issued a press release on Form 8-K

entitled "The St. Joe Company (NYSE: JOE) Reports Second Quarter 2008 Financial

Results."  The press release reported that the Company's investment in real estate was

$947.6 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net
> Loss for the second quarter 2008 of $(20.8) million, or
> $(0.23) per share, compared to Net Income of $25.3
> million, or $0.34 per share, for the second quarter of 2007,
> a decrease of $46.1 million. All per share references in this
> release are presented on a diluted basis.
>
> JOE's second quarter results included the following
> significant charges:
>
> •     …*Pre-tax impairment of $1.0 million, or $0.01 per
> share after-tax, associated with certain of JOE's
> communities and the write-down of a homebuilder note
> receivable;* and…
>
> Net income for the first half of 2008 was $11.2 million, or
> $0.13 per share, compared to $45.0 million, or $0.61 per
> share, for the first half of 2007. Included in results for the
> first six months of 2008 were the following significant
> charges:
>
> •     ...*Pre-tax impairment of $3.2 million, or $0.02 per
> share after-tax; and...* [Emphasis added].

*          *          *

45

**Consolidated Results**

|  | Quarter End Jun. 30, 2008 |
|---|---|
| Impairment Losses | $1,000,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($32,000,000) |
| Net Income | ($20,800,000) |
| Net Income Per Share | $0.23 |

\*　　\*　　\*

**Summary Balance Sheet**

|  | June 30, 2008 |
|---|---|
| **Assets** |  |
| Investments in real estate | $947,600,000 |

99.     Also on August 5, 2008, St. Joe filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Greene and Connolly, and reaffirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.  Additionally, the Form 10-Q discussed asset impairments, reporting:

> *Impairment Losses.* We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. *Homes and home-sites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell.*  For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing service potential of the project and *using management's best estimates about future sales prices and holding periods.* The continued decline in demand and market prices for residential real estate during the first six months of 2008 caused us to evaluate certain carrying amounts within our residential real estate segment. *As a result of our*

46

*impairment analyses, we recorded an impairment charge in our residential real estate segment of $0.2 million for the second quarter of 2008 and $2.2 million for the first quarter 2008 primarily related to completed homes in several communities.* In addition, we recorded a charge of $0.8 million related to the write down of a renegotiated builder note receivable during the second quarter 2008. [Emphasis added].

### Consolidated Statements of Income

|  | Quarter End Jun. 30, 2008 |
|---|---|
| Impairment Losses | $976,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($32,499,000) |
| Net Income | ($20,800,000) |
| Net Income Per Share | $0.23 |

\* \* \*

### Balance Sheet

|  | June 30, 2008 |
|---|---|
| **Assets** | |
| Investments in real estate | $947,644,000 |

100.     The statements in ¶¶ 98-99 were materially false and misleading when made for substantially the same reason as stated in ¶ 93.

### 4.     Third Quarter 2008 Financial Results

101.     On November 4, 2008, the Company issued a press release on Form 8-K entitled "The St. Joe Company (NYSE: JOE) Reports Third Quarter 2008 Financial Results." The press release reported that the Company's investment in real estate was $930.4 million, and stated:

The St. Joe Company (NYSE: JOE) today announced a Net Loss for the third quarter 2008 of $(19.2) million, or

$(0.21) per share, compared to a Net Loss of $(6.8) million, or $(0.09) per share, for the third quarter of 2007.

\*     \*     \*

### Year-to-Date Results

Net Loss for the first nine months of 2008 was $(8.0) million, or $(0.09) per share, compared to Net Income of $38.2 million, or $0.51 per share, for the first nine months of 2007.

### Consolidated Statements of Income

|  | Quarter End Sept. 30, 2008 |
|---|---|
| Impairment Losses | $1,300,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($30,600,000) |
| Net Income (Loss) | ($19,200,000) |
| Net Income (Loss) Per Share | ($0.21) |

\*     \*     \*

### Summary Balance Sheet

|  | Sept. 30, 2008 |
|---|---|
| **Assets** | |
| Investments in real estate | $930,400,000 |

102.    Also on November 4, 2008, St. Joe filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by Defendants Greene and Connolly, and reaffirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate. The Form 10-Q discussed asset impairments, reporting:

> The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. *Homes and home-sites substantially completed and ready*

*for sale are measured at lower of carrying value or fair value less costs to sell.* For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing project and *using management's best estimates about future sales prices and holding periods.* The continued decrease in demand and market prices for residential real estate during the first nine months of 2008 and 2007 indicated that certain carrying amounts within the Company's residential real estate segment may not be recoverable. In addition, during the second quarter 2008 the Company recorded an impairment charge of $0.8 million related to the write down of a renegotiated builder note receivable. *As a result of its 2008 impairment analyses, the Company has recorded aggregate impairment charges of $1.3 million and $4.6 million in the residential real estate segment for the three and nine months ended September 30, 2008.* The Company also recorded an impairment charge of $13.0 million in the third quarter of 2007.  [Emphasis added].

\*     \*     \*

### Consolidated Statements of Income

|  | Quarter End Sept. 30, 2008 |
| --- | --- |
| Impairment Losses | $1,329,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($30,631,000) |
| Net Income (Loss) | ($19,198,000) |
| Net Income (Loss) Per Share | ($0.21) |

\*     \*     \*

### Balance Sheet

|  | Sept. 30, 2008 |
| --- | --- |
| **Assets** |  |
| Investments in real estate | $930,420,000 |

103.    The statements in ¶¶ 101-02 were materially false and misleading when made for substantially the same reason as stated in ¶ 93.

### 5.     Fourth Quarter And Full Year 2008 Financial Results

104.    On February 24, 2009, the Company issued a press release on Form 8-K

entitled "The St. Joe Company (NYSE: Joe) Reports Fourth Quarter and Full Year 2008

Financial Results."  The press release reported that the Company's investment in real

estate was $890.6 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net
> Loss for the fourth quarter 2008 of $(27.9) million, or
> $(0.31) per share, which includes non-cash charges of
> $57.9 million, or $0.36 per share after tax. This compares
> to Net Income of $1.0 million, or $0.01 per share, for the
> fourth quarter of 2007, which includes non-cash charges of
> $10.5 million, or $0.09 per share after tax. All per-share
> references in this release are presented on a diluted basis.
>
> JOE's fourth quarter 2008 results include the following
> non-cash charges:
>
> •      *Pre-tax impairment charges of $55.8 million, or
> $0.34 per share after tax, including:*
>
> o      $28.3 million write-down related to its SevenShores
> condominium development project;…
>
> o      *$8.3 million charge for the write-down of costs to
> approximate fair value on homes in several JOE
> communities;* [Emphasis added].
>
> *           *           *
>
> **Full-Year Results**
>
> For the full year 2008, JOE had a Net Loss of $(35.9)
> million, or $(0.40) per share, compared to Net Income of
> $39.2 million, or $0.53 per share, for the full year 2007.
> Full year 2008 results include the following charges which
> totaled $109.5 million, or $0.69 per share after tax:
>
> •      Pre-tax impairment charges totaling $60.4 million
> and pre-tax loss of $1.9 million related to abandoned
> property, or an aggregate of $0.35 per share after tax;

\*      \*      \*

The full-year 2007 results were affected by the following:

•      Pre-tax impairment charges totaling $23.2 million, or $0.19 per share after tax, which includes $9.6 million recorded in discontinued operations;

\*      \*      \*

**Summary Balance Sheet**

|  | **December 31, 2008** |
|---|---|
| **Assets** |  |
| Investments in real estate | $890,600,000 |

\*      \*      \*

**Consolidated Statements of Income**

|  | **Quarter End Dec. 31, 2008** |
|---|---|
| Impairment Losses | $55,800,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($48,700,000) |
| Net Income | ($27,900,000) |
| Net Income Per Share | ($0.31) |

105.    Later on February 24, 2009, St. Joe held its quarterly earnings call for the fourth quarter and full year 2008. Defendants Greene and McCalmont participated on the call, reaffirming the Company's quarterly financial results and financial position, and discussing the Company's impairment charges for residential real estate. Defendant McCalmont stated:

> The difficult economic conditions caused us to incur significant non-cash impairment charges in the fourth quarter totaling $55.8 million pretax or $0.34 per share after tax. These non-cash impairment charges were primarily related to three items. First, *we made a decision to reduce prices on the majority of our existing housing*

51

> *inventory to reflect current market conditions, facilitate*
> *sales and eliminate continuing carrying costs. These*
> *charges affected 114 homes and totaled $8.2 million*
> *pretax.* [Emphasis added].

106.    On February 24, 2009, St. Joe filed its 2008 Annual Report with the SEC

on Form 10-K.  The Company's Form 10-K was signed by Defendants Greene and

McCalmont, among others, and reaffirmed the Company's 2008 financial results,

financial position, and the reported value of the Company's investment in real estate.

With respect to the Company's asset impairment costs, St. Joe's 2008 Annual Report

stated:

> *During 2008, we recorded total asset impairment costs of*
> *$60.5 million, $41.3 million of which primarily related to*
> *the write-down of capitalized costs at certain projects and*
> *the impairment of completed homes in several of our*
> *communities due to current market conditions.* If market
> conditions were to continue to deteriorate, and the market
> values for our homesites, remaining homes held in
> inventory and other project land were to fall below the
> book value of these assets, we could be required to take
> additional write-downs of the book value of those assets.
>
> *           *           *
>
> *Impairment of Long-lived Assets and Goodwill.* Our long-
> lived assets, primarily real estate held for investment, are
> carried at cost unless circumstances indicate that the
> carrying value of the assets may not be recoverable. If we
> determine that an impairment exists due to the inability to
> recover an asset's carrying value, a provision for loss is
> recorded to the extent that the carrying value exceeds
> estimated fair value. If such assets were held for sale, the
> provision for loss would be recorded to the extent that the
> carrying value exceeds estimated fair value less costs to
> sell.
>
> *           *           *

52

We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. *Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell.* For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and *using management's best estimates about future sales prices and holding periods.* The continued decline in demand and market prices for residential real estate during 2008 caused us to evaluate certain carrying amounts within our residential real estate segment.

*As a result of our property impairment analyses, we recorded aggregate impairment charges in our residential real estate segment of $40.3 million during 2008.* In addition, we recorded a charge of $1.0 million related to the write down of a renegotiated builder note receivable during 2008.

\*     \*     \*

## Asset Impairments

*As a result of the Company's property impairment analyses for 2008, it recorded aggregate impairment charges of $41.3 million consisting of $12.0 million related to completed homes in several communities, $28.3 million related to the Company's SevenShores condominium project and $1.0 million related to the write down of a renegotiated builder note receivable.*  [Emphasis added].

\*     \*     \*

### Summary Balance Sheet

|                          | December 31, 2008 |
| ------------------------ | ----------------- |
| **Assets**               |                   |
| Investments in real estate | $890,583,000    |

\*     \*     \*

53

### Consolidated Statements of Income

|  | Year End Dec. 31, 2008 |
|---|---|
| Impairment Losses | $60,354,000 |
| Pre-tax Income (Loss) from Continuing Operations | $(62,356,000) |
| Net Income | $(35,883,000) |
| Net Income Per Share | ($0.40) |

107.    The Notes to Consolidated Financial Statements section of the 2008 Form

10-K also discussed asset impairments and the Company's segment results, and provided

the carrying values of the Company's residential real estate and accumulated

depreciation.  In relevant part, the Form 10-K reported:

*Segment Results*

*Residential Real Estate*

\*        \*        \*

*Homes and homesites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell.* For projects under development, an estimate of future cash flows on an undiscounted basis is performed. The overall decrease in demand and market prices for residential real estate indicated that certain carrying amounts within our residential real estate segment may not be recoverable. *As a result of our impairment analyses for 2008, we recorded aggregate impairment charges of $41.3 million, consisting of $12.0 million related to completed homes in several communities,* $28.3 million related to our SevenShores condominium project, and $1.0 million related to the write down of a renegotiated builder note receivable.  [Emphasis added].

108.    The statements in ¶¶ 104-07 were materially false and misleading when

made for substantially the same reason as stated in ¶ 93.

**6.**    **First Quarter 2009 Financial Results**

109.    On May 5, 2009, the Company issued a press release on Form 8-K entitled

"The St. Joe Company (NYSE: JOE) Reports First Quarter 2009 Financial Results."  The

press release reported that the Company's investment in real estate was $888.1 million,

and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net
> Loss for the first quarter 2009 of $(11.7) million, or $(0.13)
> per share, which includes non-cash charges of $1.5 million,
> or $0.01 per share after tax. This compares to Net Income
> of $32.1 million, or $0.40 per share, for the first quarter of
> 2008, which included non-cash charges of $2.8 million, or
> $0.02 per share after tax. All per-share references in this
> release are presented on a diluted basis.

### Consolidated Statements of Income

|  | Quarter End March 31, 2009 |
|---|---|
| Impairment Losses | $1,500,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($18,600,000) |
| Net Income | ($11,700,000) |
| Net Income Per Share | ($0.13) |

\*        \*        \*

### Summary Balance Sheet

|  | Mar. 31, 2009 |
|---|---|
| **Assets** |  |
| Investments in real estate | $888,100,000 |

110.    Also on May 5, 2009, St. Joe filed its Quarterly Report with the SEC on

Form 10-Q.  The Company's Form 10-Q was signed by Defendants Greene and

Connolly, and reaffirmed the Company's quarterly financial results, financial position,

and the reported value of the Company's investment in real estate.  Additionally, the

Form 10-Q discussed asset impairments, reporting:

> The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. *Homes and homesites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell.*  For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and *using management's best estimates about future sales prices and holding periods.  In the first quarter of 2009 and 2008, the Company recorded impairment charges in the residential real estate segment of $0.2 million and $2.3 million, respectively, related to completed unsold homes.*  In addition as discussed in Note 3, the Company recorded a $1.3 million impairment charge in the first quarter of 2009 related to a renegotiated builder note receivable. [Emphasis added].

*      *      *

### Consolidated Statements of Income

|  | Quarter End March 31, 2009 |
|---|---|
| Impairment Losses | $1,536,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($18,653,000) |
| Net Income | ($11,697,00) |
| Net Income Per Share | ($0.13) |

*      *      *

### Balance Sheet

|  | Mar. 31, 2009 |
|---|---|
| **Assets** |  |
| Investments in real estate | $888,057,000 |

111.    The statements in ¶¶ 109-10 were materially false and misleading when made for substantially the same reason as set forth in ¶ 93.

### 7.      Second Quarter 2009 Financial Results

112.    On August 4, 2009, the Company issued a press release on Form 8-K entitled "The St. Joe Company (NYSE: JOE) Reports Second Quarter 2009 Financial Results." The press release reported that the Company's investment in real estate was $869.8 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net Loss for the second quarter 2009 of $(44.6) million, or $(0.49) per share, which includes pre-tax non-cash charges of $64.7 million, or $0.43 per share after tax. This compares to a Net Loss of $(20.8) million, or $(0.23) per share, for the second quarter of 2008, which included significant charges of $35.3 million, or $0.24 per share after tax. All per-share references in this release are presented on a diluted basis.

> *         *         *

> The remaining non-cash charges of $20.0 million pre-tax, or $0.13 per share after-tax, included the $7.4 million write-off of a note receivable from GVA Advantis, the $6.7 million write-down related to JOE's SevenShores condominium and marina development project, *$5.5 million of impairments associated with homes and home sites in certain of JOE's communities* and $0.4 million of impairments for the write-down of a builder note receivable.

> Net Loss for the first half of 2009 was $(56.3) million, or $(0.62) per share, compared to Net Income of $11.2 million, or $0.13 per share, for the first half of 2008.

> Included in the results for the first six months of 2009 were the following significant non-cash charges:

> •        Settlement charge on pension annuitization of $44.7 million, or $0.30 per share after-tax; and

•      Pre-tax impairment charges of $21.5 million, or $0.14 per share after-tax. [Emphasis added].

*      *      *

### Consolidated Statements of Income

|  | Quarter End Jun. 30, 2009 | Six Months End Jun. 30, 2009 |
|---|---|---|
| Impairment Losses | $20,000,000 | $21,500,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($73,600,000) | $(92,300,000) |
| Net Income | ($45,300,000) | ($57,000,000) |
| Net Income Per Share | ($0.49) | ($0.62) |

*      *      *

### Summary Balance Sheet

|  | June 30, 2009 |
|---|---|
| **Assets** |  |
| Investments in real estate | $869,800,000 |

113.    Also on August 4, 2009, St. Joe held its quarterly earnings call for the second quarter of 2009 which reaffirmed the Company's quarterly financial results, financial position, and discussed impairment charges.  Defendants Greene and McCalmont participated on the call.  McCalmont stated:

> This morning, we announced a net loss for the second quarter of $44.6 million or $0.49 per share on revenues of $40.6 million. Our net loss includes pretax non-cash charges of $64.7 million or $0.43 per share after tax. This compares to a net loss of $20.8 million or $0.23 per share, and revenues of $67.5 million for the second quarter last year. Last year's quarter included pretax non-cash charges of $35.3 million or $0.24 per share after tax.
>
> [W]e also incurred impairments related to our real estate holdings. These charges included an approximate $7

58

million impairment related to an additional write-down of our Seven Shores condominium development and the Perico marina project located on non-legacy land in Bradenton, Florida. This project was written down to approximate the current fair market value of the project.

*We also incurred impairments of approximately $6 million [to] associate homes, home sites, and a builder note receivable in certain of our communities.* [Emphasis added].

114. During the call McCalmont also addressed an analyst's direct question about the modest $6 million impairment taken by the Company on its residential real estate. McCalmont implied that the Company was writing down all of its residential real estate projects to reflect *current market value*:

Buck Horne - Raymond James & Associates - Analyst

A couple of questions here. I guess, first, a little housekeeping -- can I get the finished home count that you still had left in inventory and what the remaining book value is of those -- of that inventory?

Bill McCalmont - The St. Joe Company - EVP and CFO

Buck, at the end of the quarter, we had 123 homes in inventory and 1,370 home sites, for a total of 1,493 units.

Buck Horne - Raymond James & Associates - Analyst

Okay, all right. And I guess just trying to get a feel for the impairments that you took on those homes -- can you give us any color on the assumptions or the price reduction that you took intra-quarter that required the impairments?

Bill McCalmont - The St. Joe Company - EVP and CFO

Sure. We took them at a variety of our communities *as we trued up the carrying values to reflect current market values*; that the largest impairments in terms of dollars were at five homes at WindMark Beach. And then as we wrote down the carrying value of the 27 condominium units at

Artisan Park, following the auction results that we
experienced this past weekend. [Emphasis added.]

115.   Also on August 4, 2009, St. Joe filed its Quarterly Report with the SEC on

Form 10-Q.  The Company's Form 10-Q was signed by Defendants Greene and

Connolly, and reaffirmed the Company's quarterly financial results, financial position,

and the reported value of the Company's investment in real estate.  Additionally, the

Form 10-Q discussed asset impairments, reporting:

> *Impairment Losses.*  We review our long-lived assets for
> impairment whenever events or changes in circumstances
> indicate that the carrying amount of an asset may not be
> recoverable.  *Homes and homesites substantially completed
> and ready for sale are measured at the lower of carrying
> value or fair value less costs to sell.*  For projects under
> development, an estimate of future cash flows on an
> undiscounted basis is performed using estimated future
> expenditures necessary to maintain and complete the
> existing project and *using management's best estimates
> about future sales prices and holding periods.  During the
> second quarter of 2009 we recorded impairment charges of
> $12.1 million in the residential real estate segment related
> to completed unsold homes and homesites* and a write-
> down of our SevenShores condominium and marina
> development project…
>
> *During the first six months of 2009 we recorded
> impairment charges of $12.4 million in the residential real
> estate segment related to completed unsold homes and
> homesites* and a write-down of our SevenShores
> condominium and marina development project.  [Emphasis
> added].

*     *     *

60

**Consolidated Statements of Income**

|  | Quarter End Jun. 30, 2009 |
|---|---|
| Impairment Losses | $19,962,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($73,636,000) |
| Net Income | ($45,275,000) |
| Net Income Per Share | ($0.49) |

\* \* \*

**Balance Sheet**

|  | June 30, 2009 |
|---|---|
| **Assets** |  |
| Investments in real estate | $869,750,000 |

116. The statements in ¶¶ 112-15 were materially false and misleading when made for substantially the same reason as set forth in ¶ 93.

### 8. Third Quarter 2009 Financial Results

117. On November 3, 2009, the Company issued a press release on Form 8-K entitled "The St. Joe Company Reports Third Quarter 2009 Results." The press release reported that the Company's investment in real estate was $844.9 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net Loss for the third quarter of 2009 of $(14.4) million, or $(0.16) per share, which included pre-tax charges of $12.9 million, or $0.08 per share after tax. This compares to a Net Loss of $(19.2) million, or $(0.21) per share, for the third quarter of 2008, which included pre-tax charges of $13.0 million, or $0.09 per share after tax. All per-share references in this release are presented on a diluted basis.
>
> St. Joe's third quarter earnings included $11.1 million of pre-tax, non-cash impairment charges including $9.0 million related to the settlement of the Saussy Burbank notes receivable, $2.0 million associated with various

61

homes, homesites and other long-term assets and $0.1
million related to various builder notes receivable.

*     *     *

**Year-to-Date Results**

Net Loss for the first nine months of 2009 was $(70.7)
million, or $(0.77) per share, compared to Net Loss of
$(8.0) million, or $(0.09) per share, for the first nine
months of 2008.  Included in the results for the first nine
months of 2009 were significant pre-tax charges of $79.1
million, or $0.52 per share after tax, compared to pre-tax
charges of $51.8 million, or $0.35 per share after tax, in the
first nine months of 2008.

*     *     *

**Consolidated Statements of Income**

|  | Quarter End Sept. 30, 2009 |
|---|---|
| Impairment Losses | $11,100,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($26,300,000) |
| Net (Loss) Income | ($14,400,000) |
| Net Income Per Share | ($0.16) |

*     *     *

**Summary Balance Sheet**

|  | Sept. 30, 2009 |
|---|---|
| **Assets** |  |
| Investments in real estate | $844,900,000 |

118.    On November 3, 2009, St. Joe held its quarterly earnings call for the

second quarter of 2009.  Defendants Greene and McCalmont participated on the call.

McCalmont commented on third quarter impairment charges:

We also incurred pretax non-cash impairments of
approximately $2.1 million, associated with various homes,

62

home sites and builder note receivables in certain
communities.

119.    Also on November 3, 2009, St. Joe filed its Quarterly Report with the SEC

on Form 10-Q.   The Company's Form 10-Q was signed by Defendants Greene and

Connolly, and reaffirmed the Company's quarterly financial results, financial position,

and the reported value of the Company's investment in real estate.   Additionally, the

Form 10-Q discussed asset impairments, reporting:

> *Impairment Losses*.   We review our long-lived assets for
> impairment whenever events or changes in circumstances
> indicate that the carrying amount of an asset may not be
> recoverable.   *Homes and homesites substantially completed
> and ready for sale are measured at the lower of carrying
> value or fair value less costs to sell.*   For projects under
> development, an estimate of future cash flows on an
> undiscounted basis is performed using estimated future
> expenditures necessary to maintain and complete the
> existing project and using management's best estimates
> about future sales prices and holding periods.
>
> During the third quarter of 2009:
>
> •      We recorded a $9.0 million write-down related to
> the settlement of the Saussy Burbank notes receivable, a
> $0.1 million write-down of builder notes receivable and a
> $1.1 million impairment charge related to other long-term
> assets; and
>
> •      *We recorded a $0.9 million write-down related to
> completed unsold homes and homesites within other
> communities.*
>
> *During the third quarter of 2008 we recorded impairment
> charges of $1.3 million related to completed unsold homes.*
>
> During the first nine months of 2009:
>
> •      *We recorded a $6.5 million impairment charge
> related to completed unsold homes and homesites in our
> communities and a $6.7 million write-down of our*

SevenShores condominium and marina development project…[Emphasis added].

\* \* \*

### Consolidated Statements of Income

|  | **Quarter End Sept. 30, 2009** |
|---|---|
| Impairment Losses | $11,063,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($26,330,000) |
| Net (Loss) Income | ($14,490,000) |
| Net Income Per Share | ($0.16) |

\* \* \*

### Balance Sheet

|  | **Sept. 30, 2009** |
|---|---|
| **Assets** |  |
| Investments in real estate | $844,911,000 |

120. The statements in ¶¶ 117-19 were materially false and misleading when made for substantially the same reason as set forth in ¶ 93.

### 9. Fourth Quarter and Full Year 2009 Financial Results

121. On February 23, 2010, the Company issued a press release on Form 8-K entitled "The St. Joe Company Reports Full Year and Fourth Quarter 2009 Results." The press release reported that the Company's investment in real estate was $749.5 million, and stated:

The St. Joe Company (NYSE: JOE) today announced a Net Loss for the full year ended 2009 of $(130.0) million, or $(1.42) per share, compared to a Net Loss of $(35.9) million, or $(0.40) per share, for the year ended 2008. Included in the 2009 results were significant pre-tax

charges of $163.1 million, or $1.07 per share after tax,
compared to pre-tax charges of $109.5 million, or $0.69 per
share after tax, in the year ended 2008.  All per-share
references in this release are presented on a diluted basis.

*       *       *

**Fourth Quarter 2009 Financial Results**

For the fourth quarter of 2009, St. Joe had a Net Loss of
$(59.3) million, or $(0.65) per share, which included pre-
tax charges of $84.0 million, or $0.56 per share after tax.
This compares to a Net Loss of $(27.9) million, or $(0.31)
per share, for the fourth quarter of 2008, which included
pre-tax charges of $57.9 million, or $0.36 per share after
tax.

St. Joe's fourth quarter earnings included $73.3 million of
pre-tax, non-cash impairment charges including $67.8
million related to the sale of the remaining assets at
Victoria Park ($6.9 million recorded in discontinued
operations), $3.5 million related to the sale of the St. Johns
Golf & Country Club (recorded in discontinued
operations), $1.1 million related to the sale of the assets
acquired in connection with the settlement of our Saussy
Burbank notes receivable, *$0.8 million associated with
various homes and homesites* and $0.1 million associated
with a builder note receivable.  The Company also wrote-
off $7.2 million of capitalized costs related to abandoned
development plans in certain of our projects and incurred a
restructuring charge of $3.5 million related to one-time
termination benefits.  [Emphasis added].

*       *       *

**Consolidated Statements of Income**

|  | **Quarter End Dec. 31, 2009** | **Year End Dec. 31, 2009** |
| --- | --- | --- |
| Impairment Losses | $70,100,000 | $102,700,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($86,900,000) | ($205,100,000) |
| Net (Loss) Income | ($59,300,000) | ($130,800,000) |
| Net Income Per Share | ($0.65) | ($1.42) |

65

\*      \*      \*

### Summary Balance Sheet

|  | Dec. 31, 2009 |
|---|---|
| **Assets** | |
| Investments in real estate | $749,500,000 |

122.    Also on February 23, 2010, St. Joe held its quarterly earnings call to discuss the Company's the fourth quarter and year end 2009 results.  Defendants Greene and McCalmont participated on the call.  During the call, McCalmont stated:

> For the fourth quarter of 2009 we had a net loss of $59.3 million or $0.65 per share, which included pretax charges of $84 million or $0.56 per share after tax. Included in the pretax charges were $73 million of noncash impairment charges, including $67.8 million related to the sale of the company's remaining assets at Victoria Park in DeLand, Florida; $3.5 million related to the sale of the St. Johns Golf & Country Club near Jacksonville; $1 million related to the sale of assets acquired in connection with the settlement of our Saussy Burbank notes receivable; *and approximately $1 million associated with various homes, home sites and a builder's note receivable.*
>
> We also wrote off just over $7 million of capitalized costs related to abandoned development projects in certain of our projects and incurred a restructuring charge of $3.5 million related to one-time termination benefits.  [Emphasis added].

123.    On February 23, 2010, St. Joe filed its 2009 Annual Report with the SEC on Form 10-K.  The Company's Form 10-K was signed by Defendants Greene and McCalmont, among others, and reaffirmed the Company's 2009 financial results, financial position, and the reported value of the Company's investment in real estate.

66

With respect to the Company's asset impairment costs, St. Joe's 2009 Annual Report reported:

> *Impairment Losses.* During the past three years, we have recorded significant impairment charges as a result of the continued decline in demand and market prices within our real estate markets. The following table summarizes our impairment charges for the three years ended December 31:

| | Year End Dec. 31 | | |
|---|---|---|---|
| | **2009** | **2008** | **2007** |
| Impairment Charge: Home and Homesites – various residential communities | $7,300,000 | $12,000,000 | $7,800,000 |

> Investment in Real Estate:
>
> We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. *Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell.* For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and *using management's best estimates about future sales prices and holding periods.* The continued decline in demand and market prices for residential real estate during 2007 through 2009 caused us to reevaluate certain carrying amounts within our residential real estate segment, which resulted in the recording of significant impairment charges.
>
> Given the downturn in our real estate markets, we implemented a tax strategy for 2009 to benefit from the sale of certain non-strategic assets at a loss. Under federal tax rules, losses from asset sales realized in 2009 can be carried back and applied to taxable income from 2007, resulting in a federal income tax refund for 2009.
>
> As part of this strategy, we conducted a nationally marketed sale process for the disposition of the remaining

assets of our non-strategic Victoria Park community in Deland, Florida, including homes, homesites, undeveloped land, notes receivable and a golf course. Based on the likelihood of the closing of the sale, we concluded on December 15, 2009 that an impairment charge for $67.8 million was necessary. We completed the sale on December 17, 2009 for $11.0 million.

In addition, we completed the sale of our SevenShores condominium and marina development project for $7.0 million earlier in 2009, which resulted in an impairment charge of $6.7 million due to lower market pricing. We also wrote-off $7.2 million of capitalized costs related to abandoned development plans in certain of our communities. We also sold our St. Johns Golf and Country Club for $3.0 million in December 2009 which resulted in an impairment charge of $3.5 million. [Emphasis added].

\*      \*      \*

### Consolidated Statements of Income

|  | Year End Dec. 31, 2009 |
|---|---|
| Impairment Losses | $102,683,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($205,127,000) |
| Net (Loss) Income | ($130,840,000) |
| Net Income Per Share | ($1.42) |

\*      \*      \*

### Summary Balance Sheet

|  | Dec. 31, 2009 |
|---|---|
| **Assets** |  |
| Investments in real estate | $749,500,000 |

124.   The statements in ¶¶ 121-23 were materially false and misleading when made for substantially the same reason as set forth in ¶ 93.

**10.**    **First Quarter 2010 Financial Results**

125.    On May 4, 2010, the Company issued a press release on Form 8-K entitled

"The St. Joe Company Reports First Quarter 2010 Results." The press release reported

that the Company's investment in real estate was $747.3 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net
> Loss for the first quarter ended March 31, 2010 of $(11.4)
> million, or $(0.13) per share, compared to a Net Loss of
> $(12.0) million, or $(0.13) per share, for the first quarter of
> 2009.

*     *     *

<strong>Consolidated Statements of Income</strong>

|  | **Quarter End March 31, 2010** |
|---|---|
| Impairment Losses | $100,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($17,600,000) |
| Net (Loss) Income | ($11,400,000) |
| Net Income Per Share | ($0.13) |

*     *     *

<strong>Summary Balance Sheet</strong>

|  | **March 31, 2010** |
|---|---|
| **Assets** |  |
| Investments in real estate | $747,300,000 |

126.    Also on May 4, 2010, St. Joe filed its Quarterly Report with the SEC on

Form 10-Q. The Company's Form 10-Q was signed by Defendants Greene and

Connolly, and reaffirmed the Company's quarterly financial results, financial position,

and the reported value of the Company's investment in real estate.  Additionally, the

Form 10-Q discussed asset impairments, reporting:

> The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. *Homes and homesites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell.*  The fair value of homes and homesites is determined based upon final sales prices of inventory sold during the period (level 2 inputs).  For inventory held for sale, estimates of selling prices based on current market data are utilized (level 3 inputs).  For projects under development, an estimate of future cash flows on an undiscounted basis is performed *using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods (level 3 inputs).  In the first quarter of 2010 and 2009, the Company recorded impairment charges in the residential real estate segment of $0.1 million and $0.2 million, respectively.*

> *       *       *

**Segment Results**

***Residential Real Estate***

Our residential real estate segment typically plans and develops mixed-use resort, primary and seasonal residential communities of various sizes, primarily on our existing land. We own large tracts of land in Northwest Florida, including significant Gulf of Mexico beach frontage and waterfront properties, and land near Jacksonville and Tallahassee.

Our residential sales remain weak due to the real estate downturn and economic recession in Florida. Inventories of resale homes and homesites remain high in our markets and prices remain depressed, and, predicting when real estate markets will return to health remains difficult. Although we have noticed some renewed interest in residential real estate

activity, we do not expect any significant favorable changes in market conditions during 2010. [Emphasis added].

\* \* \*

### Consolidated Statements of Income

|  | Quarter End March 31, 2010 |
|---|---|
| Impairment Losses | $53,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($17,636,000) |
| Net (Loss) Income | ($11,424,000) |
| Net Income Per Share | ($0.13) |

\* \* \*

### Balance Sheet

|  | March 31, 2010 |
|---|---|
| Assets | |
| Investments in real estate | $747,341,000 |

127. The statements in ¶¶ 125-26 were materially false and misleading when made for substantially the same reason as set forth in ¶ 93.

**11.** **Second Quarter 2010 Financial Results**

128. On August 5, 2010, the Company issued a press release on Form 8-K entitled "The St. Joe Company Reports Second Quarter 2010 Results." The press release reported that the Company's investment in real estate was $748.2 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net Loss for the second quarter ended June 30, 2010 of $(8.6) million, or $(0.09) per share, including a pre-tax restructuring charge of $1.2 million or $0.01 per share after tax. This compares to a Net Loss in the second quarter of 2009 of $(44.8) million, or $(0.49) per share, which included pre-tax non-cash charges of $64.7 million or $0.43 per share after tax.

Net Loss for the first half of 2010 was $(20.0) million, or $(0.22) per share. This compares to a Net Loss during the same period of 2009 of $(56.9) million, or $(0.62) per share, which included pre-tax non-cash charges of $66.2 million or $0.44 per share after tax.

\*　　\*　　\*

### Consolidated Statements of Income

|  | Quarter End June 30, 2010 |
|---|---|
| Impairment Losses | $500,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($14,700,000) |
| Net (Loss) Income | ($8,600,000) |
| Net Income Per Share | ($0.09) |

\*　　\*　　\*

### Summary Balance Sheet

|  | June 30, 2010 |
|---|---|
| **Assets** |  |
| Investments in real estate | $748,200,000 |

129.　Also on August 5, 2010, St. Joe filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by Defendants Greene and Connolly, and reaffirmed the Company's financial results, financial position, and the reported value of the Company's investment in real estate. Additionally, the Form 10-Q discussed asset impairments, reporting:

> *Impairment Losses.* We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. *Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell.* For projects under

development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and *using management's best estimates about future sales prices and holding periods. During the second quarter of 2010 and the first six months of 2010, we recorded impairment charges on homes and homesites of zero and $0.1 million, respectively, in the residential real estate segment.* During the second quarter of 2010 we also recorded a $0.5 million write-down resulting from a renegotiated builder note receivable in the residential segment. [Emphasis added].

\* \* \*

**Consolidated Statements of Income**

|  | **Quarter End June 30, 2010** |
|---|---|
| Impairment Losses | $502,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($14,719,000) |
| Net (Loss) Income | ($8,630,000) |
| Net Income Per Share | ($0.09) |

\* \* \*

**Summary Balance Sheet**

|  | **June 30, 2010** |
|---|---|
| **Assets** |  |
| Investments in real estate | $748,195,000 |

130. The statements in ¶¶ 128-29 were materially false and misleading when made for substantially the same reason as set forth in ¶ 93.

## 12.   **Third Quarter 2010 Financial Results**

131.   On November 2, 2010, the Company issued a press release on Form 8-K

entitled "The St. Joe Company Reports Third Quarter 2010 Results."  The press release

reported that the Company's investment in real estate was $746.8 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net
> Loss for the third quarter ended September 30, 2010 of
> $(13.1) million, or $(0.14) per share, including pre-tax
> charges of $13.1 million, or $0.09 per share after tax. This
> compares to a Net Loss in the third quarter of 2009 of
> $(14.5) million, or $(0.16) per share, which included pre-
> tax charges of $12.9 million or $0.08 per share after tax.
> Third quarter 2010 pre-tax charges included an $8.8 million
> reserve for litigation involving a contract dispute related to
> a 1997 land purchase, a $2.6 million charge for legal and
> clean-up costs resulting from the Deepwater Horizon oil
> spill and $1.7 million of restructuring charges.
>
> Year-to-Date Net Loss for 2010 was $(33.2) million, or
> $(0.36) per share including pre-tax charges of $15.8 million
> or $0.11 per share after tax. This compares to a Net Loss
> during the same period of 2009 of $(71.4) million, or
> $(0.78) per share, which included pre-tax charges of $79.1
> million or $0.52 per share after tax.

*      *      *

### Consolidated Statements of Income

|  | **Quarter End Sept. 30, 2010** |
|---|---|
| Impairment Losses | -- |
| Pre-tax Income (Loss) from Continuing Operations | ($21,700,000) |
| Net (Loss) Income | ($13,100,000) |
| Net Income Per Share | ($0.14) |

*      *      *

**Summary Balance Sheet**

|  | Sept. 30, 2010 |
|---|---|
| **Assets** | |
| Investments in real estate | $746,800,000 |

132.     Also on November 2, 2010, St. Joe filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Greene and Connolly, and reaffirmed the Company's financial results, financial position, and the reported value of the Company's investment in real estate.  Additionally, the Form 10-Q discussed asset impairments, reporting:

### Results of Operations

Net loss decreased by $1.4 million to a loss of $(13.1), or $(0.14) per share, in the third quarter of 2010, compared to a net loss of $(14.5) million, or $(0.16) per share, for the third quarter of 2009.

*         *         *

*Impairment Losses.* We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. *Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell.* For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and *using management's best estimates about future sales prices, sales volume, sales velocity and holding periods.* In addition, the estimated length of expected development periods, related economic cycles and inherent uncertainty with respect to these projects, such as the impact of change in development plans and our intent and ability to hold the projects through the development period, could result in changes to these estimates. *During the nine months ended September 30, 2010, we recorded impairment charges on homes and homesites of $0.1*

*million, in the residential real estate segment.* During the
first nine months of 2010 we also recorded a $0.5 million
write-down resulting from a renegotiated builder note
receivable in the residential segment. [Emphasis added].

\*       \*       \*

**Consolidated Statements of Income**

|  | **Quarter End Sept. 30, 2010** |
|---|---|
| Impairment Losses | -- |
| Pre-tax Income (Loss) from Continuing Operations | ($21,649,000) |
| Net (Loss) Income | ($13,126,000) |
| Net Income Per Share | ($0.14) |

\*       \*       \*

**Summary Balance Sheet**

|  | **Sept. 30, 2010** |
|---|---|
| **Assets** |  |
| Investments in real estate | $746,791,000 |

133.    The statements in ¶¶ 131-32 were materially false and misleading when
made for substantially the same reason as set forth in ¶ 93.

**H.    The Truth Is Revealed**

134.    On October 13, 2010, the truth about the carrying values for St. Joe's
residential real estate was finally revealed.  David Einhorn ("Einhorn"), an investor with
a short position in St. Joe's stock, had conducted an extensive investigation into St. Joe's
residential real estate development business.  Einhorn undertook an in-depth analysis of
the current value of certain of St. Joe's residential real estate projects that were in
development, relying on, *inter alia*, detailed information gleaned from tax assessment

records, Freedom of Information Act requests, Florida county public records, and on-the-ground surveillance of St. Joe's properties.  His conclusions shocked the market and, following the presentation of his findings, St. Joe's stock plummeted 9.7% in a single day.

135.   Based on his investigation, which includes evidence similar to the evidence set forth at ¶¶ 30-88, 171-85, Einhorn concluded that St. Joe had impermissibly failed to take the necessary and required impairment charges to its residential real estate projects in development, because it was not possible for the value of the properties to meet or exceed their stated carrying values.  Einhorn presented his investigation and conclusions to the investing public at the Value Investing Congress, in a presentation entitled "Field of Schemes: If You Build It, They Won't Come."[41]  As *Reuters* subsequently reported, Einhorn's presentation notes that St. Joe's "development plans have fallen flat, leaving it with 'ghost towns' and inevitable writedowns."  Einhorn also stated how the Company "was 'stuck' after making an aggressive bet on beachfront developments that have gone nowhere, and that it was overvaluing the real estate holdings on its books," and that "[t]here's little evidence of how Joe spent so much money on these developments.  Many developments are ghost towns and little value remains."  In addition, Einhorn stated that "[w]ith the popping of the bubble, Joe's business has practically stopped."

---

[41] The presentation included a 139-page slide show of the Company's real estate holdings, including footage and film of St. Joe's developments.

136.    On this news, shares of the Company's stock fell $2.38 per share, or 9.7

percent, to close on October 13, 2010 at $22.16 per share, on unusually heavy trading

volume.

137.    After the close of the market on October 13, 2010, *Bloomberg* published

an article entitled "Einhorn Says St. Joe Needs 'Substantial' Writedowns."  The article

recounted:

> St. Joe Co.'s shares plunged after David Einhorn, who
> profited from bets against Lehman Brothers Holdings Inc.
> in 2008, said the Florida real-estate firm must take
> "substantial" asset-impairment charges and that further
> building will drive the stock price to zero.
>
> "The best properties have been sold, many lots were sold to
> speculators during the boom, and when the boom ended,
> business essentially stopped," Einhorn, who runs hedge-
> fund operator Greenlight Capital Inc., said today at the
> Value Investing Congress in New York.  "There's little
> evidence of how Joe spent so much money on these
> developments.  Many developments are ghost towns and
> little value remains."
>
> *         *         *
>
> The company is accounting for untouched land as
> developed, Einhorn said.  Also, St. Joe's RiverTown
> community is a "moonscape," and WaterSound is empty,
> he said.
>
> "Joe's highest and best use is to return to a rural land
> company," he said.  "Management should sell the
> company, but it can't because the stock price is too high."

138.    The following day the Company's shares declined an additional $2.42 per

share, or 10.9 percent, to close on October 14, 2010 at $19.74 per share, again on

unusually heavy trading volume.  Over these two days, St. Joe's shares declined a total of

$4.80 per share, or over 19.5 percent.

I.     **Failure to Comply with SEC Regulations and**
       **Generally Accepted Accounting Principles ("GAAP")**

139.   All of the financial statements issued by St. Joe during the relevant periods

alleged herein, including those set forth in its press releases, Forms 10-Q, 10-K and other

SEC filings issued by the Company, were materially misleading because they failed to

comply with Generally Accepted Accounting Principles and SEC rules as set forth

herein.

1.     **Failure to Comply With Regulation S-K, Item 303**

140.   Federal Regulations strictly govern what must be included in documents

filed with the SEC.  The SEC regulates statements by companies "that can reasonably be

expected to reach investors and the trading markets, whoever the intended primary

audience." SEC Release No. 33 6504, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120, at 17,095, 17

C.F.R. § 241.20560 (Jan. 13, 1984).  In addition to the periodic reports required under the

Exchange Act, management of a public company has a duty promptly "to make full and

prompt announcements of material facts regarding the company's financial condition."

SEC Release No. 34 8995, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120A, at 17,095, 17 C.F.R. §

241.8995 (Oct. 15, 1970).  The SEC has emphasized that "[i]nvestors have legitimate

expectations that public companies are making, and will continue to make, prompt

disclosure of significant  corporate developments." SEC Release No. 18271, [1981 1982

Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,049, at 84,618 (Nov. 19, 1981).

141.   Regulation S-K provides, in part, that annual and period reports must

contain a section entitled "management's discussion and analysis of financial condition

and results of operations" (the "Management Discussion").   *See* 17 C.F.R. § 229.10, *et*

*seq.*

142.    Item 303 of Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), governs

what must be contained in the Management Discussion.  Item 303 requires, in part, that

the Management Discussion must:

> Discuss registrant's financial condition, changes in
> financial condition and results of operations.  The
> discussion shall provide information as specified in
> paragraphs (a)(1) through (5) of this Item and also shall
> provide such other information that the registrant believes
> to be necessary to an understanding of its financial
> condition, changes in financial condition and results of
> operations.

143.    Paragraph (a)(3) of Item 303 requires, in part, that the Management

Discussion discuss a company's "results of operations" as follows:

> (i)  Describe any unusual or infrequent events or
> transactions or any significant economic changes that
> materially affected the amount of reported income from
> continuing operations and, in each case, indicate the extent
> to which income was so affected.  In addition, describe any
> other significant components of revenues or expenses that,
> in the registrant's judgment, should be described in order to
> understand the registrant's results of operations.

> (ii)  Describe any known trends or uncertainties that have
> had or that the registrant reasonably expects will have a
> material favorable or unfavorable impact on net sales or
> revenues or income from continuing operations.  If the
> registrant knows of events that will cause a material change
> in the relationship between costs and revenues (such as
> known future increases in costs of labor or materials or
> price increases or inventory adjustments), the change in the
> relationship shall be disclosed.

144.    The instructions in the Notes to Item 303 provide the requirements for

public companies like St. Joe.  Instructions 1 - 3 provide:

> 1. The registrant's discussion and analysis shall be of the
> financial statements and of other statistical data that the
> registrant believes will enhance a reader's
> understanding of its financial condition, changes in
> financial condition and results of operations. Generally,
> the discussion shall cover the three year period covered
> by the financial statements and shall use year-to-year
> comparisons or any other formats that in the registrant's
> judgment enhance a reader's understanding.  However,
> where trend information is relevant, reference to the five
> year selected financial data appearing pursuant to Item
> 301 of Regulation S-K (§ 229.301) may be necessary.
>
> 2. The purpose of the discussion and analysis shall be to
> provide to investors and other users information
> relevant to an assessment of the financial condition and
> results of operations of the registrant as determined by
> evaluating the amounts and certainty of cash flows from
> operations and from outside sources.
>
> 3. The discussion and analysis shall focus specifically on
> material events and uncertainties known to management
> that would cause reported financial information not to
> be necessarily indicative of future operating results or of
> future financial condition.  This would include
> descriptions and amounts of (A) matters that would
> have an impact on future operations and have not had an
> impact in the past, and (B) matters that have had an
> impact on reported operations and are not expected to
> have an impact upon future operations.

145.    The Officer Defendants had knowledge of material adverse information

concerning the recoverability of the carrying values of certain real estate projects in

development, and the effects that the lack of recoverability of those carrying values

would – and did – have on St. Joe and its financial statements during the Class Period.

These Defendants knew that the decrease in sales prices and sales volume, and the

Company's decision to halt development, would necessarily negatively affect the value of St. Joe's assets, yet failed to disclose this to the public. The Officer Defendants had an obligation to disclose the financial impact on, and concomitant risks to, St. Joe pursuant to Regulation S-K, Item 303. Their failure to adequately disclose this information renders St. Joe's Class Period SEC filings materially incomplete, false and misleading. Irrespective of St. Joe's trend and risk disclosures, the financial statements were still misleading because "[f]inancial statements not in conformity with GAAP are presumed to be inaccurate or misleading, notwithstanding explanatory disclosures in footnotes or in the accountant's report." SEC Division of Corporate Finance Accounting Disclosure Rules And Practices training material March 31, 2000 and December 2010-Topic Four.

### 2. Failure to Comply With Regulation S-X and GAAP.

146. At all relevant times during the Class Period, St. Joe represented that its financial statements were prepared in conformity with GAAP. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.

147. Prior to September 15, 2009 the hierarchy of authoritative GAAP literature was as follows. The highest authority was comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Statements ("SFAS"), FASB Interpretations ("FIN"), APB Opinions ("APB"), and AICPA Accounting Research Bulletins ("ARB"). GAAP provided other authoritative pronouncements including, among others, AICPA Statements of Position ("SOP"), Consensus Positions of

the FASB Emerging Issues Task Force ("EITF"), and the FASB Concept Statements ("SFAC").

148.    On July 1, 2009 the Financial Accounting Standards Board launched the FASB Accounting Standards Codification as the single source of authoritative nongovernmental U.S. generally accepted accounting principles. The Codification became effective for interim and annual periods ending after September 15, 2009. As a result of the Codification all existing standards documents are superseded as described in SFAS No. 168, "The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles." Instead of issuing new FASB standards, the FASB now issues FASB Accounting Standards Updates ("ASU"). The Codification did not change existing GAAP, it only introduced a newly organized structure.

149.    St. Joe's annual and interim (*e.g.*, quarterly) financial statements must be prepared in accordance with GAAP. The SEC requires GAAP presentation in Regulation S-X, 17 C.F.R. §210.4-01(a)(1), which provides that financial statements filed both annually and quarterly with the SEC must comply with GAAP, except quarterly statements are not required to have the same level of footnote disclosure. If the filings do not comply with GAAP, they are "presumed to be misleading and inaccurate," despite footnote or other disclosure. *See* Regulation S-X, 17 C.F.R. §210.4-01(a)(1).

150.    Moreover, as set forth in SFAC No. 1, "Objective of Financial Reporting by Business Enterprises," one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented. For example, SFAC No. 1, ¶ 42 states:

> Financial reporting should provide information about an
> enterprise's financial performance during a period.
> Investors and creditors often use information about the past
> to help in assessing the prospects of an enterprise. Thus,
> although investment and credit decisions reflect investors'
> and creditors' expectations about future enterprise
> performance, those expectations are commonly based at
> least partly on evaluations of past enterprise performance.

151. Management is responsible for preparing financial statements that

conform to GAAP. As noted by Public Company Accounting Oversight Board (PCAOB)

professional standards, AU Section 110, "Responsibilities and Functions of the

Independent Auditor":

> Financial statements are management's responsibility…
>
> Management is responsible for adopting sound accounting
> policies and for establishing and maintaining internal
> controls that will, among other things, record, process,
> summarize, and report transactions consistent with
> management's assertions embodied in the financial
> statements. The entity's transactions and the related assets,
> liabilities and equity are within the direct knowledge and
> control of management… Thus, the fair presentation of
> financial statements in conformity with Generally Accepted
> Accounting Principles is an implicit and integral part of
> management's responsibility.

152. In Securities Act Release No. 6349 (September 8, 1981), the SEC stated

that:

> [I]t is the responsibility of management to identify and
> address those key variables and other qualitative and
> quantitative factors which are peculiar to and necessary for
> an understanding and evaluation of the individual company.

153. In Accounting Series Release 173, the SEC reiterated the duty of

management to present a true representation of a company's operations:

> [I]t is important that the overall impression created by the
> financial statements be consistent with the business realities
> of the company's financial position and operations.

154.    As such, GAAP imposes upon public companies, such as St. Joe, a duty

to:

> (i)   disclose in periodic reports filed with the SEC "known
> trends or any known demands, commitments, events or
> uncertainties" that are reasonably likely to have a material
> impact on a company's sales revenues, income or liquidity,
> or cause previously reported financial information "not to
> be necessarily indicative of future operating results or
> future financial condition."  17 C.F.R. § 229.303(a)(1)-3(3)
> and Instruction 3; and

> (ii)  "make full and prompt announcements of material
> facts regarding the company's financial condition," as
> "[i]nvestors have legitimate expectations that public
> companies are making, and will continue to make, prompt
> disclosure of significant corporate developments."  SEC
> Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶
> 23,120A, at 17,095 17 C.F.R. § 241.8995 (October 15,
> 1970); SEC Release No. 18271, [1981-1982 Transfer
> Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,049, at 84,618
> (November 19, 1981).

155.    Pursuant to these requirements, and as detailed herein, the Defendants

caused St. Joe to represent that the Company's financial statements complied with SEC

regulations and were prepared in conformity with GAAP in all material respects, when,

in reality, they did not.  As a result, St. Joe's financial statements were materially false

and misleading.  *See* Regulation S-X, 17 C.F.R. § 210.4-01(a)(1).

156.    The Company's financial statements during the Class Period were

materially false and misleading because the Company overstated the value of its

residential real estate assets due to its failure to timely and adequately record impairment

charges for its assets under development.  St. Joe falsely and fraudulently reported

prospects for future cash inflows and its ability to recover its capitalized costs.  As a

result, St. Joe failed to adequately disclose material facts regarding the extent to which

income was affected throughout the Class Period.

157.    In accordance with Codification Subtopic 360-10 (formerly SFAS No. 144

Accounting for the Impairment or Disposal of Long-Lived Assets) there is essentially a

three-step process for recording an impairment loss for assets that are held and used.  St.

Joe had significant assets under development throughout the Class Period, which were

classified as held for use.

158.    The first step in the process is to determine when to evaluate an asset for

recoverability.  According to ASU 360-10-35-21 "a long-lived asset shall be tested for

recoverability whenever events or changes in circumstances indicate that its carrying

amount may not be recoverable."  Examples of changes in events or circumstances

include the following:

> a. A significant decrease in the market price of a long-lived asset (asset group)
>
> b. A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition
>
> c. A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator
>
> d. A accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group)

e. A current-period operating or cash flow loss combined with a history of operating cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-term lived asset (asset group)

f. A current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life.  The term *more likely than not* refers to a level of likelihood that is more than 50 percent.

159.    Once it is determined to evaluate a long-lived asset for recoverability, which the Company has acknowledged was necessary by purportedly performing an impairment analysis for every quarter during the Class Period, the next two steps are to perform a recoverability test to determine if there is any impairment and, if necessary, record an impairment loss based on the fair value of the particular long-lived asset.  This process is described in the following paragraph:

An impairment loss shall be recognized only if the carrying of a long-lived asset (asset group) is not recoverable and exceeds its fair value.  [Step two;] The carrying amount of a long-lived asset (asset group) is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group).  That assessment shall be based on the carrying amount of the asset (asset group) at the date it is tested for recoverability, whether in use…or under development….[Step three;] An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value. [ASU 360-10-35-17]

160.    Once an asset is impaired, the adjusted carrying amount becomes the new cost basis and restoration of a previously recognized impairment loss is prohibited.  [ASU 360-10-35-20]

161.    GAAP requires that the estimates used by management to test for
recoverability *must be reasonable*.  Paragraph 35-30 of ASU 360-10 states "[e]stimates
of future cash flows used to test the recoverability of a long-lived asset (asset group) shall
incorporate the entity's own assumptions about its use of the asset (asset group) and *shall
consider all available evidence*.  The assumptions used in developing those estimates
*shall be reasonable* in relation to the assumptions used in developing other information
used by the entity for comparable periods, such as internal budgets and projections,
accruals related to incentive compensation plans, or information communicated to
others..." [emphasis added].

162.    GAAP addresses timing of cash flows as follows: "Estimates of future
cash flows used to test the recoverability of a long-lived asset (asset group) shall be made
for the remaining useful life of the asset (asset group) to the entity…"  [ASU 360-10-35-
31 ]

163.    GAAP also specifically addresses estimates of future cash flows for assets
under development and for assets under development that are part of an asset group that
is in use:

> Estimates of future cash flows used to test the
> recoverability of a long-lived asset (asset group) that is
> under development shall be based on the expected service
> potential of the asset (group) when development is
> substantially complete.  Those estimates shall include cash
> flows associated with all future expenditures necessary to
> develop a long-lived asset (asset group), including interest
> payments that will be capitalized as part of the cost of the
> asset (asset group)…  [ASU 360-10-35-34 ].

> If a long-lived asset that is under development is part of an
> asset group that is in use, estimates of future cash flow used

> to test the recoverability of that group shall include the cash
> flows associated with future expenditures necessary to
> maintain the existing service potential of the group…as
> well as the cash flows associated with all future
> expenditures necessary to substantially complete the asset
> that is under development (see the preceding paragraph)…
> [ASU 360-10-35-35 ]

164.    The guidance for assets held for sale is different than for long-lived assets to be held and used.  For long-lived assets classified as held for sale GAAP requires that "long-lived assets shall be measured at the lower of its carrying amount or fair value less cost to sell…."  [ASU 360-10-35-43]  The expected gain or loss on sale "shall be recognized for any initial or subsequent write-down to fair value less cost to sell.  A gain shall be recognized for any subsequent increase in fair value less cost to sell, but not in excess of the cumulative loss previously recognized (for a write-down to fair value less cost to sell)."  [ASU 360-10-35-40]

165.    Prior to 2008, in measuring the fair value of an asset (Step 3) SFAS No. 144 provided the following guidance:

> The fair value of an asset…is the amount at which that
> asset…could be bought (incurred) or sold (settled) in a
> current transaction between willing parties, that is, other
> than in a forced or liquidation sale.  Quoted market prices
> in active markets are the best evidence of fair value and
> shall be used as the basis for the measurement, if available.
> However, in many instances, quoted market prices in active
> markets will not be available for the long-lived assets (asset
> groups) covered by this Statement.  In those instances, the
> estimate of fair value shall be based on the best information
> available, including prices for similar assets (groups) and
> the results of using other valuation techniques. [FAS 144 §
> 22]

> A present value technique is often the best available valuation technique with which to estimate the fair value of a long-lived asset (asset group)… [FAS 144 § 23]
>
> If a present value technique is used, estimates of future cash flows shall be consistent with the objective of measuring fair value. Assumptions that marketplace participants would use in their estimates of fair value shall be incorporated whenever that information is available without undue cost and effort…Otherwise, the entity may use its own assumptions. [FAS 144 § 24]

166.    Beginning in 2008, St. Joe was required to follow the guidance of SFAS 157, "Fair Value Measurements" to measure the fair value of its assets. SFAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The definition focuses on the price that would be received to sell the asset (an exit price), not the price that would be paid to acquire the asset (an entry price). Fair value is intended to be a market-based measurement, not an entity-specific measurement.

167.    To make these measurements market-based, paragraphs 22-30 of FAS 157 create a "fair value hierarchy" that distinguishes among three levels of value:

> (1) Level One: Observable inputs based on market data obtained from sources independent of the reporting entity, including most frequently the quoted prices (unadjusted) in active markets for identical assets or liabilities at the measurement date;
>
> (2) Level Two: Observable inputs other than quoted prices for the asset or liability, either direct or indirect, including:
>
> > (a) Quoted prices for similar assets or liabilities in active markets.
> >
> > (b) Quoted prices for identical/similar assets or liabilities in markets that are not active; i.e., in which there are few transactions for the asset or

liability, the prices are not current, or price quotations vary over time or among market makers (some brokered markets), or in which little information is released publicly (a principal-to-principal market).

(c) Observable inputs other than quoted prices for the asset or liability (e.g., interest rates and yield curves observable at commonly quoted intervals, volatilities, prepayment speeds, loss severities, credit risks, and default rates).

(d) Inputs that are derived principally from or corroborated by observable market data by correlation or other means (market-corroborated inputs); and

(3) Level Three: Unobservable inputs, developed from the reporting entity's assessment of market participant assumptions, based on the best information available under the circumstances.

168.    In particular, the notion of unobservable or Level 3 inputs applies when there is little, if any, market activity for the asset or liability at the measurement date. As the Summary to FAS 157 explains: "In those situations, the reporting entity need not undertake all possible efforts to obtain information about market participant assumptions. However, the reporting entity must not ignore information about market participant assumptions that is reasonably available without undue cost and effort."

169.    Additionally, SFAS 157 preserved SFAS 144 ¶23, but amended it to state, "For long-lived assets (asset groups) that have uncertainties both in timing and amount, an expected present value technique will often be the appropriate technique with which to estimate fair value."

170.   Thus, in assessing the recoverability of its real estate, St. Joe should have considered certain core factors when estimating its future cash flows, including (1) the impact of market supply and demand; (2) the rate of sales and inventory on the market; (3) selling prices including sales incentives; (4) current sales; (5) anticipated land development and future development costs to be incurred including interest and overhead costs; (6) price erosion; (7) the time to complete the project and sell its units; and (8) risks specific to each land parcel or community.

**J.    Additional Indicia of Scienter**

**1.    Defendants' Knowledge of Average
Sales Prices on St. Joe's Properties**

171.   The Officer Defendants' knowledge of the falsity of St. Joe's public statements regarding the carrying values of its residential real estate investments is established by the Company's public filings[42] and public records.  In 2007, St. Joe took a $7.8 million impairment charge for *all* of its residential real estate home and homesites. RiverTown alone had a carrying value of $65,615,000.  In 2007, St. Joe sold six lots in RiverTown at an average sales price of $72,133.  Based on this average price, the 185 remaining lots would have a value of $13,344,605, in stark contrast to the stated carrying

---

[42] Carrying values are only provided in the Company's year-end filings, and then only on a per county basis, making it almost impossible to determine the carrying values for lots and properties in counties containing multiple residential real estate projects. Similarly, in the periods when St. Joe did take impairment charges for residential real estate, the Company did not specifically identify the properties that were impaired.

value of more than $65 million, in the same year the Company took only $7.8 million in impairment charges for *all* of its homes and homesites.[43]

172.    In 2008, St. Joe took an impairment charge of $12 million for *all* residential real estate.  At RiverTown alone, the carrying value was $77,143,000[44] in 2008 and $74,491,000 in 2009.  Defendants knew of the complete real estate market crash at the time.  St. Joe sold three RiverTown homesites in the first quarter of 2008 for an average price of $72,500 and none for the rest of the year.  Based on these comparable sales, the fair value for the 185 remaining developed RiverTown lots in 2008 was only $13,412,500 (an average price of $72,500 x 185 developed lots), while St. Joe was carrying the project for over $77 million.  However, the Company took just $12 million in impairment charges for *all* of its residential real estate homes and homesites in that year.  Defendants, therefore, materially, falsely and fraudulently misrepresented the carrying values of the Company's assets, failed to take appropriate impairment charges in violation of GAAP and materially overstated the Company's earnings.

173.    St. Joe did not sell another lot in RiverTown until the third quarter of 2009, when it sold two lots for an average sales price of just $31,250.  Thus, in 2009 the fair value of the 185 remaining developed lots at RiverTown had decreased to

---

[43] In 2007, St. Joe took another $5.2 million of impairment charges related to abandoned development plans, for a total of $130 million in residential real estate impairment charges.

[44] St. Johns Golf & Country Club was also located in St. Johns county.  However, St. Johns Golf & Country Club was virtually sold out, with only one unit remaining in 2008, and therefore had a negligible effect on the Company's financial statements. Accordingly, the entire residential real estate carrying value for St. Johns County in 2008 is attributable to RiverTown.  St. John's Golf & Country Club was not listed as a project in development in the Company's 2009 Form 10-K.

$5,781,250, in contrast to the reported carrying value of $75 million in 2009.  For *all* of its homes and homesites, the Company took an impairment charge of just $7.3 million.[45] The Officer Defendants, therefore, materially, falsely and fraudulently misrepresented the carrying values of the Company's assets, failed to take appropriate impairment charges in violation of GAAP and materially overstated the Company's earnings.

174.    Defendants also possessed knowledge that the reported carrying value for SummerCamp Beach was overstated.  St. Joe did not sell any homes or homesites in SummerCamp Beach in 2008.  It sold only two homesites in 2009 for an average sales price of $184,450, and then only four more beachfront lots in the third quarter of 2010 for an average sales price of $330,000.  St. Joe also listed interior lots for a high price of only $59,000.[46]  In 2008, however, St. Joe reported a carrying value of $41,218,000 for SummerCamp Beach, and a carrying value of $41,768,000 in 2009.  There were 23 remaining developed beachfront lots and 121 remaining developed interior lots.[47]  Even assuming the highest average sales price numbers, the value of those remaining lots would have been $14,850,000 – over $26 million *less* than the assigned carrying values in 2008 and 2009.   Notwithstanding this evidence, the Company took just $12 million and $7.3 million in impairment charges for *all* residential real estate homes and homesites in 2008 and 2009, respectively.  Accordingly, the Officer Defendants materially, falsely and

---

[45] In 2009, St. Joe took another $7.2 million impairment charges in residential real estate related to abandoned development plans for a total of $14.5 million in residential real estate impairment charges.

[46] Einhorn Presentation, "Field of Schemes: If You Build It, They Won't Come," citing listing for exclusive SummerCamp Beach agent.

[47] Einhorn Presentation, "Field of Schemes: If You Build It, They Won't Come," citing Franklin County Tax Appraiser Office.

fraudulently misrepresented the carrying value of the Company's residential real estate assets, failed to take the appropriate impairment charges as required by GAAP and materially overstated its earnings.

175. CW4 further confirmed that the 2007 carrying value of $48,201,000 for the SouthWood project in Leon County was overstated. According to CW4, St. Joe developed about 50 to 75 SouthWood lots at a time, so the Company would have about that many lots on the books at any given time. Thus, the 2007 carrying value of approximately $48 million, spread over 50 to 75 lots, suggests that St. Joe would be able to recover between $960,000 and $640,000 per lot – a highly unrealistic number according to CW4, given market conditions and recent sales history. CW4 explained that, in 2007, SouthWood did not have many lots for sale, but had approximately 2000 entitlements. However, those entitlements were of only nominal value, because of the difficulty in obtaining permits in Tallahassee, where SummerCamp Beach is located, and because costs of infrastructure were high. CW4 explained that St. Joe and the Officer Defendants could not realistically expect any significant profit when the development costs exceeded the price that St. Joe could obtain for developed lots.

176. In addition to its quarterly meetings described in ¶ 66, the Management Committee had weekly calls in which Greene, Rummell and McCalmont also participated. On these calls the regional general managers provided updates on each of the projects in their regions. Thus, Greene and Rummell and McCalmont were constantly updated on the status of each of St. Joe's residential real estate projects.

### 2. Defendants' Fair Value Analyses Grossly Differ From Their Undiscounted Future Cash Flow Analyses

177.    The sale of St. Joe's Victoria Park property further demonstrates Defendants' knowledge that the Company was overstating the value of its residential real estate assets.  Victoria Park was a residential real estate development project in Volusia County.  In 2009, St. Joe sold all of its remaining assets in the Victoria Park development for $11 million.  The carrying value just before the sale, by contrast, was $78.8 million. The Company announced in a December 18, 2009 press release that on December 15, 2009, the Company determined that material conditions for the $11 million sale had been met, and that St. Joe had taken an impairment charge of $67.8 million just *two days* before the sale closed.

178.    Prior to the Victoria Park sale, the Company had not taken any impairment charges to the property, falsely and fraudulently leading the market to believe that the value of the property was completely recoverable.  When forced to categorize the project as "held for sale," however, which mandates a fair value analysis based on current market conditions, the Company took an impairment charge for *over 80%* of the project's purported carrying value.  The huge discrepancy between the undiscounted cash flow analysis used to evaluate impairment and the fair value analysis mandated by the sale supports the notion that Defendants knew the value of the Company's residential real estate assets were materially overstated.

179.    In late 2007, Defendant Greene asked CW4 to become familiar with the values of all of St. Joe's residential real estate developments because St. Joe planned either to sell or to engage in strategic joint venture deals for certain of its properties.

Greene asked CW4 to participate in negotiating with potential buyers or partners. As part of this process, CW4 produced a 15-20 tab spreadsheet setting forth the revenue, cost and income of the respective projects he reviewed. CW4 determined the business plans that St. Joe had for properties including Seven Shores, Victoria Park and RiverTown, did not make any sense because they were using sales and absorption rates that were unrealistically high. CW4 also created versions of these spreadsheets to provide to potential buyers or partners, using realistic sales prices and absorption rates. CW4 derived materially lower values than those reported in the Company's fraudulently misleading SEC filings.

180.   CW4 confirmed that the Officer Defendants knew the 2007 carrying vale for Victoria Park, a property CW4 analyzed in his spreadsheets, was overstated. According to CW4, St. Joe recorded a much higher book value for Victoria Park than its true value. CW4 explained that builders were selling homes for approximately $250,000 to $300,000, and that sophisticated national builders would not pay more than 20% of the projected gross sales price for the land. Thus, the lots were only worth $40,000 to $60,000. CW4 further stated the undeveloped land at Victoria Park had a *negative* value because the prices builders were willing to pay for undeveloped lots were lower than the cost of developing the land. CW4 prepared an excel spreadsheet model of Victoria Park analyzing its value, and sent it to Defendants Greene and McCalmont, and a financial analyst at the Company. CW4 learned through conversations with Greene and McCalmont that both knew in late 2007 they were not going to be able to recoup the

book value for Victoria Park, and that "it was known that Victoria Park was a loser and they [Greene and McCalmont] wanted to get out."

181.    The Seven Shores development project was similarly written down when it was sold for significantly less than the carrying value on St. Joe's books.  St. Joe carried the project for nearly $45 million and sold it in 2009 for only $7 million.

182.    In April 2008, CW4 wrote a memo to Greene that summarized the status of the troubling asset valuations that CW4 had uncovered at Seven Shores, Victoria Park, and RiverTown.  CW4 was dealing with potential partners offering prices that were significantly lower than the values reflected in St. Joe's business plans for these properties.  CW4 met with the potential partners, but they "were all talking prices that were a fraction of Joe's 2008 business plan."  CW4 concluded that St. Joe's valuations made no sense, as later evidenced by the sales prices of Victoria Park and Seven Shores. CW4 further stated that RiverTown remains highly overvalued, along with the remainder of St. Joe's unsold developments.

### 3.        The February 2008 Stock Offering

183.    The February 2008 stock offering provided Defendants with a significant incentive to underreport necessary impairments and thereby overstate the Company's assets and earnings, to maintain the value of St. Joe stock.  According to CW4, when McCalmont joined the Company, St. Joe had $300 to $400 million in debt and was in jeopardy of violating debt covenants.  To eliminate the debt, the Company offered 17,145,000 shares of common stock for $35.00 a share.  The Company used the proceeds of the offering to pay off substantially all of its outstanding debt.  Had the Company

taken significant impairment charges, it is highly unlikely that it would have received the same high price per share for the offering.

### 4. Defendants Knew the Airport Could Not Justify Carrying Values

184. The new international Panama City airport that the Company repeatedly touted to investors was not a reasonable factor to justify the carrying values of the residential real estate properties discussed above. St. Joe dedicated significant resources to bringing the new airport to Panama City, securing entitlements and permits, and engaging in litigation to secure the airport's re-location. St. Joe also donated 4,000 acres of its land to the Airport Authority for the airport's new location. However, it was unreasonable for St. Joe to rely on the arrival of the airport to substantiate its inflated carrying values. In reality, the new "international" airport is miniscule. Only two airlines, Delta and Southwest, serve the airport with limited flight options. Additionally, in order to convince Southwest to serve the airport, St. Joe had to agree to cover any losses suffered by Southwest in the first three years as result of its business with the new airport.

185. Both the small size of the airport and its location render unreasonable any assessment of the airport's purported effects on its asset values. The airport is in the middle of a pine forest. There are no colleges, commercial districts or dense populations in the area. St. Joe's assumption that the addition of a tiny and limited airport would drive up demand for its real estate, and to use that to justify fraudulently high carrying values, was therefore misleading.

### 5. The Officer Defendants Were Highly Compensated During the Class Period

186.    Throughout the Class Period, the Officer Defendants profited from their false portrayal of the Company's financial health, as St. Joe maintained grossly inflated carrying values on its books.  According to the Company's 2010 proxy, filed on March 29, 2010, Defendant Greene received total compensation of $2,808,270 in 2007, $6,697,540 in 2008 and $2,085,941 in 2009.  He received grant of stock and options that were worth $625,024, $5,423,650 and $1,109,737 on the grant dates in 2007, 2008 and 2009, respectively.[48]  Greene also sold shares of St. Joe stock or exercised his option for a total profit of $1,513,902.85 during the Class Period.

187.    According to the Company's 2009 Proxy, filed on March 31, 2009, Defendant Rummell received total compensation of $2,836,798 in 2007 and $1,400,197 in 2008.  According to his most recent Form 4, filed on October 12, 2007, Rummell owned 1,013,17 St. Joe shares directly and 920,695 shares through an LLC and limited partnerships.

188.    According to the Company's 2010 Proxy, filed on March 29, 2010, Defendant McCalmont received total compensation of $1,256,531 in 2007, $1,593,077 in 2008 and $1,2085,941 in 2009.  He received grant of stock and options that were worth $2,364,415, $986,929 and $428,409 on the grant dates in 2007, 2008 and 2009, respectively.  McCalmont also sold shares of St. Joe's stock or exercised his options for a

---

[48] 2007 Proxy filed on April 13, 2007; 2008 Proxy, filed on March 28 2008; 2009 Proxy filed on March 31, 2009.

total profit of $773,026.52 during the Class Period. Defendant Connolly also sold shares or exercised options for a total profit of $297,399.83 during the Class Period.

### K.  Loss Causation/Economic Loss

189.  Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and the Class.

190.  During the Class Period, as detailed herein, St. Joe and the Officer Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of St. Joe's common stock by improperly and fraudulently understating the required impairment charges for the Company's residential real estate projects in development.

191.  When the Officer Defendants' prior misrepresentations and fraudulent conduct were disclosed, St. Joe's common stock plummeted as the prior inflation was released. As a result of their purchases of St. Joe's common stock during the Class Period, Plaintiff and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

192.  By failing to disclose the true impairment charges that were required in its residential real estate projects, St. Joe and the Officer Defendants presented a misleading picture of St. Joe's business and prospects. These false and misleading statements had the intended effect and caused St. Joe's common stock to trade at artificially inflated levels throughout the Class Period.

101

L.    **Control Person Allegations**

193.    The Officer Defendants, because of their positions of control and authority as senior executive officers and/or directors of the Company, had access to the adverse undisclosed information about the Company's understated impairment charges for the residential real estate sector, and the Company's financials as a whole (including its undiscounted cash flow analyses and the assumptions incorporated for each of the residential real estate properties in development), through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith with St. Joe's business.

194.    Each of the above officers of St. Joe's, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning each of St. Joe's residential real estate properties in development, including its economic models and assumptions and cash flow analyses, financial statements, and financial condition, as alleged herein.

195.    The Officer Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

196.     The Officer Defendants, as senior executive officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Officer Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Officer Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

197.     As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange and governed by the provisions of the federal securities laws, the Officer Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's performance, operations, business, and financial condition and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Officer Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

198.     Each of the Officer Defendants, as well as St. Joe, is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of St. Joe's securities during the Class Period, which included the

dissemination of materially false and misleading statements and concealment or omission of material adverse facts.  The scheme: (i) deceived the investing public regarding St. Joe's core financial statements by improperly accounting for and understating the impairment charges for the carrying values of its residential real estate properties in development; (ii) deceived the investing public regarding the true value of the Company's residential real estate properties; and (iii) caused Plaintiff and other members of the Class to purchase St. Joe's securities at artificially inflated prices, which fell as the truth concerning the true value of the residential real estate properties ultimately became known.

199.    In making the statements complained of herein, the Officer Defendants, who were all senior officers and controlling persons of St. Joe's, were acting on behalf of the Company in the regular course of business.  Therefore, each of the statements made by the Officer Defendants is attributable to the Company.

### M.    <u>No Safe Harbor</u>

200.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false

forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of St. Joe's who knew that those statements were false when made.

### N. Applicability Of Presumption Of Reliance Under The Affiliate Ute Doctrine And/Or, In The Alternative, The Fraud On The Market Doctrine

201.     Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are primarily predicated upon omissions of material fact which there was a duty to disclose.

202.     Plaintiff is entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material information regarding the Company's understated impairment charges and the assumptions that formed the basis of its undiscounted cash flow analyses for residential real estate projects in development, as well as the resulting false financial information reported by St. Joe's throughout the Class Period.

203.     In the alternative, Plaintiff is entitled to a presumption of reliance under the fraud on the market doctrine of the Defendants' material misrepresentations and omissions, because at all relevant times, the market for St. Joe's common stock was an efficient market for the following reasons, among others:

(a)     St. Joe's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)      As a regulated issuer, St. Joe filed periodic public reports with the SEC (and was eligible to file SEC Forms S-1) and the New York Stock Exchange;

(c)      St. Joe regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      St. Joe was followed by numerous investor research services that published publicly available reports, as well as by numerous securities analysts (including Buck Horne of Raymond James & Associates; Sheila McGrath of Keefe Bruyette & Woods; David Cohen of Morgan Stanley; Eric Landry of Morningstar; and Chris Haley of Wachovia Securities) employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

204.    As a result of the foregoing, the market for St. Joe's common stock promptly digested current information regarding St. Joe from all publicly available sources and reflected such information in St. Joe's stock price.  Under these circumstances, all purchasers of St. Joe's common stock during the Class Period suffered similar injury through their purchase of St. Joe's common stock at artificially inflated prices and a presumption of reliance applies.

### III.  CLASS ACTION ALLEGATION RELEVANT TO ALL CLAIMS

205.  Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all purchasers of the securities of St. Joe's (the "Class") between February 19, 2008 and October 12, 2010, inclusive (the "Class Period"), including purchasers of the Company's securities pursuant or traceable to the Company's public offering on or about February 27, 2008, and who were damaged when the truth about St. Joe's business was disclosed.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

206.  The members of the Class are so numerous that joinder of all members is impracticable.  According to the Company's Form 10-Q filed with the SEC on August 5, 2010, St. Joe had over 92 million shares of stock outstanding, owned by thousands of persons.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by St. Joe or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

207.  Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

208. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

209. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period;

(c) whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) to state material facts about the business, operations and management of St. Joe; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

210. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

IV.     **EXCHANGE ACT COUNTS**

### COUNT I

**Violation Of Section 10(b) Of The Exchange Act
And Rule 10b-5(b) Promulgated Thereunder Against
St. Joe and The Officer Defendants**

211.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against St. Joe and the Officer Defendants.

212.    During the Class Period, St. Joe and the Officer Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding St. Joe's business, operations, management and the intrinsic value of St. Joe's common stock; and (ii) cause Plaintiff and other members of the Class to purchase St. Joe's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, these Defendants, and each of them, took the actions set forth herein.

213.    St. Joe and the Officer Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for St. Joe's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All of these Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

214.    St. Joe and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the improper accounting for impairment of residential real estate, in order to manipulate St. Joe's reported financials, as specified herein.

215.    St. Joe and the Officer Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of St. Joe's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about St. Joe's and its business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of St. Joe's common stock during the Class Period.

216.    Each of these Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Officer Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the

Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

217.    St. Joe and the Officer Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing St. Joe's operating condition from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by these Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, these  Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

218.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts regarding the materially understated impairment charges, as set forth above, the market price of St. Joe's securities was

artificially inflated during the Class Period.  In ignorance of the fact that market prices of St. Joe's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants but not disclosed in public statements during the Class Period, Plaintiff and the other members of the Class acquired St. Joe's securities during the Class Period at artificially high prices and were damaged when the value of their securities declined upon disclosure of the truth about the Company's false and misleading statements and omissions.

219.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding St. Joe's financial results, which were not disclosed by St. Joe and the Officer Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their St. Joe securities, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

220.    By virtue of the foregoing, St. Joe and the Officer Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

221.    As a direct and proximate result of such wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### COUNT  II

### Violation Of Section 20(a) Of The Exchange
### Act Against the Officer Defendants

222.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against Greene, McCalmont, Rummell and Connolly.

223.    The Officer Defendants acted as controlling persons of St. Joe's within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Officer Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements regarding St. Joe's core financials, which were materially misstated as set forth above, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

224.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

225.     As set forth above, St. Joe violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## V.     THE SECURITIES ACT CLAIMS

226.     Plaintiff's claims for relief under the Securities Act do not incorporate by reference the paragraphs above, unless specifically noted by paragraph number.

227.     Plaintiff asserts these claims against certain of the Company's officers and directors, as well as Deutsche Bank Securities Inc. ("Deutsche Bank"), for violations of §§ 11, 12(a)(2) and/or 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77(o), on behalf of all persons and entities, other than the Offering Defendants (defined below) and certain related persons and entities, who, purchased or acquired the Company's securities pursuant or traceable to St. Joe's Form S-3ASR Shelf Registration Statement No. 333-149371 dated February 25, 2008, Prospectus dated February 25, 2008, and Prospectus Supplement filed February 27, 2008 (collectively, the "Offering Materials"), and were damaged thereby.  Plaintiff does not allege or intend to

allege any claims or assertions of fraud, and the claims in this section of the Complaint are rooted exclusively in theories of innocent and/or negligent conduct to which the strict liability provisions of the foregoing statutes apply

### A.  Nature Of The Securities Act Claims

228.     St. Joe is one of largest real estate development companies in Florida owning approximately 577,000 acres of land concentrated primarily in Northwest Florida.  Approximately 405,000 acres, or approximately 70 percent of St. Joe's total land holdings, are within 15 miles of the coast of the Gulf of Mexico.  The Company operates through four segments: (1) residential real estate; (2) commercial real estate; (3) rural land sales; and (4) forestry.  St. Joe trades its securities on the New York Stock Exchange under the ticker symbol "JOE".

229.     For more than two years, St. Joe did not take the necessary impairments on its development projects, even though sales of lots in these projects have plummeted, and St. Joe itself has virtually halted development spending in partially developed projects.

230.     Many of St. Joe's residential real estate projects remain largely unfinished and undeveloped, though it reports the projects as "in development."  For example, RiverTown, in St. John's County – one of St. Joe's largest projects – is less than 5% developed, with only 215 lots developed out of a planned 4,500.  Similarly, St. Joe's WindMark project in Gulf County is only 15% developed with 224 lots developed out of a planned 1,516.  The WaterSound and SummerCamp Beach projects in Walton and Franklin counties, respectively, are both less than 50% developed.  Despite these

extremely low development rates in some of the Company's largest residential real estate projects, St. Joe has almost stopped investing money in these projects, and development activity has virtually ceased.

**B.      Jurisdiction And Venue**

231.     The claims asserted herein arise under and pursuant to §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k, 77l(a)(2), and 77o.

232.     This Court has jurisdiction over the subject matter of this action pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v.

233.     Venue is proper in this District pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v; St. Joe's principal executive offices are located within this District.

234.     Many of the acts and omissions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of the materially untrue and misleading Offering Materials, took place in this District.

235.     In connection with the allegations herein, the Defendants named herein, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**C.      Parties**

236.     Lead Plaintiff is defined in ¶ 23 above, which is incorporated by reference.

237.     Lead Plaintiff asserts the claims in this Section of the Complaint on behalf of members of the Class who purchased or acquired St. Joe securities pursuant or

traceable to the Company's public offering of over 17 millions shares of common stock on or about February 27, 2008 (collectively, "Plaintiffs.")

238.    Defendant St. Joe is defined in ¶ 24 above, which is incorporated by reference.

239.    Defendants Rummell, Greene, McCalmont and Connolly are defined in ¶¶ 25-28 above, which are incorporated by reference.

240.    On February 25, 2008, Rummell, Greene, McCalmont and Connolly signed the Registration Statement on Form S-3ASR (Registrant No. 333-149371), pursuant to which the shares in the February 27, 2008 offering were issued.

241.    Rummell, Greene, McCalmont and Connolly signed the 2007 10-K that was incorporated by reference in the Offering Materials.

242.    Defendant Deutsche Bank is an investment bank and acted as an underwriter with respect to the Company's February 27, 2008 public stock offering. Deutsche Bank's US headquarters are located at 60 Wall Street, New York, New York. Deutsche Bank served as a financial advisor and assisted in the preparation and dissemination of the Offering Materials.

243.    The following Defendants are collectively referred to as the "Director Defendants":

(a)      Defendant Michael L. Ainslie ("Ainslie") has served as a member of the Company's Board of Directors since 1998.  He is a member of the Board's Audit and Finance Committee and the Governance and Nominating Committee.  Ainslie signed the 2007 10-K that was incorporated into the Offering

Materials. Ainslie also signed the Company's February 25, 2008 registration statement, pursuant to which the shares in the February 27, 2008 public offering were issued.

(b)     Defendant Hugh M. Durden ("Durden") has served as Chairman of the Company's Board of Directors since August 2008 and was Lead Director from 2003 to 2008. He is a member of the Board's Compensation Committee and Chair of the Governance and Nominating Committee. Durden signed the 2007 10-K that was incorporated into the Offering Materials. Durden also signed the Company's February 25, 2008 registration statement, pursuant to which the shares in the February 27, 2008 public offering were issued.

(c)     Defendant Thomas A. Fanning ("Fanning") has served as a member of the Company's Board of Directors since 2005. He is Chair of the Board's Audit and Finance Committee and a member of the Compensation Committee. Fanning signed the 2007 10-K that was incorporated into the Offering Materials. Fanning also signed the Company's February 25, 2008 registration statement, pursuant to which the shares in the February 27, 2008 public offering were issued.

(d)     Defendant Harry H. Frampton, III ("Frampton") was a member of the Company's Board of Directors from August 2005 to November 2008. Frampton signed the 2007 10-K that was incorporated into the Offering Materials. Frampton also signed the Company's February 25, 2008 registration statement, pursuant to which the shares in the February 27, 2008 public offering were issued.

(e)     Defendant Adam W. Herbert, Jr. ("Herbert") was a member of the Company's Board of Directors from 2004 to 2010.  Herbert signed the 2007 10-K that was incorporated into the Offering Materials.  Herbert also signed the Company's February 25, 2008 registration statement, pursuant to which the shares in the February 27, 2008 public offering were issued.

(f)     Defendant Delores M. Kesler ("Kesler") has served as a member of the Company's Board of Directors since 2004.  She is a member of the Board's Audit and Finance Committee and the Compensation Committee.  Kesler signed the 2007 10-K that was incorporated into the Offering Materials.  Kesler also signed the Company's February 25, 2008 registration statement, pursuant to which the shares in the February 27, 2008 public offering were issued.

(g)     Defendant John S. Lord ("Lord") has served as a member of the Company's Board of Directors since 2000.  He is a member of the Board's Audit and Finance Committee, Chair of the Compensation Committee, and a member of the Governance and Nominating Committee.  Lord signed the 2007 10-K that was incorporated into the Offering Materials.  Lord also signed the Company's February 25, 2008 registration statement, pursuant to which the shares in the February 27, 2008 public offering were issued.

(h)     Defendant Walter L. Revell ("Revell") has served as a member of the Company's Board of Directors since 1994.  He is a member of the Board's Audit and Finance Committee and the Governance and Nominating Committee.  Revell signed the 2007 10-K that was incorporated into the Offering

Materials. Revell also signed the Company's February 25, 2008 registration statement, pursuant to which the shares in the February 27, 2008 public offering were issued.

(i) Defendant William H. Walton, III ("Walton") was a member of the Company's Board of Directors from 2004 to May 2008. Walton signed the 2007 10-K that was incorporated into the Offering Materials. Walton also signed the Company's February 25, 2008 registration statement, pursuant to which the shares in the February 27, 2008 public offering were issued.

244. St. Joe, Rummell, Greene, McCalmont, Connolly, the Director Defendants, and Deutsche Bank are collectively referred to herein as the "Offering Defendants."

**D.** **Substantive Allegations**

245. Around the time of the February 27, 2008 offering, residential real estate development made up the overwhelming majority of St. Joe's business. In 2007, St. Joe's investment in residential operating and development properties comprised almost 85% of its entire investment in real estate. Correspondingly, residential real estate made up 67.1% of St. Joe's total assets in 2007.

246. Also around the time of the February 27, 2008 offering, Florida was experiencing one of the largest real estate crashes in decades. Empirical evidence, as well as the Company's disclosures, reveal the devastation of the real estate market in Florida – one of the first states affected by the deteriorating real estate market nation-wide.

247.    St. Joe reported a loss in revenues from its residential real estate segment – its largest asset – of over $43 million in 2007, down from positive revenues of $24 million in 2006.  In 2008, the trend worsened, in a reflection of the deteriorating real estate market, with St. Joe reporting a loss of over $115 million.  Similarly, St. Joe's sales of home and homesites decreased from 1,260 in 2006 to 478 in 2007, to 122 in 2008.  From 2006 to 2007 alone, St. Joe's sales dropped by over $200 million.

248.    In 2006, St. Joe spent $570,925,000 on its operating properties.  In 2007, that amount plummeted almost 60% to $227,675,000.  St. Joe has since virtually ceased development activity on its residential real estate projects.

249.    At the same time the Company was essentially halting its development activities, however, it failed to take any significant impairment charges to its residential real estate properties, even though (1) plummeting real estate values in the Florida market; and (2) lack of further development.

250.    As a result, the Offering Materials contained materially false carrying values for St. Joe's projects, which remained unimpaired, even as the real estate market was imploding and St. Joe halted development.

251.    As further evidence that St. Joe's values were overstated, St. Joe recognized a $68 million impairment on its Victoria Park property under a fair value analysis, which it was compelled to perform in order to effectuate the sale of that property, even though it had reported under the preceding quarter that Victoria Park, with a stated carrying value of $79 million, did *not* require an impairment.

252.    On February 27, 2008, St. Joe conducted a public offering of 17,145,000 shares of common stock.  The shares were issued pursuant to a Registration Statement on Form S-3ASR (Registrant No. 333-149371), dated February 25, 2008 and underwritten by Deutsche Bank, who offered shares for sale to the investing public.  The Offering Defendants issued a Prospectus dated February 25, 2008 that was part of the Registration Statement, which described the securities St. Joe was able to offer generally under the Company's shelf registration statement.  The Defendants charged in this section of the complaint also filed a Prospectus Supplement on February 27, 2008 that specifically described the February 27, 2008 offering.  The Prospectus incorporated by reference St. Joe's 2007 annual report, filed with the SEC as its 2007 10-K.  The shares were traded on the NYSE.

253.    The February 27, 2008 Prospectus Supplement stated that "[a] prospectus supplement and the accompanying prospectus in electronic format are being made available on an Internet web site maintained by the underwriter [Deutsche Bank]."  Thus, Deutsche Bank distributed the prospectus to the investing public, through its web site.

254.    The 2007 10-K that was incorporated by reference in the February 25, 2008 Prospectus contained the following materially false and misleading statements:

255.    On February 25, 2008, the Company filed its 2007 Annual Report with the SEC on Form 10-K.  The Company's Form 10-K reaffirmed the Company's 2007 financial results, financial position, and the reported value of the Company's investment in real estate as previously announced on February 19, 2008.  With respect to the Company's asset impairment costs, St. Joe's 2007 Annual Report stated:

*During 2007, we recorded total asset impairment costs of $23.2 million, $13.0 million of which related to the write down of capitalized costs at certain projects due to changes in development plans and the impairment of completed homes in several of our communities due to current market conditions.* If market conditions were to continue to deteriorate, and the market values for our home sites, remaining homes held in inventory and other project land were to fall below the book value of these assets, we would need to take additional write-downs of the book value of these assets. Any such write-downs would decrease the value of these assets on our balance sheet and would reduce our net income.

*     *     *

*Impairment Losses.* We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. *Homes and home-sites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell.* For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing service potential of the project and *using management's best estimates about future sales prices and holding periods.* The decline in demand and market prices for residential real estate caused us to conclude that carrying amounts within our residential real estate segment may not be recoverable, and we performed an impairment analysis. *As a result of our impairment analyses, we recorded an impairment charge of $13.6 million in the residential real estate segment.*

*     *     *

In 2007 we recorded impairments totaling $13.6 million primarily due to current adverse market conditions for residential real estate. Approximately $5.2 million of the impairments related to capitalized costs at certain projects due to changes in development plans, approximately $7.8 million related primarily to completed spec homes in several communities and approximately $0.6 million

123

related to the modified terms of certain promissory notes. [Emphasis added].

\*     \*     \*

**Consolidated Results**

| | Year End Dec. 31 | |
|---|---|---|
| | 2007 | 2006 |
| Impairment Losses | $13,609,000 | -- |
| Pre-tax Income from Continuing Operations | $18,406,000 | $53,046,000 |
| Net Income | $39,207,000 | $51,020,000 |
| Net Income Per Share | $0.53 | $0.69 |

\*     \*     \*

**Balance Sheet**

| | December 31, 2007 | December 31, 2006 |
|---|---|---|
| **Assets** | | |
| Investments in real estate | $943,540,000 | $1,213,500,000 |

256.    These statements were false and misleading because they overstated the true carrying value of St. Joe's residential real estate properties, understated the Company's impairment losses and overstated its earnings and earnings per share.

257.    It was not until the October 13, 2010 Einhorn presentation that the truth about the actual impaired values of St. Joe's properties was disclosed. Plaintiff could not have discovered the truth about the Company's carrying values until Einhorn's presentation because that compilation of information was not reasonably available to investors.

258.    In response, St. Joe's stock plummeted 9.7%, with 12,828,900 shares traded on unusually heavy volume (compared with an average daily volume over the

Class Period of 1,093,197 shares), causing Plaintiffs to suffer economic damages as the prior inflation in their shares was released.

## VI.    SECURITIES ACT COUNTS

### COUNT  III

**For Violations Of § 11 Of The Securities Act
Against St. Joe, Rummell, Greene, McCalmont,
Connolly, the Director Defendants and Deutsche Bank**

259.    Plaintiffs repeat and reallege each of the foregoing paragraphs in Section V as if fully set forth herein.

260.    This Count is brought by Plaintiffs on behalf of the Class, pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, against the Offering Defendants.  Plaintiffs do not intend to allege, and have not alleged, fraud on the part of any Offering Defendant.

261.    The Offering Materials were inaccurate and misleading, contained untrue statements of material facts regarding the Company's impairment of its real estate development projects, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

262.    The Offering Defendants were responsible for the contents and dissemination of the Offering Materials issued in connection with the February 27, 2008 offering of common stock described above, and caused them to be filed with the SEC. With the exception of the Deutsche Bank, each of the Offering Defendants signed the Registration Statement pursuant to which the stock for the February 27, 2008 offering

were issued and/or the 2007 10-K that was incorporated by reference into the Offering

Materials, or audited the 2007 10-K consolidated financial statements.

263.     By incorporating the 2007 10-K into the Offering Materials, the Offering

Defendants assumed the duty to provide all material information about St. Joe's

impairment of its real estate development projects.

264.     As the issuer of the common stock in the February 27, 2008 public

offering, St. Joe is liable to the Plaintiffs, who acquired the common stock pursuant to the

false and misleading Offering Materials, under § 11 of the Securities Act.

265.     Plaintiffs acquired the common stock described above pursuant to the

Offering Materials without knowledge of the truth of any misrepresented fact or

omission.

266.     None of the Offering Defendants made a reasonable investigation or

possessed reasonable grounds for the belief that the statements contained in the Offering

Materials were true and without omissions of any material facts and were not misleading.

Each of the Offering Defendants named in this Count acted negligently in issuing the

Offering Materials.

267.     The Offering Defendants issued, caused to be issued and participated in

the issuance of materially false and misleading written statements to the investing public

which were contained in the Offering Materials, which misrepresented or failed to

disclose, *inter alia*, the facts set forth above.  By reasons of the conduct herein alleged,

each Offering Defendant violated § 11 of the Securities Act.

268.     At the times they acquired the common stock described above, Plaintiffs were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

269.     This Count has been brought within one year after the discovery of the untrue statements or omissions, or after such discovery could have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

## COUNT IV

### For Violations Of § 12(a)(2) Of The Securities Act
### Against St. Joe, Rummell, Greene, McCalmont, Connolly And Deutsche Bank

270.     Plaintiffs repeat and reallege each of the foregoing paragraphs in ¶¶ 226-69 as if fully set forth herein.

271.     This Count is brought by Plaintiffs pursuant to § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, on behalf of themselves and all other members of the Class who acquired the common stock in the February 27, 2008 public offering described above, pursuant to the Offering Materials, against the Defendants named above in this Count (the "§ 12 Offering Defendants"). This claim does not sound in fraud and should be read to exclude any reference in the preceding paragraphs to recklessness, fraud, or intentional acts by the § 12 Offering Defendants.

272.     The § 12 Offering Defendants were sellers and/or offerors of the common stock offered pursuant to the Offering Materials.

273.     The Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and

127

concealed but failed to disclose material facts. The § 12 Offering Defendants' actions of solicitation included participating in the preparation of the false and misleading Offering Materials.

274. The § 12 Offering Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Offering Materials, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The § 12 Offering Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Materials as set forth above.

275. Plaintiffs acquired the common stock from the February 27, 2008 offering pursuant to the defective Offering Materials. Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Materials.

276. By reason of the conduct alleged herein, the § 12 Offering Defendants violated, and/or controlled a person who violated, § 12(a)(2) of the Securities Act. Accordingly, Plaintiffs are entitled to damages pursuant to § 12(a)(2).

277. This Count has been brought within one year after the discovery of the untrue statements or omissions, or after such discovery could have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

## COUNT V

### For Violations Of § 15 Of The Securities Act
### Against Rummell, Greene, McCalmont, And Connolly

278. Plaintiffs repeat and reallege each of the foregoing paragraphs in ¶¶ 226-77 as if fully set forth herein.

279. This Count is brought pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o against Defendants Rummell, Greene, McCalmont, and Connolly.

280. Defendants Rummell, Greene, McCalmont, and Connolly exercised direct control over St. Joe, acting as day-to-day managers of St. Joe, and by virtue of their positions as Officers and/or Directors of St. Joe. As a result of Rummell's, Greene's, McCalmont's, and Connolly's actual control over the Company's day-to-day operations, financial statements, public filings and their intimate involvement and control over the Offering Materials, Rummell, Greene, McCalmont, and Connolly had the power, and exercised the same, to cause St. Joe to engage in the violations of law complained of herein and were able to and did control the contents of the Offering Materials.

281. As a result of their control over St. Joe, Defendants Rummell, Greene, McCalmont, and Connolly are jointly and severally liable with and to the same extent as St. Joe to Plaintiffs.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP as Lead Counsel;

(b)      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding rescissionary damages under §12(a)(2);

(c)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  February 24, 2011                LABATON SUCHAROW LLP

By:/s/ Jonathan Gardner
MARK S. ARISOHN
JONATHAN GARDNER
MINDY S. DOLGOFF
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
Florida Bar No. 984795
JACK REISE
Florida Bar No. 58149
STEPHEN R. ASTLEY
Florida Bar No. 139254
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
jreise@rgrdlaw.com
sastley@rgrdlaw.com

*Co-Lead Counsel for Plaintiff*


VANOVERBEKE MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

*Additional Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 24, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Electronic Mail Notice List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>/s/ Jonathan Gardner</u>
JONATHAN GARDNER

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **JOHN PATTERSON BRUMBAUGH**
  pbrumbaugh@kslaw.com
- **JASON RICHARD EDGECOMBE**
  jedgecombe@kslaw.com,tkirillova@kslaw.com
- **JOHN W FOREHAND**
  jforehand@kfb-law.com,jhelms@kfb-law.com,awylie@kfb-law.com
- **JONATHAN GARDNER**
  jgardner@labaton.com,fmalonzo@labaton.com,anguyen@labaton.com,electronic
  casefiling@labaton.com
- **CHARLES ALAN GILMAN**
  cgilman@cahill.com,mmcloughlin@cahill.com
- **JAYNE ARNOLD GOLDSTEIN**
  jgoldstein@sfmslaw.com,pmauger@sfmslaw.com
- **CLIFFORD CARLTON HIGBY**
  chigby@aol.com,denaburch@knology.net
- **DAVID G JANUSZEWSKI**
  djanuszewski@cahill.com,mmcloughlin@cahill.com
- **AMY DESMOND LAMBERTI**
  alamberti@cahill.com,mmcloughlin@cahill.com
- **DENNIS K LARRY**
  dlarry@cphlaw.com,aschneid@cphlaw.com
- **SCOTT RHEAD SHEPHERD**
  sshepherd@sfmslaw.com,pmauger@sfmslaw.com
- **DOUGLAS SCOTT WILENS**
  dwilens@rgrdlaw.com,e_file_fl@rgrdlaw.com
- **NATHAN CURTIS ZIPPERIAN**
  nzipperian@sfmslaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)