**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**ROBERT MEYER, Individually
and On Behalf of All Others
Similarly Situated,**

      **Plaintiff,**

**vs.**                                 **CASE NO. 5:11-cv-27/RS-EMT**

**THE ST. JOE COMPANY,
et al.,**

      **Defendants.**
_____/

**<u>ORDER</u>**

      Before me are Defendants' Motion to Dismiss (Doc. 72) and Memorandum in Support (Doc. 73), Plaintiff's Response in Opposition (Doc. 79), and Defendants' Reply (Doc. 81).

**Background**

      This is a purported class action securities fraud case against the St. Joe Company ("St. Joe"), its former chief executive officer and president William Greene ("Mr. Greene"), its former chief financial officer and executive vice president William McCalmont ("Mr. McCalmont"), its former chairman of the board and chief executive officer Peter Rummel ("Mr. Rummell"), and its present chief financial officer and senior vice president (and former chief accounting officer) Janna Connolly ("Ms. Connolly"). Plaintiff alleges Defendants intentionally deceived investors about the value of certain properties located throughout the Florida panhandle in violation of sections 10(b) and

1

20(a) of the Securities Exchange Act of 1934 ("Exchange Act"),  15 U.S.C. §§ 78j(b),

78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.   Plaintiff seeks to hold St. Joe, Mr.

McCalmont, Mr. Rummell, and Ms. Connolly liable under section 10(b) of the Exchange

Act and Rule 10b-5 (Count I), and to impose joint and several liability against them under

section 20(a) of the Exchange Act as persons controlling another liable under the Act

(Count II). Defendants move to dismiss the Consolidated Class Action Complaint (Doc.

52) for failure to state a claim.[1]

St. Joe began as a timber and paper company in the 1930s and is now one of the

largest real estate development companies in Florida.  With approximately 577,000 acres

of land, the publically traded company operates its business in four segments: (1)

residential real estate; (2) commercial real estate; (3) rural land sales; and (4) forestry

(Doc. 52, p. 8-11).  By the mid-2000s, the real estate market in Florida was booming, and

St. Joe's stock was regularly trading at more than $80 per share in 2005.  *Id*. at 11.

During this period, and continuing through the end of the decade, St. Joe began to

develop a number of properties which are the subject of this valuation dispute:

RiverTown, a residential real estate project in Saint Johns County; WaterColor and

WaterSound, residential real estate projects in Walton County; SummerCamp Beach, a

residential real estate project in Franklin County; WindMark Beach, a resort community

in Gulf County; and the Northwest Florida Beaches International Airport in Bay County.

*Id* at 5, 18-28.

---

[1] Plaintiff's claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (Counts III, IV, and V) have been dismissed. (*See* Docs. 70 & 71).

Just prior to and during the Class Period -- February 19, 2008, through October 12, 2010 -- the real estate market nationwide and in Florida crashed.  During this same period, many of St. Joe's development projects were performing poorly, causing St. Joe to "effectively cease its development activit[ies]." *Id*. at 16-17.  The sales prices for its developments decreased significantly.  *Id*. at 29-34.  Plaintiff alleges that despite these signs, Defendants failed to take appropriate impairment charges[2] reflecting the known true value of the development projects, thereby ". . . materially oversta[ting] its asset values and its earnings during the Class Period." *Id.* at 2.  Plaintiff alleges that Defendants' actions did not comply with SEC regulations and Generally Accepted Accounting Principles ("GAAP").  *Id*. at 79-92.

On October 13, 2010, these general allegations came to light not in a courtroom but at an investor conference presentation by David Einhorn ("Mr. Einhorn"), an investor with a short position in St. Joe stock.  *Id*. at 76-77.  Mr. Einhorn's research led him to conclude that "St. Joe had impermissibly failed to take the necessary and required impairment charges to its residential real estate projects in development, because it was not possible for the value of the properties to meet or exceed their carrying value."  *Id*. at 77.  St. Joe's stock price declined approximately twenty per cent in the two days following this disclosure.  *Id.* at 78.  Lead Plaintiff City of Southfield Fire & Police Retirement System seeks to represent a class of all persons who purchased St. Joe publically traded stock during the class period.

---

[2] This issue over impairment charges serves as the basis of Plaintiff's assertion that St. Joe's financial statements were materially false and misleading (*See* Doc. 52, p. 89).  "Impairment charges are special, non-recurring charges on an asset with an overstated carrying value.  Thus, taking an impairment charge decreases the previously reported value of an asset and reduces earnings."  *Id.* at 7.

**Discussion**

Plaintiff sues Defendants for securities fraud under sections 10(b)[3] and 20(a)[4] of the Exchange Act and Rule 10b-5[5] promulgated thereunder.  Plaintiff must establish the following elements: (1) a material misrepresentation or omission by the Defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Instituto de Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1352 (11th Cir. 2008) (*citing Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Defendants move to dismiss the Consolidated Class Action Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Defendants contend that the Consolidated Class Action Complaint (Doc. 52) fails to adequately plead loss causation, actionable misrepresentation, and scienter.  (Doc. 73, p. 3).

**Standard of Review**

To survive a motion to dismiss, a complaint must contain sufficient facts, which accepted as true, state a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569, 127 S. Ct.

---

[3] Section 10(b) of the Exchange Act forbids the use or employ, in connection with the purchase or sale of securities, of any manipulative or deceptive device or contrivance in contravention of the rule and regulations the Securities and Exchange Commission may prescribe as necessary or appropriate in the public interest or for investors' protection.  15 U.S.C. §78j(b).

[4] Section 20(a) of the Exchange Act imposes joint and several liability on any person who controls another person liable under the Exchange Act.  15 U.S.C. § 78t(a).

[5] Rule 10b-5(b) forbids a person from making any untrue statement of material fact or omitting to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading.  17 C.F.R. § 240. 10b-5(b).

1955, 1974 (2007).  Granting a motion to dismiss is appropriate if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations of the complaint.  *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984).  In making this determination, the court must accept all factual allegations in the complaint as true and in the light most favorable to Plaintiff. *Christopher v. Harbury*, 536 U.S. 403, 406, 122 S. Ct. 2179, 2182 (2003).

Allegations of fraud such as Plaintiff's security fraud claim are subject to the heightened pleading standards set forth in Federal Rule of Civil Procedure 9(b). *Instituto de Prevision Militar*, 546 F.3d at 1352.  Plaintiff must "state with particularity the circumstances constituting the fraud."  Fed. R. Civ. P. 9(b). In addition, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), further raises the pleading standard for securities fraud claims.  Plaintiff must specify each statement alleged to have been misleading and the reasons why the statement is misleading.  15 U.S.C. § 78u-4(b)(1)(B).  With respect to each statement or omission, Plaintiff must state with particularity facts giving rise to a strong inference that Defendants acted with the required scienter.  *Id*. § 78u-4(b)(2).


**Loss Causation**

Plaintiff has the burden of proving that the act or omission of the Defendants "caused the loss for which [P]lainitff seeks to recover damages."  *Id*. § 78u-4(b)(4).  Loss causation is not subject to heightened pleading standards but must be supported by a "short and plain statement of the claim showing that the pleader is entitled to relief."  *See*

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (citing Fed. R. Civ. P. 8(a)(2)) (assuming without deciding that loss causation subject to normal pleading standards). Loss causation may not be established by simply alleging that corporate stock was purchased at an artificially inflated price. *Dura Pharms., Inc.* 544 U.S. at 342.  Rather, to sufficiently plead loss causation, Plaintiff must "allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Durham v. Whitney Info. Network, Inc.*, 2009 U.S. Dist. LEXIS 113757, *26-27 (M.D. Fla. 2009) (*citing Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1278-79 (M.D. Fla. 2009) (*quoting Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).  Otherwise, a plaintiff could not distinguish between a decrease in stock value associated with the revelation of the truth from a lower value which may "reflect not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura Pharms*., 544 U.S. at 342-343 (punctuation altered).

The revelation of truth, the moment when the alleged misstatements or omissions become public, is sometimes called a "corrective disclosure." *See e.g., In re DVI, Inc. Secs. Litig.*, 2011 U.S. App. LEXIS 6302, n.17 (3d Cir. 2011).  Here, Defendants do not dispute that St. Joe stock decreased in value immediately following Mr. Einhorn's presentation.  Rather, Defendants dispute whether Mr. Einhorn's presentation is a

corrective disclosure at all.  First, they assert that Mr. Einhorn's presentation was merely a repackaging of publically available sources and previously disclosed facts and, thus, could not be a new disclosure.  Second, Defendants contend that the presentation fails to qualify as a corrective disclosure because it did not address the alleged misstatements in St. Joe's *prior* financial statements but rather "opined on the possibility of *future* occurrence[s]" (Doc. 73, p.19) (emphasis added).  These contentions overlap and will be considered together.

Mr. Einhorn's presentation "Field of Schemes: If You Build It, They Won't Come" (Doc. 74, Exhibit E), begins with a clear disclaimer.  It states that the information contained in the presentation "has been obtained from publically available sources."  *Id.* at 2.  These sources include, among other things, St. Joe's SEC filings, press releases, and earnings call transcripts, Freedom of Information Act requests, meeting minutes of the airport board, and county property appraiser's sales lists.  *E.g., id.* at 15, 23, 25, 26, 29.

Defendants contend that the fraud on the market doctrine cuts both ways when it comes to the effect of public information.  That doctrine entitles a plaintiff to a presumption of reliance where the information in question is material, the market is sufficiently active to be deemed efficient, and the misinformation has been disseminated publically.  THOMAS HAZEN, THE LAW OF SECURITIES REGULATION § 12.10 (6th ed. 2009).  The fraud on the market doctrine is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."  *Ross v. Bank South, N.A.*, 885 F.2d 723, 749 n.5 (11th Cir. 1989) (*quoting Basic, Inc. v. Levinson*, 485

U.S. 224, 241-42 (1988)).  In other words, the theory "posits that all publically available information about a security is reflected in the market price of the security."  *Thompson v. RelationServe Media, Inc*., 610 F.3d 628, 690 (11th Cir. 2010) (Tjoflat, J., concurring in part and dissenting in part).  Here, Plaintiff asserts that a presumption of reliance is proper because the fraud on the market doctrine is applicable (Doc. 52, p. 109-10).  Defendants turn this argument around and assert that because of the doctrine and the fact that all of the information contained in Mr. Einhorn's October 2010 presentation was publically available, it could not be a corrective disclosure because "'the market had already known and digested all the information supposedly' disclosed therein."  (Doc. 73, p.11) (*quoting Thompson*, 610 F.3d at 690).  Plaintiff counters that Mr. Einhorn's presentation constituted new information generated by analyzing separate publically available "data points . . . [and] connecting the dots regarding their aggregate meaning."  (Doc. 79, p.30).

Neither party has cited an Eleventh Circuit case directly on point.  Defendants cite a string of cases standing for the proposition that "a negative . . . characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the [author's] opinions."  *In re Omnicom Group, Inc. Sec. Litig*., 597 F.3d 501, 512 (2d Cir. 2010).  *See also Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007) ("The problem with plaintiffs' theory . . . is that these facts had already been disclosed in public filings, so their [subsequent] revelation . . . could not have caused [the company's] stock price to decline."); *In re Retek Inc. Sec. Litig*., 621 F. Supp. 2d 690, 705 (D. Minn. 2009) ("Generally, a re-characterization of previously disclosed news cannot be a corrective

disclosure for loss causation purposes.); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) ("The mere negative characterization of existing facts that were never hidden from investors does not permit [plaintiff] to plead loss causation.); *In re Teco Energy Sec. Litig.*, 2006 U.S. Dist. LEXIS 18101, *19-20 (M.D. Fla. 2006) ("The opinions, predictions, and generalized statements offered by Plaintiffs as 'revelations' of the 'truth' regarding [company's] financial status, without more, are not sufficient to establish loss causation." Specifically, an analyst's "revelations" which do "not identify, reveal or correct any prior misstatement, omission, or improper accounting practice by Defendants" is not actionable.).

Plaintiff counters with two cases. In the first, *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501 (N.D. Ill. 2007), Motorola had disclosed in a proxy that it was owed $1.7 billion by a Turkish company. A week later, Bloomberg published an article which "unearthed" the information "buried" in the proxy. *Id.* at 548. The district court in Illinois found that loss causation was supported by *both* the article and the proxy. *Id.* at 557. Plaintiff contends that the rationale for allowing the article to support loss causation was, in part, that "a reasonable investor would not have undertaken such a detailed investigation of publically available information as that done by a journalist." (Doc. 79, p. 24).

This case is not persuasive. First, the argument that professionals are the gatekeepers to understanding financial records and unearthing fraud is in conflict with traditional concept of constructive notice. *See Dura Pharms., Inc.*, 544 U.S. at 341 (noting that action for private damages under the Exchange Act "resembles, but is not

identical to, common-law tort actions for deceit and misrepresentation).   It also is in conflict with the efficient market theory which presumes that all publically available information is incorporated into a stock's price.  As the district court in *Motorola* noted, there may be a lag between when new information is released and when it is incorporated into the efficient market.  *In re Motorola Sec. Litig.*, 505 F. Supp. 2d at 553-54.   Here, the events which are the subject of the dispute took place over a long duration--as the real estate market declined, St. Joe allegedly failed to take proper impairment charges.   This lengthy duration was adequate time for the information disclosed by St. Joe to have been scoured by investors to reveal the methodology St. Joe used to arrive at its real estate valuations.

Plaintiff's reliance on *Motorola* is also misplaced because that case is distinguishable.  In *Motorola*, the plaintiff asserted that the disclosure at issue concerned Motorola's vendor financing of the Turkish company.  This information was "buried" in SEC filings.  *Id*. at 555-56.  In addition, knowledge of the interrelationship of two Turkish businesses and knowledge of the poor public reputation of a Turkish family that controlled one of the businesses was required to discern the information.  *Id*.   Quite simply, the alleged misrepresentations of St. Joe are much different.  The value of Florida real estate is at the heart of St. Joe's business operation, unlike the foreign operations of *Motorola*.  Plaintiff concedes St. Joe disclosed how it accounted for impairment of asset carrying values (*E.g.,* Doc. 52, ¶ 91), and reasonable investors should have focused on

those valuations and methodologies.[6]  There were no significant impediments to

investors' analysis St. Joe's prior disclosures.

Plaintiff cites a second case which states that "in addition to formal disclosure by a

defendant, 'the market may learn of possible fraud [from] a number of sources: e.g., from

whistleblowers, analysts' questioning financial results, resignation of CFOs or auditors,

announcements by the company of changes in accounting treatment going forward,

newspapers and journals, etc.'"  *In re Winstar Communs.*, 2006 U.S. Dist. LEXIS 7618,

*46 (S.D.N.Y. 2006) (*citing In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 2005

U.S. Dist. LEXIS 41240 (S.D. Tex. 2005)).  In that case, the district court in New York

found that a short-seller's report which was based on public information and contained

conclusions which were derived from an analysis of the company's financials was

---

[6] For Example, Plaintiff notes St Joe's 2007 Annual Report which stated:
During 2007, we recorded total asset impairment costs of $23.2 million, $13.0 million of which related to the write down of capitalized costs at certain projects due to changes in development plans and the impairment of completed homes in several of our communities due to current market conditions. If market conditions were to continue to deteriorate, and the market values for our home sites, remaining homes held in inventory and other project land were to fall below the book value of these assets, we would need to take additional write-downs of the book value of these assets. Any such write-downs would decrease the value of these assets on our balance sheet and would reduce our net income.

* * *

Impairment Losses. We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and home-sites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing service potential of the project and using management.'s best estimates about future sales prices and holding periods. The decline in demand and market prices for residential real estate caused us to conclude that carrying amounts within our residential real estate segment may not be recoverable, and we performed an impairment analysis. As a result of our impairment analyses, we recorded an impairment charge of $13.6 million in the residential real estate segment.

* * *

In 2007 we recorded impairments totaling $13.6 million primarily due to current adverse market conditions for residential real estate. Approximately $5.2 million of the impairments related to capitalized costs at certain projects due to changes in development plans, approximately $7.8 million related primarily to completed spec homes in several communities and approximately $0.6 million related to the modified terms of certain promissory notes.

sufficient to support loss causation. *Id*. at *47-48. The short-seller's report disclosed the company's cash-flow shortage and likely default and "revealed [the company's] questionable accounting practices, of which the public had not previously been aware." The report was "contrary to the false statements allegedly made by defendants" which were "repeatedly denied and actively concealed." *Id*. at *17-18, 47-48.

Neither *Winstar*, nor any of the other sources establish a *per se* rule always allowing or always prohibiting disclosures based on already released information. Likewise, none of the cases establish a bright-line test of when a report based on publically released data becomes a corrective disclosure. The touchstone is whether the report contains genuinely new information beyond a mere re-characterization of previously disclosed facts. The author must add significant original insight that identifies, reveals, or corrects prior misstatements, omissions, or improper accounting practices. The case that best shows this distinction is *In re Teco Energy Sec. Litig.*, 2006 U.S. Dist. LEXIS at *19-20 which stated that "the opinions, predictions, and generalized statements offered by Plaintiffs as "revelations" of the "truth" regarding [company's] financial status, without more, are not sufficient to establish loss causation." Rather, an analyst's "revelations" must "identify, reveal or correct any prior misstatement, omission, or improper accounting practice by Defendants." *Id*.

Turning to the content of Mr. Einhorn's presentation, Plaintiff contends the presentation "concluded that St. Joe *had impermissibly* failed to take the *necessary* and *required* impairment charges to its residential real estate projects in development." (Doc. 52, p. 81) (emphasis added). If true, this contention would indicate some prior improper

practice--the word "had" meaning in the past, and the word "impermissibly" meaning improper.   However, Plaintiff overstates what Mr. Einhorn's presentation actually stands for.  To start, the words "impermissible," "necessary" and "required" appear nowhere in the presentation.   They are characterizations of the presentation added by Plaintiff.

The 139-slide presentation makes mention of "impairments" in several contexts. First, Mr. Einhorn notes that "despite making huge investments ahead of the bust, [St. Joe] has taken only modest write-downs." (Doc. 74, Exhibit E, p. 40).  As a result, the presentation states that a number of the residential developments "should be impaired." *Id*. at 63, 98, 115.  At this point, the language of the presentation indicates future action that St. Joe needed to take and does not indicate an impermissible practice.

The presentation poses, but does not answer the question "why haven't these [residential developments] been written down?" *Id.* at 122.   Plaintiff would like to assert that the answer was impermissible practices by St. Joe.  However, the presentation certainly does not, by its own terms, reach that conclusion.

Finally, in the conclusion section of the presentation, Mr. Einhorn states that "[St. Joe] needs to take substantial impairment."  *Id*. at 124.  Again, this language indicates a future action.  Mr. Einhorn then equivocates and in summary the presentation contemplates both a situation "if no impairment is needed" and another one "if [St. Joe] needs to take an impairment." *Id*. at 133.   These also are potential future actions.

Plaintiff correctly points out that media further disseminated the conclusions of Mr. Einhorn's presentation which increased downward pressure on St. Joe stock (*See*

Doc. 79, p.11).  However, in multiple articles about the presentation, reporters interpreted Mr. Einhorn's predictions as being that St. Joe would need to take some future action of impairment.  *See, e.g.*, Nikolaj Gammeltoft and John Gittelsohn, *Einhorn Says St. Joe Needs 'Substantial' Writedowns*, October 13, 2010, http://www.businessweek.com/news /2010-10-13/einhorn-says-st-joe-needs-substantial-writedowns.html.

When viewed as a whole and in the light most favorable to Plaintiff, Mr. Einhorn's presentation offers opinion about the need for future impairments.  It is entirely based on previously disclosed facts and offers nothing new concerning prior improper practices.  The decline in St. Joe's stock value in the days following the presentation can be just as easily attributed to Mr. Einhorn's predictions about future impairments, as they could be to what Plaintiff contends are improper past impairments.  Taken together, these facts establish that Mr. Einhorn's presentation is not a corrective disclosure and, thus, fails to meet the threshold requirement of a short and plain statement showing that Plaintiff is entitled to relief.

**Actionable Misrepresentation**

To sustain a claim under Section 10(b), Plaintiff must allege that Defendants "made a false statement or omission of material fact."  *Bruschi v. Brown*, 876 F.2d 1526, 1528 (11th Cir.1989).  To fulfill the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002) (*citing*

*Basic Incorporated v. Levinson*, 485 U.S. 224, 23132 (1988)).  The heightened pleading standards of PSLRA apply to the materiality requirement.  PSLRA requires the complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

Here, the heart of Plaintiff's contention is that "Defendants repeatedly touted the Company's net income and value of the Company's real estate assets, while at the same time reporting minimal impairments, thus portraying a misleadingly positive financial picture."  (Doc. 79, p. 8).  Plaintiff contends that by reporting minimal impairments, Defendants misrepresented that St. Joe's financial statements conformed to GAAP.  *Id.*; (Doc. 52, ¶156).

GAAP are a series of general principles followed by accountants.  More specifically, GAAP are the official standards adopted by the American Institute of Certified Public Accountants ("AICPA"), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board, and the Financial Accounting Standards Board.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 160, n.4 (2d Cir. 2000).

"GAAP is not [a] lucid or encyclopedic set of pre-existing rules." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995).  "Far from a single-source accounting rulebook, GAAP 'encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time.'" *Id.* (*citing* Kay & Searfoss,

ch. 5, at 7 (1994 Update)).  "The determination that a particular accounting principle is

generally accepted may be difficult because no single source exists for all principles.

There are 19 different GAAP sources, any number of which might present conflicting

treatments of a particular accounting question."  *Id.* (punctuation altered).  When conflict

arises between the sources, the accountant must consult "an elaborate hierarchy of GAAP

sources to determine which treatment to follow."  I*d.*[7]

Violations of the GAAP may constitute false or misleading statements of material

fact.  *In re Sci. Atlanta*, 239 F. Supp. 2d 1351, 1363 (N.D. Ga. 2002); A*malgamated Bank

v. Coca-Cola Co*., 2006 U.S. Dist. LEXIS 73909, *37 (N.D. Ga. 2006).  GAAP violations

must be pled with particularity.  "Plaintiffs must point to particular transactions and

explain why those transactions violated GAAP standards.  *In re Coca-Cola Enters. Inc.

Secs. Litig*., 510 F. Supp. 2d 1187, 1200 (N.D. Ga. 2007) (*citing Lovelace v. Software

Spectrum Inc.*, 78 F.3d 1015, 1021 (5th Cir. 1996)).  When it comes to impairment

violations of GAAP, "the Complaint must go further than merely alleging with the

benefit of hindsight that an impairment should have been taken to reflect a decline in fair

market value.  Rather, the Complaint must provide detail as to why an impairment was

required under then-existing accounting rules."  *In re Mirant Corp. Secs. Litig*., 2009

U.S. Dist. LEXIS 789, *80 (N.D. Ga. 2009) (citations omitted).  Thus, in order to plead

---

[7] Midway through the class period, on July 1, 2009, the Financial Accounting Standards Board launched the FASB Accounting Standards Codification as the single source of authoritative nongovernmental U.S. generally accepted accounting principles. The Codification became effective for interim and annual periods ending after September 15, 2009. As a result of the Codification all existing standards documents are superseded as described in SFAS No. 168, ."The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles.." Instead of issuing new FASB standards, the FASB now issues FASB Accounting Standards Updates (."ASU."). The Codification did not change existing GAAP, it only introduced a newly organized structure. (Doc. 52, ¶148).

an adequately particularized claim, the Complaint must, for example, detail how the results of an impairment test were reported fraudulently in the company's financial disclosures, or how impairment testing should have been conducted and how that testing would have necessarily required a recognition of an impairment.  *Id.*

Plaintiff asserts that there is a three step process which governs recording an impairment loss for assets, such as St. Joe's, that are held and used.  (Doc. 52, ¶157). The first step instructs accountants to test for recoverability whenever events or changes in circumstances indicate that its carrying value may not be recoverable.  *Id*. at ¶158 (*citing* ASU 360-10-35-21).  Examples of changes in events include decreases in market price and adverse changes in the manner in which the asset will be used.  *Id*.  The next two steps "are to perform a recoverability test to determine if there is any impairment." *Id.* at ¶159.  Plaintiff describes the process as follows:

> An impairment loss shall be recognized only if the carrying of a long-lived asset (asset group) is not recoverable and exceeds its fair value. [Step two;] The carrying amount of a long-lived asset (asset group) is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group). That assessment shall be based on the carrying amount of the asset (asset group) at the date it is tested for recoverability, whether in use….or under development …..[Step three;] An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value.

*Id*. (*citing* ASU360-10-35-17).

GAAP requires the recoverability test to be reasonable.  GAAP also requires the test to incorporate the "entity's own assumptions about the use of the asset (asset group)"

and to consider "all available evidence." *Id.* at ¶161 (citing ASU 360-10).  Plaintiff asserts that eight factors should have been considered by Defendants, which would have demonstrated the need for further impairments.  (Doc. 79, p. 15).  Plaintiff claims that these factors were "so apparent" that Defendants failure to do so was fraudulent.  *See Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 2002 U.S. Dist. LEXIS 28072, *57-58 (N.D. Ga. 2002) (where the need to write-down is "so apparent" that the failure to do so amounts to fraud.).  These factors are (1) the impact of market supply and demand; (2) the rate of sales and inventory on the market; (3) selling prices including sales incentives; (4) current sales; (5) anticipated land development and future development costs to be incurred including interest and overhead costs; (6) price erosion; (7) the time to complete the project and sell its units; and (8) risks specific to each land parcel or community.  (Doc. 53, ¶170).

Plaintiff's allegations are insufficient to show that Defendants made material misrepresentations that St. Joe's financial statements were GAAP compliant.  First, while Plaintiff claims that Defendants failed to consider the eight purported essential factors, Plaintiff does not offer any concrete evidence in support.  For example, Plaintiff lists "selling prices" and "current sales" as two of the essential factors.  St. Joe's 2008 Annual Report, however, specifically details the number of units sold and the revenues from those units.  *See* The St. Joe Company, Annual Report (Form 10-K), at 35 (February 24, 2009).  Taken directly from St. Joe's SEC filing, the following contradicts Plaintiff's assertion that Defendants did not consider at least some of the eight relevant factors in their impairment analysis.

| | Year Ended December 31, 2008 | | | | Year Ended December 31, 2007 | | | |
|---|---|---|---|---|---|---|---|---|
| | Closed Units | Revenues | Cost of Sales | Gross Profit | Closed Units | Revenues | Cost of Sales | Gross Profit |
| | | | | (Dollars in millions) | | | | |
| **Northwest Florida:** | | | | | | | | |
| Resort | | | | | | | | |
| Single-family homes | 8 | $ 8.6 | $ 8.3 | $ 0.3 | 20 | $ 23.1 | $ 19.3 | $ 3.8 |
| Multi-family homes | — | — | — | — | 1 | 0.9 | 0.6 | 0.3 |
| Homesites | 21 | 6.7 | 3.5 | 3.2 | 47 | 36.6 | 12.9 | 23.7 |
| Primary | | | | | | | | |
| Single-family homes | 1 | 0.3 | 0.3 | 0.0 | 15 | 4.4 | 3.5 | 0.9 |
| Townhomes | — | — | — | — | 5 | 1.1 | 0.9 | 0.2 |
| Homesites | 23 | 1.3 | 1.0 | 0.3 | 178 | 14.2 | 9.4 | 4.8 |
| **Northeast Florida:** | | | | | | | | |
| Primary | | | | | | | | |
| Single-family homes | 2 | 0.9 | 1.0 | (0.1) | 9 | 4.3 | 4.0 | 0.3 |
| Homesites | 3 | 0.2 | 0.1 | 0.1 | 29 | 2.0 | 1.1 | 0.9 |
| **Central Florida:** | | | | | | | | |
| Primary | | | | | | | | |
| Single-family homes | 10 | 4.5 | 4.4 | 0.1 | 20 | 11.8 | 9.2 | 2.6 |
| Multi-family homes | 9 | 3.1 | 2.9 | 0.2 | 39 | 5.7 | 4.0 | 1.7 |
| Townhomes | 3 | 0.5 | 0.5 | 0.0 | 15 | 7.1 | 5.9 | 1.2 |
| Homesites | 42 | 1.9 | 2.0 | (0.1) | 100 | 4.8 | 6.1 | (1.3) |
| Total | 122 | $ 28.0 | $ 24.0 | $ 4.0 | 478 | $ 116.0 | $ 76.9 | $ 39.1 |

The chart also undermines Plaintiff's assertion that Defendants misrepresented anything at all. Defendants properly listed the relevant information—sales data, revenues, and profits. Defendants also disclosed how the impairment charge was calculated. *See, e.g.,* The St. Joe Company, Annual Report (Form 10-K), at 26 (February 24, 2009) (detailing the step-by-step method used for taking impairment). Any investor could look at the data to make up their own mind whether St. Joe had adequately taken write-downs or would need further impairments in the future. Plaintiff would have a case for misrepresentation if, for example, St. Joe had not accurately disclosed the number of homes which were sold. That is not what happened here.

The second reason why Plaintiff has not shown actionable misrepresentation is because Plaintiff does not allege that adverse facts were hidden or misrepresented, but rather that Defendants' opinions based on those facts were wrong.  For example, Plaintiff states that Defendants were misleading because the Florida real estate market had crashed, many of St. Joe's developments remained largely undeveloped, and sales prices and volumes had declined.  (*See* Doc. 79, p. 8). Plaintiff does not allege, and the record does not indicate, that these facts themselves were hidden by Defendant.  Specifically, St. Joe reported that the Florida real estate market was weak and could lead to future impairments.  The 2008 Annual Report states, "If market conditions were to continue to deteriorate, and the market values for our homesites, remaining homes held in inventory and other project land were to fall below the book value of these assets, we could be required to take additional write-downs of the book value of those assets."  The St. Joe Company, Annual Report (Form 10-K), at 12 (February 24, 2009).   The 2008 and 2009 reports note that a "continued downturn in the demand for real estate, combined with the increase in the supply of real estate available for sale and declining prices, will continue to adversely impact our business." The St. Joe Company, Annual Report (Form 10-K), at 8 (February 23, 2010); *Id*. at 30.

Rather than hiding these market conditions, St. Joe made note of them in their SEC filings.  The heart of Plaintiff's assertion, then, is not that these facts were hidden, but that St. Joe looked at the facts and fraudulently ignored their impairment ramifications.  Plaintiff does not offer an alternative calculation of what it believes the proper impairment charges should have been.  While an alternative calculation may or

may not be required, its absence in this case suggests that the correct impairments were

not "so apparent."  Reasonable professionals could differ about the effect of these market

forces on St. Joe's impairment analysis, especially without the aid of hindsight.  In the

midst of the financial meltdown, Defendants cannot be held to a prescient standard to

know how the market would behave to affect the future value of their holdings.  Rather,

they were required to conduct a reasonable recoverability test, not a perfect one.

Defendants made a reasoned business judgment that the market in Florida would improve

before they could sell assets.   While this judgment may have proven wrong, it does not

mean that there was actionable misrepresentation.  Plaintiff has not brought forth any

evidence beyond mere speculation that Defendants' actions amounted to false statements

of fact.


**Scienter**

Plaintiff must "state with particularity facts giving rise to a strong inference that

the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The

required state of mind is "an intent to deceive, manipulate, or defraud, or severe

recklessness."  *Thompson*, 610 F.3d at 634 (punctuation altered).  Severe recklessness is

limited to those "highly unreasonable omissions or misrepresentations that involve not

merely simple or even inexcusable negligence, but an extreme departure from the

standards of ordinary care."  *Id.*

The inference that the defendant acted with scienter "need not be irrefutable" or

even the "most plausible of competing inferences."  *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 324 (2007) (citation omitted).   Rather, "the inference of scienter must be more than merely 'reasonable' or 'permissible'--it must be cogent and compelling, thus strong in light of other explanations. *Id.*  A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. *Id.*

"The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1209 (11th Cir. 2001) (*citing In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)).   Inaccurate figures may be caused by "accountants . . . reasonably reach[ing] different conclusions" in conducting impairment analysis. *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1260 (M.D. Fla. 2002) (in the FAS 121 context). Likewise, inaccuracies "can easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 433 (5th Cir. 2002)

Here, Plaintiff alleges that seven factors establish Defendants' scienter: (1) that the Individual Defendants possessed substantial internal information contradicting their public statements; (2) that the Individual Defendants were intimately aware of the value of St. Joe's real estate portfolio; (3) that Defendants' misstatements related to St. Joe's core operations; (4) that the nature of the GAAP violations evidences knowledge; (5) that Defendants held the highest positions in St. Joe; (6) that Defendants were severly reckless in certifying the accuracy of Sarbanes-Oxley certifications; and (7) that Individual Defendants had motive and opportunity to underreport the necessary impairments.  (Doc.

79, p. 18).  Assuming that these seven inferences are true, and that St. Joe did, in fact, improperly perform its impairment analysis, Plaintiff has not brought forth sufficient evidence to suggest that Defendants acted with anything more than mere negligence.

Plaintiff's seven allegations amount to a simple inference that during the class period the Defendants knew the value of St. Joe's real estate portfolio had declined in value.  The fact that current sales prices were below carrying values says nothing about Defendants' beliefs regarding how the real estate market would value St. Joe's developments in the future.  This time distinction -- what Defendants knew about current valuations and what they believed would happen in the future -- is critical.

Under GAAP, impairment analysis is performed by the "undiscounted cash flow analysis" to determine the "recoverable value for each project - the value of the project to St. Joe of its useful life."  (Doc. 52, ¶8)(quotation omitted).  For long-lived assets, the appropriate technique to calculate the carrying value is the "expected present value technique."  *Id.* at ¶ 169.  Present value is the sum of money that would amount to a specified sum at a specified future date; i.e., future value discounted to its value today. BLACK'S LAW DICTIONARY 993 (Abridged 8th ed. 2005).  Because the essence of impairment analysis is to predict what a future value will be, the most compelling inference is that St. Joe expected market conditions to improve before it sold its assets.  A sharp decline in the Florida real estate market portended a long-term structural decline in valuation.  However, that conclusion results from the benefit of hindsight.  Defendants made their impairment decisions in real time, and it just as easily could have turned out that a sharp downturn would be followed by a sharp upturn.

To buttress its argument that Defendants were severely reckless, Plaintiff relies upon information provided by a confidential witness ("CW4") who was a "Senior Vice President and Regional General Manger."  (Doc. 52, ¶66).  CW4 stated that the Individual Defendants knew "detailed information about the projects including, revenues and revenue projections, absorption rates, sales information, development plans and budget requests." *Id*.  CW4 prepared a memorandum and spreadsheet for some of the Individual Defendants which "summarize[ed] the status of the troubling asset valuations he had uncovered at several of the Company's projects" and "revealed materially lower values than those reported in the Company's SEC filings" (Doc. 79, p.20).

The complaint does not detail the process CW4 used to calculate the carrying values.  The complaint also does not state that CW4 was an accountant who was trained to perform GAAP compliant impairment analysis.  Rather, it appears that CW4 used his personal judgment, based on professional experience, to conclude that the developments were overvalued.  For example, CW4 believed that St. Joe's SouthWood project 2007 carrying value of $48,201,000 was overstated.  (Doc. 52, ¶175).  CW4 calculated that $48 million divided by the 50-75 lots under development at any given time suggested that St. Joe would be able to recover between $960,000 to $640,000 per lot.  CW4 claims that the 2000 entitlements at SouthWood were of "little value, because of the difficulty in obtaining permits" and they were not included in his rough valuation calculation. Plaintiff claims CW4's calculations show that St. Joe was using "highly unrealistic" figures "given market conditions and recent sales history."  *Id*.

While CW4's analysis and representations to Defendants shed some light on what Defendants knew, CW4 is not persuasive when it comes to scienter. CW4 offered opinions, not facts. Defendants were entitled to discount CW4's opinions, especially because he was not an accountant. Defendants' actions may have been unreasonable, but CW4 does not show that Defendants were severely reckless constituting an "extreme departure from standards of ordinary care." *Thompson*, 610 F.3d. at 634.

## Conclusion

Plaintiff's claims of misrepresentation are insufficient to meet the standard of pleading fraud with particularity because they fail to allege that Defendants acted with the requisite scienter and made statements that they knew were materially false at the time. Additionally, Plaintiff has failed to establish loss causation.

**IT IS ORDERED:**

1. The Motion to Dismiss (Doc. 72) is **GRANTED**.

2. The Case is **DISMISSED without prejudice**.

3. Plaintiff shall have twenty days, until September 14, 2011, in which to serve an Amended Consolidated Complaint. Failure to file an amended complaint shall result in dismissal with prejudice and the case being closed.

**ORDERED** on August 24, 2011.

/S/ Richard Smoak
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**

25