**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Panama City Division**

| | |
|---|---|
| ROBERT J. MEYER, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Civil Action No. 5:11-cv-00027-RS-EMT |
| Plaintiff, ) ) | **FIRST AMENDED CONSOLIDATED** |
| v. ) ) | **CLASS ACTION COMPLAINT FOR** **VIOLATIONS OF FEDERAL** |
| THE ST. JOE COMPANY, et al., ) ) | **SECURITIES LAWS** |
| Defendants. ) ) | **JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

I.      SUMMARY OF THE ACTION ............................................................................1

II.     JURISDICTION AND VENUE ........................................................................6

III.    THE PARTIES.................................................................................................7

    A.      Lead Plaintiff ......................................................................................7

    B.      Defendants .........................................................................................7

        1.      The Company.............................................................................7

        2.      Individual Defendants..............................................................7

    C.      Control Person Allegations ...............................................................9

IV.     SUBSTANTIVE ALLEGATIONS ...............................................................11

    A.      The Company and Its Business........................................................11

    B.      St. Joe's Real Estate Development Was a Core Operation During the Class Period ..........................................................................................12

    C.      The Drastic Downturn in the Florida Residential Real Estate Market Negatively Impacted St. Joe's Core Business.........................................13

        1.      The Real Estate Crash ............................................................13

        2.      The Real Estate Crash Caused the Company's Revenues to Decline and Losses to Increase Dramatically.............................................15

        3.      St. Joe Halts Further Development of Its Projects....................16

    D.      The Values of St. Joe's Residential Real Estate Development Projects Were Overstated During the Class Period ............................................17

        1.      RiverTown ...............................................................................18

        2.      The WaterSound Developments ...............................................23

        3.      SummerCamp Beach ................................................................26

        4.      WindMark Beach .....................................................................30

        5.      Victoria Park ...........................................................................33

6.    Seven Shores ......................................................................34

7.    SouthWood ...........................................................................34

V.    DEFENDANTS FAILED TO COMPLY WITH SEC REGULATIONS AND GAAP ............................................................................................................35

A.    Defendants Failed to Comply With Regulation S-K, Item 303 .............................35

B.    Defendants Failed to Comply With Regulation S-X and GAAP .........................38

C.    Defendants' GAAP Violations Caused Their Asset Values to Be Materially Overstated During the Class Period ......................................................40

1.    Fair Value Analysis ..............................................................41

2.    Assets Substantially Complete and Ready for Sale ..................................43

3.    Assets Under Development .................................................45

a.    Step One – Evaluating recoverability: ..........................................45

b.    Step Two – Performing recoverability test to determine impairment: ......................................................................46

c.    Step Three – Recording the impairment: ......................................47

VI.    SCIENTER ALLEGATIONS ..............................................................................51

A.    The Individual Defendants Were Heavily Involved In Valuing the Company's Real Estate, a Core Operation .............................................................52

B.    The Individual Defendants Participated in Quarterly Meetings and Weekly Calls Regarding the Company's Development Projects .......................................54

C.    Defendants Knew of the Significant Impairments Related to the Company's Core Operation ..............................................................................55

D.    The February 2008 Stock Offering ..............................................................56

E.    Defendants Avoided Taking Necessary Impairments to Comply with Debt Covenants ......................................................................................................57

F.    Defendants Failed to Comply with Disclosure Requirements ..............................59

G.    The Individual Defendants Were Highly Compensated During the Class Period ......................................................................................................62

VII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
       OMISSIONS ........................................................................................63

       A.   Fourth Quarter and Full Year 2007 Financial Results ...........................63

       B.   First Quarter 2008 Financial Results .....................................................68

       C.   Second Quarter 2008 Financial Results..................................................70

       D.   Third Quarter 2008 Financial Results.....................................................73

       E.   Fourth Quarter And Full Year 2008 Financial Results...........................75

       F.   First Quarter 2009 Financial Results .....................................................79

       G.   Second Quarter 2009 Financial Results..................................................81

       H.   Third Quarter 2009 Financial Results.....................................................85

       I.   Fourth Quarter and Full Year 2009 Financial Results............................88

       J.   First Quarter 2010 Financial Results .....................................................92

       K.   Second Quarter 2010 Financial Results..................................................94

       L.   Third Quarter 2010 Financial Results.....................................................96

       M.   Fourth Quarter and Full Year 2010 Financial Results ...........................98

       N.   First Quarter 2011 Financial Results ...................................................102

VIII.  THE TRUTH BEGINS TO EMERGE ...............................................................106

       1.   October 13, 2010 - Einhorn's "Field of Schemes Presentation" .............106

       2.   January 10, 2011 - The SEC Inquiry ....................................................111

       3.   July 1, 2011 - The Company Announces that the SEC Investigation
            Has Become Formal...............................................................................115

IX.    NO SAFE HARBOR .........................................................................................116

X.     APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE
       AFFILIATED UTE DOCTRINE AND/OR, IN THE ALTERNATIVE, THE
       FRAUD ON THE MARKET DOCTRINE ....................................................116

XI.    LOSS CAUSATION...........................................................................................118

XII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS........................................124

COUNT I ..................................................................................................................125

COUNT II .................................................................................................................129

XIII.   PRAYER FOR RELIEF .............................................................................................130

XIV.   JURY TRIAL DEMANDED ........................................................................................130

Lead Plaintiff City of Southfield Fire & Police Retirement System ("Lead Plaintiff" or "Plaintiff"), by its undersigned attorneys, hereby alleges the following against The St. Joe Company ("St. Joe" or the "Company") and certain of its officers.  The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel, which included interviews of former employees of St. Joe and other persons with knowledge of the matters alleged herein (some of whom have provided information in confidence; these confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, etc.)), review and analysis of publicly available information, including United States Securities and Exchange Commission ("SEC") filings by St. Joe, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and consultations with experts.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.      SUMMARY OF THE ACTION

1.      This is a federal securities class action against St. Joe and certain of its officers for violations of the federal securities laws.  Plaintiff brings this action on behalf of itself and all similarly situated persons and entities that purchased St. Joe's publicly traded securities between February 19, 2008 and July 1, 2011, inclusive (the purchasers being the "Class" and the time frame being the "Class Period").[1]  Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§78a *et seq.* (the "Exchange Act").

---

[1]      The Class Period has been extended to reflect significant Company events, including an SEC inquiry and a formal SEC investigation into St. Joe and its officers.

2.      St. Joe is one of the largest real estate development companies in Florida, owning approximately 577,000 acres of land concentrated primarily in Northwest Florida.  Approximately 405,000 acres (70%) of St. Joe's total land holdings are within 15 miles of the coast of the Gulf of Mexico.  St. Joe's core business is real estate development, and the Company operates in residential development, commercial and industrial development and rural land sales.  In addition, St. Joe owns significant interests in timber.

3.      For more than three years, St. Joe systematically and fraudulently misled the market regarding the true value of its residential real estate development projects.  The Company recognized only marginal impairments over the Class Period (including quarters in which St. Joe booked no impairment at all), even though sales and sale prices of property lots in St. Joe's real estate projects had plummeted, and St. Joe has dramatically reduced or halted development spending in its partially developed projects.  By failing to take appropriate impairment charges reflecting the known (or reasonably knowable) true value of its development projects, St. Joe materially overstated its asset values and its earnings during the Class Period.

4.      Many of St. Joe's residential real estate projects remain largely unfinished and undeveloped.  As of 2009, one of its largest projects, RiverTown in St. Johns County, was less than 5% developed with only 215 developed lots out of a planned 4,500.  The WindMark project in Gulf County was only 15% developed with 224 developed lots out of a planned 1,516.  Similarly, during the Class Period, the WaterSound and SummerCamp Beach projects in Walton and Franklin Counties, respectively, were both less than 50% developed.  Even though only fractions of their biggest projects are developed, St. Joe has essentially ceased any further development, and large tracts of undeveloped land remain.  In addition, St. Joe has had tremendous difficulty selling any of its developed properties, and its average sales prices for those it has sold have significantly declined.

2

5.      Under the relevant accounting rules, including Generally Accepted Accounting Principles ("GAAP"), as explained more fully below, St. Joe must test its development projects for impairment when there are certain indicators of impairment such as, *inter alia*, a significant decrease in the market price of real estate properties or the ability to sell, as occurred in Florida during the Class Period.  Indeed, St. Joe admits that these indicators were present throughout the Class Period since it claims to have tested its development projects for impairment every quarter during the Class Period.  Testing for impairment is critical.  Impairment charges are special, non-recurring charges on an asset with an overstated carrying value.[2]  Thus, taking an impairment charge decreases the previously reported value of an asset and reduces earnings accordingly.

6.      St. Joe's residential real estate assets fall into two categories: (1) assets substantially complete and ready for sale; and (2) assets under development, which were "to be held and used."  For assets substantially completed and "ready for sale," St. Joe must record a loss each quarter to the extent the carrying value exceeded estimated fair value (minus the costs of selling that asset).  For assets to be "held and used," once certain indicators of impairment exist, St. Joe must conduct an undiscounted cash flow analysis to determine the "recoverable value" for each development project – *i.e.*, the value of the project to St. Joe over its useful life.  When the undiscounted cash flow total is less than the carrying value for the relevant project (which represents the amount St. Joe has spent to date in developing the land, including acquisition costs), an impairment loss must be recorded, measured as the difference between the carrying value and the current fair value.

7.      As explained below, the average sales prices of the Company's developed properties (such as RiverTown) indicate that the carrying values assigned by St. Joe to those properties far

---

[2]      Carrying value is simply the amount at which an asset is shown in the accounting records (*i.e.* on the balance sheet).

exceeded the fair values during the Class Period, rendering the properties impaired.  Moreover, for undeveloped properties, GAAP requires Defendants to consider all available evidence (including current conditions in the real estate market) when performing a valid cash flow analysis for the purposes of impairment testing and measurement.  Despite overwhelming evidence during the Class Period that the Company's properties were impaired, St. Joe repeatedly represented, quarter after quarter, that the values of its partially developed projects remained near constant.

8.      St. Joe and its senior officers knew, and were required to consider, certain core factors in order to derive the carrying value of the Company's residential real estate projects, including but not limited to: (1) the recent sales prices of lots and units; (2) the "sales velocities" for the region (*i.e.*, the sales volumes and rates of sales); (3) the number of developed units that were ready to be sold; and (4) the time period for each project's useful life (*i.e.*, the time period for complete development), which in turn depends on the expiration date of the permits and entitlements St. Joe obtained from agencies in order to develop the land.

9.      Given the severe decline in the economy generally and the real estate market in particular, the relevant sales history at St. Joe's residential real estate projects, and the development rate of its projects, Defendants knew, or were severely reckless in not knowing, that the values of St. Joe's residential real estate development projects should have been significantly impaired under GAAP, and that those values were accordingly overstated.  As a result, the Company overstated its earnings throughout the Class Period.

10.      Ultimately, St. Joe's failure to timely write down its impaired residential real estate is evidenced by the huge impairments that the Company recorded upon the sale of its ***entire*** residential projects at Victoria Park and Seven Shores.  While St. Joe sold these projects, it was forced to write-off the difference between the final sales price (which is dictated by current market conditions, as is

4

any valid fair value analysis) and reported carrying value.  As late as two days before the sale, St. Joe maintained the full inflated value for the Victoria Park project.

11.     On October 13, 2010, the truth about St. Joe's inflated carrying values began to emerge.  David Einhorn ("Einhorn"), an investor in St. Joe, undertook a lengthy and in-depth analysis of St. Joe's real estate properties, based on expert analysis of detailed information gleaned from more than twenty sources, not all of which were readily available to the public, and presented his analysis and conclusions to the market at the Value Investing Congress.  Einhorn's presentation provided original insight that revealed St. Joe's improper accounting and its failure to have taken the necessary impairments based on historical data.  Indeed, shocked investors learned that (1) many of St. Joe's properties were undeveloped; (2) sales prices had plummeted at many of St. Joe's projects; and (3) a large portion of St. Joe's properties was less than ideally situated for residential projects.

12.     Einhorn's presentation and associated analyst and media commentary on October 13 and October 14, 2010 concerning the true value of St. Joe's properties, and its failure to take the necessary impairments, caused St. Joe's stock price to plummet approximately 20%, as it fell $4.80 per share to close at $19.74 on October 14, 2010 on unusually high trading volume.

13.     Just months later, on January 10, 2011, the Company further disclosed in a Form 8-K that the SEC was conducting an informal inquiry into St. Joe's practices regarding impairment of investment in real estate assets.  The market reacted negatively, and St. Joe's stock price dropped approximately 7% during after hours trading.

14.     The market learned the full truth regarding St. Joe's improper accounting and failure to take required impairments after the market closed on July 1, 2011, when the Company revealed that after a six-month inquiry into St. Joe's impairment practices, the SEC had issued a related order of private investigation covering several matters for the period beginning January 1, 2007 –

including the antifraud provisions of the federal securities laws applicable to Defendants.  This announcement, like the January 10, 2011 announcement, disclosed the SEC's investigation of the Company's historical practices concerning its impairment of real estate assets, and conveyed to the market the extent and likelihood of the Company's improper accounting.  In response, the Company's stock plummeted by approximately 9.1% on unusually high trading volume, causing investors to suffer millions of dollars in losses.

## II.     JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in this District.  St. Joe's principal executive offices are also located within this District.

18.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities market.

III.    THE PARTIES

    A.    Lead Plaintiff

19.    On January 25, 2011, this Court appointed City of Southfield Fire & Police Retirement System as Lead Plaintiff in this action.  As evidenced by the Certificate previously filed, Lead Plaintiff purchased St. Joe stock during the Class Period and was damaged thereby.

    B.    Defendants

        1.    The Company

20.    Defendant St. Joe is a Florida corporation with its principal executive offices located at 133 South WaterSound Parkway, WaterSound, Florida.  St. Joe is one of the largest real estate development companies in Florida, owning approximately 577,000 acres of land concentrated primarily in Northwest Florida.  Approximately 405,000 acres (70%) of St. Joe's total land holdings are within 15 miles of the coast of the Gulf of Mexico.  The Company operates through four business segments: (1) residential real estate; (2) commercial real estate; (3) rural land sales; and (4) forestry.  St. Joe trades its securities on the New York Stock Exchange under the ticker symbol "JOE."

        2.    Individual Defendants

21.    Defendant William Britton Greene ("Greene") served as the Company's Chief Executive Officer ("CEO") from May 2008 and as President of the Company from October 2007 until his resignation on March 2, 2011.  Greene has worked at the Company since 1998, holding various positions, including President of West Florida Residential and Resort Operations, President of St. Joe Towns & Resorts, and President of St. Joe Commercial Real Estate.  Greene signed the Company's Forms 10-K for the Fiscal Years 2007, 2008, and 2009, and Forms 10-Q throughout the Class Period.  Pursuant to Sections 302 and 906 of Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), Greene certified the accuracy of the Company's Forms 10-K for the Fiscal Years 2008, 2009, and 2010 as well as its Forms 10-Q throughout the Class Period.

7

22.     Defendant William S. McCalmont ("McCalmont") served as the Company's Chief Financial Officer ("CFO") from May 2007 and as Executive Vice President of the Company from January 2009 until May 20, 2011.  McCalmont signed the Company's Forms 10-K for the Fiscal Years 2007, 2008, and 2009, and Forms 10-Q throughout the Class Period.  Pursuant to Sections 302 and 906 of Sarbanes-Oxley, McCalmont certified the accuracy of the Company's Forms 10-K for the Fiscal Years 2007, 2008, 2009, and 2010, as well as its Forms 10-Q throughout the Class Period.

23.     Defendant Peter S. Rummell ("Rummell") was the Company's Chairman of the Board and CEO from January 1997 until he retired from his position as CEO in May 2008, and as Chairman in July 2008.  Rummell signed the Company's Form 10-K for the Fiscal Year 2007 and Form 10-Q for the Second Quarter 2008.  Pursuant to Sections 302 and 906 of Sarbanes-Oxley, Rummell certified the accuracy of the Company's Form 10-K for the Fiscal Year 2007, as well as its Form 10-Q for the Second Quarter 2008.

24.     Defendant Janna L. Connolly ("Connolly") is the Company's Senior Vice President and CFO.  Defendant Connolly served as the Company's Senior Vice President and Chief Accounting Officer from January 2010 until May 21, 2011, when she became CFO.  Connolly has approximately 32 years of accounting experience and joined the Company in November 1996 as Controller.  Connolly is a Certified Public Accountant in the State of Florida.  Defendant Connolly worked for KPMG, the Company's outside auditor, for seven years.   Connolly signed the Company's Forms 10-K for the Fiscal Years 2007, 2008, and 2009, and Forms 10-Q throughout the Class Period.

25.     Defendants Greene, McCalmont, Rummell, and Connolly are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of St. Joe's reports to

the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

### C.    Control Person Allegations

26.    The Individual Defendants, because of their positions of control and authority as senior executive officers and/or directors of the Company, had access to the adverse undisclosed information about the Company's understated impairment charges for the residential real estate sector, and the Company's financials as a whole (including its undiscounted cash flow analyses and the assumptions incorporated for each of the residential real estate properties in development), through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith with St. Joe's business.

27.    Each of the above officers of St. Joe's, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning each of St. Joe's residential real estate properties in development, including its economic models and assumptions and cash flow analyses, financial statements, and financial condition, as alleged herein.

28.     The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

29.     The Individual Defendants, as senior executive officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.   The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected.   Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

30.     As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's performance, operations, business, and financial condition and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

31.     Each of the Individual Defendants, as well as St. Joe, is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of St.

Joe's securities during the Class Period, which included the dissemination of materially false and misleading statements and concealment or omission of material adverse facts. The scheme: (i) deceived the investing public regarding St. Joe's core financial statements by improperly accounting for and understating the impairment charges for the carrying values of its residential real estate properties in development; (ii) deceived the investing public regarding the true value of the Company's residential real estate properties; and (iii) caused Plaintiff and other members of the Class to purchase St. Joe securities at artificially inflated prices, which fell as the truth concerning the true value of the residential real estate properties ultimately became known.

32.    In making the statements complained of herein, the Individual Defendants, who were all senior officers and controlling persons of St. Joe, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants are attributable to the Company.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.    The Company and Its Business

33.    St. Joe was founded in 1936 as a paper mill and timber company. It is now one of the largest real estate development companies in Florida. The Company operates through four business segments: (1) Residential Real Estate, which develops mixed use resort, seasonal, and primary residences and amenities such as golf courses; (2) Commercial Real Estate, which plans, develops, and sells real estate for commercial purposes and concentrates on the area surrounding the airport in Panama City; (3) Rural Land Sales, which focuses in the sale and limited development of timberland; and (4) Forestry, which grows, harvests, and sells St. Joe's extensive timber holdings. The Company currently owns approximately 577,000 acres of land, the majority in Northwestern Florida. Approximately 70 percent of St. Joe's land is within 15 miles of the Gulf of Mexico. St. Joe acquired much of its land in the 1930s and 1940s.

11

**B.    St. Joe's Real Estate Development Was a Core Operation During the Class Period**

34.    Although the Company was originally formed to operate as a paper mill, by the 1990s St. Joe was focused on real estate development.  Prior to and during the Class Period, residential real estate development made up the overwhelming majority of St. Joe's business and was a core part of the Company's operations.  According to the Company's Forms 10-K filed with the SEC during the Class Period, in 2008, St. Joe's total investment in residential properties comprised almost *85%* of its entire investment in real estate.  In 2009 and in 2010, residential real estate investment totaled *82%* of St. Joe's total investment in real estate.  This is illustrated in the table below:

| St. Joe's Investment in Real Estate ($ in thousands) | | | |
|---|---|---|---|
| | **2010** | **2009** | **2008** |
| **Residential Real Estate Operating Property** | $178,417 | $173,190 | $185,798 |
| **Residential Real Estate Development Property** | $478,278 | $487,870 | $596,011 |
| **Total Real Estate Investment** | $797,384 | $802,006 | $923,541 |
| **Percentage Residential Real Estate of Total Real Estate Investment** | **82%** | **82%** | **85%** |

35.    Similarly, the Company's financial statements reveal that residential real estate made up a majority of St. Joe's total assets during the Class Period.  Residential real estate made up 71.3% of St. Joe's total assets in 2007, 67.1% in 2008, 59.0% in 2009, and 60.8% in 2010.

36.    The significance of real estate development to St. Joe's business is set forth in a 2010 letter to shareholders, which stated:

> When we first embarked on our highest and best use strategy, our priority was to seek as many land use entitlements for commercial

and residential development in our region as possible. ***This continues to be one of our core competencies.***[3]

C.    **The Drastic Downturn in the Florida Residential Real Estate Market Negatively Impacted St. Joe's Core Business**

1.    **The Real Estate Crash**

37.    Just prior to and during the Class Period, the United States in general, and Florida in particular, experienced one of the largest real estate crashes in decades.  Empirical evidence and the Company's own disclosures demonstrate that the real estate market in Florida, which was one of the first states affected by the deteriorating real estate market, was devastated by this crash.  For example, a comparison of the percent change, by quarter, in the Federal Housing Finance Agency's Home Price Index for Florida and the United States, from 2007 to the third quarter of 2010, reveals the extent of the devastation suffered by the Florida real estate market:[4]

---

[3]    Internal citations are omitted, and emphasis is added, unless otherwise noted.

[4]    Home Price Index information obtained from www.fhfa.gov/Default.aspx



38.     In addition, historical data from the Case Shiller Home Price Index for the city of

Tampa, Florida for the same period further evidences this decline:[5]

---

[5]     Tampa is the closest city to the majority of St. Joe's residential real estate for which Case Shiller provided housing index information.

14



**2.    The Real Estate Crash Caused the Company's Revenues to Decline and Losses to Increase Dramatically**

39.    Not surprisingly, the economic recession (with its concomitant real estate crash) had a profound effect on the Company, causing the Company's residential real estate revenues – which was its largest asset class – to decline drastically during the Class Period, while at the same time its losses in residential real estate soared.  This is evidenced in the chart below:

|  | **2006** | **2007** | **2008** | **2009** | **2010** |
|---|---|---|---|---|---|
| **Revenue from Residential Real Estate ($ in thousands)** | $358,439 | $155,550 | $65,498 | $89,850 | $40,252 |
| **(Loss) Income from Residential Real Estate[6] ($ in thousands)** | $23,827 | ($43,071) | ($115,062) | ($137,855) | ($47,370) |

---

[6]    Includes total impairment charges of $4.8 million, $94.8 million, $60.3 million and $13.6 million in 2010, 2009, 2008, and 2007, respectively.  The majority of the impairment charges of

15

40.     In addition to the loss of revenue, St. Joe's home and homesite sales plummeted as a result of the downturn in the real estate market.  According to the Company's Forms 10-K filed with the SEC during the Class Period, the Company's closed units decreased by nearly **95%** from 1,610 closed units in 2005 to a mere 85 in 2010.

|  | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** |
|---|---|---|---|---|---|---|
| **Closed Units** | 1610 | 1260 | 478 | 122 | 164 | 85 |

41.     Furthermore, the Company's gross profit from home and homesite sales decreased dramatically during the Class Period.  Gross profit plunged from $39.1 million to $2.2 million.

|  | **2007** | **2008** | **2009** | **2010** |
|---|---|---|---|---|
| **Sales of Homes & Homesites ($ in millions)** | $116.0 | $28.0 | $31.3 | $8.5 |
| **Gross Profit ($ in millions)** | $39.1 | $4.0 | $2.7 | $2.2 |

### 3.     St. Joe Halts Further Development of Its Projects

42.     The state of the real estate market in the United States, particularly Florida, and the performance of St. Joe's residential real estate projects over the course of the Class Period, forced the Company to conclude that it would not be economical to continue investing in the development of its residential real estate projects.

43.     Beginning in 2007, St. Joe effectively ceased its development activity.  The Company drastically decreased the amount of money it invested in developing its residential real estate.  As shown in the table below, St. Joe invested $570,925,000 in 2006 on its residential real estate.  In 2007, that amount dropped almost **60%** to $227,675,000.  In 2008, St. Joe's capital expenditures on its properties again declined another **87%** to $28,515,000, resulting in a decline of more than **95%** in

$94.8 and $60.3 million taken in 2009 and 2008, respectively, were related to the impairments for Victoria Park and Seven Shores, where the Company had no alternative but to take those charges.

16

only two years.  By 2009, St. Joe's expenditures on its residential real estate properties decreased yet again by more than 50%, to a mere $13,687,000, and in 2010, they were only $7,557,000.

| | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| **Capital Expenditures for Residential Real Estate ($ in thousands)** | $570,925 | $227,675 | $28,515 | $13,687 | $7,557 |

44.     Moreover, the Company reduced its employee workforce by two-thirds, or 66%, in 2007.  A large portion of this reduction was centered in the residential real estate segment.  In 2006, St. Joe reported that it had 441 employees in its residential real estate sector.  By 2007, that declined to just 148 employees.

> **D.     The Values of St. Joe's Residential Real Estate Development Projects Were Overstated During the Class Period**

45.     As a result of the economic downturn, throughout the Class Period, St. Joe's developments suffered.  First, because the Company halted development, only a fraction of the planned units for many of these properties was ever completed, and the associated lots planned for retail, office, schools, golf courses, and light industrial space remain barren.  Further, the average prices for the properties the Company ***has*** sold have substantially declined.  Defendants knew or should have known of these significant problems during the Class Period because they were required to account for these problems, along with ***all available evidence*** when evaluating the Company's properties for impairment.  Defendants' failure to write down these materially impaired assets during the Class Period demonstrates their knowing and reckless disregard for this critical information in their impairment analyses.

17

### 1.    RiverTown

46.    RiverTown is a residential real estate project in St. Johns County, Florida that St. Joe began developing in 2006.  In its 2009 Form 10-K, St. Joe described its plans for RiverTown: "[RiverTown is] situated on approximately 4,170 acres located in St. Johns County south of Jacksonville, [and] is currently planned for 4,500 housing units and 500,000 square feet of commercial space. The centerpiece of the community will be a 58-acre park along the St. Johns River.  RiverTown is planned to include several distinct neighborhoods and amenities."  However, the Company's Class Period SEC filings failed to disclose that only 215 units, or less than 5% of the planned 4,500 units for this project had actually been developed.[7]  Indeed, of those 215 lots, only 12 had homes built on them.[8]  Further, only 30 units, or less than 1% of the planned 4,500 units, had been sold.[9]  In fact, on May 22, 2009, Issa Homes – one of the builders that had bought several lots within RiverTown – sued St. Joe, alleging that, *inter alia*, the lack of development rendered the property more of a "moonscape" than a "luxury development."[10]

47.    By January 31, 2010, only a tiny fraction of the lots planned for RiverTown was developed, and St. Joe had yet to complete ***any*** of the retail space, office space, light industrial space, golf course, or school that had been planned.  Of a planned 186 acres of community parks,

---

[7]    The number of developed lots cited in the RiverTown Development of Regional Impact ("DRI") Biennial Monitoring Report 2008-2009, dated January 31, 2010 ("RiverTown Biennial Report").

[8]    Einhorn Presentation, "Field of Schemes: If You Build It, They Won't Come," citing St. Johns County Tax Appraiser Office.

[9]    *Id.*

[10]    *Issa Homes, Inc. v. St. Joe Co.*, Case No. CA09-1229 (Fla. Cir. Ct. St. Johns County).

only 37 were completed.[11]  CW1, the former Site Development Manager at RiverTown from 2006 through July 31, 2008, noted that only a "handful" of homes had been built, the project still lacked electricity, utility lines had not been cleared, and sewer lines had not been installed.  Thus, it was highly unlikely that anyone would purchase the few completed homes that did exist.  Accordingly, CW1 agreed with Issa Homes' description of the development as a "moonscape."

48.     Moreover, CW1 explained that, during CW1's tenure at the Company, cost became a major concern for St. Joe.  When CW1 was initially hired in 2006, the Company planned to develop all of the land for sale to builders.  CW1 was later instructed to change the plans and focus only on particular neighborhoods.  CW1 stated that infrastructure plans changed as well.  The Company scaled back its plans for high-end aesthetics such as "fancy bridges" and similar features, and CW1 was instead instructed to implement only the necessities.

49.     The lack of progress and the uncertainty of future development at RiverTown is underscored by the fact that its land entitlements, which are the necessary permits required in order to develop the land, expire in 2016.  By January 31, 2010, development of RiverTown was far behind schedule, with no possibility of completion before 2016.

50.     In addition to the lack of development at RiverTown, St. Joe was unable to sell the properties it had completed.  An independent study conducted in the first quarter of 2010 of the sales velocities over the course of 2008, 2009 and the first quarter of 2010, in conjunction with the amount of homesite inventory on the market in central St. Johns county (where RiverTown is located),

---

[11]     Biennial Monitoring Report for RiverTown Development of Regional Impact progress reports from the RiverTown DRI Monitoring Report 2008-2009, dated January 31, 2010.

revealed that as of the first quarter of 2010, there was almost **nine years** of homesite inventory in the region.[12]   In other words, it would take nine years to sell the available lots.

51.     Moreover, the sales prices for the RiverTown units that were developed or completed also plummeted during the Class Period.  For example, in October 2007, St. Joe sold six RiverTown lots to Weekley Homes at an average sales price of $72,133 per lot.  However, by August 2010, St. Joe sold two similar lots to Weekley Homes for an average price of just $31,250 per lot.  This difference represents a **57%** decline in the value of RiverTown lots.

52.     Despite this decline, St. Joe listed the carrying values for RiverTown as follows:[13]

| ($000's) | St. Johns County Carrying Value (net of accumulated depreciation) as of December 31 | | | |
|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010** |
| **Land with infrastructure** | 5,119 | 5,023 | 1,016 | 1,016 |
| **Buildings** | 3,393 | 2,912 | 611 | 513 |
| **Residential** | 65,615 | 77,143 | 74,491 | 93,740 |
| **Total** | 74,127 | 85,078 | 76,118 | 95,269 |

53.     St. Joe improperly maintained these overstated carrying values even though: (1) RiverTown was barely developed; (2) the Company had determined that it was not going to invest in any further development of the property; (3) the Company was selling very few lots, and the lots that did sell were for significantly lower amounts than prior to the Class Period; and (4) there was a nine-

---

[12]     *See* Einhorn's October 13, 2010 presentation "Field of Schemes: If You Build It, They Won't Come", citing Metrostudy Jacksonville Residential Survey, 1Q 2010.

[13]     St. Joe only reports carrying values by county, not by project, in its SEC filings, making it extremely difficult, if not impossible, to determine the carrying values for individual lots and projects, particularly if there is more than one residential real estate property in a county.

year supply of homesite inventory within the region of Florida where RiverTown was located. Accordingly, although Defendants knew or should have known these facts, they continued to represent that the carrying value of the project was 100% recoverable.

54.     In reality, RiverTown's carrying values were overstated and its developed properties (assets substantially complete and ready for sale) and undeveloped properties were significantly impaired during the Class Period.  Indeed, in 2008 and 2009, RiverTown's developed lots ready for sale were impaired by between approximately $7 million and $12 million as illustrated in the table below:

|  | Dec. 31, 2009 | Dec. 31, 2008 |
|---|---|---|
| estimated RiverTown infrastructure costs allocated to single family residential lots[14] | $326,806,701 | $326,806,701 |
| + estimated RiverTown initial costs (land and encumbrances) allocated to single family residential lots[15] | $13,858,572 | $33,479,021 |
| = estimated total capitalized costs allocated to single family residential lots[16] | $340,665,273 | $360,285,722 |
| ÷ total # of single family residential lots | 3,822 | 3,822 |
| = estimated carrying value per single family residential developed lot | $89,133 | $94,266 |
| x # of developed lots | 187 | 187 |
| = total estimated carrying value of developed lots | $16,667,871 | $17,627,742 |
| estimated total impairment on developed lots assuming fair value per lot of:[17] |  |  |

[14]     Main Street 2008 CDD Bond Offering Prospectus.

[15]     Form 10-K December 31, 2009. Calculated as total residential initial costs applied proportionately to single family residential lots (3822/4500).

[16]     Main Street 2008 CDD Bond Offering Prospectus.

[17]     The $30,000, $40,000 and $50,000 represent various possible selling prices.  This range is based on the average selling price of $31,000 for lots sold in August 2010.

| | | |
|---|---|---|
| $30,000 | **$11,057,871** | **$12,017,742** |
| $40,000 | **$9,187,871** | **$10,147,742** |
| $50,000 | **$7,317,871** | **$8,277,742** |

55.     RiverTown's undeveloped lots were also significantly impaired as of December 31,

2009.  The following table represents an estimate of the undiscounted cash flow analysis that should

have been performed as of December 31, 2009.  This analysis utilizes data from the Main Street

(RiverTown) 2008 CDD Bond Offering Prospectus and the 2009 10-K to estimate the total cash

outflows to develop the remainder of the project.  It also assumes a range of potential future selling

prices based largely on the average selling price of lots sold in August 2010.

| | |
|---|---|
| # of remaining residential units (lots and multifamily) to be developed[18] | 4,285 |
| estimated costs to develop remaining residential units[19] | $347,257,758 |
| **-** estimated development costs already incurred on undeveloped residential units[20] | $(48,135,332) |
| + estimated initial costs allocated to undeveloped units[21] | $15,537,410 |
| = estimated carrying value of remaining units after development | $314,659,835 |

---

[18]     Einhorn Presentation, "Field of Schemes: If You Build It, They Won't Come", citing RiverTown Development of Regional Impact Biennial Monitoring Report 2008-2009, dated January 31, 2010.

[19]     Einhorn Presentation, "Field of Schemes: If You Build It, They Won't Come", citing Main Street 2008 CDD Bond Offering Prospectus. Calculated as infrastructure costs allocated to residential units applied proportionately to remaining undeveloped units (4285/4500).

[20]     Total residential capitalized costs to date ($65,559,000 per 2009 Form 10-K; $68,001,000 per 2008 Form 10-K) less estimated costs allocated to 215 developed units ($17,423,668 per Main Street 2008 CDD Bond Offering Prospectus; costs applied equally to all residential units)= $48,135,332.

[21]     Schedule III of the 2009 Form 10-K. Calculated as total residential initial costs applied proportionately to undeveloped residential units (single-family residential) lots (4285/4500).

| estimated total impairment for the developed project at average future unit selling price of: | |
|---|---|
| $30,000 | **$186,109,835** |
| $40,000 | **$143,259,835** |
| $50,000 | **$100,409,835** |

56.     This indicates that St. Joe would lose between approximately $100 million and $186 million on the entire project after incurring all costs to complete it and then selling all of the units remaining as of December 31, 2009 for prices ranging from $30,000 to $50,000 per lot.  Thus, an impairment loss should have been taken for most, if not all, of the approximately $58 million ($74.5 million total St. Johns County carrying value minus $16.6 million carrying value of developed lots) carrying value on the Company's books as of December 31, 2009.

## 2.     The WaterSound Developments

57.     The WaterSound developments, which include WaterSound, WaterSound Beach and WaterSound Beach West, are situated in Walton County in Northwest Florida.[22]  The WaterSound project is the largest of the three WaterSound projects with 1,432 units planned, but only 211, or 14% of those units, had been developed[23] and only 29 had been sold during the Class Period.[24]

58.     The WaterSound projects are described by the Company in its 2009 Form 10-K as follows:

---

[22]     WaterColor, WaterSound, WaterSound Beach and WaterSound Beach West are all St. Joe residential real estate development projects situated in Walton County in northwest Florida.  The WaterColor development has 1,140 units planned, is 90% developed, and 81% of its planned units have been sold.

[23]     WaterSound and WaterColor DRI Monitoring Report 2007-2008, dated April 1, 2009 ("WaterSound North DRI Report").

[24]     Form 10-Q for second quarter 2011.

WaterSound Beach is located approximately five miles east of WaterColor and is planned to include approximately 511 units. Situated on approximately 256 acres, WaterSound Beach includes over one mile of beachfront on the Gulf of Mexico. The WaterSound Beach Club, a private, beachfront facility featuring a 7,000 square-foot, free-form pool and a restaurant, is located within the community.

WaterSound West Beach is located approximately one-half mile west of WaterSound Beach on the beach-side of County Road 30A. This community is situated on 62 acres and includes 199 units with amenities that include private beach access through the adjacent Deer Lake State Park and a community pool and clubhouse facility.

WaterSound is situated on approximately 2,425 acres and is planned for 1,432 residential units and approximately 450,000 square feet of commercial space. It is located approximately three miles from WaterSound Beach north of U.S. 98 in Walton County. WaterSound includes Origins, a uniquely designed Davis Love III golf course, as well as a community pool and clubhouse facility.

59.     There are no longer any beachfront lots available at WaterSound Beach.   The Company sold its last beachfront lot on September 20, 2010 for $1,253,800.[25]   WaterSound, WaterSound Beach and WaterSound Beach West collectively contain 253 interior lots that cannot command nearly as high a sales price as the beachfront lots.[26]  Many of the remaining interior lots are situated on land separated from the ocean, and the rest of the development, by a highway. Moreover, the average sales prices at WaterSound steadily decreased during the Class Period.[27]

---

[25]     Einhorn Presentation, "Field of Schemes: If You Build It, They Won't Come," citing Walton County Tax Appraiser Office.

[26]     *Id*.

[27]     Walton County Property Appraiser's website, http://qpublic.net/walton/index.html

60.     At WaterSound, during the Class Period, none of the retail or office space had been completed and no other units had been initiated.[28]  With no further investment in the property, it is unclear when the WaterSound project will be fully developed, or even when the current existing units will be sold.  According to CW2, the Director of Construction on several projects for St. Joe from March 2006 through September 2009,[29] "WaterSound North was tremendously expensive" to develop.  "It cost $100,000 per lot and couldn't sell for close to that" because they were smaller lots with small backyards and big setbacks.  They were "bad when the market was half-way decent and really bad after the market went bad."

61.     Despite this, Defendants failed to take any significant impairment charges to these properties during the Class Period.   The Company's carrying values for Walton County (encompassing of the WaterSound projects as well as WaterColor) were:[30]

| ($000's) | Walton County Carrying Value (net of accumulated depreciation) as of December 31 | | | |
|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 |
| **Land with infrastructure** | 3,491 | 3,589 | 3,631 | 3,382 |

[28]     *Id*.

[29]     CW2 reported to former President of Development Nick Cassala and Executive Vice President for WaterSound Mary Rosenheim.  During CW2's tenure, CW2 did a lot of work at the Wild Heron and RiverCamps projects. CW2 focused primarily on building development amenities, and some commercial buildings.

[30]     The Company only discloses its carrying value by county, therefore, it is impossible to know the carrying value for a project if there is more than one project in that county.  WaterColor, WaterSound, WaterSound Beach and WaterSound Beach West are all located in Walton County and the reported carrying value is an aggregate carrying value for all of those properties.  The decrease in the carrying value for Walton County during the Class Period is likely due to the sales made at those properties during the Class Period, and is not explained by the minimal impairment charges that St. Joe recorded to its existing homes and homesites of $7.8 million in 2007, $12.8 million in 2008, and $7.3 million in 2009.  *See* 2009 Form 10-K.

| ($000's) | Walton County Carrying Value (net of accumulated depreciation) as of December 31 | | | |
|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010** |
| **Buildings** | 39,016 | 32,823 | 63,385 | 63,856 |
| **Residential** | 166,533 | 151,647 | 86,842 | 83,982 |
| **Total** | 209,040 | 188,059 | 153,858 | 151,220 |

62.     The characteristics of the WaterSound development are very similar to those of the RiverTown development.  Both developments were located in the same general area, faced the same market conditions, and were largely undeveloped.  As of June 30, 2011, at the end of the Class Period, only 0.7% and 1.3% of the total planned residential units had been sold at RiverTown and WaterSound, respectively.   Accordingly, an impairment analysis similar to the one above for RiverTown would apply to the WaterSound development, and would likely demonstrate that WaterSound was similarly impaired during the Class Period.

### 3.      SummerCamp Beach

63.     SummerCamp Beach is a residential real estate project located in Franklin County, Florida.  In its 2009 Form 10-K, the Company describes SummerCamp Beach as being "situated on the Gulf of Mexico on approximately 762 acres in Franklin County. The community includes the SummerCamp Beach Club, a private beachfront facility with a pool, restaurant, boardwalks and canoe and kayak rentals. Plans for SummerCamp Beach include approximately 499 units."

64.   St. Joe failed to disclose, however, that Franklin County has a tiny population of 11,280,[31] with approximately 13% of that population living in Franklin County's prison.[32]  In 2009, only 4,934 people were in the labor force, and the median income was $34,787.[33]

65.   SummerCamp Beach was not fully developed during the Class Period.  Of its 499 planned units, 226, or less than half, were developed.[34]  Of those 226 units, only 87 had been sold as of September 30, 2010.  Because St. Joe has stopped further development of many of its residential real estate projects, it is unclear when or if this development will ever be completed.

66.   The sales prices at SummerCamp Beach also decreased significantly throughout the Class Period.  In November 2006, the Company sold five beachfront lots for an average price of $880,000 per lot.[35]  However, in July 2010, St. Joe sold four beachfront lots for an average price of approximately $331,000, or a 62.4% decline in value.[36]  Moreover, St. Joe provided the mortgage on the four beachfront lots that it sold in July 2010.[37]

---

[31]   US Census 2009 Estimate, http://quickfacts.census.gov

[32]   Inmate population information list, http://www.dc.state.fl.us/activeinmates/list.asp?DataAction=Paging

[33]   US Census 2009 Estimate, http://quickfacts.census.gov

[34]   Einhorn Presentation, "Field of Schemes: If You Build It, They Won't Come", citing Franklin County Tax Appraiser Office.

[35]   Franklin County Property Appraiser's website, http://qpublic.net/franklin/index.html

[36]   *Id.*

[37]   http://www.myfloridacounty.com/services/officialrecords_intro.shtml

67.     The value of interior lots at SummerCamp Beach also plummeted during the Class Period.  Between 2005 and 2006, interior lots at SummerCamp Beach were sold for approximately $150,000 to $165,000.[38]  By 2010, St. Joe was pricing interior lots for as low as $39,000.[39]

68.     St. Joe's residential carrying value for this project was $36,329,000 in 2007, *increasing* to approximately $41,218,000 in 2008, and remaining relatively constant at approximately $41,361,000 in 2009 as set forth below: [40]

| ($000's) | Franklin County Carrying Value (net of accumulated depreciation) as of December 31 | | | |
|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010** |
| **Land with infrastructure** | 55 | 51 | 48 | 38 |
| **Buildings** | 8,504 | 3,607 | 2,035 | 2,701 |
| **Residential** | 36,329 | 41,218 | 41,361 | 38,851 |
| **Total** | 44,888 | 44,876 | 43,444 | 41,590 |

69.     Thus, St. Joe *increased* the carrying value for this project during the Class Period despite: (1) the free-falling sales prices for both beachfront and interior lots; (2) the location of the project in a sparsely populated and low-income area; and (3) halting its plans to complete the project's development.

---

[38]     Franklin County Property Appraiser's website, http://qpublic.net/franklin/index.html

[39]     Einhorn Presentation, "Field of Schemes: If You Build It, They Won't Come", citing listings offered by SummerCamp Beach exclusive realtor.

[40]     These carrying values include the carrying value of the Cutter Ridge project, which is also in Franklin County.  However, according to the 2008 Form 10-K, the value of Cutter Ridge is insignificant due to the minimal amount of work that has been done on the project and the stated carrying values largely represent the carrying value for SummerCamp Beach.

70.     Moreover, average home sales prices in the SummerCamp Beach development during the Class Period illustrate that the development's reported carrying value was overstated.  St. Joe sold only one unit in SummerCamp Beach in each of 2008 and 2009.  It sold six homesites in 2010, including four beachfront lots in the third quarter of 2010 for an average sales price of $331,000.[41] St. Joe also listed interior lots for a high price of only $59,000 in 2010.[42]  In 2008, however, St. Joe reported a carrying value of $41,218,000 for SummerCamp Beach, and a net carrying value of $41,361,000 in 2009.  During the Class Period, there were 23 remaining developed beachfront lots and 121 remaining developed interior lots.[43]  Even assuming the highest average sales price numbers, the value of those remaining lots would have been $14,752,000.   Notwithstanding this evidence, the Company took just $12 million and $7.3 million in impairment charges for *all* residential real estate homes and homesites for the ***entire*** company in 2008 and 2009, respectively.

71.     CW4[44] explained that the 2007 carrying value of $36,329,000 for SummerCamp Beach was inflated.  According to CW4, in late 2006 St. Joe sold five lots at SummerCamp Beach for an average of $800,000, but the cheapest lots were being listed at $150,000.  The number of lots

---

[41]     Einhorn  Presentation,  citing  Franklin  County  Property  Appraiser's  website, http://qpublic.net/franklin/index.html

[42]     Einhorn Presentation, "Field of Schemes: If You Build It, They Won't Come," citing listing for exclusive SummerCamp Beach agent.

[43]     Einhorn Presentation, "Field of Schemes: If You Build It, They Won't Come," citing Franklin County Tax Appraiser Office.

[44]     CW4 was a former Senior Vice President and General Manager for the "capital region" of Tallahassee, Florida, which included Leon, Franklin, and Wakulla Counties.  CW4 was employed by the Company from 2004 until June 2008.  CW4 reported directly to Defendant Greene and was responsible for all land management (including, but not limited to, environmental concerns, the DRI process, engineering, feasibility, planning, construction, sales, marketing) in CW4's region.

available for sale was approximately 140.  The carrying value of $36.3 million, when spread over 140 lots, gives rise to an average of approximately $250,000 per lot at SummerCamp Beach.

### 4.   WindMark Beach

72.      WindMark Beach is located in Gulf County.  In its 2009 Form 10-K, St. Joe describes WindMark as "a beachfront resort community situated on approximately 2,020 acres in Gulf County near the town of Port St. Joe.  Plans for WindMark Beach include approximately 1,662 residential units and 75,000 square feet of commercial space."  WindMark is located in the rural area of Gulf County, with a population of 15,755.[45]  In 2009, there were only 6,411 people in the labor force and the median household income is $38,632.[46]

73.      Like many of St. Joe's other residential real estate projects, WindMark was largely undeveloped during the Class Period.  Of 1,516 planned units, only 224 (or 15%) were developed.[47] The Biennial Report[48] for WindMark confirms that no development occurred during the two-year period covered by the report (April 1, 2008 – April 1, 2010).  The project build-out date for all development is December 31, 2018, and the termination and development order expiration dates are December 31, 2023.  From the current lack of development, it is unlikely that the Company will be able to meet these deadlines.  Because St. Joe has ceased development of its projects, it is uncertain if the project will ever be completed.

---

[45]      US Census 2009 Estimate, http://quickfacts.census.gov

[46]      *Id.*

[47]      WindMark Beach DRI Monitoring Report 2008-2009, dated April 1, 2010.

[48]      Biennial reports are status reports that the developer of a property is required to submit to the relevant local government agencies that are monitoring the development project on a biennial basis.

74.     The Company was also unsuccessful in selling its developed units during the Class Period.  Of 224 developed units, only 150 units of the 1,516 planned units (10%) were sold as of September 30, 2010.  Moreover, sales prices of the completed units in WindMark have, as with St. Joe's other projects, plummeted during the Class Period.  For example, in September 2007, St. Joe sold a beachfront lot at WindMark for $695,000.  In October 2009, another beachfront lot sold for $350,000.  By August 2010, a beachfront lot sold for only $188,000.[49]

75.     St. Joe's residential carrying value for WindMark, notwithstanding the plummeting sales prices, was $189,593,000 in 2007, $195,165,000 in 2008, $163,979,000 in 2009 and $160,211,000 in 2010 as detailed below:

| ($000's) | Gulf County Carrying Value (net of accumulated depreciation) as of December 31 | | | |
|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010** |
| **Land with infrastructure** | 3,111 | 4,695 | 5,462 | 5,520 |
| **Buildings** | 3,197 | 14,004 | 38,926 | 41,515 |
| **Residential** | 189,593 | 195,165 | 163,979 | 160,211 |
| **Total** | 195,901 | 213,864 | 208,367 | 207,246 |

76.     Defendants knew that the carrying value for WindMark was overstated.  According to CW4, the WindMark project began as a joint venture with two luxury resort, spa and timeshare developers.  CW4 explained that in late 2007, the joint venture fell apart and St. Joe was forced to pay a $5 million break-up fee to one of its joint venture partners, with the concomitant knowledge

---

[49]     The October 2009 and August 2010 sales were not made directly by St. Joe, but were resales between third parties.  The Individual Defendants knew of resales of properties within the Company's development projects.  Rummell admitted on the Company's 1Q 2008 earnings conference call that resale pricing was a "benchmark" for St. Joe.

that, without the business partner, the huge investment Defendants had made in this property would likely not be recovered.

77.     Sales data from the WindMark property further establishes that the carrying value for this property was overstated during the Class Period.  Sales history data shows that a beachfront lot sold in October 2009 for $350,000.[50]  The seller was Regions Bank.[51]  In 2010, several interior lots at WindMark were sold for an average price of $93,950.[52]  There were 17 developed beachfront lots remaining in WindMark and 55 interior lots.[53]  Using recent sales history, the remaining developed beachfront lots are worth $5,950,000 (17x$350,000) and the remaining interior lots at WindMark are worth $5,167,250 (55 x $93,950).[54]  WindMark also contains condominium units that Einhorn has valued at $5,000,000.  Collectively, therefore, the condominiums, beachfront and interior lots are worth $17,825,000.  In 2009, St. Joe reported WindMark's net residential carrying value as $163,979,000 and took just $7.3 million in impairment charges for **all** of the Company's residential real estate.  As detailed below, Defendants knew from comparable sales evidence and other detailed information presented to them at the Management Committee meetings that the reported carrying value was overstated.

---

[50]     Gulf County Property Appraiser's website, http://qpublic.net/gulf/index.html

[51]     *Id.*

[52]     *Id.*

[53]     Einhorn Presentation, "Field of Schemes: If You Build It, They Won't Come," citing Gulf County Tax Appraisal Office.

[54]     Einhorn used an average price of $125,000 for interior lots.  He used that average price based on an August 2010 sale for $104,000 and then rounded up.  Even using this higher average price, the interior lots are only worth $6,875,000 and the total value of all lots plus condominiums is $17,825,000.

5.      **Victoria Park**

78.      The carrying value for the Company's Victoria Park development was also inflated. In 2009, St. Joe sold all of its remaining assets in its Victoria Park development in Volusia County for $11 million.  In sharp contrast to this $11 million dollar price, the Company's carrying value for this property just before the sale was $78.8 million.  Indeed, on December 18, 2009, the Company announced in a Form 8-K that on December 15, 2009, it had determined that material conditions for the $11 million sale had been met, and that St. Joe had taken an impairment charge of *$67.8* million just *two days* before the sale closed.  Prior to the sale, the Company had not taken any impairment charges to the property, falsely and fraudulently leading the market to believe that the value of the property was completely recoverable.  However, when forced to categorize the project as "held for sale" and conduct a fair value analysis based on current market conditions, the Company took an impairment charge for *over 80%* of the project's purported carrying value.

79.      CW4 confirmed that the Individual Defendants knew the 2007 carrying value for Victoria Park, a property CW4 analyzed in CW4's spreadsheets, was overstated.  According to CW4, St. Joe recorded a much higher book value for Victoria Park than its true value.  CW4 explained that builders were selling homes for approximately $250,000 to $300,000, and that sophisticated national builders would not pay more than 20% of the projected gross sales price for the land.  Thus, the lots were only worth $40,000 to $60,000.  CW4 further stated the undeveloped land at Victoria Park had a *negative* value because the prices builders were willing to pay for undeveloped lots were lower than the cost of developing the land.  CW4 prepared an excel spreadsheet model of Victoria Park analyzing its value, and sent it to Defendants Greene and McCalmont, and a financial analyst at the Company.  CW4 learned directly through conversations with Greene and McCalmont that *both knew in late 2007 they were not going to be able to recoup*

*the book value* for Victoria Park, and that "it was known that Victoria Park was a loser and they [Greene and McCalmont] wanted to get out."

### 6. Seven Shores

80.     The carrying value for the Company's Seven Shores development was also inflated. The Seven Shores development project was also written down shortly before it was sold for significantly less than the carrying value on St. Joe's books.  St. Joe carried the project for nearly $45 million and sold it in the third quarter of 2009 for only $12.5 million.  Prior to the fourth quarter of 2008, the Company had not taken any impairment charges to the property, falsely and fraudulently leading the market to believe that the value of the property was completely recoverable. However, in the fourth quarter of 2008, St. Joe was finally forced to take an impairment charge when Defendants decided not to exercise their option to acquire additional land under their option agreement, and the scope of the project was reduced.  St. Joe was forced to take an additional impairment charge in the second quarter of 2009 resulting from the impending sale.  Ultimately, the Company took an impairment charge totaling $35 million of the project's purported carrying value during this time.

### 7. SouthWood

81.     In addition, CW4 further confirmed that the 2007 residential net carrying value of $48 million for the SouthWood project in Leon County was overstated.  According to CW4, St. Joe developed about 50 to 75 SouthWood lots at a time, so the Company would have about that many lots on the books at any given time.  Thus, the 2007 carrying value of approximately $47 million, spread over 50 to 75 lots, suggests that St. Joe would be able to recover between $940,000 and $626,000 per lot – a highly unrealistic number according to CW4, given market conditions and recent sales history.  CW4 explained that, in 2007, SouthWood did not have many lots for sale, but had approximately 2000 entitlements.  However, those entitlements were of only nominal value,

because of the difficulty in obtaining permits in Tallahassee, where SouthWood is located, and because costs of infrastructure were high. CW4 explained that St. Joe and the Individual Defendants could not realistically expect any significant profit when the development costs exceeded the price that St. Joe could obtain for developed lots.

82.     In sum, it is evident that the carrying values for many of St. Joe's most significant development projects were overstated during the Class Period and that the Company failed to take the necessary impairments for these developments, causing its asset values and earnings to be materially inflated. This is further established by the accounting analysis below.

## V.   DEFENDANTS FAILED TO COMPLY WITH SEC REGULATIONS AND GAAP

83.     As a result of the foregoing, all of the financial statements issued by St. Joe during the Class Period, including those set forth in its press releases, Forms 10-Q, 10-K and other SEC filings issued by the Company, were materially misleading because they violated the relevant GAAP and SEC rules. Defendants' material overstatement of St. Joe's assets, and their failure to record the necessary impairment charges, consequently inflated the Company's net income and earnings per share.

### A.   Defendants Failed to Comply With Regulation S-K, Item 303

84.     Federal regulations strictly govern what must be included in documents filed with the SEC. The SEC regulates statements by companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience." SEC Release No. 33 6504, 3 Fed. Sec. L. Rep. (CCH) ¶23,120, at 17,095, 17 C.F.R. §241.20560 (Jan. 13, 1984). In addition to the periodic reports required under the Exchange Act, management of a public company has a duty promptly "to make full and prompt announcements of material facts regarding the company's financial condition." SEC Release No. 34 8995, 3 Fed. Sec. L. Rep. (CCH) ¶23,120A, at

17,095, 17 C.F.R. §241.8995 (Oct. 15, 1970).  The SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments."  SEC Release No. 18271, [1981 1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) 1183,049, at 84,618 (Nov. 19, 1981).

85.     Regulation S-K provides, in part, that annual and period reports must contain a section entitled "management's discussion and analysis of financial condition and results of operations" (the "Management Discussion").  *See* 17 C.F.R. §229.10, *et seq.*

86.     Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), governs what must be contained in the Management Discussion.  Item 303 requires, in part, that the Management Discussion must:

> Discuss registrant's financial condition, changes in financial condition and results of operations.  The discussion shall provide information as specified in paragraphs (a)(1) through (5) of this Item and also shall provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations.

87.     Paragraph (a)(3) of Item 303 requires, in part, that the Management Discussion discuss a company's "results of operations" as follows:

> (i)     Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> (ii)     Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

88.     The instructions in the Notes to Item 303 provide the requirements for public companies like St. Joe.  Instructions 1 - 3 provide:

> 1.)     The registrant's discussion and analysis shall be of the financial statements and of other statistical data that the registrant believes will enhance a reader's understanding of its financial condition, changes in financial condition and results of operations. Generally, the discussion shall cover the three year period covered by the financial statements and shall use year-to-year comparisons or any other formats that in the registrant's judgment enhance a reader's understanding.   However, where trend information is relevant, reference to the five year selected financial data appearing pursuant to Item 301 of Regulation S-K (§229.301) may be necessary.

> 2.)     The purpose of the discussion and analysis shall be to provide to investors and other users information relevant to an assessment of the financial condition and results of operations of the registrant as determined by evaluating the amounts and certainty of cash flows from operations and from outside sources.

> 3.)     The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.  This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

89.     The Individual Defendants had knowledge of material adverse information concerning the recoverability of the carrying values of certain real estate projects in development as well as the fair value of homes and homesites substantially completed and ready for sale, and the effects that the lack of recoverability of those carrying values would — and did — have on St. Joe and its financial statements during the Class Period.  These Defendants knew that the decrease in sales prices and sales volume, and the Company's decision to halt development, would necessarily negatively affect the value of St. Joe's assets, yet failed to disclose this to the public.  The Individual Defendants had an obligation to disclose the financial impact on, and concomitant risks to, St. Joe

pursuant to Regulation S-K, Item 303.  Their failure to adequately disclose this information renders St. Joe's Class Period SEC filings materially incomplete, false, and misleading.  Irrespective of St. Joe's trend and risk disclosures, the financial statements were still misleading because "[f]inancial statements not in conformity with GAAP are presumed to be inaccurate or misleading, notwithstanding explanatory disclosures in footnotes or in the accountant's report."  SEC Division of Corporate Finance Accounting Disclosure Rules And Practices training material March 31, 2000 and December 2010-Topic Four.

### B.     Defendants Failed to Comply With Regulation S-X and GAAP

90.     At all relevant times during the Class Period, Defendants represented that the Company's financial statements were prepared in conformity with GAAP.  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.[55]  St. Joe's annual and interim (*e.g.*, quarterly) financial statements must be prepared in accordance with GAAP.  The SEC requires GAAP presentation in Regulation S-X, 17 C.F.R. §210.4-01(a)(1), which provides that financial statements filed both annually and quarterly with the SEC must comply with GAAP, except

---

[55]     Prior to September 15, 2009 the hierarchy of authoritative GAAP literature was as follows. The highest authority was comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Statements ("SFAS"), FASB Interpretations ("FIN"), APB Opinions ("APB"), and AICPA Accounting Research Bulletins ("ARB").  GAAP provided other authoritative pronouncements including, among others, AICPA Statements of Position ("SOP"), Consensus Positions of the FASB Emerging Issues Task Force ("EITF"), and the FASB Concepts Statements ("SFAC").  On July 1, 2009 the Financial Accounting Standards Board launched the FASB Accounting Standards Codification ("ASC") as the single source of authoritative nongovernmental U.S. generally accepted accounting principles.  The Codification became effective for interim and annual periods ending after September 15, 2009.  As a result of the Codification, all existing standards documents are superseded as described in SFAS No. 168, "The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles."  Instead of issuing new FASB standards, the FASB now issues FASB Accounting Standards Updates ("ASU"). The Codification did not change existing GAAP, it only introduced a newly organized structure.

quarterly statements are not required to have the same level of footnote disclosure.  If the filings do not comply with GAAP, they are "presumed to be misleading and inaccurate," despite footnote or other disclosure.  *See* Regulation S-X, 17 C.F.R. §210.4-01(a)(1).

91.   Moreover, as set forth in SFAC No. 1, "Objective of Financial Reporting by Business Enterprises," one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period presented. For example, SFAC No. 1, ¶42 states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

92.   It is management's responsibility to prepare financial statements that conform to GAAP. As noted by Public Company Accounting Oversight Board ("PCAOB") professional standards, AU Section 110, "Responsibilities and Functions of the Independent Auditor":

> Financial statements are management's responsibility... Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management... Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

93.   In Securities Act Release No. 6349 (September 8, 1981), the SEC stated that:

> [I]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

94.    In Accounting Series Release 173, the SEC reiterated the duty of management to present a true representation of a company's operations:

> [I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

95.    As such, GAAP imposes on public companies, such as St. Joe, a duty to:

> (i)    disclose in periodic reports filed with the SEC "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information "not to be necessarily indicative of future operating results or future financial condition." 17 C.F.R. §229.303(a)(1)-3(3) and Instruction 3; and

> (ii) "make full and prompt announcements of material facts regarding the company's financial condition," as "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments." SEC Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶23,120A, at 17,095 17 C.F.R. §241.8995 (October 15, 1970); SEC Release No. 18271, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) 1183,049, at 84,618 (November 19, 1981).

96.    Pursuant to these requirements, and as detailed herein, the Defendants fraudulently represented that the Company's financial statements complied with SEC regulations and were prepared in conformity with GAAP in all material respects, when, in reality, they did not.  As a result, St. Joe's financial statements were materially false and misleading.  *See* Regulation S-X, 17 C.F.R. §210.4-01(a)(1).

## C.    Defendants' GAAP Violations Caused Their Asset Values to Be Materially Overstated During the Class Period

97.    St. Joe's financial statements during the Class Period were materially false and misleading because Defendants overstated the value of the Company's residential real estate assets due to their failure to timely and adequately record impairment charges for two categories of assets: (1) assets substantially complete and ready for sale; and (2) assets under development (*i.e.*, "to be

held and used").  These categories of assets require different accounting treatments under GAAP, premised on a fair value analysis.  During the Class Period, St. Joe falsely and fraudulently misrepresented: (1) fair values; (2) reported prospects for future cash inflows; and (3) misrepresented its ability to recover its capitalized costs for these assets.  As a result, St. Joe failed to adequately disclose material facts regarding the extent to which income was affected throughout the Class Period.

### 1.    Fair Value Analysis

98.    GAAP provides detailed guidance for determining fair value.  Beginning in 2008, St. Joe was required to comply with SFAS 157, "Fair Value Measurements" (subsequently codified as ASC 820) to measure the fair value of its assets, and the Company's SEC filings state that this was St. Joe's policy.[56]  SFAS 157 defines fair value as "the price that would be received to sell an asset

––––––––––––––––––––

[56]    Prior to 2008, in measuring the fair value of an asset SFAS No. 144 provided the following guidance:

> The fair value of an asset...is the amount at which that asset... could be bought (incurred) or sold (settled) in a current transaction between willing parties, that is, other than in a forced or liquidation sale. ***Quoted market prices in active markets are the best evidence of fair value and shall be used as the basis for the measurement, if available.***  However, in many instances, quoted market prices in active markets will not be available for the long-lived assets...  In those instances, the estimate of fair value shall be based on the best information available, including prices for similar assets (groups) and the results of using other valuation techniques... A present value technique is often the best available valuation technique with which to estimate the fair value of a long-lived asset (asset group)...

> If a present value technique is used, estimates of future cash flows shall be consistent with the objective of measuring fair value. Assumptions that marketplace participants would use in their estimates of fair value shall be incorporated whenever that

or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  The definition focuses on the price that **would be received to sell the asset (an exit price)**, not the price that would be paid to acquire the asset (an entry price).  Fair value is intended to be a **market-based measurement**, not an entity-specific measurement.

99.     To make these measurements market-based, paragraphs 22-30 of SFAS 157 create a "fair value hierarchy" that distinguishes among three levels of value:[57]

> 1) **Level One**: Observable inputs based on market data obtained from sources independent of the reporting entity, including most frequently the quoted prices (unadjusted) in active markets for identical assets or liabilities at the measurement date;
>
> 2) **Level Two**: Observable inputs other than quoted prices for the asset or liability, either direct or indirect, including:
>
> > (a)   Quoted prices for similar assets or liabilities in active markets.
> >
> > (b)   Quoted prices for identical/similar assets or liabilities in markets that are not active; *i.e.*, in which there are few transactions for the asset or liability, the prices are not current, or price quotations vary over time or among market makers (some brokered markets), or in which little information is released publicly (a principal to principal market).
> >
> > (c)   Observable inputs other than quoted prices for the asset or liability (*e.g.*, interest rates and yield curves observable at commonly quoted intervals, volatilities, prepayment speeds, loss severities, credit risks, and default rates).
> >
> > (d)   Inputs that are derived principally from or corroborated by observable market data by correlation or other means (market-corroborated inputs); and

---

> information is available without undue cost and effort.  Otherwise,
> the entity may use its own assumptions. [SFAS 144 ¶¶22-24]

[57]     The fair value hierarchy gives the highest priority to quoted prices (unadjusted) in active markets (Level 1) and the lowest priority to unobservable inputs (Level 3). SFAS 157 ¶22.

3) **Level Three**: Unobservable inputs, developed from the reporting entity's assessment of market participant assumptions, based on the best information available under the circumstances.

100.    In particular, the notion of unobservable or Level 3 inputs applies when there is little, if any, market activity for the asset or liability at the measurement date.  As the Summary to SFAS 157 explains: "In those situations, the reporting entity need not undertake all possible efforts to obtain information about market participant assumptions.  However, the reporting entity must not ignore information about market participant assumptions that is reasonably available without undue cost and effort."

101.    St. Joe had both assets that were ready for sale and assets under development which are analyzed for impairment using accounting processes largely premised on fair value.  The Company's SEC filings filed during the Class Period specifically state St. Joe was complying with SFAS 144, SFAS 157 and ASC 820 described above.  According to St. Joe's 2009 10-K, Defendants used final sales prices of inventory sold during the period (Level 2 inputs) to determine fair value of the Company's homes and homesites substantially completed and ready for sale.  For projects under development, an estimate of future cash flows on an undiscounted basis was performed using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods (Level 3 inputs).

## 2.    Assets Substantially Complete and Ready for Sale

102.    St. Joe stated that homes and homesites substantially completed and ready for sale were measured at the lower of carrying value (*i.e.*, the amount at which the asset is shown on the balance sheet) or fair value less costs to sell.  For a long-lived asset classified as held for sale GAAP requires that a long-lived asset "shall be measured at the lower of its carrying amount or fair value less cost to sell...." [ASC 360-10-35-43]  In other words, the Company simply must evaluate each reporting period whether the asset's carrying value is more than its fair value, where fair value is

determined following the guidance of ASC 820 as described in ¶98 above.  Defendants disclose in

St. Joe's Forms 10-K that they comply with ASC 360 and ASC 820 and state that a provision for

loss would be recorded to the extent that the carrying value exceeds estimated fair value less costs to

sell.  *See*, *e.g.*, p. 27 of 2009 10-K.   The expected gain or loss on sale "shall be recognized for any

initial or subsequent write-down to fair value less cost to sell.  A gain shall be recognized for any

subsequent increase in fair value less cost to sell, but not in excess of the cumulative loss previously

recognized (for a write-down to fair value less cost to sell)." [ASC 360-10-35-40]

103.    As described in this Complaint, at least for RiverTown, SummerCamp and

WindMark, Defendants knew St. Joe was unable to sell its homes and homesites for amounts that

supported the excessive carrying values borne by the remaining unsold lots.  For example, by the end

of 2009, the fair value of the homes and homesites ready for sale at RiverTown was approximately

between $5.6 and $9.4 million, while the carrying value on the Company's balance sheet was

approximately $16.7 million, indicating these assets were impaired by $7 to $11 million.  *See*, *e.g.*,

¶54.  Additionally, the number of units developed as a percentage of total planned units was less

than 5%, 14%, 15% and 50% in RiverTown, WaterSound, WindMark and SummerCamp Beach

respectively.  The Company's failure to complete these developments has reduced the overall value

of the developed properties in these projects and has made the remaining properties more difficult to

sell.  The average selling prices had been declining drastically; the average sales price of a

residential unit decreased nearly 50% from $221 million to $188 million to $114 million in 2008,

2009 and 2010, respectively.  The average sales price for RiverTown's lots declined by more than

57% between 2007 and 2010.  Likewise, the average sales price for SummerCamp Beach lots

declined by 62% between 2006 and 2010.  Despite this, Defendants failed to record adequate

impairment losses to reduce the carrying value of its homes and homesites to fair value, resulting in inflated assets, net income and earnings per share during the Class Period.

### 3.   Assets Under Development

104.   The accounting guidance for assets (projects) under development is different than for assets substantially complete and ready for sale as described above.  In accordance with Codification Subtopic 360-10 (formerly SFAS No. 144 Accounting for the Impairment or Disposal of Long-Lived Assets) there is essentially a three-step process for recording an impairment loss for assets that are held and used: (1) determine when to evaluate an asset for recoverability; (2) perform a recoverability test to determine if there is any impairment; and (3) if necessary, record an impairment loss based on the asset's fair value.  St. Joe had significant assets under development throughout the Class Period, which were classified as held for use and were subject to such evaluation.

### a.   Step One – Evaluating recoverability:

105.   The first step in the process is to determine when to evaluate an asset for recoverability.   According to ASC 360-10-35-21, "a long-lived asset shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable."  Examples of changes in events or circumstances include the following:

(a)   A significant decrease in the market price of a long-lived asset (asset group)

(b)   A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition

(c)   A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator

(d)   A accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group)

(e)     A current-period operating or cash flow loss combined with a history of operating cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-term lived asset (asset group)

(f)     A current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life.  The term more likely than not refers to a level of likelihood that is more than 50 percent.

### b.     Step Two – Performing recoverability test to determine impairment:

106.     Once it is determined to evaluate a long-lived asset for recoverability, which St. Joe has acknowledged was necessary by purportedly performing an impairment analysis for every quarter during the Class Period, the next step is to perform a recoverability test to determine if there is any impairment.

107.     GAAP requires that the estimates used by management to test for recoverability must be reasonable.  Paragraph 30 of ASC 360-10-35 states, "[e]stimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall incorporate the entity's own assumptions about its use of the asset (asset group) and shall *consider all available evidence*. The assumptions used in developing those estimates *shall be reasonable* in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others..."

108.     GAAP also specifically addresses estimates of future cash flows for assets under development and for assets under development that are part of an asset group that is in use:

Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) that is under development shall be based on the expected service potential of the asset (group) when development is substantially complete. Those estimates shall include cash flows associated with all future expenditures necessary to

develop a long-lived asset (asset group), including interest payments that will be capitalized as part of the cost of the asset (asset group)... [ASC 360-10-35-34]

If a long-lived asset that is under development is part of an asset group that is in use, estimates of future cash flow used to test the recoverability of that group shall include the cash flows associated with future expenditures necessary to maintain the existing service potential of the group...as well as the cash flows associated with all future expenditures necessary to substantially complete the asset that is under development (see the preceding paragraph)... [ASC 360-10-35-35]

109.    St. Joe disclosed in its SEC filings during the Class Period that it complied with GAAP as described in the paragraphs above.  For example, the Company states in its 2009 Form 10-K that "[f]or projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods (level 3 inputs)."

### c.    Step Three – Recording the impairment:

110.    If the recoverability test determines an impairment, that impairment loss must be recorded based on the fair value of the particular long-lived asset.  This process is described in the following paragraph:

111.    "An impairment loss shall be recognized only if the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value.  The carrying amount of a long-lived asset (asset group) is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group).  That assessment shall be based on the carrying amount of the asset (asset group) at the date it is tested for recoverability, whether in use...or under development....An impairment loss shall be measured as the amount by

which the carrying amount of a long-lived asset (asset group) exceeds its fair value." [ASC 360-10-35-17]

112.    Once an asset is impaired, an impairment loss is recognized which reduces the carrying amount of the asset on the balance sheet and reduces net income on the income statement. The adjusted carrying amount becomes the new cost basis and restoration of a previously recognized impairment loss is prohibited. [ASC 360-10-35-20]

113.    St. Joe disclosed in its SEC filings that its policy was consistent with that described above: "If we determine that an impairment exists due to the inability to recover an asset's carrying value, a provision for loss is recorded to the extent that the carrying value exceeds estimated fair value." *See* p. 27 of 2009 10-K.

114.    Given the facts detailed above, showing that Defendants should have deemed various real estate assets impaired during the Class Period, St. Joe was either not performing the quarterly evaluations as required by steps One and Two, or was performing them but failing to record the necessary provisions for impairment loss for its impaired projects under development, per step Three.  As a result, St. Joe violated GAAP and its own publicly-stated policy, and the Company's financial statements fraudulently reported inflated assets, net income, and earnings per share during the Class Period**.**

115.    In assessing the recoverability of its real estate – both assets ready for sale and assets under development – St. Joe should have considered certain core factors when estimating its future cash flows and fair value, including but not limited to: (1) the impact of market supply and demand; (2) the rate of sales and inventory on the market; (3) selling prices including sales incentives; (4) current sales; (5) anticipated land development and future development costs to be incurred

including interest and overhead costs; (6) price erosion; (7) the time to complete the project and sell its units; and (8) risks specific to each land parcel or community.

116.    Defendants knew, or should have known based on overwhelming evidence confronting them, that these eight factors supported impairment of its development properties during the Class Period.  During the Class Period, Defendants cut back on their development plans and nixed some construction projects within various developments in order to cut costs.  Indeed, in RiverTown, less than 5% of the planned 4,500 units have been developed.  *See* ¶46 above.  In WaterSound, only 14% of the Company's planned 1,432 units have been developed.  *See* ¶57 above. In WindMark, only 15% of the planned 1,516 planned units have been developed.  *See* ¶73 above. And, in SummerCamp Beach, less than half of the planned units have been developed.  *See* ¶65 above.  Moreover, the Company's failure to complete these developments has reduced the overall value of the developed properties in these projects and has made the remaining properties more difficult to sell.  The costs to complete these projects and sell these units would be massive. Defendants knew the anticipated development costs, which are established by engineers and managers in the planning stages of any project, and are also published in offering documents for the bonds to finance the developments.  For example, the Main Street (RiverTown) 2008 CDD Bond Offering Prospectus indicates the average cost to develop a single family residential unit was $89,133 and the estimated costs to develop the remaining residential units were $347,257,758.

117.    In addition, the market demand and rate of sales was steadily decreasing throughout the Class Period.  According to a Keefe, Bruyette & Woods analyst report dated January 11, 2011, there was an "oversupply" of residential real estate in Florida and the "oversupply and lackluster conditions" were not expected to improve in the near term.  This reiterates what Defendants stated in

the Company's SEC filings.[58]  Moreover, as detailed in ¶50 there is ***nine years*** of homesite inventory in central St. Johns County where RiverTown is located, indicating prices are not increasing there.

118.    In addition, the sales rate of St. Joe's properties dramatically declined during the Class Period.  St. Joe's closed sales for residential units dwindled each year from 1,610 in 2005 to only 85 in 2010 – an approximate ***95%*** decline.[59]  Moreover, the Company's selling prices also declined drastically; the average price of a residential unit decreased nearly 50% from $221 million to $188 million to $114 million in 2008, 2009 and 2010, respectively.  And, as detailed above, average sales prices for many of the Company's developments declined during the Class Period.  For example, the average sales price for RiverTown's lots declined by more than 57% between 2007 and 2010.  *See* ¶51 above.  Likewise, the average sales price for SummerCamp Beach lots declined by 62% between 2006 and 2010.  *See* ¶66 above.  In addition, Defendants also knew that the Company's gross profit percentage had decreased from 34% in 2007 to 14% in 2008 to 9% in 2009 as a result of the price erosion.

119.    Accordingly, had Defendants done a valid recoverability analysis in accordance with GAAP and the Company's own publicly-stated accounting policy, St. Joe would have recorded significantly larger impairment losses during the Class Period, resulting in significantly lower reported assets, net income and earnings per share.

---

[58]    "Our residential sales remain weak due to the collapse of the housing markets in Florida. Inventories of resale homes and homesites remain high in our markets and prices continue to decline. With the U.S. and Florida economics battling the adverse effects of home foreclosures, severely restrictive credit, significant inventories of unsold homes and recessionary economic conditions, predicting when real estate markets will return to health remains difficult.  Currently, we do not expect any significant favorable changes in these market conditions during 2010."  2009 10-K, p. 37.

[59]    The number of residential units for which sales were closed by St. Joe was 1,260 in 2006, 478 in 2007, 122 in 2008, and 164 in 2009.

VI.    SCIENTER ALLEGATIONS

120.    The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, and knowingly or severely recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

121.    In addition to the numerous allegations throughout the Complaint that demonstrate the Individual Defendants' scienter, for the reasons below, each of the Individual Defendants knew or recklessly disregarded that the public statements and documents the Company issued or disseminated were materially false and misleading.  Moreover, Individual Defendants were motivated to conceal the fraud alleged in order to conduct a public offering of 17,145,000 shares of common stock for $35.00 per share during the Class Period.

122.    Indeed, the Individual Defendants, because they received information reflecting the true facts regarding St. Joe and its business practices, and through their control over and/or receipt of St. Joe's allegedly materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information, were active and culpable participants in the fraudulent scheme alleged herein.  The Individual Defendants knew and/or severely recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.  Their ongoing fraud could not have been perpetrated over such a substantial period of time without the knowledge and/or severe recklessness and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

### A.     The Individual Defendants Were Heavily Involved In Valuing the Company's Real Estate, a Core Operation

123.     The Individual Defendants were all high-ranking officers who were heavily involved with, and had day-to-day responsibilities concerning, the Company's core business of developing and selling residential real estate, including the overarching business of valuing the Company's assets.  Defendant Greene was, at all relevant times, the President of the Company and was the CEO for the majority of the Class Period, beginning in May 2008.  As the President and CEO, Greene was intimately involved in all aspects of the Company's business, including its "priority" and "core competency" of entitling land for residential development, and had access to internal reports and information regarding the residential real estate projects, their values and impairment charges.  Moreover, Defendants Greene, McCalmont and Connolly signed the Company's quarterly and annual filings during the Class Period, which stated that the Company's financial statements were prepared in accordance with GAAP and set forth the GAAP provisions that the Company was required to follow to appropriately value its real estate assets.

124.     CW3, the Director of Financial Reporting at St. Joe from February 2006 through May 2010, reported directly to Defendant Connolly and was responsible for compiling and preparing the Company's SEC filings.  CW3 stated that Defendants McCalmont and Connolly were responsible for determining the quarterly impairment charges.  CW3 noted that impairment was a "hot topic" at St. Joe's during CW3's tenure and confirmed that the Company was undertaking impairment analyses for all of its properties on a quarterly basis during the Class Period.  CW3 described the impairment reviews as "very detailed" and explained that the ultimate analysis was performed by Defendants McCalmont and Connolly.  Based on these meetings, Defendants McCalmont and Connolly told CW3 what impairment charges to report in the Company's SEC filings.

125.    CW4 explained that valuations and the impairment process at St. Joe was primarily handled by Defendants McCalmont and Greene.  Indeed, he stated that "[t]he chief architect" of impairment decisions at St. Joe was McCalmont, who had control of the "master spreadsheet" of values for real estate developments.  CW4 explained that St. Joe's Director of Accounting Phil Jones provided Defendant McCalmont an initial spreadsheet and data about values.  McCalmont and Greene then met privately to finalize and edit the numbers.  Moreover, CW4 explained that based on his experiences and observations at St. Joe, there is "no doubt in [his] mind" there was no process where they did discounting of future sales at some agreeable NPV [net present value] and then add up the NPV's for all the developments.  CW4 stated that St. Joe "didn't do that."  Instead, St. Joe just used "straight cost" for determining value.  St. Joe just "kept it at what they paid for it."  St. Joe was not projecting values out and then discounting them back.  They "didn't bother with it" and just used cost instead.  CW4 stated "[w]e just said we spent $50 million developing that property" so that is what it is worth.

126.    By way of example, CW4 explained that he had oversight responsibility and tracked the numbers for the Summer Camp and Southwood developments.  In addition, because CW4 was tasked with efforts to find a "strategic partner" to acquire RiverTown and Victoria Park, he also closely tracked the numbers for Victoria Park and Rivertown.  Based on his experience and familiarity with these developments, CW4 is sure that the values on St. Joe books for the four developments was the same as the cost St. Joe had expended on those properties.  If St. Joe was actually calculating present values based on future valuations, the valuations on those developments would not have equaled the amounts expended on the developments.  There would have been some variations, at least on some of the developments.

127.     Moreover, in late 2007, Defendant Greene asked CW4 to become familiar with the values of all of St. Joe's residential real estate developments because St. Joe planned either to sell or to engage in strategic joint venture deals for certain of its properties.   Greene asked CW4 to participate in negotiating with potential buyers or partners.  As part of this process, CW4 produced a 15-20 tab spreadsheet setting forth the revenue, cost and income of the respective projects he reviewed.   CW4 determined the business plans that St. Joe had for properties including Seven Shores, Victoria Park and RiverTown, did not make any sense because they were using sales and absorption rates that were unrealistically high.  CW4 also created versions of these spreadsheets to provide to potential buyers or partners, using realistic sales prices and absorption rates.   CW4 derived materially lower values than those reported in the Company's fraudulently misleading SEC filings.  In April 2008, CW4 wrote a memo to Greene that summarized the status of the troubling asset valuations that CW4 had uncovered at Seven Shores, Victoria Park, and RiverTown.

128.     Thus, the Individual Defendants were significantly involved with the Company's impairment accounting and carefully followed development and sales data for St. Joe's properties.

**B.     The Individual Defendants Participated in Quarterly Meetings and Weekly Calls Regarding the Company's Development Projects**

129.     In addition to their heavy involvement with impairment valuations, the Individual Defendants were also aware of the conditions of the Company's residential real estate developments from quarterly meetings and weekly calls.  CW4, who reported directly to Defendant Greene, explained that as a Regional Manager, CW4 attended quarterly meetings of a committee known internally as the "Management Committee" which consisted of, among others, the other four Regional General Managers, Greene, Rummell, and McCalmont and Connolly.  At the quarterly meetings, the Management Committee would discuss in detail all of the development projects on a project-by-project basis.  Regional General Managers presented detailed information about their

projects, including revenues and revenue projections, absorption rates, sales information, development plans and budget requests.  Often, sales directors from the various projects would also attend the meetings.

130.   In addition to these quarterly meetings, CW4 explained that the Management Committee had weekly calls in which Greene, Rummell and McCalmont also participated. On these calls the regional general managers provided updates on each of the projects in their regions.  Thus, Defendants Greene and Rummell and McCalmont were constantly updated on the status of each of St. Joe's residential real estate projects.

### C.   Defendants Knew of the Significant Impairments Related to the Company's Core Operation

131.   As is detailed above in ¶¶123-130, the Individual Defendants were all high-ranking officers who were intimately involved with, and had day-to-day responsibilities concerning the Company's core business of developing and selling residential real estate, including the overarching business of valuing the Company's assets.   Defendant Greene was, at all relevant times, the President of the Company and was the CEO for the majority of the Class Period, beginning in May 2008.  As the President and CEO, Greene was intimately involved in all aspects of the Company's business including its "priority" and "core competency" of entitling land for residential development, and had access to internal reports and information regarding the residential real estate projects, their values and impairment charges.  According to CW3 and CW4, Defendants McCalmont, Greene and Connolly were intimately involved in the impairment valuation process.  The improper accounting was not a result of inexperienced accounting managers who did not understand accounting rules. To the contrary, Connolly – the Company's CFO and former Chief Accounting Officer – is a CPA with more than 30 years of experience in accounting, auditing, financial management, and business development.  Connolly trained and was employed as a CPA for seven years with KPMG, a "Big

Four" accounting firm that is also the Company's outside auditor.  Subsequently, she served in senior financial positions with several other major companies prior to joining St. Joe in 1996.  As such, Defendant Connolly was thoroughly versed in cost accounting procedures, financial reporting and internal accounting control, and would have discovered accounting problems quickly. Moreover, Defendants Greene, McCalmont and Connolly signed the Company's quarterly and annual filings during the Class Period, which stated that the Company's financial statements were prepared in accordance with GAAP and set forth the GAAP provisions that the Company was required to follow to appropriately value its real estate assets.  Accordingly, Defendants knew or should have known of the average sales prices of its properties and that based on these prices, the carrying values for the remaining developed properties were materially overstated during the Class Period.  *See* ¶¶51-54; 66-70.  Moreover, Defendants knew from the impairments required by the fair value analyses they conducted in conjunction with the sale of the Victoria Park and Seven Shores properties, that the carrying values of these properties were materially overstated during the Class Period.  *See* ¶¶78-80.

### D.    The February 2008 Stock Offering

132.    The February 2008 stock offering also provided Defendants with a significant incentive to underreport necessary impairments and thereby overstate the Company's assets and earnings to maintain the value of St. Joe stock.  According to CW4, when McCalmont joined the Company, St. Joe had $300 to $400 million in debt and was in jeopardy of violating debt covenants. To eliminate the debt, the Company offered 17,145,000 shares of common stock for $35.00 a share. The Company used the proceeds of the offering to pay off substantially all of its outstanding debt. Had the Company taken significant impairment charges, it is highly unlikely that it would have received the same high price per share for the offering.

E.     **Defendants Avoided Taking Necessary Impairments to Comply with Debt Covenants**

133.    Defendants also failed to take necessary impairments to avoid defaulting on its financial debt covenants during the Class Period.  St. Joe executed a $100 million Credit Agreement with Branch Banking & Trust ("BB&T") Company and BB&T Capital Markets on September 19, 2008.[60]  The credit agreement contained several financial covenants relating to leverage (total indebtedness to total asset value of no more than 50%); unencumbered asset value (unencumbered assets value to unsecured debt of at least 2.00 to 1.00); net worth (at least 95% of the Company's net worth at June 30, 2008); liquidity (at least $20 million, including the undrawn amount of the facility); and additional debt (limited to $250 million in the aggregate with a sublimit of $125 million for secured debt).  This credit agreement purposefully did not contain a fixed charge covenant, which the Company's previous credit agreement had included.  St. Joe found the fixed charge covenant to be "the most problematic covenant in the current real estate market" since it required the Company to generate earnings in excess of the Company's fixed charges each quarter.  Defendants were clearly aware that the market conditions were causing decreased sales, earnings, and fair market values and that St. Joe would not be able to meet this covenant going forward.

134.    Less than six weeks later, on October 30, 2008, Defendants amended the credit agreement that had been entered into on September 19, 2008 in order to lower the minimum consolidated tangible net worth from 95% to 90% of net worth at June 30, 2008.  Defendants disclosed in the third quarter 2008 10-Q, "This change will provide us with greater flexibility to

---

[60]     At the start of the Class Period, St. Joe had a $500 million revolving credit facility, a $100 million term loan and $240 million of outstanding senior notes, all of which contained financial covenants.  In connection with the execution of the $100 million credit agreement on September 19, 2008, the Company terminated the lenders' commitments under its $500 million revolving credit facility.

withstand the current difficult conditions in our real estate markets." If St. Joe had not been able to amend the agreement, the Company would have violated the minimum net worth covenant in the fourth quarter of 2008.

135.    Defendants amended the credit agreement for a second time the following quarter, on February 20, 2009. Defendants disclosed in the 2008 10-K, "We have twice amended our Credit Agreement to provide for a lower minimum tangible net worth requirement. The current required level of $900 million will provide us with greater flexibility to withstand the current economic recession and the difficult conditions in our real estate markets." If St. Joe had not been able to amend the agreement, the Company would have violated the minimum net worth covenant in the first quarter of 2009.

136.    On October 19, 2009, St. Joe again amended the credit agreement to lower the minimum tangible net worth requirement by $100 million, down to $800 million. If St. Joe had not been able to amend the agreement, the Company would have defaulted on the minimum net worth covenant in the fourth quarter of 2009, and all subsequent quarters.

137.    St. Joe could not afford to violate its financial covenants as described in its 10-K's:

> If we do not comply with the minimum tangible net worth covenant, we could have an event of default under our credit facility. There can be no assurance that the bank will be willing to amend the facility to provide for more lenient terms prior to any such default, or that it will not charge significant fees in connection with any such amendment. If we had borrowings under the facility at the time of a default, the bank could immediately accelerate all outstanding amounts and file a mortgage on the majority of our properties to secure the repayment of the debt. Even if we had no outstanding borrowings under the facility at the time of a default, the bank may choose to terminate the facility or seek to negotiate additional or more severe restrictive covenants or increased pricing and fees. We could be required to seek an alternative funding source, which may not be available at all or available on acceptable terms. Any of these events could have a material adverse effect on our financial condition and results of operations.

*See* 2009 Form 10-K at 15.

138.    Nevertheless, St. Joe's reported amounts were always dangerously close to violating the net worth requirement each quarter during the Class Period.  Thus, a significant impairment charge in any one quarter during the Class Period would trigger a default on the Company's financial covenants.  For this reason, Defendants were motivated to avoid taking significant impairment charges during the Class Period.

### F.    Defendants Failed to Comply with Disclosure Requirements

139.    In St. Joe's 2007, 2008 and 2009 financial statements, Defendants knew but failed to provide all the required disclosures required by GAAP for fair value measurements for its projects that are under development and measured on a non-recurring basis.  ASC 820 (formerly FAS 157) governs how the Company must measure the fair value of its real estate properties.  In its Form 10-K for the period ended December 31, 2009, the Company disclosed that for its real estate assets held for sale it used final sales prices (level 2 inputs) or estimates of selling prices based on current market data (level 3 inputs).  For projects under development that did not meet the criteria as held for sale, the Company disclosed that an estimate of future undiscounted cash flows including costs to complete and estimated future sales proceeds was performed.  St. Joe disclosed that it used management's best estimates about future sales prices and holding periods (level 3 inputs) for these projects under development, but failed to provide the pertinent disclosures necessary to enable investors to assess the inputs used to develop these fair value measurements.  According to ASC 820-10-50-5 (formerly FAS 157 ¶33), St. Joe was required to

> …disclose information that enables users of its financial statements to assess the inputs used to develop those measurements.  To meet that objective, the reporting entity shall disclose all of the following information for each interim and annual period separately for each major category of assets and liabilities:
>
> a.   The fair value measurements recorded during the period and the reasons for the measurements

b.   The level within the fair value hierarchy in which the fair value measurements in their entirety fall, segregating fair value measurements using any of the following: 1. Quoted prices in active markets for identical assets or liabilities (Level 1) 2. Significant other observable inputs (Level 2) 3. Significant unobservable inputs (Level 3).

c.   ***For fair value measurements using significant unobservable inputs (Level 3), a description of the inputs and the information used to develop the inputs***.

d.   The inputs and valuation technique(s) used to measure fair value and a discussion of changes, if any, in the valuation technique(s) and related inputs used to measure similar assets and/or liabilities in prior periods.

140.   It was not until after Einhorn's presentation and the filing of this action that Defendants belatedly and for the first time disclosed the inputs for the accounting estimate related to real estate impairment evaluation for projects under development.  In the Form 10-K filed March 3, 2011 for the year ended December 31, 2010, they stated as follows:

The projection of undiscounted cash flows requires that management develop various assumptions including:

- the projected pace of sales of homesites based on estimated market conditions and the Company's development plans;

- projected price appreciation over time, which can generally range from 0% to 7% annually;

- the amount and trajectory of price appreciation over the estimated selling period;

- the length of the estimated development and selling periods, which can range from 5 years to 17 years depending on the size of the development and the number of phases to be developed;

- the amount of remaining development costs and holding costs to be incurred over the selling period;

- in situations where development plans are subject to change, the amount of entitled land subject to bulk land sales or alternative use and the estimated selling prices of such property;

- for commercial development property, future pricing which is based on sales of comparable property in similar markets; and

- assumptions regarding the intent and ability to hold individual investments in real estate over projected periods and related assumptions regarding available liquidity to fund continued development.

For operating properties, an estimate of undiscounted cash flows requires management to make similar assumptions about the use and eventual disposition of such properties. Some of the significant assumptions that are used to develop the undiscounted cash flows include:

- for investments in hotel and rental condominium units, average occupancy and room rates, revenues from food and beverage and other amenity operations, operating expenses and capital expenditures, and the amount of proceeds to be realized upon eventual disposition of such properties as condo-hotels or condominiums, based on current prices for similar units appreciated to the expected sale date;

- for investments in commercial or retail property, future occupancy and rental rates and the amount of proceeds to be realized upon eventual disposition of such property at a terminal capitalization rate; and

- for investments in golf courses, future rounds and greens fees, operating expenses and capital expenditures, and the amount of proceeds to be realized upon eventual disposition of such properties at a multiple of terminal year cash flows.

Other properties that management does not intend to sell in the near term or under current market conditions are evaluated for impairment based on management's best estimate of the long-term use and eventual disposition of the property.

*See* pages 28-29 of the 2010 Form 10-K.

141.   Prior to this filing, no such disclosures were made by Defendants regarding assumptions used in determining fair value in any of the other financial statements filed (or elsewhere).  St. Joe disclosed that it used significant unobservable inputs (level 3) for its projects under development in order to value those assets.  See p. F-20, 2009 10-K.  Thus, the disclosure requirements of ASC 820-10-50-5 and FAS 157 ¶33 clearly applied but Defendants wholly ignored them.  By omitting these required disclosures, investors were unable to assess the inputs used to develop the Company's fair value measurements for projects that were under development during the vast majority of the Class Period.

### G.    The Individual Defendants Were Highly Compensated During the Class Period

142.    Throughout the Class Period, the Individual Defendants profited from their false portrayal of the Company's financial health, as St. Joe maintained grossly inflated carrying values on its books.  According to the Company's 2010 and 2011 Proxies, filed on March 29, 2010 and April 6, 2011, respectively, Defendant Greene received total compensation of $2,085,941 in 2007, $6,697,540 in 2008, $2,808,270 in 2009, and $4,508,249 in 2010.  He received grants of stock worth $312,517, $5,423,650, $1,109,736, and $2,344,059 on the grant dates in 2007, 2008, 2009, and 2010, respectively.[61]   Greene also sold shares of St. Joe stock or exercised his options for a total profit of $1,513,902.85 during the Class Period.

143.    According to the Company's 2009 Proxy, filed on March 31, 2009, Defendant Rummell received total compensation of $2,836,798 in 2007 and $1,400,197 in 2008.  According to his most recent Form 4, filed on October 12, 2007, Rummell owned 101,317 St. Joe shares directly and 920,695 shares through an LLC and limited partnerships.

144.    According to the Company's 2010 and 2011 Proxies, filed on March 29, 2010 and April 6, 2011, respectively, Defendant McCalmont received total compensation of $4,078,507 in 2007, $1,593,077 in 2008, $1,256,531 in 2009, and $1,807,635 in 2010.  He received grants of stock worth $1,828,015, $986,929, $428,490, and $835,756 on the grant dates in 2007, 2008, 2009, and 2010, respectively.  McCalmont also sold shares of St. Joe's stock or exercised his options for a total profit of $773,026.52 during the Class Period.  Defendant Connolly also sold shares or exercised options for a total profit of $297,399.83 during the Class Period.

---

[61]    2007 Proxy filed on April 13, 2007; 2008 Proxy, filed on March 28, 2008; 2009 Proxy filed on March 31, 2009.

## VII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

145.   Because asset values and impairment charges are a key element of each core financial metric reported by St. Joe and relied upon by investors, and because St. Joe failed to take proper impairment charges, all of St. Joe's key financial metrics that incorporate falsely and fraudulently understated impairment charges during the Class Period – including St. Joe's impairment charges, asset values, income or loss from continuing operations, net income or loss and earnings per share ("EPS") – were rendered materially false and misleading.

### A.   Fourth Quarter and Full Year 2007 Financial Results

146.   On February 19, 2008, the first day of the Class Period, the Company issued a press release on Form 8-K entitled "The St. Joe Company (NYSE: JOE) Reports Fourth Quarter And Full Year 2007 Financials."  The press release reported that the Company's investment in real estate was $943.5 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced Net Income for the fourth quarter 2007 of $1.0 million, or $0.01 per share, compared with $22.3 million, or $0.30 per share, for the fourth quarter of 2006…
>
> For the full year 2007, JOE had Net Income of $39.2 million, or $0.53 per share, compared with $51.0 million, or $0.69 per share, for the full year 2006.  Full year results were affected by:
>
> • Pre-tax impairment charges for the full year 2007 totaled $23.2 million, or $0.19 per share after tax, which included:
>
> • Approximately $13.6 million primarily related to a write-down of costs on homes and home sites in JOE's residential segment to approximate fair value;
>
> *       *       *

**Consolidated Results**

|  | Quarter End Dec. 31, 2007 | Year End Dec. 31, 2007 |
|---|---|---|
| Impairment Losses | $600,000 | $13,600,000 |
| Pre-tax Income from Continuing Operations | $4,800,000 | $18,400,000 |
| Net Income | $1,000,000 | $39,200,000 |
| Net Income Per Share | $0.01 | $0.53 |

\*       \*       \*

**Summary Balance Sheet**

|  | December 31, 2007 |
|---|---|
| **Assets** |  |
| Investments in real estate | $943,500,000 |

147.    On February 25, 2008, the Company filed its 2007 Annual Report with the SEC on Form 10-K.  The Company's Form 10-K reaffirmed the Company's 2007 financial results, financial position, and the reported value of the Company's investment in real estate as announced on February 19, 2008.  With respect to the Company's asset impairment costs, St. Joe's 2007 Annual Report stated:

> *During 2007, we recorded total asset impairment costs of $23.2 million, $13.0 million of which related to the write down of capitalized costs at certain projects due to changes in development plans and the impairment of completed homes in several of our communities due to current market conditions.*  If market conditions were to continue to deteriorate, and the market values for our home sites, remaining homes held in inventory and other project land were to fall below the book value of these assets, we would need to take additional write-downs of the book value of these assets.  Any such write-downs would decrease the value of these assets on our balance sheet and would reduce our net income.

> \*       \*       \*

> *Impairment Losses*.  We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.  *Homes and home-sites substantially completed and ready for sale are measured*

*at the lower of carrying value or fair value less costs to sell.* For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing service potential of the project and *using management's best estimates about future sales prices and holding periods.* The decline in demand and market prices for residential real estate caused us to conclude that carrying amounts within our residential real estate segment may not be recoverable, and we performed an impairment analysis. *As a result of our impairment analyses, we recorded an impairment charge of $13.6 million in the residential real estate segment.*

*       *       *

In 2007 we recorded impairments totaling $13.6 million primarily due to current adverse market conditions for residential real estate. Approximately $5.2 million of the impairments related to capitalized costs at certain projects due to changes in development plans, approximately $7.8 million related primarily to completed spec homes in several communities and approximately $0.6 million related to the modified terms of certain promissory notes.

*       *       *

### Consolidated Results

|  | Year End Dec. 31, 2007 |
|---|---|
| Impairment Losses | $13,609,000 |
| Pre-tax Income from Continuing Operations | $18,406,000 |
| Net Income | $39,207,000 |
| Net Income Per Share | $0.53 |

*       *       *

### Balance Sheet

|  | December 31, 2007 |
|---|---|
| **Assets** |  |
| Investments in real estate | $943,540,000 |

65

148.    The Company's Form 10-K for 2007 was signed by Defendants Greene and

Connolly.   Moreover, all of the Quarterly and Annual Reports also contained the certification

required by Sarbanes-Oxley ("SOX"), which was signed by Defendants Rummell and McCalmont:

> I, [Peter S. Rummell / William S. McCalmont], certify that:
>
> 1.   I have reviewed this annual report on Form 10-K for the year ended December 31, 2007 of The St. Joe Company;
>
> 2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures,

as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\*      \*      \*

Pursuant to 18 USC §1350, the undersigned officer of The St. Joe Company (the "Company") hereby certifies that the Company's Annual Report on Form 10-K for the year ended December 31, 2007 (the "Report") fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.[62]

149.   For the reasons stated in the Substantive Allegations above, in Section V above, and as further detailed herein, the statements in ¶¶146-148 above were materially false and misleading when made or omitted to make such statements not false and misleading because: (1) the economic

---

[62]   Each of the Company's subsequent Class Period Form 10-Qs and 10-Ks also contain Sarbanes Oxley required certifications signed by certain of the Officer Defendants which are substantially similar to this certification.

downturn and associated real estate crash severely impacted the Company's core operation – real estate development; (2) many of the Company's large residential real estate projects, including RiverTown, the WaterSounds, SummerCamp Beach and WindMark remained largely undeveloped; (3) St. Joe had substantially halted further development activity at its residential real estate projects; (4) sales volumes at its residential real estate properties plummeted during the Class Period; (5) the average sales prices at St. Joe's projects sharply declined; (6) as a result, Defendants violated GAAP and SEC regulations by failing to take appropriate impairment charges to their residential real estate assets; (7) accordingly, St. Joe had materially overstated its asset values and earnings during the Class Period; (8) St. Joe's financial statements failed to comply with GAAP, despite Defendants' false assurances; and (9) the Company's Class Period Forms 10-K and 10-Q were also materially false and misleading because they failed to disclose (in violation of Item 303 of regulation S-K) that the Company's decision to halt development, the decrease in sales volume, and the decline in average sales prices had a material adverse effect on the Company's earnings.

### B. First Quarter 2008 Financial Results

150.    On May 6, 2008, the Company issued a press release on Form 8-K entitled "The St. Joe Company (NYSE: Joe) Reports First Quarter 2008 Financial Results." The press release reported that the Company's investment in real estate was $950.7 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced Net Income for the first quarter 2008 increased $12.4 million to $32.1 million, or $0.40 per share, compared to Net Income of $19.7 million, or $0.27 per share, for the first quarter of 2007. JOE's first quarter results included pre-tax impairment charges of $2.3 million, or $.02 per share after taxes, as a result of continuing declines in sales and listing prices principally in our primary communities. Also included in 2008 results are pre-tax restructuring charges of $0.5 million, or less than $0.01 per share after tax, compared to $3.2 million, or $0.03 per share after tax, in 2007. All per share references in this release are presented on a diluted basis.

*     *     *

**Consolidated Results**

|  | **Quarter Ended March 31, 2008** |
|---|---|
| Impairment Losses | $2,300,000 |
| Pre-tax Income from Continuing Operations | $49,500,000 |
| Net Income | $32,100,000 |
| Net Income Per Share | $0.40 |

\*       \*       \*

**Summary Balance Sheet**

|  | **March 31, 2008** |
|---|---|
| **Assets** |  |
| Investments in real estate | $950,700,000 |

151.   Also on May 6, 2008, St. Joe filed its Quarterly Report with the SEC on Form 10-Q.
The Company's Form 10-Q was signed by Defendants Rummell and Connolly, and reaffirmed the
Company's quarterly financial results, financial position, impairment losses and the reported value
of the Company's investment in real estate.   Additionally, the Form 10-Q discussed asset
impairments, reporting:

> The Company reviews its long-lived assets for impairment whenever
> events or changes in circumstances indicate that the carrying amount
> of an asset may not be recoverable. *Homes and home-sites
> substantially completed and ready for sale are measured at lower of
> carrying value or fair value less costs to sell.* For projects under
> development, an estimate of future cash flows on an undiscounted
> basis is performed using estimated future expenditures necessary to
> maintain the existing service potential of the project and *using
> management's best estimates about future sales prices and holding
> periods*. The continued decrease in demand and market prices for
> residential real estate during the first quarter of 2008 indicated that
> certain carrying amounts within our residential real estate segment
> may not be recoverable. *As a result of the first quarter 2008
> impairment analysis, the Company has recorded an impairment
> charge of $2.3 million in the residential real estate segment.*

\*       \*       \*

69

**Consolidated Results**

|  | Quarter End Mar. 31, 2008 |
|---|---|
| Impairment Loss | $2,257,000 |
| Pre-tax Income from Continuing Operations | $49,447,000 |
| Net Income | $32,052,000 |
| Net Income Per Share | $0.40 |

\*          \*          \*

**Balance Sheet**

|  | March 31, 2008 |
|---|---|
| **Assets** |  |
| Investments in real estate | $950,669,000 |

152.    Following the reporting of its financial results on May 6, 2008, the Company held its quarterly earnings call for the first quarter 2008.  Defendants Greene, Rummell and McCalmont participated in the call and discussed the Company's impairment charges for residential real estate. Defendant Rummell stated:

> Joe's first quarter results included pretax impairment charges of $2.3 million or $0.02 a share after-tax as a result of continuing declines in sales and listing prices in our primary communities. Also included in first quarter results are pretax restructuring charges of $0.5 million or less than $0.01 per share after-tax, compared to $3.2 million or $0.03 a share after-tax in 2007.

153.    The statements in ¶¶150-152 were false and misleading when made for substantially the same reasons set forth in ¶149.

**C.      Second Quarter 2008 Financial Results**

154.    On August 5, 2008, the Company issued a press release on Form 8-K entitled "The St. Joe Company (NYSE: JOE) Reports Second Quarter 2008 Financial Results."  The press release reported that the Company's investment in real estate was $947.6 million, and stated:

The St. Joe Company (NYSE: JOE) today announced a Net Loss for the second quarter 2008 of $(20.8) million, or $(0.23) per share, compared to Net Income of $25.3 million, or $0.34 per share, for the second quarter of 2007, a decrease of $46.1 million. All per share references in this release are presented on a diluted basis. JOE's second quarter results included the following significant charges:

*        *        *

•        *Pre-tax impairment of $1.0 million, or $0.01 per share after-tax, associated with certain of JOE's communities and the write-down of a homebuilder note receivable;* and

*        *        *

Net income for the first half of 2008 was $11.2 million, or $0.13 per share, compared to $45.0 million, or $0.61 per share, for the first half of 2007. Included in results for the first six months of 2008 were the following significant charges:

*        *        *

•        *Pre-tax impairment of $3.2 million, or $0.02 per share after-tax;* and

*        *        *

### Consolidated Results

|  | Quarter End Jun. 30, 2008 |
|---|---|
| Impairment Losses | $1,000,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($32,400,000) |
| Net Income | ($20,800,000) |
| Net Income Per Share | $0.23 |

*        *        *

### Summary Balance Sheet

|  | June 30, 2008 |
|---|---|
| **Assets** |  |
| Investments in real estate | $947,600,000 |

71

155.    Also on August 5, 2008, St. Joe filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Greene and Connolly, and reaffirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.  Additionally, the Form 10-Q discussed asset impairments, reporting:

> *Impairment Losses.* We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.  *Homes and home-sites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell.*  For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing service potential of the project and *using management's best estimates about future sales prices and holding periods.*  The continued decline in demand and market prices for residential real estate during the first six months of 2008 caused us to evaluate certain carrying amounts within our residential real estate segment. *As a result of our impairment analyses, we recorded an impairment charge in our residential real estate segment of $0.2 million for the second quarter of 2008 and $2.2 million for the first quarter 2008 primarily related to completed homes in several communities.*  In addition, we recorded a charge of $0.8 million related to the write down of a renegotiated builder note receivable during the second quarter 2008.

**Consolidated Statements of Income**

|  | Quarter End Jun. 30, 2008 |
|---|---|
| Impairment Losses | $976,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($32,449,000) |
| Net Income | ($20,818,000) |
| Net Income Per Share | $0.23 |

*      *      *

**Balance Sheet**

|  | **June 30, 2008** |
|---|---|
| **Assets** | |
| Investments in real estate | $947,644,000 |

156.     The statements in ¶¶154-155 were materially false and misleading when made for substantially the same reasons as stated in ¶149.

**D.     Third Quarter 2008 Financial Results**

157.     On November 4, 2008, the Company issued a press release on Form 8-K entitled "The St. Joe Company (NYSE: JOE) Reports Third Quarter 2008 Financial Results."  The press release reported that the Company's investment in real estate was $930.4 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net Loss for the third quarter 2008 of $(19.2) million, or $(0.21) per share, compared to a Net Loss of $(6.8) million, or $(0.09) per share, for the third quarter of 2007.

*     *     *

> **Year-to-Date Results**
>
> Net Loss for the first nine months of 2008 was $(8.0) million, or $(0.09) per share, compared to Net Income of $38.2 million, or $0.51 per share, for the first nine months of 2007.

**Consolidated Statements of Income**

|  | **Quarter End Sept. 30, 2008** |
|---|---|
| Impairment Losses | $1,300,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($30,600,000) |
| Net Income (Loss) | ($19,200,000) |
| Net Income (Loss) Per Share | ($0.21) |

*     *     *

**Summary Balance Sheet**

|  | Sept. 30, 2008 |
|---|---|
| **Assets** | |
| Investments in real estate | $930,400,000 |

158.    Also on November 4, 2008, St. Joe filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Greene and Connolly, and reaffirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.  The Form 10-Q discussed asset impairments, reporting:

> The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. *Homes and home-sites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell.* For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing project and *using management's best estimates about future sales prices and holding periods.* The continued decrease in demand and market prices for residential real estate during the first nine months of 2008 and 2007 indicated that certain carrying amounts within the Company's residential real estate segment may not be recoverable. In addition, during the second quarter 2008 the Company recorded an impairment charge of $0.8 million related to the write down of a renegotiated builder note receivable. *As a result of its 2008 impairment analyses, the Company has recorded aggregate impairment charges of $1.3 million and $4.6 million in the residential real estate segment for the three and nine months ended September 30, 2008.* The Company also recorded an impairment charge of $13.0 million in the third quarter of 2007.

*        *        *

**Consolidated Statements of Income**

|  | Quarter End Sept. 30, 2008 |
|---|---|
| Impairment Losses | $1,329,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($30,631,000) |
| Net Income (Loss) | ($19,198,000) |
| Net Income (Loss) Per | ($0.21) |

74

| Share | |
|---|---|

\*        \*        \*

**Balance Sheet**

| | Sept. 30, 2008 |
|---|---|
| **Assets** | |
| Investments in real estate | $930,420,000 |

159.    The statements in ¶¶157-158 were materially false and misleading when made for substantially the same reasons as stated in ¶149.

**E.    Fourth Quarter And Full Year 2008 Financial Results**

160.    On February 24, 2009, the Company issued a press release on Form 8-K entitled "The St. Joe Company (NYSE: Joe) Reports Fourth Quarter and Full Year 2008 Financial Results."  The press release reported that the Company's investment in real estate was $890.6 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net Loss for the fourth quarter 2008 of $(27.9) million, or $(0.31) per share, which includes non-cash charges of $57.9 million, or $0.36 per share after tax. This compares to Net Income of $1.0 million, or $0.01 per share, for the fourth quarter of 2007, which includes non-cash charges of $10.5 million, or $0.09 per share after tax. All per-share references in this release are presented on a diluted basis.
>
> JOE's fourth quarter 2008 results include the following non-cash charges:
>
> - *Pre-tax impairment charges of $55.8 million, or $0.34 per share after tax, including:*
>
> - $28.3 million write-down related to its SevenShores condominium development project;
>
>           \*        \*        \*
>
> - *$8.3 million charge for the write-down of costs to approximate fair value on homes in several JOE communities;*
>
>           \*        \*        \*

75

**Full-Year Results**

For the full year 2008, JOE had a Net Loss of $(35.9) million, or $(0.40) per share, compared to Net Income of $39.2 million, or $0.53 per share, for the full year 2007. Full year 2008 results include the following charges which totaled $109.5 million, or $0.69 per share after tax:

- Pre-tax impairment charges totaling $60.4 million and pre-tax loss of $1.9 million related to abandoned property, or an aggregate of $0.35 per share after tax;

*      *      *

The full-year 2007 results were affected by the following:

- Pre-tax impairment charges totaling $23.2 million, or $0.19 per share after tax, which includes $9.6 million recorded in discontinued operations;

*      *      *

**Summary Balance Sheet**

|  | December 31, 2008 |
|---|---|
| **Assets** |  |
| Investments in real estate | $890,600,000 |

*      *      *

**Consolidated Statements of Income**

|  | Quarter End Dec. 31, 2008 |
|---|---|
| Impairment Losses | $55,800,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($48,700,000) |
| Net Income | ($27,900,000) |
| Net Income Per Share | ($0.31) |

161.    Later on February 24, 2009, St. Joe held its quarterly earnings call for the fourth quarter and full year 2008. Defendants Greene and McCalmont participated on the call, reaffirming

the Company's quarterly financial results and financial position, and discussing the Company's

impairment charges for residential real estate.  Defendant McCalmont stated:

> The difficult economic conditions caused us to incur significant non-cash impairment charges in the fourth quarter totaling $55.8 million pretax or $0.34 per share after tax. These non-cash impairment charges were primarily related to three items. First, *we made a decision to reduce prices on the majority of our existing housing inventory to reflect current market conditions, facilitate sales and eliminate continuing carrying costs. These charges affected 114 homes and totaled $8.2 million pretax....*

162.    On February 24, 2009, St. Joe filed its 2008 Annual Report with the SEC on Form

10-K.  The Company's Form 10-K was signed by Defendants Greene and McCalmont, among

others, and reaffirmed the Company's 2008 financial results, financial position, and the reported

value of the Company's investment in real estate.  With respect to the Company's asset impairment

costs, St. Joe's 2008 Annual Report stated:

> *During 2008, we recorded total asset impairment costs of $60.5 million, $41.3 million of which primarily related to the write-down of capitalized costs at certain projects and the impairment of completed homes in several of our communities due to current market conditions.* If market conditions were to continue to deteriorate, and the market values for our homesites, remaining homes held in inventory and other project land were to fall below the book value of these assets, we could be required to take additional write-downs of the book value of those assets.

>     *        *        *

> *Impairment of Long-lived Assets and Goodwill.* Our long-lived assets, primarily real estate held for investment, are carried at cost unless circumstances indicate that the carrying value of the assets may not be recoverable. If we determine that an impairment exists due to the inability to recover an asset's carrying value, a provision for loss is recorded to the extent that the carrying value exceeds estimated fair value. If such assets were held for sale, the provision for loss would be recorded to the extent that the carrying value exceeds estimated fair value less costs to sell.

>     *        *        *

77

We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. *Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell.* For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and *using management's best estimates about future sales prices and holding periods.* The continued decline in demand and market prices for residential real estate during 2008 caused us to evaluate certain carrying amounts within our residential real estate segment. *As a result of our property impairment analyses, we recorded aggregate impairment charges in our residential real estate segment of $40.3 million during 2008.* In addition, we recorded a charge of $1.0 million related to the write down of a renegotiated builder note receivable during 2008.

\*       \*       \*

**Asset Impairments**

\*       \*       \*

*As a result of the Company's property impairment analyses for 2008, it recorded aggregate impairment charges of $41.3 million consisting of $12.0 million related to completed homes in several communities, $28.3 million related to the Company's SevenShores condominium project and $1.0 million related to the write down of a renegotiated builder note receivable.*

\*       \*       \*

**Summary Balance Sheet**

|                            | **December 31, 2008** |
| -------------------------- | --------------------- |
| **Assets**                 |                       |
| Investments in real estate | $890,583,000          |

\*       \*       \*

**Consolidated Statements of Income**

|                            | **Year End Dec. 31, 2008** |
| -------------------------- | -------------------------- |
| Impairment Losses          | $60,354,000                |
| Pre-tax Income (Loss) from | $(62,356,000)              |

78

| Continuing Operations | |
|---|---|
| Net Income | $(35,883,000) |
| Net Income Per Share | ($0.40) |

163.     The Notes to Consolidated Financial Statements section of the 2008 Form 10-K also discussed asset impairments and the Company's segment results, and provided the carrying values of the Company's residential real estate and accumulated depreciation.  In relevant part, the Form 10-K reported:

> **Segment Results**
>
> **Residential Real Estate**
>
> *             *             *
>
> *Homes and homesites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell.* For projects under development, an estimate of future cash flows on an undiscounted basis is performed. The overall decrease in demand and market prices for residential real estate indicated that certain carrying amounts within our residential real estate segment may not be recoverable. *As a result of our impairment analyses for 2008, we recorded aggregate impairment charges of $41.3 million, consisting of $12.0 million related to completed homes in several communities,* $28.3 million related to our SevenShores condominium project, and $1.0 million related to the write down of a renegotiated builder note receivable.

164.     The statements in ¶¶160-163 were materially false and misleading when made for substantially the same reasons as stated in ¶149.

**F.     First Quarter 2009 Financial Results**

165.     On May 5, 2009, the Company issued a press release on Form 8-K entitled "The St. Joe Company (NYSE: JOE) Reports First Quarter 2009 Financial Results."   The press release reported that the Company's investment in real estate was $888.1 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net Loss for the first quarter 2009 of $(11.7) million, or $(0.13) per share, which includes non-cash charges of $1.5 million, or $0.01 per share after tax. This compares to Net Income of $32.1 million, or $0.40 per

share, for the first quarter of 2008, which included non-cash charges of $2.8 million, or $0.02 per share after tax. All per-share references in this release are presented on a diluted basis.

### Consolidated Statements of Income

|  | Quarter End March 31, 2009 |
| --- | --- |
| Impairment Losses | $1,500,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($18,600,000) |
| Net Income | ($11,700,000) |
| Net Income Per Share | ($0.13) |

\*          \*          \*

### Summary Balance Sheet

|  | Mar. 31, 2009 |
| --- | --- |
| Assets |  |
| Investments in real estate | $888,100,000 |

166.   Also on May 5, 2009, St. Joe filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by Defendants Greene and Connolly, and reaffirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.  Additionally, the Form 10-Q discussed asset impairments, reporting:

The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.  *Homes and homesites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell.*  For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and *using management's best estimates about future sales prices and holding periods.  In the first quarter of 2009 and 2008, the Company recorded impairment charges in the residential real estate segment of $0.2 million and $2.3 million, respectively, related to completed unsold homes.*  In addition as discussed in Note 3, the Company recorded a $1.3 million impairment charge in the first quarter of 2009 related to a renegotiated builder note receivable.

\*         \*         \*

### Consolidated Statements of Income

|  | Quarter End March 31, 2009 |
|---|---|
| Impairment Losses | $1,536,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($18,653,000) |
| Net Income | ($11,697,000) |
| Net Income Per Share | ($0.13) |

\*         \*         \*

### Balance Sheet

|  | Mar. 31, 2009 |
|---|---|
| Assets |  |
| Investments in real estate | $888,057,000 |

167.    The statements in ¶¶165-166 were materially false and misleading when made for substantially the same reasons as stated in ¶149.

**G.    Second Quarter 2009 Financial Results**

168.    On August 4, 2009, the Company issued a press release on Form 8-K entitled "The St. Joe Company (NYSE: JOE) Reports Second Quarter 2009 Financial Results." The press release reported that the Company's investment in real estate was $869.8 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net Loss for the second quarter 2009 of $(44.6) million, or $(0.49) per share, which includes pre-tax non-cash charges of $64.7 million, or $0.43 per share after tax. This compares to a Net Loss of $(20.8) million, or $(0.23) per share, for the second quarter of 2008, which included significant charges of $35.3 million, or $0.24 per share after tax. All per-share references in this release are presented on a diluted basis.

> \*         \*         \*

> The remaining non-cash charges of $20.0 million pre-tax, or $0.13 per share after-tax, included the $7.4 million write-off of a note receivable from GVA Advantis, the $6.7 million write-down related

to JOE's SevenShores condominium and marina development project, *$5.5 million of impairments associated with homes and home sites in certain of JOE's communities* and $0.4 million of impairments for the write-down of a builder note receivable.

Net Loss for the first half of 2009 was $(56.3) million, or $(0.62) per share, compared to Net Income of $11.2 million, or $0.13 per share, for the first half of 2008.

Included in the results for the first six months of 2009 were the following significant non-cash charges:

- Settlement charge on pension annuitization of $44.7 million, or $0.30 per share after-tax; and

- Pre-tax impairment charges of $21.5 million, or $0.14 per share after-tax.

\*       \*       \*

### Consolidated Statements of Income

|  | Quarter End Jun. 30, 2009 | Six Months End Jun. 30, 2009 |
|---|---|---|
| Impairment Losses | $20,000,000 | $21,500,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($73,600,000) | $(92,300,000) |
| Net Income | ($45,300,000) | ($57,000,000) |
| Net Income Per Share | ($0.49) | ($0.62) |

\*       \*       \*

### Summary Balance Sheet

|  | June 30, 2009 |
|---|---|
| **Assets** |  |
| Investments in real estate | $869,800,000 |

169.    Also on August 4, 2009, St. Joe held its quarterly earnings call for the second quarter of 2009 which reaffirmed the Company's quarterly financial results, financial position, and

discussed impairment charges.   Defendants Greene and McCalmont participated on the call.

McCalmont stated:

> This morning, we announced a net loss for the second quarter of
> $44.6 million or $0.49 per share on revenues of $40.6 million. Our
> net loss includes pretax non-cash charges of $64.7 million or $0.43
> per share after tax. This compares to a net loss of $20.8 million or
> $0.23 per share, and revenues of $67.5 million for the second quarter
> last year. Last year's quarter included pretax non-cash charges of
> $35.3 million or $0.24 per share after tax…we also incurred
> impairments related to our real estate holdings. These charges
> included an approximate $7 million impairment related to an
> additional write-down of our Seven Shores condominium
> development and the Perico marina project located on non-legacy
> land in Bradenton, Florida. This project was written down to
> approximate the current fair market value of the project. *We also
> incurred impairments of approximately $6 million [to] associate
> homes, home sites, and a builder note receivable in certain of our
> communities.*

170.   During the call McCalmont also addressed an analyst's direct question about the

modest $6 million impairment taken by the Company on its residential real estate.   McCalmont

implied that the Company was writing down all of its residential real estate projects to reflect *current*

*market value*:

> **Buck Horne - Raymond James & Associates - Analyst**
>
> A couple of questions here. I guess, first, a little housekeeping -- can I
> get the finished home count that you still had left in inventory and
> what the remaining book value is of those -- of that inventory?
>
> Bill McCalmont - The St. Joe Company - EVP and CFO
>
> Buck, at the end of the quarter, we had 123 homes in inventory and
> 1,370 home sites, for a total of 1,493 units.
>
> Buck Horne - Raymond James & Associates - Analyst
>
> Okay, all right. And I guess just trying to get a feel for the
> impairments that you took on those homes -- can you give us any
> color on the assumptions or the price reduction that you took intra-
> quarter that required the impairments?

Bill McCalmont - The St. Joe Company - EVP and CFO

Sure. We took them at a variety of our communities *as we trued up the carrying values to reflect current market values*; that the largest impairments in terms of dollars were at five homes at WindMark Beach. And then as we wrote down the carrying value of the 27 condominium units at Artisan Park, following the auction results that we experienced this past weekend.

171.   Also on August 4, 2009, St. Joe filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by Defendants Greene and Connolly, and reaffirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.   Additionally, the Form 10-Q discussed asset impairments, reporting:

*Impairment Losses.*  We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.  *Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell.*  For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and *using management's best estimates about future sales prices and holding periods.  During the second quarter of 2009 we recorded impairment charges of $12.1 million in the residential real estate segment related to completed unsold homes and homesites* and a write-down of our SevenShores condominium and marina development project.

*During the first six months of 2009 we recorded impairment charges of $12.4 million in the residential real estate segment related to completed unsold homes and homesites* and a write-down of our SevenShores condominium and marina development project.

\*        \*        \*

### Consolidated Statements of Income

|                                                    | Quarter End Jun. 30, 2009 |
|----------------------------------------------------|----------------------------|
| Impairment Losses                                  | $19,962,000                |
| Pre-tax Income (Loss) from Continuing Operations   | ($73,636,000)              |
| Net Income                                         | ($45,275,000)              |

| Net Income Per Share | ($0.49) |
|---|---|

\*       \*       \*

### Balance Sheet

| | **June 30, 2009** |
|---|---|
| **Assets** | |
| Investments in real estate | $869,750,000 |

172.     The statements in ¶¶168-171 were materially false and misleading when made for substantially the same reasons as stated in ¶149.

### H.     Third Quarter 2009 Financial Results

173.     On November 3, 2009, the Company issued a press release on Form 8-K entitled "The St. Joe Company Reports Third Quarter 2009 Results."  The press release reported that the Company's investment in real estate was $844.9 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net Loss for the third quarter of 2009 of $(14.4) million, or $(0.16) per share, which included pre-tax charges of $12.9 million, or $0.08 per share after tax.  This compares to a Net Loss of $(19.2) million, or $(0.21) per share, for the third quarter of 2008, which included pre-tax charges of $13.0 million, or $0.09 per share after tax.  All per-share references in this release are presented on a diluted basis.

> St. Joe's third quarter earnings included $11.1 million of pre-tax, non-cash impairment charges including $9.0 million related to the settlement of the Saussy Burbank notes receivable, $2.0 million associated with various homes, homesites and other long-term assets and $0.1 million related to various builder notes receivable.

\*       \*       \*

### Year-to-Date Results

> Net Loss for the first nine months of 2009 was $(70.7) million, or $(0.77) per share, compared to Net Loss of $(8.0) million, or $(0.09) per share, for the first nine months of 2008.  Included in the results for the first nine months of 2009 were significant pre-tax charges of $79.1 million, or $0.52 per share after tax, compared to pre-tax

charges of $51.8 million, or $0.35 per share after tax, in the first nine months of 2008.

* * *

**Consolidated Statements of Income**

|  | **Quarter End Sept. 30, 2009** |
|---|---|
| Impairment Losses | $11,100,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($26,300,000) |
| Net (Loss) Income | ($14,400,000) |
| Net Income Per Share | ($0.16) |

* * *

**Summary Balance Sheet**

|  | **Sept. 30, 2009** |
|---|---|
| **Assets** |  |
| Investments in real estate | $844,900,000 |

174.    On November 3, 2009, St. Joe held its quarterly earnings call for the second quarter of 2009.  Defendants Greene and McCalmont participated on the call. McCalmont commented on third quarter impairment charges:

> We also incurred pretax non-cash impairments of approximately $2.1 million, associated with various homes, home sites and builder note receivables in certain communities.

175.    Also on November 3, 2009, St. Joe filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Greene and Connolly, and reaffirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.  Additionally, the Form 10-Q discussed asset impairments, reporting:

> *Impairment Losses*.  We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the

86

carrying amount of an asset may not be recoverable. *Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell.* For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods.

During the third quarter of 2009:

- We recorded a $9.0 million write-down related to the settlement of the Saussy Burbank notes receivable, a $0.1 million write-down of builder notes receivable and a $1.1 million impairment charge related to other long-term assets; and

- *We recorded a $0.9 million write-down related to completed unsold homes and homesites within other communities.*

*During the third quarter of 2008 we recorded impairment charges of $1.3 million related to completed unsold homes.*

During the first nine months of 2009:

- We recorded a $6.5 million impairment charge related to completed unsold homes and homesites in our communities and a $6.7 million write-down of our SevenShores condominium and marina development project.

*   *   *

### Consolidated Statements of Income

|  | Quarter End Sept. 30, 2009 |
|---|---|
| Impairment Losses | $11,100,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($26,300,000) |
| Net (Loss) Income | ($14,400,000) |
| Net (Loss) Income Per Share | ($0.16) |

*   *   *

**Balance Sheet**

|  | Sept. 30, 2009 |
|---|---|
| **Assets** |  |
| Investments in real estate | $844,900,000 |

176.    The statements in ¶¶173-175 were materially false and misleading when made for substantially the same reasons as stated in ¶149.

**I.    Fourth Quarter and Full Year 2009 Financial Results**

177.    On February 23, 2010, the Company issued a press release on Form 8-K entitled "The St. Joe Company Reports Full Year and Fourth Quarter 2009 Results."  The press release reported that the Company's investment in real estate was $749.5 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net Loss for the full year ended 2009 of $(130.0) million, or $(1.42) per share, compared to a Net Loss of $(35.9) million, or $(0.40) per share, for the year ended 2008.  Included in the 2009 results were significant pre-tax charges of $163.1 million, or $1.07 per share after tax, compared to pre-tax charges of $109.5 million, or $0.69 per share after tax, in the year ended 2008.  All per-share references in this release are presented on a diluted basis.
>
> *          *          *
>
> **Fourth Quarter 2009 Financial Results**
>
> For the fourth quarter of 2009, St. Joe had a Net Loss of $(59.3) million, or $(0.65) per share, which included pre-tax charges of $84.0 million, or $0.56 per share after tax.  This compares to a Net Loss of $(27.9) million, or $(0.31) per share, for the fourth quarter of 2008, which included pre-tax charges of $57.9 million, or $0.36 per share after tax.
>
> St. Joe's fourth quarter earnings included $73.3 million of pre-tax, non-cash impairment charges including $67.8 million related to the sale of the remaining assets at Victoria Park ($6.9 million recorded in discontinued operations), $3.5 million related to the sale of the St. Johns Golf & Country Club (recorded in discontinued operations), $1.1 million related to the sale of the assets acquired in connection with the settlement of our Saussy Burbank notes receivable, *$0.8 million associated with various homes and homesites* and $0.1

million associated with a builder note receivable. The Company also wrote-off $7.2 million of capitalized costs related to abandoned development plans in certain of our projects and incurred a restructuring charge of $3.5 million related to one-time termination benefits.

*     *     *

### Consolidated Statements of Income

|  | Quarter End Dec. 31, 2009 | Year End Dec. 31, 2009 |
|---|---|---|
| Impairment Losses | $70,100,000 | $102,700,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($86,900,000) | ($205,100,000) |
| Net (Loss) Income | ($59,300,000) | ($130,800,000) |
| Net Income Per Share | ($0.65) | ($1.42) |

*     *     *

### Summary Balance Sheet

|  | Dec. 31, 2009 |
|---|---|
| **Assets** |  |
| Investments in real estate | $749,500,000 |

178.    Also on February 23, 2010, St. Joe held its quarterly earnings call to discuss the Company's the fourth quarter and year end 2009 results. Defendants Greene and McCalmont participated on the call. During the call, McCalmont stated:

> For the fourth quarter of 2009 we had a net loss of $59.3 million or $0.65 per share, which included pretax charges of $84 million or $0.56 per share after tax. Included in the pretax charges were $73 million of noncash impairment charges, including $67.8 million related to the sale of the company's remaining assets at Victoria Park in DeLand, Florida; $3.5 million related to the sale of the St. Johns Golf & Country Club near Jacksonville; $1 million related to the sale of assets acquired in connection with the settlement of our Saussy Burbank notes receivable; *and approximately $1 million associated with various homes, home sites and a builder's note receivable.*
>
> We also wrote off just over $7 million of capitalized costs related to abandoned development projects in certain of our projects and

incurred a restructuring charge of $3.5 million related to one-time termination benefits.

179.    On February 23, 2010, St. Joe filed its 2009 Annual Report with the SEC on Form

10-K.  The Company's Form 10-K was signed by Defendants Greene and McCalmont, among

others, and reaffirmed the Company's 2009 financial results, financial position, and the reported

value of the Company's investment in real estate.  With respect to the Company's asset impairment

costs, St. Joe's 2009 Annual Report reported:

> *Impairment Losses.*  During the past three years, we have recorded significant impairment charges as a result of the continued decline in demand and market prices within our real estate markets. The following table summarizes our impairment charges for the three years ended December 31:

| | Year End Dec. 31 | | |
|---|---|---|---|
| | **2009** | **2008** | **2007** |
| Impairment Charge: Home and Homesites – various residential communities | $7,300,000 | $12,000,000 | $7,800,000 |

> Investment in Real Estate:
>
> We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.  *Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell.*  For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and *using management's best estimates about future sales prices and holding periods.*  The continued decline in demand and market prices for residential real estate during 2007 through 2009 caused us to reevaluate certain carrying amounts within our residential real estate segment, which resulted in the recording of significant impairment charges.
>
> Given the downturn in our real estate markets, we implemented a tax strategy for 2009 to benefit from the sale of certain non-strategic assets at a loss. Under federal tax rules, losses from asset sales

realized in 2009 can be carried back and applied to taxable income from 2007, resulting in a federal income tax refund for 2009.

As part of this strategy, we conducted a nationally marketed sale process for the disposition of the remaining assets of our non-strategic Victoria Park community in Deland, Florida, including homes, homesites, undeveloped land, notes receivable and a golf course. Based on the likelihood of the closing of the sale, we concluded on December 15, 2009 that an impairment charge for $67.8 million was necessary. We completed the sale on December 17, 2009 for $11.0 million.

In addition, we completed the sale of our SevenShores condominium and marina development project for $7.0 million earlier in 2009, which resulted in an impairment charge of $6.7 million due to lower market pricing. We also wrote-off $7.2 million of capitalized costs related to abandoned development plans in certain of our communities. We also sold our St. Johns Golf and Country Club for $3.0 million in December 2009 which resulted in an impairment charge of $3.5 million.

\*       \*       \*

### Consolidated Statements of Income

|  | Year End Dec. 31, 2009 |
|---|---|
| Impairment Losses | $102,683,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($205,127,000) |
| Net (Loss) Income | ($130,840,000) |
| Net Income Per Share | ($1.42) |

\*       \*       \*

### Summary Balance Sheet

|  | Dec. 31, 2009 |
|---|---|
| **Assets** | |
| Investments in real estate | $749,500,000 |

180.    The statements in ¶¶177-179 were materially false and misleading when made for substantially the same reasons as stated in ¶149.

91

### J.   First Quarter 2010 Financial Results

181.   On May 4, 2010, the Company issued a press release on Form 8-K entitled "The St.

Joe Company Reports First Quarter 2010 Results."  The press release reported that the Company's

investment in real estate was $747.3 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net Loss for
> the first quarter ended March 31, 2010 of $(11.4) million, or $(0.13)
> per share, compared to a Net Loss of $(12.0) million, or $(0.13) per
> share, for the first quarter of 2009.

*       *       *

#### Consolidated Statements of Income

|  | Quarter End March 31, 2010 |
| --- | --- |
| Impairment Losses | $100,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($17,600,000) |
| Net (Loss) Income | ($11,400,000) |
| Net Income Per Share | ($0.13) |

*       *       *

#### Summary Balance Sheet

|  | March 31, 2010 |
| --- | --- |
| **Assets** |  |
| Investments in real estate | $747,300,000 |

182.   Also on May 4, 2010, St. Joe filed its Quarterly Report with the SEC on Form 10-Q.

The Company's Form 10-Q was signed by Defendants Greene and Connolly, and reaffirmed the

Company's quarterly financial results, financial position, and the reported value of the Company's

investment in real estate.  Additionally, the Form 10-Q discussed asset impairments, reporting:

> The Company reviews its long-lived assets for impairment whenever
> events or changes in circumstances indicate that the carrying amount
> of an asset may not be recoverable.  *Homes and homesites*
> *substantially completed and ready for sale are measured at lower of*

92

*carrying value or fair value less costs to sell.* The fair value of homes and homesites is determined based upon final sales prices of inventory sold during the period (level 2 inputs). For inventory held for sale, estimates of selling prices based on current market data are utilized (level 3 inputs). For projects under development, an estimate of future cash flows on an undiscounted basis is performed *using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods (level 3 inputs). In the first quarter of 2010 and 2009, the Company recorded impairment charges in the residential real estate segment of $0.1 million and $0.2 million, respectively.*

*       *       *

## Segment Results

### *Residential Real Estate*

Our residential real estate segment typically plans and develops mixed-use resort, primary and seasonal residential communities of various sizes, primarily on our existing land. We own large tracts of land in Northwest Florida, including significant Gulf of Mexico beach frontage and waterfront properties, and land near Jacksonville and Tallahassee.

Our residential sales remain weak due to the real estate downturn and economic recession in Florida. Inventories of resale homes and homesites remain high in our markets and prices remain depressed, and, predicting when real estate markets will return to health remains difficult. Although we have noticed some renewed interest in residential real estate activity, we do not expect any significant favorable changes in market conditions during 2010.

*       *       *

**Consolidated Statements of Income**

|  | **Quarter End March 31, 2010** |
|---|---|
| Impairment Losses | $53,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($17,636,000) |
| Net (Loss) Income | ($11,424,000) |
| Net Income Per Share | ($0.13) |

93

\*       \*       \*

**Balance Sheet**

|  | **March 31, 2010** |
|---|---|
| **Assets** |  |
| Investments in real estate | $747,341,000 |

183.    The statements in ¶¶181-182 were materially false and misleading when made for substantially the same reasons as stated in ¶149.

**K.      Second Quarter 2010 Financial Results**

184.    On August 5, 2010, the Company issued a press release on Form 8-K entitled "The St. Joe Company Reports Second Quarter 2010 Results."   The press release reported that the Company's investment in real estate was $748.2 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net Loss for the second quarter ended June 30, 2010 of $(8.6) million, or $(0.09) per share, including a pre-tax restructuring charge of $1.2 million or $0.01 per share after tax.  This compares to a Net Loss in the second quarter of 2009 of $(44.8) million, or $(0.49) per share, which included pre-tax non-cash charges of $64.7 million or $0.43 per share after tax.

> Net Loss for the first half of 2010 was $(20.0) million, or $(0.22) per share.  This compares to a Net Loss during the same period of 2009 of $(56.9) million, or $(0.62) per share, which included pre-tax non-cash charges of $66.2 million or $0.44 per share after tax.

\*       \*       \*

94

**Consolidated Statements of Income**

|  | Quarter End June 30, 2010 |
|---|---|
| Impairment Losses | $500,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($14,700,000) |
| Net (Loss) Income | ($8,600,000) |
| Net Income Per Share | ($0.09) |

\*      \*      \*

**Summary Balance Sheet**

|  | June 30, 2010 |
|---|---|
| **Assets** |  |
| Investments in real estate | $748,200,000 |

185.    Also on August 5, 2010, St. Joe filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Greene and Connolly, and reaffirmed the Company's financial results, financial position, and the reported value of the Company's investment in real estate.  Additionally, the Form 10-Q discussed asset impairments, reporting:

> *Impairment Losses.*  We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.  *Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell.*  For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and *using management's best estimates about future sales prices and holding periods.  During the second quarter of 2010 and the first six months of 2010, we recorded impairment charges on homes and homesites of zero and $0.1 million, respectively, in the residential real estate segment.*  During the second quarter of 2010 we also recorded a $0.5 million write-down resulting from a renegotiated builder note receivable in the residential segment.

\*       \*       \*

**Consolidated Statements of Income**

|  | **Quarter End June 30, 2010** |
|---|---|
| Impairment Losses | $502,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($14,719,000) |
| Net (Loss) Income | ($8,630,000) |
| Net Income Per Share | ($0.09) |

\*       \*       \*

**Summary Balance Sheet**

|  | **June 30, 2010** |
|---|---|
| **Assets** | |
| Investments in real estate | $748,195,000 |

186.    The statements in ¶¶184-185 were materially false and misleading when made for substantially the same reasons as stated in ¶149.

**L.    Third Quarter 2010 Financial Results**

187.    On November 2, 2010, the Company issued a press release on Form 8-K entitled "The St. Joe Company Reports Third Quarter 2010 Results."  The press release reported that the Company's investment in real estate was $746.8 million, and stated:

> The St. Joe Company (NYSE: JOE) today announced a Net Loss for the third quarter ended September 30, 2010 of $(13.1) million, or $(0.14) per share, including pre-tax charges of $13.1 million, or $0.09 per share after tax. This compares to a Net Loss in the third quarter of 2009 of $(14.5) million, or $(0.16) per share, which included pre-tax charges of $12.9 million or $0.08 per share after tax. Third quarter 2010 pre-tax charges included an $8.8 million reserve for litigation involving a contract dispute related to a 1997 land purchase, a $2.6 million charge for legal and clean-up costs resulting from the Deepwater Horizon oil spill and $1.7 million of restructuring charges.
>
> Year-to-Date Net Loss for 2010 was $(33.2) million, or $(0.36) per share including pre-tax charges of $15.8 million or $0.11 per share

after tax. This compares to a Net Loss during the same period of 2009 of $(71.4) million, or $(0.78) per share, which included pre-tax charges of $79.1 million or $0.52 per share after tax.

\*     \*     \*

### Consolidated Statements of Income

|  | Quarter End Sept. 30, 2010 |
| --- | --- |
| Impairment Losses | -- |
| Pre-tax Income (Loss) from Continuing Operations | ($21,700,000) |
| Net (Loss) Income | ($13,100,000) |
| Net Income Per Share | ($0.14) |

\*     \*     \*

### Summary Balance Sheet

|  | Sept. 30, 2010 |
| --- | --- |
| **Assets** |  |
| Investments in real estate | $746,800,000 |

188.    Also on November 2, 2010, St. Joe filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Greene and Connolly, and reaffirmed the Company's financial results, financial position, and the reported value of the Company's investment in real estate.  Additionally, the Form 10-Q discussed asset impairments, reporting:

### Results of Operations

Net loss decreased by $1.4 million to a loss of $(13.1), or $(0.14) per share, in the third quarter of 2010, compared to a net loss of $(14.5) million, or $(0.16) per share, for the third quarter of 2009.

\*     \*     \*

*Impairment Losses.* We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. *Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell.* For

97

projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and *using management's best estimates about future sales prices, sales volume, sales velocity and holding periods.* In addition, the estimated length of expected development periods, related economic cycles and inherent uncertainty with respect to these projects, such as the impact of change in development plans and our intent and ability to hold the projects through the development period, could result in changes to these estimates. *During the nine months ended September 30, 2010, we recorded impairment charges on homes and homesites of $0.1 million, in the residential real estate segment.* During the first nine months of 2010 we also recorded a $0.5 million write-down resulting from a renegotiated builder note receivable in the residential segment.

*       *       *

### Consolidated Statements of Income

|  | Quarter End Sept. 30, 2010 |
|---|---|
| Impairment Losses | -- |
| Pre-tax Income (Loss) from Continuing Operations | ($21,649,000) |
| Net (Loss) Income | ($13,126,000) |
| Net Income Per Share | ($0.14) |

*       *       *

### Summary Balance Sheet

|  | Sept. 30, 2010 |
|---|---|
| **Assets** |  |
| Investments in real estate | $746,791,000 |

189.    The statements in ¶¶187-188 were materially false and misleading when made for substantially the same reasons as stated in ¶149.

### M.    Fourth Quarter and Full Year 2010 Financial Results

190.    March 1, 2011, the Company issued a press release on Form 8-K entitled "The St. Joe Company Reports Full Year and Fourth Quarter 2010 Results." The press release reported that the

Company's investment in real estate for the year ending December 31, 2010 was $755.4 million, and

stated in pertinent part:

> WATERSOUND, Fla.--(BUSINESS WIRE)--March 1, 2011--The St. Joe Company (NYSE: JOE) today announced a Net Loss for the full year ended 2010 of $(35.9) million, or $(0.39) per share, which included pre-tax charges of $27.1 million, or $0.12 per share after tax. This compares to a Net Loss of $(130.0) million, or $(1.42) per share, for the year ended 2009, which included pre-tax charges of $163.1 million, or $1.07 per share after tax.
>
> For the fourth quarter of 2010, St. Joe had a Net Loss of $(2.7) million, or $(0.03) per share, which included pre-tax charges of $10.7 million, or $0.12 per share after tax. This compares to a Net Loss of $(58.7) million, or $(0.64) per share, for the fourth quarter of 2009, which included pre-tax charges of $84.0 million, or $0.56 per share after tax. Pre-tax charges for the fourth quarter of 2010 included $8.0 million, or $.05 per share after tax, for impairments on unconsolidated affiliates, real estate and other assets; $1.6 million, or $.06 per share after tax, for costs resulting from the Deepwater Horizon oil spill; and $1.1 million, or $0.01 per share after tax, of restructuring and other charges.

*    *    *

**Consolidated Results**

|  | Quarter End Dec. 31, 2010 | Year End Dec. 31, 2010 |
|---|---|---|
| Impairment Losses | $4,200,000 | $4,800,000 |
| Pre-tax Income from Continuing Operations | $(1,400,000) | $(55,400,000) |
| Net (loss) Income | $(2,700,000) | $(35,900,000) |
| Net (loss) Income Per Share | $(0.03) | $(0.39) |

*    *    *

**Summary Balance Sheet**

|  | December 31, 2010 |
|---|---|
| **Assets** |  |
| Investments in real estate | $755,400,000 |

99

191.    Also, on March 2, 2011, St. Joe filed its 2010 Annual Report with the SEC on Form

10-K.  The Company's Form 10-K was signed by Defendants Greene and McCalmont, among

others, and reaffirmed the Company's 2009 financial results, financial position, and the reported

value of the Company's investment in real estate.  With respect to the Company's asset impairment

costs, St. Joe's 2010 Annual Report reported:

> *Impairment Losses*.  During the past three years, we have recorded
> significant impairment charges as a result of the decline in demand
> and market prices in our real estate markets. The following table
> summarizes our impairment charges for the three years ended
> December 31, 2010, 2009 and 2008:

| | Year End Dec. 31 | | |
|---|---|---|---|
| | **2010** | **2009** | **2008** |
| Impairment Charge: Home and Homesites – various residential communities | $4,300,000 | $7,300,000 | $12,000,000 |

*      *      *

> We review our long-lived assets for impairment whenever events or
> changes in circumstances indicate that the carrying amount of an
> asset may not be recoverable. Homes and homesites substantially
> completed and ready for sale and which management intends to sell
> in the near-term under current market conditions, are measured at the
> lower of carrying value or fair value less costs to sell. Other
> properties that management does not intend to sell in the near term or
> under current market conditions are evaluated for impairment based
> upon management's best estimate of the long-term use and the
> eventual disposition of the property. For projects under development,
> an estimate of future cash flows on an undiscounted basis is
> performed using estimated future expenditures necessary to maintain
> and complete the existing project and using management's best
> estimates about future sales prices and holding periods. The
> continued decline in demand and market prices for residential real
> estate during 2008 through 2010 caused us to reevaluate certain
> carrying amounts within our residential real estate segment. During
> 2010, we recorded a $3.8 million impairment on our investment in
> East San Marco L.L.C., a joint venture located in Jacksonville,
> Florida and approximately $4.3 million in impairment charges on
> homes and homesites.

Given the downturn in our real estate markets, we implemented a tax strategy in 2009 to benefit from the sale of certain non-strategic assets at a loss. Under federal tax rules, losses from asset sales realized in 2009 can be carried back and applied to taxable income from 2007, resulting in a federal income tax refund for 2009.

As part of this strategy, during 2009, we conducted a nationally marketed sale process for the disposition of the remaining assets of our non-strategic Victoria Park community in Deland, Florida, including homes, homesites, undeveloped land, notes receivable and a golf course. Based on the likelihood of the closing of the sale, we determined on December 15, 2009 that an impairment charge for $67.8 million was necessary. We completed the sale on December 17, 2009 for $11.0 million.

In addition, we completed the sale of our SevenShores condominium and marina development project for $7.0 million earlier in 2009, which resulted in an impairment charge of $6.7 million due to lower market pricing. We also wrote-off $7.2 million of capitalized costs related to abandoned development plans in certain of our communities in 2009. We also sold our St. Johns Golf and Country Club for $3.0 million in December 2009 which resulted in an impairment charge of $3.5 million.

As a result of our property impairment analyses for 2008, we recorded impairment charges related to investment in real estate of $40.3 million consisting of $12.0 million related to completed homes in several communities and $28.3 million related to our SevenShores condominium and marina development project.

The SevenShores condominium project was written down in the fourth quarter of 2008 to approximate the fair market value of land entitled for 278 condominium units. This write-down was necessary because we elected not to exercise our option to acquire additional land under our option agreement. Certain costs had previously been incurred with the expectation that the project would include 686 units.

A continued decline in demand and market prices for our real estate products may require us to record additional impairment charges in the future.

*       *       *

**Consolidated Statements of Operations**

|  | Year End Dec. 31, 2010 |
|---|---|
| Impairment Losses | $4,799,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($55,446,000) |
| Net Loss | ($35,905,000) |
| Net Income Per Share | ($0.39) |

\*      \*      \*

**Summary Balance Sheet**

|  | Dec. 31, 2010 |
|---|---|
| **Assets** | |
| Investments in real estate | $755,392,000 |

192.    The statements in ¶¶190-191 were materially false and misleading when made for substantially the same reasons as stated in ¶149.

**N.    First Quarter 2011 Financial Results**

193.    On May 5, 2011, the Company issued a press release on Form 8-K entitled: "The St. Joe Company Reports First Quarter 2011 Results."  The press release reported that the Company's investment in real estate was $750.4 million, and stated in pertinent part:

> The St. Joe Company (NYSE:JOE) today announced Net Income for the first quarter of 2011 of $14.1 million, or $0.15 per share, compared to a Net Loss of $(11.4) million, or $(0.13) per share for the first quarter of 2010.

\*      \*      \*

**Consolidated Statements of Operations**

|  | Quarter End March 31, 2011 |
|---|---|
| Impairment Losses | $800,000 |
| Pre-tax Income (Loss) from Continuing Operations | $21,600,000 |
| Net Income (Loss) | $14,100,000 |
| Net Income Per Share | $0.15 |

\*       \*       \*

**Summary Balance Sheet**

|  | March 31, 2011 |
|---|---|
| **Assets** |  |
| Investments in real estate | $750,400,000 |

194.    Also, on May 5, 2011, St. Joe filed its Quarterly Report with the SEC on Form 10-Q. The Form 10-Q was signed by Defendant Connolly and Park Brady, the Company's Chief Operating Officer, and reaffirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.  Additionally, the Form 10-Q discussed asset impairments, reporting:

> The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Long-lived assets include the Company's investments in operating, development and investment property. Some of the events or changes in circumstances that are considered by the Company as indicators of potential impairment include:
>
> - a prolonged decrease in the market price or demand for the Company's properties;
>
> - a change in the expected use or development plans for the Company's properties;
>
> - a current period operating or cash flow loss for an operating property; and,
>
> - an accumulation of costs in a development property that significantly exceeds its historically low basis in property held long-term.
>
> Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell. Homes and homesites ready for sale include properties that are actively marketed with an intent to sell such properties in the near term. Management identifies properties as being ready for sale when

the intent is to sell such assets in the near term and under current market conditions. Other properties for which management does not intend to sell in the near term under current market conditions are evaluated for impairment based on management's best estimate of the long-term use and eventual disposition of such property.

For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to develop and maintain the existing project and using management's best estimates about future sales prices and holding periods. The projection of undiscounted cash flows requires that management develop various assumptions including:

- the projected pace of sales of homesites based on estimated market conditions and the Company's development plans;

- projected price appreciation over time, which can range from 0% to 7% annually;

- the amount and trajectory of price appreciation over the estimate selling period;

- the length of the estimated development and selling periods, which can range from 5 years to 17 depending on the size of the development and the number of phases to be developed;

- the amount of remaining development costs and holding costs to be incurred over the selling period;

- in situations where development plans are subject to change, the amount of entitled land subject to bulk land sales or alternative use and the estimated selling prices of such property;

- for commercial development property, future pricing is based on sales of comparable property in similar markets; and

- assumptions regarding the intent and ability to hold individual investments in real estate over projected periods and related assumptions regarding available liquidity to fund continued development.

*      *      *

**Segment Results**

***Residential Real Estate***

Our residential real estate segment typically plans and develops mixed-use resort, primary and seasonal residential communities of various sizes, primarily on our existing land. We own large tracts of land in Northwest Florida, including significant Gulf of Mexico beach frontage and waterfront properties, and land near Jacksonville and Tallahassee.

Our residential sales improved from the previous year, although due to the real estate downturn, the slow economic recovery, the Deepwater Horizon oil spill and other adverse market conditions, sales remain weak. Inventories of resale homes and homesites remain high in our markets and prices remain depressed, and predicting when real estate markets will return to health remains difficult. Although we have noticed some renewed interest in residential real estate activity, we do not expect any significant favorable changes in market conditions during 2011.

We review our long-lived assets for impairment whenever events or change in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale which management intends to sell in the near term under current market conditions are measured at lower of carrying value or fair value less costs to sell. Other properties that management does not intend to sell in the near term or under current market conditions, including development and operating properties, are evaluated for impairment based on management's best estimate of the long-term use and eventual disposition of the property. For projects under development, an estimate of future cash flows on an undiscounted basis is performed. These estimates did not indicate any need for impairment charges in the first quarter 2011. In the first quarter of 2010, we recorded impairment charges of $0.1 million.

*       *       *

### Consolidated Statements of Income

|  | Quarter End March 31, 2011 |
|---|---|
| Impairment Losses | $782,000 |
| Pre-tax Income (Loss) from Continuing Operations | ($21,667,000) |
| Net (Loss) Income | ($14,090,000) |
| Net Income Per Share | $0.15 |

*       *       *

105

**Balance Sheet**

|  | March 31, 2011 |
|---|---|
| **Assets** |  |
| Investments in real estate | $750,473,000 |

195.   The statements in ¶¶193-194 were materially false and misleading when made for substantially the same reasons as stated in ¶149.

## VIII.   THE TRUTH BEGINS TO EMERGE

### 1.   October 13, 2010- Einhorn's "Field of Schemes Presentation"

196.   On October 13, 2010, the truth about the inflated carrying values for St. Joe's residential real estate began to emerge when Einhorn, an investor with a short position in St. Joe's stock, presented the results of the extensive investigation he had conducted into St. Joe's residential real estate development business to the investing public at the Value Investing Congress, in a presentation entitled "Field of Schemes: If You Build It, They Won't Come."[63]   Einhorn's presentation was based on an in-depth analysis he undertook with the assistance of a battery professional staff and real estate valuation experts, of the current value of certain of St. Joe's residential real estate projects that were in development, relying on detailed information gleaned from various disparate sources not readily accessible to the investing public.   For example, Einhorn's presentation used photographs of St. Joe's properties, including aerial photos, that are not likely available to all investors without traveling to St. Joe's properties.   It also used information from conversations with the Airport Authority and FOIA requests sent to the Airport Authority Board.

---

[63]   The presentation included a 139-page slide show of the Company's real estate holdings, including footage and film of St. Joe's developments.

197.    In addition, Einhorn's presentation gathered and analyzed information from more than twenty sources, including:

- Broyhill Asset Management, "Buy When There's Oil in the Water" presentation Q2 2010

- Airport Board Minutes, June 2010

- Walton County, FL property appraiser's December 2009 sale list

- county appraisal office records

- *Issa Homes v. The St. Joe Company*, filed May 22, 2009

- RiverTown Development of Regional Impact Biennial Monitoring Report 2008-2009, dated January 31, 2010

- St. Johns County Tax Appraisal Office

- Metrostudy Jacksonville Residential Survey, 1Q 2010

- Walton County Tax Appraisal Office

- Warranty Deed on file with Walton County

- US Census 2009 estimate, http://quickfacts.census.gov

- Inmate population information list, http://www.dc.state.fl.us/activeinmates/list.asp?DataAction=Paging

- http://www.eflorida.com/floridasregionsSubpage.aspx?id=284

- Franklin County Florida zoning ordinances

- Franklin County Tax Appraisal Office

- Franklin County Property Appraiser's website, http://qpublic.net/franklin/index.html

- Florida Official Records office http://www.myfloridacounty.com/services/officialrecords_intro.shtml

- Listing offered by SummerCamp executive realtor

- Gulf County Tax Appraisal Office

- WaterSound North DRI, 2007-2008 Biennial Report

- WindMark DRI, April 1, 2008 - April 1, 2010 Biennial Report

- RiverTown Development of Regional Impact Biennial Monitoring Report 2008-2009

- WaterSound North DRI, 2007-2008 Biennial Report

- Public filings for other companies relevant to an analysis of St. Joe, including Leucadia National Corp, IP, Timber Mart-South Market News Quarterly, 2nd Quarter 2010 – Vol.15 No.2-A

- St. Joe's public filings, including press releases, letters to shareholders, conference call transcripts, and investor conference transcripts from an investor conference

198.    Based on Einhorn's investigation and expert analysis, which evaluated evidence similar to the evidence set forth in Section IV above,[64] Einhorn concluded that based on current and historical information, the Company ***should take*** impairments that ***should have been but were not previously taken*** on various residential real estate projects, because it was not possible for the value of the properties to meet or exceed their stated carrying values.   In such a way, Einhorn's presentation provided original insight that revealed St. Joe's improper accounting and its failure to have taken the necessary impairments during the Class Period.

_____

[64]    Moreover, as detailed by CW5, who worked for Greenlight Capital and was the individual responsible for putting together the "Field of Schemes" presentation, Einhorn's analysis "utilized different experts in the real estate valuation community to confirm the accounting discrepancy and perform a 'comp analysis' of Joe for the time period of 2008-2010."   According to CW5, the purpose for the presentation was to show the "enormous gap" between St. Joe's "market value" and its internal valuation.   From CW5's analysis, it was evident that as of early 2008, the Company should have written off 20% of their carrying value, yet it has only written off 2%.

199.    Based on current and historical data, Einhorn's presentation indicated that impairments needed to be taken to correct flaws in historical accounting and management practices. This is evident from the transcript of the presentation.[65]  For example, during the presentation, Einhorn stated:

- With respect to the SummerCamp East, he stated that "Joe has 144 remaining developed lots that we have generously valued at $15 million.  The carrying value of about 42 million is 290,000 per developed lot.  There's nothing go on at the site and *we think it should be impaired*."

- With respect to WindMark, he stated that "I assume most of that is for the vacant city center.  There are around 224 residential lots of a total planned for 1,516 lots, 72 that we count available for sale.  And the developed ones are of course the ones on the beach.  So there's less than 15 percent developed.  Somehow there's 165 million in capitalized costs on the balance sheet.  If we allocate those costs over the 224 actual developed lots, that implies $736,000 cost per lot.  Even if all remaining 1,367 lots were eventually developed, that was applied over $120,000 [sic] allocated to each lot, counting the future costs to actually develop them.  What exactly did Joe capitalize *in mid-month*?  I suspect it includes the cost of moving the highway, which might be sitting on Joe's balance sheet.  Joe has 42 million in developed and we think 50 commercial real estate here.  *We think there should be a large impairment on this property.*"

- "Now Joe says that the market value falling below the book value would cause a required writedown.  I think that *Joe and its accountants might want to update their calculations.*  Joe has taken substantial impairments but only for communities it has sold."

200.    Following this presentation, *Reuters* reported that Einhorn's presentation notes that St. Joe's "development plans have fallen flat, leaving it with 'ghost towns' and inevitable writedowns."  Einhorn also stated how the Company "was 'stuck' after making an aggressive bet on beachfront developments that have gone nowhere, and that it was overvaluing the real estate

---

[65]    *See* Audio Transcript of "Field of Schemes," marketfolly, "Why David Einhorn is Short St. Joe (JOE): Presentation from Value Investing Congress, " available at: http://www.marketfolly.com/2010/10/why-david-einhorn-is-short-st-joe-joe.html#ixzz1YjRjQd9H (last visited Sept. 22, 2011).

holdings on its books," and that "[t]here's little evidence of how Joe spent so much money on these developments.  Many developments are ghost towns and little value remains."  In addition, Einhorn stated that "[w]ith the popping of the bubble, Joe's business has practically stopped."

201.   After the close of the market on October 13, 2010, *Bloomberg* published an article entitled "Einhorn Says St. Joe Needs 'Substantial' Writedowns."  The article recounted:

> St. Joe Co.'s shares plunged after David Einhorn, who profited from bets against Lehman Brothers Holdings Inc. in 2008, said the Florida real-estate firm must take "substantial" asset-impairment charges and that further building will drive the stock price to zero.
>
> "The best properties have been sold, many lots were sold to speculators during the boom, and when the boom ended, business essentially stopped," Einhorn, who runs hedge-fund operator Greenlight Capital Inc., said today at the Value Investing Congress in New York.  "There's little evidence of how Joe spent so much money on these developments.  Many developments are ghost towns and little value remains."
>
> *         *         *
>
> The company is accounting for untouched land as developed, Einhorn said.  Also, St. Joe's RiverTown community is a "moonscape," and WaterSound is empty, he said.
>
> "Joe's highest and best use is to return to a rural land company," he said.  "Management should sell the company, but it can't because the stock price is too high."

202.   The market was shocked by Einhorn's presentation and associated media commentary on October 13 and October 14, 2010, which revealed the true value of St. Joe's properties and its failure to take the necessary impairments, causing the price of St. Joe's stock to plummet approximately 20%, as it fell $4.80 per share to close at $19.74 on October 14, 2010 on unusually high trading volume.

### 2.   January 10, 2011-The SEC Inquiry

203.   On January 10, 2011, the market learned that the SEC was conducting an informal inquiry into St. Joe's practices concerning impairment of investment in real estate assets, when after the market closed, Defendants issued the following statement on Form 8-K:

> The Securities and Exchange Commission (the "SEC") has notified The St. Joe Company ("St. Joe") that it is conducting an informal inquiry into St. Joe's policies and practices concerning impairment of investment in real estate assets. St. Joe intends to cooperate fully with the SEC in connection with the informal inquiry. The notification from the SEC does not indicate any allegations of wrongdoing, and an inquiry is not an indication of any violations of federal securities laws.

204.   This announcement indicated that the SEC was looking into the Company's prior practices[66] concerning its impairment of real estate assets and conveyed to the market the extent and likelihood of the Company's improper accounting.  As a result, the market reacted negatively to this announcement, causing St. Joe's stock price to drop approximately 7% during after hours trading, as it fell $1.57 per share to open at $21.50.

205.   While the Company's stock price did close up on January 11, 2011, this was due to Defendants' attempt to offset the announced SEC inquiry with information that global asset manager BlackRock, Inc. had boosted its stake in St. Joe to 11.7 million shares or 12.59%, from the 6.3 million shares it held at the same time last year.  While this information was revealed in a Schedule SC 13G/A during trading on January 10, 2011, it was not until after the close of trading on that day and the following day that the market learned, through news articles the significance of this information.

---

[66]    As detailed in the Company's July 1, 2011 10-K, the SEC was investigating the Company's practices for the period beginning January 1, 2007.

206.    For example, on January 10, 2011, at 7:08 PM, *Businessweek* published an article

online entitled "St. Joe Reports Informal SEC Inquiry of Impairments," which stated:

> - St. Joe Co., the largest private landholder in northern Florida, said it faces an
> informal inquiry by the U.S. Securities and Exchange Commission over its policies
> for impairing investment in real estate assets.
>
> The notification by the SEC "does not indicate any allegations of wrongdoing," and
> St. Joe will "cooperate fully," the WaterSound, Florida-based company said today in
> a regulatory filing made after the close of regular U.S. trading. Its shares fell as much
> as 11 percent in after-hours trading.
>
> The filing comes three months after David Einhorn, who runs hedge-fund operator
> Greenlight Capital Inc., said St. Joe failed to properly write down the value of its
> land after having sold its most valuable waterfront properties. Einhorn was shorting
> the stock, meaning he bet the share price would decline.
>
> "St. Joe's valuation practices remain open to question," Jonathan Doorley, a
> spokesman for Greenlight Capital, said today. "It is hard to understand how the
> company invested hundreds of millions of dollars during the real estate bubble and
> hasn't seen fit to take a material writedown."
>
> St. Joe Chief Executive Officer Britt Greene said in November that the land was
> acquired decades ago, when the company was primarily in the timber business, and
> needs little revaluation because the cost basis is so low. The company has taken more
> than $196 million of impairments since 2007, St. Joe Chief Financial Officer William
> McCalmont said in November.
>
> Falling Land Values
>
> Land values have plummeted in Florida, which has the highest number of home
> foreclosures after California, according to RealtyTrac Inc., an Irvine, California-
> based real estate information company.
>
> BlackRock Inc., the world's largest money manager, today reported its funds owned
> a 12.6 percent stake in St. Joe, according to a regulatory filing. The company's
> largest shareholder is Bruce Berkowitz's Fairholme Capital Management LLC.
> Berkowitz was named to St. Joe's board last month.
>
> St. Joe shares fell to $20.74 as of 6:22 p.m. New York time, and traded as low as
> $20.60. They have dropped 22 percent in the past 12 months.

207.    Also, at 11:02 PM, *RTTNews* issued an online article entitled "St. Joe Plunges 10%

On News Of Informal SEC Inquiry," which stated:

- Real estate developer St. Joe Co. (JOE: News ) revealed Monday in a regulatory filing that the U.S. Securities and Exchange Commission has launched an informal inquiry into its policies and practices concerning impairment of investment in real estate assets. Following the announcement, the company's stock plunges nearly 10% in after-hours trading.

The news of the informal inquiry comes months after hedge fund Greenlight Capital, Inc.'s President and Co-founder David Einhorn reportedly questioned St. Joe's real-estate accounting in October, claiming its holdings of Florida land are overvalued and nowhere St. Joe's valuation.

The Jacksonville, Florida-based company noted that it intends to cooperate fully with the regulatory agency in connection with the informal inquiry.

However, the company added in the filing that the notification and informal inquiry by the agency does not indicate any allegations of wrongdoing, and is not an indication of any violations of federal securities laws.

*Meanwhile, global asset manager BlackRock, Inc. (BLK: News ) revealed in a regulatory filing earlier in the day that it has boosted its stake in St. Joe to 11.7 million shares or 12.59%, from the 6.3 million shares it held at the same time last year.*

In early November, St. Joe reported a loss for the third quarter that narrowed from the year-ago quarter, despite a downturn in residential real estate sales, helped by the recognition of deferred revenue from the Florida Department of Transportation and increased revenues from rural land sales and commercial sales.

Loss narrowed to $13.1 million or $0.14 per share from $14.5 million or $0.16 per share in the year-ago quarter. Total quarterly revenues dropped to $27.1 million from $41.9 million in the same quarter last year.

JOE closed Monday's regular trading session at $23.07, up $0.02 or 0.09% on a volume of 1.42 million shares, lower than the three-month average volume of 1.70 million shares. However, the stock plunged $2.25 or 9.75% in after-hours trading.

208.    On January 11, 2011, the popular economic news and analysis blog, Seeking Alpha,

published an article entitled "Battleground Stock St. Joe Co. Gets a Boost and a Blow," which stated:

Since The St. Joe Company (JOE) is now a battleground stock (Bruce Berkowitz versus David Einhorn), it's only fitting that we continue our coverage of the name. Just Monday, some interesting developments arose that we wanted to highlight.

First, JOE revealed in an 8-K filed with the SEC that the company is the subject of an SEC informal inquiry into St. Joe's policies and practices concerning impairment of investment in real estate assets.

113

**SEC Inquiry**

Shares of JOE plunged almost 10% in after-hours trading Monday on this news. Market Folly readers will, of course, recall that Greenlight Capital's David Einhorn is short JOE. His bearish thesis centers largely around the company needing to take impairments and writedowns, the exact issue the SEC seems to be looking into.

The 8-K went on to say that, St. Joe intends to cooperate fully with the SEC in connection with the informal inquiry. The notification from the SEC does not indicate any allegations of wrongdoing, and an inquiry is not an indication of any violations of federal securities laws.

Einhorn has garnered a reputation as a successful short-seller and it might not be too much of a stretch to suggest that his involvement has piqued the SEC's interest. After all, Einhorn had correctly identified problems at both Allied Capital and Lehman Brothers in the past and profited from his short positions. You can read about his short-selling battle in his book, Fooling Some of the People All of the Time.

**BlackRock Boosts Stake**

In a separate development involving St. Joe, we also saw an updated 13G filed with the SEC by BlackRock. The money manager has disclosed a 12.59% ownership stake in JOE with 11,668,299 shares, boosting its collective position. This disclosure was made due to activity on December 31st, 2010.

This development is interesting because it brings another large institutional player into the ring. Previously, the main notable JOE long was Bruce Berkowitz's Fairholme Capital, who owns almost 29% of the company. However, Berkowitz is currently in a standstill agreement and can't purchase more shares. Instead, he has joined the company's board. BlackRock's position increase marks a second vote of confidence on the long side of the trade.

**Battleground Stock**

So now that Berkowitz has BlackRock for company, the two major shareholders will square off against David Einhorn and a bevy of other short-sellers, including Whitney Tilson's T2 Partners, among many other hedge funds who have undoubtedly not disclosed their position (yet). With word of the SEC's informal inquiry, the short sellers have delivered another potential blow to JOE longs. What comes out of the inquiry, though, remains to be seen.

209.    These articles which further explained the import of BlackRock's stake in St. Joe had

the intended effect of offsetting the news regarding the SEC inquiry and buoying the stock price.

### 3.   July 1, 2011 – The Company Announces that the SEC Investigation Has Become Formal

210.   On July 1, 2011, just after the market closed at the start of a holiday weekend, the Company revealed the full truth regarding Defendants' improper accounting when it disclosed that on June 24, 2011, after a six month inquiry by the SEC regarding its impairment practices, the Company learned it was now the subject of a more formal investigation.  On that day, after the close of the market, Defendants disclosed the following on Form 8-K:

> The Company previously disclosed in January 2011 that the Securities and Exchange Commission (the "SEC") is conducting an informal inquiry into the Company's policies and practices concerning impairment of investment in real estate assets. On June 24, 2011, the Company received notice from the SEC that it has issued a related order of private investigation. ***The order of private investigation covers a variety of matters for the period beginning January 1, 2007*** including (a) the antifraud provisions of the Federal securities laws as applicable to the Company and its past and present officers, directors, employees, partners, subsidiaries, and/or affiliates, and/or other persons or entities, (b) compliance by past and present reporting persons or entities who were or are directly or indirectly the beneficial owner of more than 5% of the Company's common stock (which includes Fairholme Funds, Inc., Fairholme Capital Management L.L.C. and the Company's current Chairman Bruce R. Berkowitz) with their reporting obligations under Section 13(d) of the Exchange Act, (c) internal controls, (d) books and records, (e) communications with auditors and (f) financial reports. The order designates officers of the SEC to take the testimony of the Company and third parties with respect to any or all of these matters, and the Company is cooperating with the SEC.

211.   This announcement indicated that the SEC was looking into the Company's prior practices concerning impairment of its real estate assets (for the period beginning January 1, 2007) and conveyed to the market the extent and likelihood of the Company's improper accounting.  Accordingly, as this announcement made its way into the market, the market reacted negatively, causing the Company's stock price to plummet by approximately 9%, as it fell $1.90 per share to close at $18.97 on July 5, 2011 on abnormally high trading volume, causing millions in investor losses.

## IX.     NO SAFE HARBOR

212.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of St. Joe's who knew that those statements were false when made.

## X.      APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE AFFILIATED UTE DOCTRINE AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE

213.    Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are primarily predicated upon omissions of material fact which there was a duty to disclose.

214.    Plaintiff is entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material information regarding the Company's understated impairment charges and the assumptions that formed the basis of its undiscounted cash flow analyses for residential real estate projects in development, as well as the resulting false financial information reported by St. Joe's throughout the Class Period.

215.    In the alternative, Plaintiff is entitled to a presumption of reliance under the fraud on the market doctrine of the Defendants' material misrepresentations and omissions, because at all

relevant times, the market for St. Joe's common stock was an efficient market for the following reasons, among others:

        (a)     St. Joe's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

        (b)     As a regulated issuer, St. Joe filed periodic public reports with the SEC (and was eligible to file SEC Forms S-1) and the New York Stock Exchange;

        (c)     St. Joe regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

        (d)     St. Joe was followed by numerous investor research services that published publicly available reports, as well as by numerous securities analysts (including Buck Horne of Raymond James & Associates; Sheila McGrath of Keefe Bruyette & Woods; David Cohen of Morgan Stanley; Eric Landry of Morningstar; and Chris Haley of Wachovia Securities) employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

    216.    As a result of the foregoing, the market for St. Joe's common stock promptly digested current information regarding St. Joe from all publicly available sources and reflected such information in St. Joe's stock price. Under these circumstances, all purchasers of St. Joe's common stock during the Class Period suffered similar injury through their purchase of St. Joe's common stock at artificially inflated prices and a presumption of reliance applies.

XI.     **LOSS CAUSATION**

217.    As detailed in this Complaint, Defendants' fraudulent scheme artificially inflated St. Joe's stock price by failing to disclose that: (a) the Company's core operation – real estate development – was dramatically impacted by the economic downturn and associate real estate crash; (b) many of the Company's large residential real estate projects, including RiverTown, the WaterSounds, SummerCamp Beach, and WindMark remained largely undeveloped; (c) St. Joe had halted further development activity at its residential real estate projects; (d) sales volumes at its residential real estate properties plummeted during the Class Period; (e) the average sales prices at its projects sharply declined; (f) as a result, Defendants failed to take appropriate impairment charges to their residential real estate assets in violation of GAAP and SEC regulations; and (g) accordingly, St. Joe had materially overstated its asset values and earnings during the Class Period. These false and misleading statements, individually and collectively, concealed St. Joe's true financial circumstances and future business prospects, resulting in the stock being artificially inflated until, as indicated herein, the relevant truth about St. Joe was revealed. While each of these misrepresentations was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate St. Joe's stock price and the image of its future business prospects to give the market the false notion that St. Joe's residential real estate development projects were performing well and that its asset values and earnings during the Class Period were higher than they actually were. Defendants' false and misleading statements had the intended effect and causes, or were a substantial contributing cause of St. Joe's stock trading at artificially inflated levels, reaching as high as $46.82 on March 24, 2008, throughout the Class Period.

218.    These false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period. The true picture of St. Joe's business, operations,

and finances was disclosed to the market through a series of revelations beginning on October 13 and 14, 2010, January 10, 2011, and, finally, July 1, 2011.

219.    On October 13 and 14, 2010, the market learned from Einhorn's presentation and related news coverage that St. Joe had impermissibly failed to take the necessary and required impairment charges to its residential real estate projects in development.  On January 10, 2011, after the market closed, the Company announced that the SEC had notified the Company that it was conducting an informal inquiry into its policies and practices concerning impairment of investment in real estate assets.  Then, on July 1, 2010, after the market closed, the Company announced that the SEC issued an order of private investigation related to its previous inquiry into the Company's policies and practices concerning impairment of investment in real estate assets.   The announcements regarding the SEC's investigation into St. Joe indicated that the SEC was looking into the Company's historical practices concerning impairment of its real estate assets and conveyed to the market the extent and likelihood of the Company's improper accounting.  The disclosures on October 13 through 14, 2010, January 10, 2011, and July 1, 2011 revealed to the market that St. Joe had materially overstated its asset values and earnings during the Class Period.

220.    When these revelations were disclosed, the market learned that Defendants' prior Class Period statements were false and misleading.  As a result of the information revealed on October 13 and 14, 2010, investors cast doubt on the veracity of Defendants' prior statements causing St. Joe's stock to drop approximately 20%, as it fell $4.80 per share to close at $19.74 on October 14, 2010 on abnormally high trading volume.  The market's negative reaction to the October 13 and 14, 2010 revelation is demonstrated in the stock chart below:



221.    Likewise, as a result of the information revealed to the market after it closed on January 10, 2011 concerning the SEC's informal inquiry into St. Joe, the market cast doubt on the veracity of Defendants' prior statements causing St. Joe's stock to drop approximately 7% during after hours trading, as it fell $1.57 per share to open at $21.50.  This negative reaction to St. Joe's January 10, 2011 revelation is demonstrated in the stock chart below:



222.    While the Company's stock price did increase at the end of trading on January 11, 2011, this was due to Defendants' attempt to offset the announced SEC inquiry with information that global asset manager BlackRock, Inc. had boosted its stake in St. Joe to 11.7 million shares or

12.59%, from the 6.3 million shares it held at the same time last year.  While this information was revealed in a Schedule SC 13G/A during trading on January 10, 2011, it was not until after the close of trading on that day and the following day that the market learned, through news articles and other commentary of the significance of this information.  As Defendants intended, the BlackRock disclosure offset the news regarding the SEC inquiry and buoyed the stock price.

223.    Finally, as a result of the information revealed to the market on July 1, 2011, the market cast doubt on the veracity of Defendants' prior statements causing St. Joe's stock to drop approximately 9%, as it fell $1.90 per share to close at $18.97 on July 5, 2011 on abnormally high trading volume.  The market's negative reaction to St. Joe's July 1, 2011 revelation is demonstrated in the stock chart below:



224.    The rapid declines in St. Joe's stock price following the Company's October 13 and 14, 2010, January 10, 2011, and July 1, 2011 disclosures were a direct consequence of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market.  Thus, the revelation of truth at the close of the Class Period, as well as the clear market reaction, support a reasonable inference that the market understood St. Joe's prior statements were false and misleading.

225.    In sum, as the truth about Defendants' prior misrepresentations and concealments was revealed, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiff was damaged suffering true economic losses.  The declines in St. Joe's stock price by: (1) approximately 20% from $24.54 on October 12, 2010 to $19.74 on October 14, 2010; (2) approximately 7% during after hours trading between January 10 and January 11, 2011; and (3) approximately 9% from $20.87 on July 1, 2011 to $18.97 on July 5, 2011, were the direct result of the nature and extent of the revelations made to investors and the market regarding the Company's failure to take appropriate impairment charges reflecting the known true value of its development projects and its overstatement of its asset values and earnings during the Class Period, that had been concealed or misrepresented by Defendants' scheme and misstatements.

226.    The timing and magnitude of St. Joe's stock price decline negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is evidenced by the chart below that demonstrates the clear divergence of St. Joe's stock price from its peer index[67] as the revelation of the truth became known to the market:

---

[67]    The Company's Peer Group consists of the following real estate-related companies: AMB Property Corporation (AMB), Developers Diversified Realty Corporation (DDR), Duke Realty Corporation (DRE), Highwoods Properties, Inc. (HIW), Jones Lang LaSalle Incorporated (JLL), Kimco Realty Corporation (KIM), The Macerich Company (MAC), MDC Holdings Inc. (MDC), NVR, Inc. (NVR), Plum Creek Timber Company, Inc. (PCL), Regency Centers Corporation (REG), Rayonier Inc. (RYN), Toll Brothers Inc. (TOL), and WP Carey & Co. LLC (WPC).  *See* 2010 Form 10-K for the period ending December 31, 2010, filed on March 3, 2011.



227.    Moreover, after extracting general market and industry conditions between October 12, 2010 and October 14, 2010 and July 1, 2011 and July 5, 2011, the price of St. Joe's stock on those dates reacted with high statistical significance to the revelations detailed above.  Indeed, while the price of St. Joe's stock declined approximately 20% between October 12 and October 14, 2010, the Dow Jones U.S. Real Estate Index ("DJUSRE") did not experience a similar decline.  In fact, the DJUSRE was up 0.97% on October 13, 2010 and down only 0.44% on October 14, 2010.  Similarly, while the price of St. Joe's stock declined approximately 9.1% between July 1 and July 5, 2011, the DJUSRE was up 0.58% and the market was down only 0.08% between these dates.

228.    Accordingly, the economic loss, *i.e.*, damages, suffered by Plaintiff was a direct and proximate result of Defendants' scheme and misrepresentations and omissions which artificially inflated St. Joe's stock price and the subsequent significant decline in the value of St. Joe's stock

123

when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the market place.

## XII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

229.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all purchasers of the securities of St. Joe's (the "Class") between February 19, 2008 and July 1, 2011 inclusive (the "Class Period"), and who were damaged when the truth about St. Joe's business was disclosed.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

230.    The members of the Class are so numerous that joinder of all members is impracticable.  According to the Company's Form 10-Q filed with the SEC on August 5, 2010, St. Joe had over 92 million shares of stock outstanding, owned by thousands of persons.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by St. Joe or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

231.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

232.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

233.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period;

(c)     whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) to state material facts about the business, operations and management of St. Joe; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

234.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations Of Section 10(b) Of the Exchange Act
### And Rule 10b-5 Promulgated Thereunder Against
### St. Joe and the Individual Defendants

235.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against St. Joe and the Individual Defendants.

236.     During the Class Period, St. Joe and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i)

deceive the investing public regarding St. Joe's business, operations, management and the intrinsic value of St. Joe common stock; and (ii) cause Plaintiff and other members of the Class to purchase St. Joe common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, these Defendants, and each of them, took the actions set forth herein.

237.    St. Joe and the Individual Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for St. Joe's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All of these Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

238.    St. Joe and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the improper accounting for impairment of residential real estate, in order to manipulate St. Joe's reported financials, as specified herein.

239.    St. Joe and the Individual Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of St. Joe's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about St. Joe's and its business operations in the light of the circumstances under which they were made, not misleading, as set forth more

particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of St. Joe's common stock during the Class Period.

240.    Each of these Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

241.    St. Joe and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing St. Joe's operating condition from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by these Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, these Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by

deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

242.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts regarding the materially understated impairment charges, as set forth above, the market price of St. Joe securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of St. Joe publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants but not disclosed in public statements during the Class Period, Plaintiff and the other members of the Class acquired St. Joe's securities during the Class Period at artificially high prices and were damaged when the value of their securities declined upon disclosure of the truth about the Company's false and misleading statements and omissions.

243.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding St. Joe's financial results, which were not disclosed by St. Joe and the Individual Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their St. Joe securities, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

244.     By virtue of the foregoing, St. Joe and the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

245.    As a direct and proximate result of such wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT II**

**For Violations Of Section 20(a) Of the Exchange Act Against the Individual Defendants**

246.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against Greene, McCalmont, Rummell and Connolly.

247.    The Individual Defendants acted as controlling persons of St. Joe within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements regarding St. Joe's core financials, which were materially misstated as set forth above, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

248.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

129

249.     As set forth above, St. Joe violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP as Lead Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XIV.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

**DATED:**  September 23, 2011

**ROBBINS GELLER RUDMAN**
    **& DOWD LLP**


*s/ Jack Reise*
JACK REISE

PAUL J. GELLER
Florida Bar No. 984795
JACK REISE
Florida Bar No. 58149
STEPHEN R. ASTLEY
Florida Bar No. 139254
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432-4809
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
jreise@rgrdlaw.com
sastley@rgrdlaw.com

**LABATON SUCHAROW LLP**
MARK S. ARISOHN
JONATHAN GARDNER
MINDY S. DOLGOFF
140 Broadway, 34th Floor
New York, NY  10005-1108
Telephone:  212/907-0700
212/818-0477 (fax)

*Co-Lead Counsel for Plaintiff*

**VANOVERBEKE MICHAUD &**
    **TIMMONY, P.C.**
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201-3120
Telephone:  313/578-1200
313/578-1201 (fax)

*Additional Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 23, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*s/Jack Reise*
_____
JACK REISE
