## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**ROBERT MEYER, Individually**
**and On Behalf of All Others**
**Similarly Situated,**

      **Plaintiff,**

**vs.**                              **CASE NO. 5:11-cv-27/RS-EMT**

**THE ST. JOE COMPANY,**
**et al.,**

      **Defendants.**
_____/

### ORDER

      Before me are Defendants' Motion to Dismiss (Doc. 107) and Memorandum in Support (Doc. 108), Plaintiff's Response in Opposition (Doc. 114), and Defendants' Reply (Doc. 115).  I previously granted Plaintiff leave to amend the complaint after finding the initial complaint inadequate.  (*See* Doc. 95).   That Order is incorporated as further background and reasoning for the conclusions reached here.

### Background

      This is a purported class action securities fraud case against the St. Joe Company ("St. Joe"), its former chief executive officer and president William Greene ("Mr. Greene"), its former chief financial officer and executive vice president William McCalmont ("Mr. McCalmont"), its former chairman of the board and chief executive officer Peter Rummel ("Mr. Rummell"), and its present chief financial officer and senior

1

vice president (and former chief accounting officer) Janna Connolly ("Ms. Connolly").

Plaintiff alleges Defendants intentionally deceived investors about the value of certain

properties located throughout the Florida panhandle in violation of sections 10(b) and

20(a) of the Securities Exchange Act of 1934 ("Exchange Act"),  15 U.S.C. §§ 78j(b),

78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.   Plaintiff seeks to hold St. Joe, Mr.

McCalmont, Mr. Rummell, and Ms. Connolly liable under section 10(b) of the Exchange

Act and Rule 10b-5 (Count I), and to impose joint and several liability against them under

section 20(a) of the Exchange Act as persons controlling another liable under the Act

(Count II). Defendants move to dismiss the First Amended Consolidated Class Action

Complaint (Doc. 101) for failure to state a claim.

St. Joe began as a timber and paper company in the 1930s and is now one of the

largest real estate development companies in Florida.  With approximately 577,000 acres

of land, the publically traded company operates its business in four segments: (1)

residential real estate; (2) commercial real estate; (3) rural land sales; and (4) forestry

(Am. Compl., p. 11).  Just prior to and during the class period-- February 19, 2008,

through July 1, 2011--the Florida real estate market "crashed."  *Id*. at 13.  St. Joe

experienced revenue losses, and sales of its homes and homesites "plummeted."  *Id*. at

16.  The sales prices for its developments decreased significantly.  *Id*. at 17.  In response,

St. Joe "effectively ceased its development activity" and reduced its workforce by two-

thirds.  *Id*. at 16-17.

Plaintiff alleges that despite these signs, Defendants failed to take appropriate impairment charges[1] reflecting the known true value of the development projects, thereby ". . . materially oversta[ting] its asset values and its earnings during the Class Period." *Id.* at 2.  Plaintiff alleges that Defendants' actions did not comply with SEC regulations and Generally Accepted Accounting Principles ("GAAP"). *Id.* at 35.

On October 13, 2010, these general allegations came to light not in a courtroom but at an investor conference presentation by David Einhorn ("Einhorn"), an investor with a short position in St. Joe stock. *Id.* at 106.  Einhorn's research led him to conclude that "St. Joe had impermissibly failed to take the necessary and required impairment charges to its residential real estate projects in development." *Id.* at 119. He believed that "it was not possible for the value of the properties to meet or exceed their carrying value." *Id.* at 108.  St. Joe's stock price declined approximately twenty per cent in the two days following this disclosure. *Id.* at 119-20.

On January 10, 2011, St. Joe announced that the SEC had notified the company that it was conducting an informal inquiry into its impairment practices.   On July 1, 2011, St. Joe announced that the SEC issued an order of private investigation related to its previous inquiry into its impairment policies and practices. *Id.*   This announcement purportedly caused a seven percent drop in St. Joe's stock price. *Id.* at 120.

---

[1] This issue over impairment charges serves as the basis of Plaintiff's assertion that St. Joe's financial statements were materially false and misleading (*See* Am. Compl., p. 16).  "Impairment charges are special, non-recurring charges on an asset with an overstated carrying value.  Thus, taking an impairment charge decreases the previously reported value of an asset and reduces earnings." *Id.* at 3.

Lead Plaintiff City of Southfield Fire & Police Retirement System seeks to represent a class of all persons who purchased St. Joe publically traded stock during the class period.

## Discussion

Plaintiff sues Defendants for securities fraud under sections 10(b)[2] and 20(a)[3] of the Exchange Act and Rule 10b-5[4] promulgated thereunder.  Plaintiff must establish the following elements: (1) a material misrepresentation or omission by the Defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Instituto de Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1352 (11th Cir. 2008) (*citing Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Defendants move to dismiss the Consolidated Class Action Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Defendants contend that the Consolidated Class Action Complaint (Doc. 102) fails to adequately plead loss causation, actionable misrepresentation, and scienter.  (Doc. 108, p. 6).

---

[2] Section 10(b) of the Exchange Act forbids the use or employ, in connection with the purchase or sale of securities, of any manipulative or deceptive device or contrivance in contravention of the rule and regulations the Securities and Exchange Commission may prescribe as necessary or appropriate in the public interest or for investors' protection.  15 U.S.C. §78j(b).

[3] Section 20(a) of the Exchange Act imposes joint and several liability on any person who controls another person liable under the Exchange Act.  15 U.S.C. § 78t(a).

[4] Rule 10b-5(b) forbids a person from making any untrue statement of material fact or omitting to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading.  17 C.F.R. § 240. 10b-5(b).

**Standard of Review**

To survive a motion to dismiss, a complaint must contain sufficient facts, which accepted as true, state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569, 127 S. Ct. 1955, 1974 (2007). Granting a motion to dismiss is appropriate if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations of the complaint. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984). In making this determination, the court must accept all factual allegations in the complaint as true and in the light most favorable to Plaintiff. *Christopher v. Harbury*, 536 U.S. 403, 406, 122 S. Ct. 2179, 2182 (2003).

Allegations of fraud such as Plaintiff's security fraud claim are subject to the heightened pleading standards set forth in Federal Rule of Civil Procedure 9(b). *Instituto de Prevision Militar*, 546 F.3d at 1352. Plaintiff must "state with particularity the circumstances constituting the fraud." Fed. R. Civ. P. 9(b). In addition, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), further raises the pleading standard for securities fraud claims. Plaintiff must specify each statement alleged to have been misleading and the reasons why the statement is misleading. 15 U.S.C. § 78u-4(b)(1)(B). With respect to each statement or omission, Plaintiff must state with particularity facts giving rise to a strong inference that Defendants acted with the required scienter. *Id*. § 78u-4(b)(2).

**Loss Causation**

### A. Einhorn's Presentation

Plaintiff has the burden of proving that the act or omission of the Defendants "caused the loss for which [P]lainitff seeks to recover damages." *Id.* § 78u-4(b)(4). Loss causation is not subject to heightened pleading standards but must be supported by a "short and plain statement of the claim showing that the pleader is entitled to relief." *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (citing Fed. R. Civ. P. 8(a)(2)) (assuming without deciding that loss causation subject to normal pleading standards). Loss causation may not be established by simply alleging that corporate stock was purchased at an artificially inflated price. *Dura Pharms., Inc.* 544 U.S. at 342. Rather, to sufficiently plead loss causation, Plaintiff must "allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Durham v. Whitney Info. Network, Inc.*, 2009 U.S. Dist. LEXIS 113757, *26-27 (M.D. Fla. 2009) (*citing Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1278-79 (M.D. Fla. 2009) (*quoting Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)). Otherwise, a plaintiff could not distinguish between a decrease in stock value associated with the revelation of the truth from a lower value which may "reflect not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together

account for some or all of that lower price." *Dura Pharms.*, 544 U.S. at 342-343 (punctuation altered).

Plaintiffs' initial complaint lacked sufficient allegations to support loss causation. (*See* Doc. 95).  To bolster their argument, Plaintiffs have added several additional allegations: 1) they claim the audio recording of Einhorn's presentation demonstrates that impairments should have been taken; 2) they claim a new confidential witness who prepared the presentation, CW5, supports the contention that the presentation involved impairments that were historical in nature; and 3) they claim that the SEC actions serve as separate loss causing events.  (Am. Compl., p. 10-14).

Plaintiffs' additional allegations do not cure the problem.  Einhorn's presentation still cannot be classified as a corrective disclosure, and the SEC actions fare no better.

A "corrective disclosure" is the event where the alleged misstatements or omissions become public.  *See e.g., In re DVI, Inc. Secs. Litig.*, 2011 U.S. App. LEXIS 6302, n.17 (3d Cir. 2011).  Information that is already publically available cannot be a corrective disclosure.  *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007) ("The problem with plaintiffs' theory . . . is that these facts had already been disclosed in public filings, so their [subsequent] revelation . . . could not have caused [the company's] stock price to decline.").  Likewise, a "negative . . . characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the [author's] opinions."  *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010).  *See also In re Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690, 705 (D. Minn. 2009) ("Generally, a re-characterization of previously disclosed news cannot be a corrective disclosure for loss

causation purposes.); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F.

Supp. 2d 349, 363 (S.D.N.Y. 2008) ("The mere negative characterization of existing facts

that were never hidden from investors does not permit [plaintiff] to plead loss causation.);

*In re Teco Energy Sec. Litig.*, 2006 U.S. Dist. LEXIS 18101, *19-20 (M.D. Fla. 2006)

("The opinions, predictions, and generalized statements offered by Plaintiffs as

'revelations' of the 'truth' regarding [company's] financial status, without more, are not

sufficient to establish loss causation.").  However, loss causation may be established

where an analyst's opinions "identify, reveal, or correct [a] prior misstatement, omission,

or improper accounting practice." *In re Teco Energy Sec. Litig.*, 2006 U.S. Dist. LEXIS

at *19-20.

Einhorn's presentation "Field of Schemes: If You Build It, They Won't Come"

(Doc. 74, Exhibit E), begins with a clear disclaimer.  It states that the information

contained in the presentation "has been obtained from publically available sources." *Id.*

at 2.  In spite of this unambiguous language, Plaintiffs' claim any assertion that the

"presentation consists of entirely public information is wrong." (Doc.114, p.6). Rather,

they contend that Einhorn's "battery of professional staff and real estate valuation

experts" looked at "twenty disparate sources not readily accessible to the investing

public." *Id*.  While some of the sources may not be easy to find, Plaintiffs' attempt to re-

characterize them as non-public is unpersuasive.

The presentation itself identifies the sources to include, among other things, St.

Joe's SEC filings, press releases, and earnings call transcripts, Freedom of Information

Act requests, meeting minutes of the airport board, and county property appraiser's sales lists. (*E.g.,* Doc. 74, Exhibit E at 15, 23, 25, 26, 29).

In addition, Plaintiffs specifically point to aerial photographs of St. Joe's properties, reports to local authorities, and information gleaned from conversations with the Airport Authority as sources of non-public information. Defendants correctly note that aerial photographs are no longer novelties and detailed satellite imagery is widely available with the click of a computer mouse. Further, Plaintiffs do not relate what relevance aerial photography had on the Einhorn presentation. This case is about the value of land. Surely the aerial photographs didn't depict that St. Joe's holdings had fallen into the sea or some other ghastly conclusion which could only be observed from above.

As to the reports, Florida's "sunshine laws" require all levels of government to make their records available to the public. *See* FLA. STAT. § 119.01. Likewise, airport board members aren't cloistered, and it is unbelievable that they would reveal non-public information to Mr. Einhorn's team while keeping it hidden from others.

All of the information relied upon in the presentation was public, and the fraud on the market theory is applicable. The theory "posits that all publically available information about a security is reflected in the market price of the security." *Thompson v. RelationServe Media, Inc*., 610 F.3d 628, 690 (11th Cir. 2010) (Tjoflat, J., concurring in part and dissenting in part). Loss causation cannot be established based on these disparate pieces of information because "the market had already known and digested all

the information supposedly disclosed therein." *Thompson*, 610 F.3d at 690 (citation and quotation omitted).

Plaintiff counters that Einhorn's presentation constituted new information generated by "his original and expert analysis of over twenty disparate sources of information." (Doc. 114, p.6). In order to be new information, Einhorn's presentation must go beyond a mere re-characterization of previously disclosed facts and must "identify, reveal or correct any *prior* misstatement, omission, or improper accounting practice by Defendants." *In re Teco Energy Sec. Litig.*, 2006 U.S. Dist. LEXIS at *19-20 (emphasis added). *See also* Doc. 95, p.8-12 (containing a more thorough examination of this issue).

Turning to the content of Einhorn's presentation, Plaintiff contends the presentation and related news coverage showed the public "that St. Joe *had impermissibly* failed to take the *necessary* and *required* impairment charges to its residential real estate projects in development." (Doc. 101, p. 119) (emphasis added). If true, this contention would indicate some prior improper practice--the word "had" meaning in the past, and the word "impermissibly" meaning improper. However, Plaintiff overstates what Einhorn's presentation actually stands for. To start, the words "impermissible," "necessary" and "required" appear nowhere in the presentation. They are characterizations of the presentation added by Plaintiff.

The 139-slide presentation makes mention of "impairments" in several contexts. First, Einhorn notes that "despite making huge investments ahead of the bust, [St. Joe] has taken only modest write-downs." (Doc. 74, Exhibit E, p. 40). As a result, the

presentation states that a number of the residential developments "should be impaired." *Id*. at 63, 98, 115.  At this point, the language of the presentation indicates future action that St. Joe needed to take and does not indicate an impermissible practice.

The presentation poses, but does not answer the question "why haven't these [residential developments] been written down?" *Id.* at 122.   Plaintiff would like to assert that the answer was impermissible practices by St. Joe.  However, the presentation certainly does not, by its own terms, reach that conclusion.

Finally, in the conclusion section of the presentation, Einhorn states that "[St. Joe] needs to take substantial impairment."  *Id*. at 124.  Again, this language indicates a future action.  Einhorn then equivocates and in summary the presentation contemplates both a situation "if no impairment is needed" and another one "if [St. Joe] needs to take an impairment." *Id*. at 133.  These also are potential future actions.

Plaintiff claims that the audio recording of the presentation makes clear that Einhorn spoke in terms of current impairment problems. (Doc. 114, p. 11-12).  However, the portions quoted in the Amended Complaint do not reveal that the presentation corrected a current or prior accounting practice.  The words "should be impaired," and "might want to update their calculations" do not imply that an action should *have* been taken.  (Am. Compl., ¶199).  Rather, they suggest current or future action and do not imply impropriety.

The confidential witness, CW5, does not add much to the presentation's meaning. *Id*. at ¶198, n.64.  The presentation speaks for itself and CW5's statements concerning the

purpose of the presentation were not heard by the audience or disseminated to the public. CW5's characterization, thus, cannot be considered.

Plaintiff correctly points out that media further disseminated the conclusions of Mr. Einhorn's presentation which increased downward pressure on St. Joe stock (*See* Doc. 79, p.11). However, in multiple articles about the presentation, reporters interpreted Mr. Einhorn's predictions as being that St. Joe would need to take some future action of impairment. *See, e.g.*, Nikolaj Gammeltoft and John Gittelsohn, *Einhorn Says St. Joe Needs 'Substantial' Writedowns*, October 13, 2010, http://www.businessweek.com/news /2010-10-13/einhorn-says-st-joe-needs-substantial-writedowns.html.

## B. SEC Actions

The Amended Complaint extends the class period to cover two actions by the SEC: the January 10, 2011, SEC inquiry and the July 1, 2011, SEC formal investigation announcement. The parties have identified a split of authority concerning whether a regulatory investigation qualifies as a corrective disclosure. *Compare Durham v. Whitney Info. Network, Inc.*, 2009 U.S. Dist. LEXIS 113757, *26-27 (M.D. Fla. 2009) *with In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008).

I find the rationale of *In re Maxim Integrated Prods.*, 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009) most persuasive. That district court found, based on 9th Circuit precedent, that SEC investigation announcements are "indicators of risk because they reveal the potential existence of future corrective information." *Id*. Much like Einhorn's presentation, the SEC investigation did not reveal impropriety. Therefore,

announcements of SEC investigations are not corrective disclosures for which Plaintiff can plead loss causation.

When viewed as a whole and in the light most favorable to Plaintiff, Einhorn's presentation offers opinion about the need for future impairments. It is entirely based on previously disclosed facts and offers nothing new concerning prior improper practices. Likewise, the SEC announcements indicated nothing more than a risk of accounting problems. The decline in St. Joe's stock value in the days following the presentation and the announcement can be just as easily attributed to predictions about future impairments, as they could be to what Plaintiff contends are improper past impairments. Taken together, these facts establish that Einhorn's presentation and the SEC announcements are not corrective disclosures. They fail to meet the threshold requirement of a short and plain statement showing that Plaintiff is entitled to relief.

**Actionable Misrepresentation**

To sustain a claim under Section 10(b), Plaintiff must allege that Defendants "made a false statement or omission of material fact." *Bruschi v. Brown*, 876 F.2d 1526, 1528 (11th Cir.1989). To fulfill the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002) (*citing Basic Incorporated v. Levinson*, 485 U.S. 224, 23132 (1988)). The heightened pleading standards of PSLRA apply to the materiality requirement. PSLRA requires the complaint

to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

Here, the heart of Plaintiff's contention is that "Defendants repeatedly touted the Company's net income and value of the Company's real estate assets, while at the same time failing to timely and adequately record impairment charges."  (Doc. 114, p. 14). Plaintiff contends that by reporting minimal impairments, Defendants misrepresented that St. Joe's financial statements conformed to GAAP.  *Id.*

GAAP are a series of general principles followed by accountants.  More specifically, GAAP are the official standards adopted by the American Institute of Certified Public Accountants ("AICPA"), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board, and the Financial Accounting Standards Board.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 160, n.4 (2d Cir. 2000).

"GAAP is not [a] lucid or encyclopedic set of pre-existing rules." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995).  "Far from a single-source accounting rulebook, GAAP 'encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time.'" *Id.* (*citing* Kay & Searfoss, ch. 5, at 7 (1994 Update)).  "The determination that a particular accounting principle is generally accepted may be difficult because no single source exists for all principles. There are 19 different GAAP sources, any number of which might present conflicting

treatments of a particular accounting question." *Id.* (punctuation altered). When conflict arises between the sources, the accountant must consult "an elaborate hierarchy of GAAP sources to determine which treatment to follow." I*d.*[5]

Violations of the GAAP may constitute false or misleading statements of material fact. *In re Sci. Atlanta*, 239 F. Supp. 2d 1351, 1363 (N.D. Ga. 2002); A*malgamated Bank v. Coca-Cola Co.*, 2006 U.S. Dist. LEXIS 73909, *37 (N.D. Ga. 2006). GAAP violations must be pled with particularity. "Plaintiffs must point to particular transactions and explain why those transactions violated GAAP standards. *In re Coca-Cola Enters. Inc. Secs. Litig.*, 510 F. Supp. 2d 1187, 1200 (N.D. Ga. 2007) (*citing Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 (5th Cir. 1996)). When it comes to impairment violations of GAAP, "the Complaint must go further than merely alleging with the benefit of hindsight that an impairment should have been taken to reflect a decline in fair market value. Rather, the Complaint must provide detail as to why an impairment was required under then-existing accounting rules." *In re Mirant Corp. Secs. Litig.*, 2009 U.S. Dist. LEXIS 789, *80 (N.D. Ga. 2009) (citations omitted). Thus, in order to plead an adequately particularized claim, the Complaint must, for example, detail how the results of an impairment test were reported fraudulently in the company's financial

---

[5] Midway through the class period, on July 1, 2009, the Financial Accounting Standards Board launched the FASB Accounting Standards Codification as the single source of authoritative nongovernmental U.S. generally accepted accounting principles. The Codification became effective for interim and annual periods ending after September 15, 2009. As a result of the Codification all existing standards documents are superseded as described in SFAS No. 168, ."The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles.." Instead of issuing new FASB standards, the FASB now issues FASB Accounting Standards Updates (."ASU."). The Codification did not change existing GAAP, it only introduced a newly organized structure. (Doc. 52, ¶148).

disclosures, or how impairment testing should have been conducted and how that testing

would have necessarily required a recognition of an impairment.  *Id.*

Plaintiff asserts that there is a three step process which governs recording an

impairment loss for assets, such as St. Joe's, that are held and used.  (Am. Compl., ¶104).

The first step instructs accountants to test for recoverability whenever events or changes

in circumstances indicate that its carrying value may not be recoverable.  *Id.* at ¶105

(*citing* ASU 360-10-35-21).  Examples of changes in events include decreases in market

price and adverse changes in the manner in which the asset will be used.  *Id.*  The next

two steps "are to perform a recoverability test to determine if there is any impairment."

*Id.* at ¶106.  Plaintiff describes the process as follows:

> An impairment loss shall be recognized only if the carrying of
> a long-lived asset (asset group) is not recoverable and exceeds
> its fair value. [Step two;] The carrying amount of
> a long-lived asset (asset group) is not recoverable if it exceeds
> the sum of the undiscounted cash flows expected to result
> from the use and eventual disposition of the asset (asset
> group). That assessment shall be based on the carrying
> amount of the asset (asset group) at the date it is tested for
> recoverability, whether in use....or under development
> .....[Step three;] An impairment loss shall be measured as the
> amount by which the carrying amount of a long-lived asset
> (asset group) exceeds its fair value.

*Id.* (*citing* ASC 360-10-35-17).

GAAP requires the recoverability test to be reasonable.  GAAP also requires the

test to incorporate the "entity's own assumptions about the use of the asset (asset group)"

and to consider "all available evidence."  *Id.* at ¶107 (citing ASC 360-10-35).

St. Joe disclosed its impairment methodology in its numerous filings.  Plaintiff does not contend that St. Joe did not follow its disclosed impairment methodology. Rather, Plaintiff asserts that St. Joe failed to consider "plummeting sales prices and volumes (and halted development)" in their analysis.  (Doc. 114, p.15).

Further, Plaintiff asserts that eight factors should have been considered by Defendants, which would have demonstrated the need for further impairments.   (Am. Compl., ¶115).  Plaintiff claims that these factors amounted to "overwhelming evidence" that supported impairment and Defendants failure to do so was fraudulent.  *See Carpenters Health & Welfare Fund v. Coca-Cola Co*., 2002 U.S. Dist. LEXIS 28072, *57-58 (N.D. Ga. 2002) (where the need to write-down is "so apparent" that the failure to do so amounts to fraud.).  These factors are (1) the impact of market supply and demand; (2) the rate of sales and inventory on the market; (3) selling prices including sales incentives; (4) current sales; (5) anticipated land development and future development costs to be incurred including interest and overhead costs; (6) price erosion; (7) the time to complete the project and sell its units; and (8) risks specific to each land parcel or community.  (Am. Compl., ¶115).

Plaintiff's allegations are insufficient to show that Defendants made material misrepresentations that St. Joe's financial statements were GAAP compliant.  First, while Plaintiff claims that Defendants failed to consider the eight purported essential factors, Plaintiff does not offer any concrete evidence in support.  For example, Plaintiff lists "selling prices" and "current sales" as two of the essential factors.  St. Joe's 2008 Annual Report, however, specifically details the number of units sold and the revenues from

those units.  *See* The St. Joe Company, Annual Report (Form 10-K), at 35 (February 24, 2009).

St. Joe's reports also undermine Plaintiff's assertion that Defendants misrepresented anything at all.  Defendants properly listed the relevant information—sales data, revenues, and profits.  Plaintiff incorrectly claims that St. Joe "failed to disclose that [at] RiverTown . . . less than 5% of planned buildings had lots [which] had been developed, only 12 of those had homes, and only 30 had been sold." (Doc. 114, p.15).  St. Joe did disclose this fact.  For example, St. Joe's 10-K specifically listed 30 RiverTown residential units closed since inception out of 4,500 projected units.  *See* The St. Joe Company, Annual Report (Form 10-K), at Table 1 (February 24, 2009).

The principal problem with Plaintiff's argument is that Defendants clearly disclosed how impairment charges were calculated.  *See, e.g.,* The St. Joe Company, Annual Report (Form 10-K), at 26 (February 24, 2009) (detailing the step-by-step method used for taking impairment).  Any investor could look at the data to make up their own mind whether St. Joe had adequately taken write-downs or would need further impairments in the future.  Plaintiff would have a case for misrepresentation if, for example, St. Joe had not accurately disclosed the number of homes which were sold.  That is not what happened here.

Plaintiff's claims concerning the impairment of Victoria Park, SummerCamp, and WindMark amount to nothing more than retrospective second guessing.  Defendants accurately reported their sales figures.  Plaintiff's allegations that St. Joe knew it "was unable to sell its homes and homesites for amounts that supported the excessive carrying

values" is mere conjecture. (Doc. 114, p.17).  Plaintiff has not shown actionable

misrepresentation because Plaintiff does not allege that adverse facts were hidden or

misrepresented, but rather that Defendants' opinions based on those facts were wrong.

The 2008 Annual Report states, "If market conditions were to continue to

deteriorate, and the market values for our homesites, remaining homes held in inventory

and other project land were to fall below the book value of these assets, we could be

required to take additional write-downs of the book value of those assets."  The St. Joe

Company, Annual Report (Form 10-K), at 12 (February 24, 2009).   The 2008 and 2009

reports note that a "continued downturn in the demand for real estate, combined with the

increase in the supply of real estate available for sale and declining prices, will continue

to adversely impact our business." The St. Joe Company, Annual Report (Form 10-K), at

8 (February 23, 2010); *Id*. at 30.

Rather than hiding these market conditions, St. Joe made note of them in their

SEC filings.  The heart of Plaintiff's assertion, then, is not that these facts were hidden,

but that St. Joe looked at the facts and fraudulently ignored their impairment

ramifications.  Plaintiff offers only cursory alternative calculations of the "proper"

impairment charges for only one of the Defendants' numerous developments,

RiverTown.   (Am. Compl., ¶ 55-56).  For RiverTown, Plaintiff posits that based on

August 2010 sales data, impairment charges in 2008 and 2009 could be as high as $12

million.  *Id*.  This alternative calculation is the type of rear-view analysis which does not

demonstrate misrepresentation.  Sales data for 2010 were not available to the Defendants

in 2008 and 2009, and do not speak to what they believed impairment charges should have been at that time.

Plaintiff's makes impairment assertions about other developments which are more flimsy.   For example, Plaintiff asserts that because WaterSound and RiverTown are "very similar" developments, WaterSound's impairment analysis would also "likely demonstrate" an improper impairment.  (Am. Compl., ¶ 62).  This type of reasoning by analogy is pure speculation.

The absence of a detailed alternative impairment analysis suggests that the correct impairments were not "so apparent."  Reasonable professionals could differ about the effect of these market forces on St. Joe's impairment analysis, especially without the aid of hindsight.  In the midst of the financial meltdown, Defendants cannot be held to a prescient standard to know how the market would behave to affect the future value of their holdings.  Rather, they were required to conduct a reasonable recoverability test, not a perfect one. Defendants made a reasoned business judgment that the market in Florida would improve before they could sell assets.   While this judgment may have proven wrong, it does not mean that there was actionable misrepresentation.  Plaintiff has not brought forth any evidence beyond mere speculation that Defendants' actions amounted to false statements of fact.

**Scienter**

Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The

required state of mind is "an intent to deceive, manipulate, or defraud, or severe recklessness." *Thompson*, 610 F.3d at 634 (punctuation altered).  Severe recklessness is limited to those "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id.*

The inference that the defendant acted with scienter "need not be irrefutable" or even the "most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (citation omitted).  Rather, "the inference of scienter must be more than merely 'reasonable' or 'permissible'--it must be cogent and compelling, thus strong in light of other explanations." *Id.*  A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.  *Id.*

"The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1209 (11th Cir. 2001) (*citing In re Software Toolworks Inc*., 50 F.3d 615, 627 (9th Cir. 1994)).  Inaccurate figures may be caused by "accountants . . . reasonably reach[ing] different conclusions" in conducting impairment analysis.  *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1260 (M.D. Fla. 2002) (in the FAS 121 context).  Likewise, inaccuracies "can easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action."  *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 433 (5th Cir. 2002)

The crux of Plaintiff's scienter allegations is that Defendants "knew or should have known of the average sales prices of its properties and that based on these prices, the carrying values for the remaining developed properties were materially overstated." (Am. Compl., ¶ 131). While Defendants may have been "heavily involved" in valuing St. Joe's holdings, their knowledge of average sales prices does not speak to the veracity of their professional opinions about future prices.

Plaintiff's arguments concerning Defendants' motives are unpersuasive. Higher compensation packages, debt covenants and approaching stock offerings are common factors affecting many companies. These generalized factors go only so far in establishing a guilty mind. Many corporate officers face similar pressures and an inference drawn from them is limited by the breadth of their coverage. *E.g., Druskin v. Answerthink, Inc*., 299 F. Supp. 2d 1307, 1338 (S.D. Fla. 2004) ("Defendants' alleged desire to meet quarterly projections, find a buyer for the Company, and increase the value of their stock options do not raise a strong inference of scienter.").

Plaintiff's allegations of GAAP violations and subsequent actions taken by Defendants are also tenuous. (Am. Compl., ¶140). First, Defendants make credible arguments that FAS 157 did not apply to St. Joe's real estate holdings in 2007 and 2008. (Doc. 108, p.22). *See* FASB Staff Position 157.2, *available at* http://72.3.243.42/pdf/fsp_fas157-2.pdf. This argument thwarts Plaintiff's contention that St. Joe's actions were purposefully misguided. At a minimum, there is some reasonable basis for their actions. Further, even presuming that Plaintiff's allegations are true, a violation of GAAP itself says nothing about the cause of the violation.

Changing the way certain disclosures were made in 2010 does not necessarily indicate that prior disclosures violated GAAP.  Defendants have offered a reasonable explanation and so called "remedial actions" may indicate that 2010 used a better practice but not that prior years were improper.

Finally, Plaintiff's reliance on CW3 and CW4 fails because neither informant was an accountant or trained in GAAP compliant analysis.  Further, Defendants points out inconsistencies in their statements which call into question their credibility.  Namely, CW3 stated that St. Joe conducted "very detailed" impairment analysis while CW4 stated that it did not perform any impairment analysis and just "kept [the value] at what they paid for it."  (*Compare* Am. Compl. ¶144 and ¶125).  Plaintiff's allegation that Defendants Greene and McCalmont "expressed" to CW4 that St. Joe would not recoup the book value for Victoria Park is inadequate to establish an admission of guilt. "Expressed" is the type of ethereal word which does not reveal any detail or context of how the supposed message was conveyed.  The lack of *any* detail makes the allegation irrelevant.

The reliance on the informants fails for these reasons and for the reasons discussed in my previous Order. (Doc. 95).

## Conclusion

Plaintiff's claims of misrepresentation are insufficient to meet the standard of pleading fraud with particularity because they fail to allege that Defendants acted with

the requisite scienter and made statements that they knew were materially false at the time.  Additionally, Plaintiff has failed to establish loss causation.

**IT IS ORDERED:**

1.  The Motion to Dismiss (Doc. 107) is **GRANTED**.

2.  The Case is **DISMISSED with prejudice**.


**ORDERED** on January 12, 2012.

/S/ Richard Smoak
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**

24