[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 12-11488

D.C. Docket No. 5:11-cv-00027-RS-EMT

ROBERT J. MEYER,
Individually and on Behalf of all
Others Similarly Situated, et al.,

Plaintiffs,

CITY OF SOUTHFIELD FIRE & POLICE RETIREMENT SYSTEM,

Plaintiff - Appellant,

versus

WILLIAM BRITTON GREENE,
WILLIAM S. MCCALMONT,
JANNA L. CONNOLLY,
KPMG LLP,
ST. JOE COMPANY,
PETER S. RUMMELL,

Defendants - Appellees,

MICHAEL L. AINSLIE, et al.,

Defendants.

________________________

Appeal from the United States District Court
for the Northern District of Florida

________________________

(February 25, 2013)

Before HULL, WILSON and ANDERSON, Circuit Judges.

WILSON, Circuit Judge:

The City of Southfield Fire & Police Retirement System ("Southfield" or the "Investors") appeals the dismissal of its consolidated class-action securities fraud complaint against the St. Joe Company ("St. Joe" or the "Company") and St. Joe's current and former officers for alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission (SEC) Rule 10b–5, 17 C.F.R. § 240.10b–5. The Investors argue that the district court erred in holding that they failed to adequately plead loss causation, actionable misrepresentation, or scienter, and also by denying their post-judgment motion to alter or amend. Because we agree that the facts as alleged in Southfield's complaint fail to show loss causation, we affirm.[1]

[1] The Investors' initial complaint was dismissed without prejudice; therefore, the complaint before us is the First Amended Complaint. Nonetheless, for the sake of clarity and ease of analysis, we refer to the First Amended Complaint as simply the "complaint," unless otherwise indicated.

## I. Background

St. Joe is a publicly traded company that began as a timber and paper company in the 1930s and is now one of the largest real-estate development corporations in the State of Florida.[2] To that end, the Company owns approximately 577,000 acres of land throughout northern Florida and operates its business in four key segments: (1) residential real estate; (2) commercial and industrial real estate; (3) rural land sales; and (4) timber. St. Joe was ambitiously invested in the Florida real estate market in the 1990s and 2000s; however, when the real estate market crashed during the period of February 19, 2008, through July 1, 2011 (the Class Period), the value of the Company's real estate holdings declined precipitously and the Company effectively ceased development of many of its projects. According to the Investors, despite knowledge of the crumbling real-estate market and the poor performance of its portfolio, St. Joe failed to write down the value of these assets in its quarterly and annual reports to the SEC.

The complaint alleges that the Company's failure to take impairment charges resulted in material overstatements of the value of its holdings and of its

[2] The facts below, which we take as true for purposes of the present motion to dismiss, are gleaned from the Investors' complaint.

performance during the Class Period.[3] Pursuant to Generally Accepted Accounting Principles (GAAP), the determination of whether an asset's value requires impairment hinges upon whether that asset is "held for sale" or "held and used." Assets "held for sale" are substantially completed and ready to be sold; these assets must be booked at the lower of carrying value or fair market value less costs to sell. The lion's share of the properties at issue here, however, were properties under development, which in accounting parlance are treated as assets "held and used." Assets "held and used" are held on the books at carrying value—the amount listed on the balance sheet—unless management makes a determination, based upon reasonably objective inputs, that the carrying amount is not recoverable, i.e., that the projected undiscounted cash flows from the asset's future use do not meet or exceed that asset's carrying value. The gravamen of the Investors' complaint is that the Company overstated its real estate holdings when it unreasonably failed to take impairment charges on assets "held and used" despite management's knowledge that, because the market had deteriorated, the carrying value of the land could never be recovered.

The Investors argue that the truth about St. Joe's overstated real estate holdings began to come to light on October 13, 2010, when David Einhorn, a

[3] An impairment charge is a non-recurring charge taken to write down the value of an asset with an overstated carrying value. Taking an impairment charge results in a non-operating expense and reduces a company's earnings accordingly.

prominent short-sale hedge fund investor, gave a presentation at the Value Investing Conference entitled "Field of Schemes: If You Build It, They Won't Come" (the Einhorn Presentation).[4] During the presentation, Einhorn suggested that St. Joe's assets were significantly overvalued and therefore "should be" impaired.[5] In the two days of trading that followed, St. Joe's stock dropped some 20% on unusually high volume.[6]

The Investors initially filed a complaint on November 3, 2010, based solely upon the drop in share price following the Einhorn Presentation. The district court dismissed that complaint without prejudice pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u–4. It found that the initial complaint failed to adequately plead loss causation, an actionable misrepresentation, or scienter, and granted the Investors leave to file an amended complaint.

---

[4] A "short sale" is the "sale of a security that the seller does not own or has not contracted for at the time of sale, and that the seller must borrow to make delivery." *Black's Law Dictionary* 1366 (8th ed. 2004). A short-seller realizes capital gains when the price of the security drops, because the seller can then buy back the shares previously borrowed at a lower price. *See id.*

[5] Though the complaint does not include Einhorn's entire 139-slide presentation as an exhibit, "if [a] document's contents are alleged in a complaint and no party questions those contents, we may consider such a document" in its entirety so long as it is central to the plaintiff's case. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *see Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). We accordingly incorporate the entire Einhorn Presentation for purposes of our analysis.

[6] St. Joe shares trade on the New York Stock Exchange under the ticker symbol "JOE." According to the complaint, the price of St. Joe shares dropped $4.80 to close at $19.74 per share in the days following the Einhorn Presentation. Incidentally, St. Joe shares have rallied back in recent months, and traded at $23.92 per share at the close on February 1, 2013.

Meanwhile, on January 10, 2011, St. Joe disclosed that the SEC had initiated an informal inquiry "into St. Joe's policies and practices concerning impairment of investment in real estate assets." Six months thereafter, on July 1, 2011, the Company announced that the SEC had issued an order of private investigation regarding St. Joe's compliance with federal antifraud securities provisions and ownership reporting requirements, in addition to its books, records and internal controls. The Investors subsequently filed an amended complaint incorporating these disclosures as allegations and adding the allegations of various confidential witnesses.

The district court again dismissed the complaint, this time with prejudice. It found that Southfield had failed to allege loss causation because the Einhorn Presentation was based solely on publicly available information, and the SEC investigations indicated nothing more than a risk of accounting problems. It further found that the Investors had failed to allege actionable misrepresentation because reasonable professionals could have disagreed about whether GAAP required St. Joe to write down its real estate assets. Finally, the district court held that the Investors had failed to adequately allege scienter because there was no indication that the Company purposefully misrepresented the value of its assets or acted with reckless disregard as to their veracity.

On January 27, 2012, a few weeks following the district court's dismissal, St. Joe announced a new business strategy that would result in the impairment of $325 million to $375 million in assets in the fourth quarter of 2011. Plaintiffs moved under Rule 59 to alter or amend the judgment in light of this "newly discovered evidence." The motion was denied, and this appeal followed.

## II. Discussion

We review a district court's order dismissing a complaint de novo, taking all well-pleaded facts as true and construing them in the light most favorable to the nonmoving party. *World Holdings, LLC v. Federal Republic of Germany*, 701 F.3d 641, 649 (11th Cir. 2012). To state a claim for securities fraud under § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, a plaintiff must adequately allege: (1) a material misrepresentation or omission; (2) scienter—a wrongful state of mind; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance, "often referred to in cases involving public securities markets (fraud-on-the-market cases) as transaction causation"; (5) economic loss; and (6) "loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42, 125 S. Ct. 1627, 1631 (2005) (emphasis omitted) (internal quotation

marks omitted).[7] Because the resolution of this case turns upon the interplay between the fraud-on-the-market theory and loss causation, we first set forth some elementary principles of the so-called efficient market hypothesis and the fraud-on-the-market theory, and then explain why those principles mandate that the Investors' claims fail for want of loss causation.

1. *The Fraud-on-the-Market Theory in § 10(b) Claims*

The original moorings of the § 10(b) implied right of action are found in the common-law tort actions of misrepresentation and deceit. *Dura*, 544 U.S. at 341, 125 S. Ct. at 1631. Therefore, and because reliance was an essential element of a claim for misrepresentation at common law, a plaintiff in a § 10(b) suit must demonstrate reliance—that is, that he or she actually relied upon the alleged misrepresentation. *Erica P. John Fund, Inc. v. Halliburton Co.*, —— U.S. ——,131 S. Ct. 2179, 2184 (2011). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—e.g., purchasing common stock—based on that specific misrepresentation." *Id.* at 2185 (emphasis omitted). "In that situation, the plaintiff plainly would have relied on the company's deceptive conduct." *Id.*; *see also Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997)

[7] Though the Investors also bring a claim under § 20(a) of the Exchange Act, liability under § 20(a) is derivative to liability under § 10(b), so the analysis of the Investors' § 20(a) claim is subsumed by the analysis of their § 10(b) claim. *See Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635–36 (11th Cir. 2010).

(explaining that reliance "is established when the misrepresentations or omissions cause the plaintiff to engage in the transaction in question" (internal quotation marks omitted)). In securities claims, however, the Supreme Court has permitted a "rebuttable presumption of reliance based on what is known as the 'fraud-on-the-market theory.'" *Halliburton*, 131 S. Ct. at 2185. The fraud-on-the-market theory, which "derive[s] from the so-called efficient market hypothesis . . . [provides] that 'in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.'" *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1309–10 (11th Cir. 2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 241, 108 S. Ct. 978, 989 (1988)), *cert. denied*, 133 S. Ct. 109 (2012). Therefore, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations," *Basic*, 485 U.S. at 246, 108 S. Ct. at 991, and we can presume "that an investor relies on public misstatements whenever he buys or sells stock at the price set by the market," *Halliburton*, 131 S. Ct. at 2185 (internal quotation marks omitted).

Not surprisingly, and because the fraud-on-the-market theory permits them to forego the onerous task of demonstrating individual reliance on a purported misstatement, plaintiffs in class-action securities fraud cases often invoke it to establish their prima facie case. The present case is no exception. The Investors

allege in their complaint that they are "entitled to a presumption of reliance under the fraud[-]on[-]the[-]market doctrine" because "the market for St. Joe's common stock promptly digested current information regarding St. Joe from all publicly available sources." We therefore assume, for purposes of this motion, that the market for St. Joe's common stock is efficient and that all publicly available information is incorporated into the market price of St. Joe's stock. As will be shown, however, though the fraud-on-the-market theory relieves the Investors of the requirement that they show reliance, it also has a dire—and indeed fatal—effect on their ability to demonstrate loss causation.

*2. Loss Causation*

To show loss causation in a § 10(b) claim, a plaintiff must offer "proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." *Robbins*, 116 F.3d at 1448; *see* 15 U.S.C. § 78u–4(b)(4) (requiring that the plaintiff prove that the misrepresentation "caused the loss for which the plaintiff seeks to recover"). "In other words, in a fraud-on-the-market case, the plaintiff must prove not only that a fraudulent misrepresentation artificially inflated the security's value but also that 'the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff.'" *Hubbard v.*

*BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012) (quoting *FindWhat*, 658 F.3d at 1311).

An example is instructive here: consider a company that manufactures two entirely discrete product lines, such as laptop computers and flat-screen televisions. Assume that the company fraudulently misrepresents that it sold two million laptops in a quarter, when in fact it had sold only one million. Based on this information, the price of the stock is artificially inflated from $20 per share to $30 per share. If an investor purchases the stock at the inflated $30 price but sells it at the same price before the truth becomes known, he has quite literally suffered no loss. *See Dura*, 544 U.S. at 342, 125 S. Ct. at 1631 ("[A]t the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." (emphasis in original)). Furthermore, if the market subsequently learns that the company's flat-screen television business, which was not the subject of the misrepresentation, has been crushed by the competition, and the stock price drops to $15 per share, the investor has still suffered no loss *on account of the misrepresentation*. That is because the fraud-induced inflation is still priced into the shares, and the drop in the stock's price was caused by other aspects of the company's business. The drop in price is wholly unrelated to the misrepresentation. As the Supreme Court explained it: "When the purchaser

subsequently resells [his] shares . . . at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id.* at 342–43, 125 S. Ct. at 1632. If, however, the wool is eventually pulled from the market's eyes and the truth becomes known about the company's misrepresentation of the amount of laptop computers it sold, a decline in stock price in reaction to the revelation—which is often called a "corrective disclosure"—will have been caused by the fraud and will be compensable. *See FindWhat*, 658 F.3d at 1310. That is the essence of loss causation.

By ensuring that only losses actually attributable to a given misrepresentation are cognizable, the loss causation requirement ensures that the federal securities laws do not "becom[e] a system of investor insurance that reimburses investors for any decline in the value of their investments." *Robbins*, 116 F.3d at 1447. In this way, loss causation polices the realm of § 10(b) claims, guarding against their use as an *in terrorem* device to force companies to settle claims simply to avoid the cost and burden of litigation. *See Dura*, 544 U.S. at 347–48, 125 S. Ct. at 1634 (explaining that allowing a plaintiff to forego the loss causation requirement "would bring about harm of the very sort the [federal securities] statutes seek to avoid" and "transform a private securities action into a

partial downside insurance policy"); *see also Thompson*, 610 F.3d at 667 (Tjoflat, J., concurring in part and dissenting in part) (discussing the legislative history of the PSLRA and Congress's concern that so-called strike suits might become a "litigation tax" on American business). Put another way, though § 10(b) is designed to protect against fraud, it is not a prophylaxis against the normal risks attendant to speculation and investment in the financial markets, and loss causation therefore ensures that private securities actions remain a scalpel for defending against the former, while not becoming a meat axe exploited to achieve the latter. To realize those objectives, loss causation does not require proof that the fraudulent misrepresentation was the *sole* cause of a security's loss in value, but the plaintiff must still demonstrate that the fraudulent statement was a "substantial" or "significant" cause of the decline in price. *See Hubbard*, 688 F.3d at 726 (citing *Robbins*, 116 F.3d at 1447).

How, then, might a plaintiff go about proving loss causation? In a fraud-on-the-market case such as that presented here, plaintiffs often demonstrate loss causation circumstantially, by:

> (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of the price drop.

*FindWhat*, 658 F.3d at 1311–12 (footnote omitted).[8] "To be corrective, [a] disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *In re Williams Sec. Litig.—WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009). Further, a plaintiff need not rely on a single, complete corrective disclosure; rather, it is possible to show that the truth gradually leaked out into the marketplace "through a series of partial disclosures." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009); *see Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir.), *cert. denied*, 132 S. Ct. 115 (2011). Regardless of the theory upon which it is based, "loss causation analysis in a fraud-on-the-market case focuses on the following question: even if the plaintiffs paid an inflated price for the stock as a result of the fraud (i.e., even if the plaintiffs relied), did the relevant truth eventually come out and thereby cause the plaintiffs to suffer losses?" *FindWhat*, 658 F.3d at 1312; *see Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (explaining that loss causation can be established by a

[8] Some courts have permitted a plaintiff to show loss causation by demonstrating that the defendant fraudulently concealed a risk that, once it materialized, caused a decline in the security's price. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (explaining the materialization-of-concealed-risk theory); *Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007); *see also Hubbard*, 688 F.3d at 726 n.25 (assuming without deciding that the materialization-of-concealed-risk theory is valid). The Investors in the present case, however, rely solely on the corrective-disclosure theory of loss causation, so we have no occasion to consider any alternative theory.

corrective disclosure that "reveal[s] to the market the falsity" of a previous representation).

The Investors in the present case base their theory of loss causation on three purported corrective disclosures: (1) the Einhorn Presentation; (2) the Company's disclosure of an informal SEC investigation in January 2011; and (3) the Company's announcement in July 2011 that the SEC's informal investigation had ripened into a "private order of investigation." We address each in turn, and explain why none qualify as a corrective disclosure for purposes of our federal securities laws.

A. The Einhorn Presentation

The Investors first argue that the Einhorn Presentation qualifies as a corrective disclosure because it contained in-depth analysis of information not readily available to the investing public and revealed to the market that St. Joe's real-estate assets "needed to be impaired." The problem with this argument is that it ignores the very efficient market hypothesis upon which the Investors' entire claim is based.

"The efficient market theory . . . posits that all publicly available information about a security is reflected in the market price of the security." *Thompson*, 610 F.3d at 691 (Tjoflat, J., concurring in part and dissenting in part). Therefore, any information released to the public is immediately digested and incorporated into

the price of a security. "A corollary of the efficient market hypothesis is that disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price." *FindWhat*, 658 F.3d at 1310. It follows that "[c]orrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time." *Katyle*, 637 F.3d at 473; *see FindWhat*, 658 F.3d at 1311 n.28 (explaining that a corrective disclosure "obviously must disclose new information").

The Einhorn Presentation contained a disclaimer on the second slide of the presentation stating that all of the information in the presentation was "obtained from publicly available sources." Indeed, the material portions of the Einhorn Presentation were gleaned entirely from public filings and other publicly available information.[9] Because a corrective disclosure "obviously must disclose *new*

---

[9] Insofar as the Investors argue that the Einhorn Presentation was not based on public information because some information in the presentation came from Freedom of Information Act requests, meeting minutes of the Airport Authority of Panama City, aerial photographs, and information gleaned from conversations with members of the Airport Authority of Panama City, that suggestion—even if it were true—would not alter our result. First of all, none of the allegations in the Investors' complaint have anything at all to do with the Company's real-estate developments in and around the Panama City Airport. The complaint alleges that St. Joe's properties at Rivertown, WaterSound, SummerCamp Beach, WindMark Beach, Victoria Park, Seven Shores, and SouthWood were overvalued. Obviously, if the complaint does not allege any fraud relating to the Company's development near the Panama City Airport, any information about that development would quite literally be unable to "reveal[] to the market the pertinent truth that was previously concealed or obscured by the company's fraud." *FindWhat*, 658 F.3d at 1311. The Investors' attempt to bootstrap these immaterial portions of the presentation in order to render the actual portions of the presentation at issue nonpublic therefore falls wide of the mark.

Moreover, and even were that not so, the only part of the Einhorn Presentation that relied on the information above was the part in which Einhorn sought to refute the "bull case" for St.

information," the fact that the sources used in the Einhorn Presentation were already public is fatal to the Investors' claim of loss causation. *See FindWhat*, 658 F.3d at 1311 n.28 (emphasis supplied).

That result makes good sense. Having based their claim of reliance on the efficient market theory, the Investors must now abide by its consequences. The Investors specifically invoked the efficient market theory in their complaint, stating that "at all relevant times, the market for St. Joe's common stock was an efficient market" and that all relevant information was therefore reflected by the price of St. Joe's stock. They did so to avail themselves of *Basic*'s presumption of reliance, so that each member of the putative class would not have to show that he or she individually relied upon the Company's alleged misstatements in making a given purchase of stock. *See Basic*, 485 U.S. at 247, 108 S. Ct. at 991. The efficient market theory, however, is a Delphic sword: it cuts both ways. The Investors cannot contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits their needs for purposes of loss causation.

---

Joe, which involved the theory that the Company's holdings in and around Panama City were worth so much money that, by buying St. Joe stock, one would "be getting the [Company's] other 500,000 acres 'for free.'" In other words, not only is that portion of the Einhorn Presentation wholly immaterial to the Investors' claims, it is also not revelatory of any fraud. Finally, and to the extent that the Investors' rest their claim on the argument that county property appraiser's sales lists are nonpublic, we simply disagree. In a case about the value of land, in which the public disclosures at issue were released over time, the efficient market would easily digest the information contained in these sales lists without the need for Einhorn to regurgitate it first. While we might be willing to countenance some lag in the market's processing of the information contained in these public sources, we reject the idea that they were not yet public on the day of the Einhorn Presentation, which is the relevant time for our purposes here.

Either the market is efficient or it is not. A plaintiff in the Investors' situation must take the bitter with the sweet, and if he chooses to embrace the efficient market theory for purposes of proving one element of a § 10(b) claim, he cannot then turn around and contend that the market is not efficient for purposes of proving another element of the very same claim.

The Investors next venture an alternative argument: they contend that the Einhorn Presentation qualifies as a corrective disclosure despite its reliance on public information because it provided "expert analysis of the source material" that was previously unavailable to the market. The problem with this argument, of course, is that the mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure. *See In re Omnicom*, 597 F.3d at 512 ("A negative . . . characterization of previously disclosed facts does not constitute a corrective disclosure . . . ."); *see also Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007) (explaining that the attribution of an improper purpose to previously disclosed facts is not a corrective disclosure); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270–71 (3d Cir. 2005) (holding that the *Wall Street Journal*'s analysis of previously available information is not a corrective disclosure). After all, if the information relied upon in forming an opinion was previously known to the market, the only thing actually disclosed to the market when the opinion is released *is the opinion*

*itself*, and such an opinion, standing alone, cannot "reveal[] to the market the falsity" of a company's prior factual representations.[10] *FindWhat*, 658 F.3d at 1311 n.28 (internal quotation marks omitted). In fact, such opinions are exactly the type of confounding information, including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events," that do not qualify as corrective disclosures for purposes of loss causation. *Dura*, 544 U.S. at 343, 125 S. Ct. at 1632. If every analyst or short-seller's opinion based on already-public information could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets could sue under § 10(b) using an analyst's negative analysis of public filings as a corrective disclosure. That cannot be—nor is it—the law.[11] *See id.* at 347–48, 125 S. Ct. at 1634.

---

[10] We need not reach the question of whether an analyst or short-seller's opinion *can ever* constitute a corrective disclosure. Just as black swans may exist, there may theoretically be some form of opinion that is factual or revelatory in nature such that it qualifies as a corrective disclosure. But at the very least, such an opinion would need to reveal to the market something previously hidden or actively concealed. That is not this case, and we need not delve into that metaphysical question here. Einhorn's opinion reveals no fact to the market. Nothing suggests that the Company obfuscated or concealed the information on which Einhorn relied. We need not go further. We merely note that if they do exist, such opinions—like black swans—will be the exception, not the rule. *Cf. In re Winstar Commc'ns*, No. 01 CV 3014, 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006) (finding that a short-seller's report could qualify as a corrective disclosure where it revealed information new to the market—namely, that the company had insufficient cash flow to funds its operations and, contrary to statements made by the defendants, would likely default on its credit obligations).

[11] Insofar as the Investors argue that not every analyst opinion, but only those that are in depth or well researched (in other words, only the *good* analyst opinions), should qualify as corrective disclosures, that argument proves far too much. The point is that the factual

The present case provides a prime example of why that is so. David Einhorn was not an insider at St. Joe, and the information upon which he relied in making his bearish call had been public for months before he made the presentation. Moreover, as a short-seller, Einhorn was bound to profit if the price of St. Joe's shares swooned in reaction to his presentation. Further, Einhorn was a maven of Wall Street, well known for accurately predicting the downfall of Lehman Brothers only two years prior. Given Einhorn's reputation, then, it is no great surprise that investors might flee like rats from a sinking ship upon news that he viewed a stock's prospects as grim.[12] Put another way, because the information used in the presentation had already been public for some time, the decline in the value of St. Joe's shares in the wake of the Einhorn Presentation was not due to the fact that the presentation was revelatory of any fraud, but was instead due to "changed investor expectations" after an investor who wielded great clout in the industry voiced a negative opinion about the Company. *See Dura*, 544 U.S. at 342–43, 125 S. Ct. at 1632 (explaining the "tangle of factors" that affect stock price but do not qualify for purposes of loss causation).

---

information upon which the opinion is based was already available to the market, which—being an efficient market—has already digested it into the security's price. The quality or exhaustiveness of the report, in other words, is simply beside the point.

[12] By way of example, when Einhorn revealed that he was short the stock of Green Mountain Coffee Roasters (GMCR), the maker of Keurig K-Cups, at the Value Investing Conference the very next year, the price of GMCR's stock declined from $91.66 to $69.80 per share over the three days of trading that followed.

Finally, we note that the opinions in the Einhorn Presentation, though certainly pessimistic about the future, were not necessarily revelatory of any past fraud. The Einhorn Presentation systematically analyzed several of St. Joe's real-estate developments and explained why, in Einhorn's view, the Company would not be able to recoup the carrying value of these holdings. Because management's determination that it would not reap future cash flows in excess of the asset's carrying value would require an impairment under GAAP's accounting treatment for assets "held and used," Einhorn explained his belief that St. Joe's assets "should be" or "need[ed] to" be impaired. Moreover, in summarizing his presentation, Einhorn equivocated, explaining that "if no impairment is needed, there has been a negative return on development," but that "if [St. Joe] needs to take an impairment, the return on development is highly negative." When all is weighed in the balance, we think these are statements about potential future action, not "reve[lations] to the market" of some previously concealed fraud or misrepresentation. *See FindWhat*, 658 F.3d at 1311. That is yet another reason why they do not qualify as corrective disclosures for purposes of loss causation.

B. The SEC Investigations

The Investors next argue that the Company's disclosure of the two SEC investigations should qualify as corrective disclosures because the investigations caused St. Joe's stock price to drop and covered the same subject matter—the

value of St. Joe's real-estate holdings—as the fraud alleged in the complaint. But a corrective disclosure must "reveal[] to the market the falsity of [a] prior misstatement[]." *FindWhat*, 658 F.3d at 1311 n.28 (internal quotation marks omitted). According to the complaint, although the January disclosure did indicate that the SEC was "conducting an informal inquiry into St. Joe's policies and practices concerning impairment of investment in real estate assets," it also made clear that "[t]he notification from the SEC does not indicate any allegations of wrongdoing, and an inquiry is not an indication of any violations of federal securities laws." The July disclosure noted that the SEC had issued a "related private order of investigation" that "cover[ed] a variety of matters for the period beginning January 1, 2007," including the Company's compliance with the "the antifraud provisions of the Federal securities laws" and the Company's financial statements. Though St. Joe's stock dropped 7% on the date the informal SEC investigation was announced and 9% on the date the order of private investigation was disclosed, the SEC never issued any finding of wrongdoing or in any way indicated that the Company had violated the federal securities laws.

In our view, the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b). The announcement of an investigation reveals just that—an investigation—and nothing more. *See In re Almost Family, Inc. Sec. Litig.*, No. 3:10-CV-00520-H, 2012 WL

443461, at *13 (W.D. Ky. Feb. 10, 2012) ("Numerous federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure."); *see also Durham v. Whitney Info. Network, Inc.*, No. 06-CV-00687, 2009 WL 3783375, at *21 (M.D. Fla. Nov. 10, 2009); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 910 (W.D. Tex. 2008); *Rudolph v. UTStarcom*, 560 F. Supp. 2d 880, 888 (N.D. Cal. 2008). To be sure, stock prices may fall upon the announcement of an SEC investigation, but that is because the investigation can be seen to portend an added *risk* of future corrective action. That does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent. *See In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009) (explaining that disclosures of SEC investigations may be "indicators of risk because they reveal the potential existence of future corrective information," but they are not corrective disclosures for purposes of loss causation). Therefore, the Company's disclosures of the two SEC investigations do not qualify as corrective disclosures.[13]

[13] That is not to say that an SEC investigation could never form the basis for a corrective disclosure. We merely hold that the disclosure of an SEC investigation, standing alone and without any subsequent disclosure of actual wrongdoing, does not "reveal[] to the market the pertinent truth" of anything, and therefore does not qualify as a corrective disclosure. *See FindWhat*, 658 F.3d at 1311. It is, after all, impossible to say that an SEC investigation was the moment when the "relevant truth beg[an] to leak out" if the truth never actually leaked out. *See Dura*, 544 U.S. at 342, 125 S. Ct. at 1631. It may be possible, in a different case, for the disclosure of an SEC investigation to qualify as a partial corrective disclosure for purposes of

In sum, the complaint as framed by the Investors fails to adequately allege loss causation—that is, a "causal connection between the misrepresentation and the investment's subsequent decline in value." *Robbins*, 116 F.3d at 1448. The district court was therefore correct to dismiss the Investors' complaint for failure to state a claim.[14] The Investors rest their showing of loss causation on three purported corrective disclosures: the disclosures of two SEC investigations and the Einhorn Presentation. As we have said, the disclosures of the SEC investigations, without more, are insufficient as a matter of law to constitute corrective disclosures. And with regard to the Einhorn Presentation, the Investors' claim of loss causation is doomed by the very dogma they invoked to forego the reliance requirement: the efficient market theory. In the financial markets, not every bit of bad news that has a negative effect on the price of a security necessarily has a *corrective* effect for purposes of loss causation. And though we appreciate the

---

opening the class period when the investigation is coupled with a later finding of fraud or wrongdoing. *See, e.g.*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 287–90 (S.D.N.Y. 2008) (holding that the disclosure of an SEC investigation was a partial corrective disclosure when it was followed by a corporate officer's plea of guilty to charges of backdating options); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 485 (S.D.N.Y. 2008) (finding that SEC inquiry could constitute a partial corrective disclosure where it "culminated in the restatement of [the company's] earnings and revenues for fiscal years 2002 through 2005"). But where, as here, there is no later finding of wrongdoing, that theory is obviously inapplicable. Therefore, our unremarkable holding—that an SEC investigation, standing alone, is insufficient to qualify as a corrective disclosure—is dispositive of the case before us.

[14] Though we affirm the district court's judgment specifically on the basis of loss causation, we note incidentally, and without need for further discussion, that we find no merit in the Investors' arguments as to actionable misrepresentation or scienter, and we discern no abuse of discretion in the denial of their motion to alter or amend.

importance of private securities fraud actions in deterring fraud and promoting confidence in the marketplace, we are equally mindful that their purpose is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura*, 544 U.S. at 345, 125 S. Ct. at 1633. Our decision today ensures that loss causation remains a key sentinel in striking that delicate balance.

**AFFIRMED.**